UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

FRED BOWERMAN, et al.,

           Plaintiffs,

    v.

FIELD ASSET SERVICES, INC., et al.,

           Defendants.

Case No. 13-cv-00057-WHO

**ORDER ON MOTION FOR CLASS CERTIFICATION**

Re:  Dkt. Nos. 43, 49

# INTRODUCTION

This case involves allegations that defendants Field Asset Services, Inc., and Field Asset Services, LLC[1] (collectively "FAS")—a company that arranges for the cleanup, maintenance, and restoration of foreclosed properties by hiring others to perform those services—misclassified its "vendors" as independent contractors instead of employees.  Plaintiffs Fred and Julia Bowerman move under Federal Rule of Civil Procedure 23 to certify a class of "all persons who at any time from January 7, 2009 up to and through the time of judgment (1) performed property preservation and maintenance services for Field Asset Services in California and (2) were designated and paid by Field Asset Services as independent contractors rather than as employees."  Mot. 1.  The proposed class includes more than 490 vendors.  Mot. 2.  Some are individuals, some are corporations (one with as many as 66 employees); some are bound by a contract that is allegedly non-negotiable, while others negotiate and some bid for specific jobs; some work solely for FAS, others are independent businesses that also work for competitors of FAS.

---

[1] Field Asset Services, LLC, is a successor in interest to Field Asset Services, Inc.  FAC ¶ 6.

1    Because the proposed class is so diverse, the common questions plaintiffs seek to ask will

2    not have common answers for the entire class.  Since the asserted common questions will not

3    predominate, the motion to certify is DENIED.  It seems possible that a better defined, narrower

4    class would be certifiable, and for that reason plaintiffs may revise this motion as they requested at

5    the hearing on August 13, 2014.

6                                              **FACTUAL BACKGROUND**

7    The parties present differing, and sometimes conflicting, facts in this case.  Below are each

8    side's versions.

9    **I.      THE PLAINTIFFS' VERSION**

10   The plaintiffs worked for FAS from September 2007 until June 2012.  First Amended

11   Compl. ("FAC") ¶ 11.  FAS is a property preservation, maintenance, and repair services company

12   for foreclosed and real-estate-owned properties.  Duckworth Decl. Ex. 1 at FAS002058, Ex. 3 (FB

13   Dep. 25:2-7).  FAS works with major mortgage and asset management companies nationwide and

14   services more than 41,000 properties "on a recurring basis."  Duckworth Decl. Ex. 1 at

15   FAS002058.  It maintains a network of "vendors" to serve its clients.  Duckworth Decl. Ex. 1 at

16   FAS002059.  FAS advertises that it "handle[s] every detail of the vendor relationship" and its

17   "technology and [ ] expertise enable [it] to scrutinize every order from placement to completion.

18   This enables [it] to measure every vendor on every step of every job."  Duckworth Decl. Ex. 1 at

19   FAS002059, Ex. 4.  FAS is involved in the training, quality control, bid management, and

20   invoicing of its vendors.  Duckworth Decl. Ex. 4.  FAS is the point of contact for its vendors and

21   facilitates the vendors' relationships on behalf of clients.  Duckworth Decl. Ex. 2 (PMK Dep.

22   65:23-66:5).  The plaintiffs and the other vendors work "virtually exclusively for FAS."  Mot. 4

23   (citing sources).

24   Applicants to become FAS vendors would first communicate with an FAS representative,

25   who explained the application process.  Duckworth Decl. Ex. 2 (PMK Dep. 19:24-20:1), Ex. 3 (FB

26   Dep. 20:15-21:1).  An applicant would state where it wished to provide services geographically, as

27   well as the type of services it would provide.  Duckworth Decl. Ex. 2 (PMK Dep. 20:24-21:1).

28   After FAS determined that there was a need for a vendor in a coverage area, it would send a

United States District Court
Northern District of California

1  packet to an applicant interested in that area.  Duckworth Decl. Ex. 2 (PMK Dep. 22:4-5).  The

2  packet contains the terms and policies an applicant must follow if approved as an FAS vendor.

3  Although the vendor packets have changed over the years, they contain insurance coverage

4  requirements and a list of services that a vendor may provide.  Duckworth Decl. Ex. 2 (PMK Dep.

5  25:6-11; 27:19-28:1; 30:23-31:13; 35:15-36:24; 40:17-21; 42:6-43:10; 78:18-79:2).  They also

6  contain provisions about pricing, invoicing, the timeframe in which vendors must complete their

7  work, and restrictions on placing liens on properties for unpaid work.  Duckworth Decl. Ex. 2

8  (PMK Dep. 35:5-38:19; 152:22-153:23).  FAS's standard vendor agreement contains a mutual at-

9  will termination clause.  Reply 4 (citing Duckworth Decl. Ex. 6 at FAS001095).

10       Once FAS receives a vendor packet from an applicant, FAS reviews the packet for

11  completeness.  Duckworth Decl. Ex. 2 (PMK Dep. 48:3-6).  Since 2009, FAS has performed

12  background checks on vendor applicants.  Duckworth Decl. Ex. 2 (PMK Dep. 80:2-20).  FAS also

13  verifies that the applicant has insurance and may require it to have a business license.  Duckworth

14  Decl. Ex. 2 (PMK Dep. 84:10-13), Ex. 3 (FB Dep. 13:7-11, 40:24-41:5).  Once FAS receives a

15  completed package and any negotiation of terms is finalized, the applicant would receive a

16  username and password for accessing FAS's software systems (FAStrack, myFAStrack, and

17  FAStrack mobile), as well as a welcome letter.  Duckworth Decl. Ex. 2 (PMK Dep. 84:14-19,

18  84:20-85:3, 244:14-19).

19       Before a vendor can start receiving work orders, the vendor must watch videos about how

20  to use FAS's proprietary software.  Duckworth Decl. Ex. 2 (PMK Dep. 85:12-15, 87:2-22).

21  Afterwards, FAS assigns work orders through its proprietary online database, FAStrack.  Mot. 5-6

22  (citing sources).  FAS notifies its individual vendors that a new work order has been assigned to it

23  through an email notification.  Duckworth Decl. Ex. 2 (PMK Dep. 160:8-161:25).  FAS assigns

24  work orders seven days a week.  Mot. 6 (citing sources).  "Cherry picking" among work orders is

25  discouraged and a vendor who does so can incur penalties, such as receiving fewer work orders.

26  Mot. 6 (citing sources).

27       After a work order has been assigned, FAS expects an acceptance or declination within a

28  few hours, but will reassign the work order to another vendor, with or without notification, if a

United States District Court
Northern District of California

1   response is not received within 24 hours.  Duckworth Decl. Ex. 6 at FAS001089.  FAS generally

2   expects that accepted work orders will be completed within three days.  Mot. 6 (citing sources).

3   While FAS technically places a cap on the number of work orders for a given vendor, it

4   occasionally assigns work orders exceeding a vendor's cap if there is a need in a given area.  Mot.

5   7 (citing sources).

6        A work order contains a list of all the tasks that a vendor must complete, such as "Kitchen:

7   Microwave cleaned (inside and out)" or "Bathrooms:  Toilets clean."  Duckworth Decl. Ex. 7 at

8   P054998.  The order also includes "instructions," such as "Surfaces:  Thoroughly clean all sinks,

9   counter tops, and cabinets" and "Ceiling fans:  Dust and clean."  Duckworth Decl. Ex. 7 at

10  P054997-98.  FAS occasionally provides detailed instructions to vendors about how to perform

11  work on the properties they service.  Mot. 8 (citing sources).  Examples include:  "When placing

12  shrink wrap on the toilets, please poke two holes in the wrap to allow for ventilation," Duckworth

13  Decl. Ex. 2 (PMK Dep. 296:22-24), Ex. 8, and "Bleeder pins should be removed only if necessary

14  to drain a Monoflow Boiler System.  If removal is necessary, you must provide action photos of

15  removing the bleeder pin and after photos replacing a bleeder pin," JB Decl. Exs. 2, 3.

16       FAS says that "[v]endors are the eyes and ears at a property," and vendors must report any

17  damages or unsafe conditions at a property.  Duckworth Decl. Ex. 6 at FAS001092.  It also says

18  that "[a]ll deviations from standard services require a bid prior to any work being done" and that

19  "[a]ll work must be authorized directly through FAS."  Duckworth Decl. Ex. 6 at FAS001090.

20  FAS requires vendors to submit daily updates on the progress of assigned work orders.  Mot. 7

21  (citation omitted).  It sends emails each day asking when an order will be finished and why an

22  order is taking longer than expected to complete, and it expects a response to update requests

23  within 24 hours, even on Saturdays.  Mot. 7.

24       While vendors are completing work orders, FAS requires them to "take before and after

25  photographs from the same perspective, frame, and angle" so that its quality-control team can see

26  if the site matches specifications, what work is done, and whether the work conforms with quality

27  specifications.  Mot. 7-8 (citing sources); Duckworth Decl. Ex. 6 at FAS001091.  FAS requires

28  vendors to upload the photos through the FAStrack Mobile application, which time stamps each

4

photo and identifies the location.  Duckworth Decl. Ex. 2 (PMK Dep. 241:21-242:8).  The photos

also allow FAS to see whether vendors are performing according to FAS's specifications,

including using specific equipment.  Mot. 8 (citing sources).

FAS's Quality Control team inspects the vendors' work.  Mot. 9 (citing sources).  FAS

informs its vendors that "[p]hotographs from every work order are reviewed by FAS'[s] Quality

Control department and every property is physically inspected by the listing agent to ensure that

all work is performed according to specifications and done in a timely, competent

manner. . . . Should unacceptable or incomplete work be found, you will be required to go back to

the property to correct your work at no cost."  Duckworth Decl. Ex. 6 at FAS001091.  If problems

are not addressed in the time given, "FAS will utilize the services of another vendor to remedy the

problem at the expense of the original vendor."  Duckworth Decl. Ex. 6 at FAS001091.

A vendor must submit invoices and photographs within 24 hours of completing a work

order in order to be paid.  Duckworth Decl. Ex. 6 at FAS001090-91.  FAS imposes a 10 percent

penalty for late invoices.  Duckworth Decl. Ex. 6 at FAS001091.  FAS will decline payment for a

work order if FAS does not approve of the way the work was completed and imposes a 10 percent

penalty if declinations are reversed.  JB Decl. ¶ 16, Ex. 6.  Work is reassigned if it was not

completed within the three days allowed and the vendor might not get paid.  Mot. 10 (citing

sources).

FAS requires that its vendors receive mandatory ongoing training.  Mot. 10 (citing

sources).  An example of an email sent to a vendor concerning training states, "***This is a follow up

email to inform you of the final mandatory training classes.  If you have not yet registered,

please do so today!*** . . . Please remember this training is ***mandatory***.  If you are not in attendance

to the makeup class, your account will be placed on hold."  JB Decl. Ex. 5 (original emphasis).

Fred Bowerman testified that he was required to attend at least three in-person quality control

meetings during his tenure with FAS, as well as telephone meetings twice a month that are

intended to keep vendors "focused on the type of jobs and what they required."  Duckworth Decl.

Ex. 5 (FB Dep. 55:13-56:10).  He also testified that he had to attend vendor conferences at his own

expense.  Duckworth Decl. Ex. 5 (FB Dep. 70:5-25).  Trainings covered topics such as safety and

client expectations. *See, e.g.*, JB Dep. 40:21-42:3. FAS also provided training guides to its vendors on topics such as quality control or "winterization" of a property. *See, e.g.*, Duckworth Decl. Exs. 14, 20.

FAS creates "scorecards" for its vendors, which track metrics such as work-order acceptance, quality-control approval, and proper photo-taking. Duckworth Decl. Exs. 15, 16. A low scorecard rating could result in decreased work in the future. Mot. 11 (citing sources). FAS has a vendor-quality policy that provides "counseling" for vendors who do not meet work order specifications; suspension or termination can be imposed for non-compliance with the policy. Duckworth Decl. Ex. 2 (PMK Dep. 211:3-8, 216:8-218:17), Ex. 17 at FAS001009-12. However, not all vendors operate under this system. Duckworth Decl. Ex. 2 (PMK Dep. 103:1-22).

Vendors often work more than eight hours a day and 40 hours per week. Mot. 11 (citing sources); Compl. ¶ 28. FAS requires that they purchase certain items as part of the job, such as "trucks, trailers, gas, mileage, car repair, computers, phones, monthly mobile internet services, dumping, and other materials for the various properties managed by FAS." Duckworth Decl. Ex. 3 (FB Dep. 137:12-17); FAC ¶ 27. These expenses were not reimbursed by FAS. Mot. 12 (citing sources). It "was impossible for Plaintiffs to work for other companies because the amount of work orders, specific requirements, and time constraints placed upon Plaintiffs by FAS. Plaintiffs personally performed the services, but also hired other employees to keep up with the work orders." FAC ¶ 18.

## II.   FAS'S VERSION[2]

FAS describes itself as a "renovation and preservation field services" company that serves hundreds of clients, each which has different requirements designed to comply with government regulations. Opp'n 2-3 & 3 n.1 (citing Hunter Decl. ¶¶ 3-4). FAS does not itself provide property preservation services, but maintains a network of independent businesses—"vendors"—with which it contracts. Hunter Decl. ¶ 5. These vendors range in size from sole proprietorships to

_____

[2] FAS contends that the plaintiffs' version of the facts "contain an alarming number of misrepresentations and outright untruths." Opp'n 2; Cole Decl. ¶¶ 2-3, Exs. 1, 2. In particular, a number of the plaintiffs' supporting declarants allegedly gave testimony in depositions that contradict their declarations in support of the plaintiffs' motion. *See* Opp'n 11-12.

long-established corporations or limited liability companies that operate in multiple states. Hunter Decl. ¶ 6; Opp'n 9 n.17. FAS negotiates both with its clients and its vendors over prices, coverage areas, and service requirements. Hunter Decl. ¶ 6. Although FAS provides vendors with specifications for particular jobs, FAS does not control how vendors meet those specifications (e.g., the techniques to be followed, the types of tools and equipment to use, whether to hire employees or use subcontractors)—specifications which vary from customer to customer based on their needs. Hunter Decl. ¶ 7; *see also* Opp'n 3 n.3 (citing sources).

"In order to ensure compliance with legal obligations and its clients' requirements, FAS takes steps to verify that the vendors have indeed completed the preservation services they have contracted to perform. FAS'[s] concern is only that the work has been properly done, not how it has been done (or who has done it)." Hunter Decl. ¶ 7; Buccola Decl. ¶ 4. Because FAS has clients across the country, but is located in Texas, reviews generally occur by inspecting photographs sent by vendors. Hunter Decl. ¶ 8. However, FAS has a number of quality control specialists that do on-site inspections and whose job is simply to verify that client expectations are met; specialists do not have authority to instruct vendors about how to perform their work. Buccola Decl. ¶¶ 2-5.

While FAS offers templates for its contracts with vendors, every term of the contract is negotiable. Hunter Decl. ¶ 10. "[A] large number of the contractual terms are negotiated (and often renegotiated) between FAS and every vendor." Hunter Decl. ¶ 11. Vendors can negotiate which services they wish to provide to FAS's clients and where they wish to provide them. Hunter Decl. ¶¶ 12-13, 15; Mot. 4 n.5 (citing sources); Mot. 5 n.6 (citing sources). Over 70 percent of vendors provide only a limited array of services, and approximately 14 percent focus only on one type of service. Hunter Decl. ¶ 14. Over the course of their relationship with FAS, vendors may add or eliminate services offered or geographic areas covered. Hunter Decl. ¶¶ 14-15. Vendors can also cap the number of properties they are willing to service or types of services they are willing to accept. Hunter Decl. ¶ 16.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Some number of vendors negotiate and modify their service prices with FAS, though FAS

2    has a set price for standardized services that can be accepted, rejected, or countered.[3]  Hunter Decl.

3    ¶ 17; Opp'n 13.  Other services are not standardized and do not have  set prices and require

4    bidding depending on the nature of the assignment.  Hunter Decl. ¶ 18; Montes Dep. 87:8-91:15.

5    Under "bid" pricing, the vendor will review the work order, determine the work to be done, and

6    offer a bid to FAS to win the work order.  Hunter Decl. ¶ 18.

7    Vendors can accept or decline work orders for any reason, but upon accepting a work

8    order, a vendor has a 72-hour window in which to ensure that the contracted services are complete.

9    Hunter Decl. ¶ 19.  Work orders are regularly rejected by vendors.  Opp'n 7 n.11 (citing sources).

10   Vendors maintain complete discretion over who actually performs work that is ordered:  some

11   vendors hire employees, subcontractors, and day laborers.  Hunter Decl. ¶ 20.  Some vendors have

12   dozens of employees and hire multiple subcontractors.  *See generally* Opp'n 13 (citing sources).

13   Other vendors are sole proprietors and work as individuals.  Fifty-eight percent of the putative

14   class members have provided FAS with an Employer Identification Number, "indicating that the

15   vendors pay employment taxes to their own employees," though FAS does not know who the

16   vendors engage to work for them—the vendors make those decisions.  Hunter Decl. ¶ 20; Opp'n 8

17   n.14.  The plaintiffs' declarants are among those vendors who hire others to complete work for

18   FAS clients.  Opp'n 8 n.13 (citing sources).

19   Vendors are fully functioning businesses.  They often work for other property preservation

20   companies while also working for FAS.  Hunter Decl. ¶ 21; Opp'n 9 n.16, 12.  These vendors

21   "display numerous other indicia of independent businesses," such as being responsible for costs

22   associated with their own business.  Hunter Decl. ¶ 22.  They make substantial investments in

23   equipment they use to service properties, such as trucks, mowers, and construction equipment.

24   Opp'n 9 n.19 (citing sources).  Vendors advertise their own businesses.  Opp'n 9 n.21 (citing

25   sources).  Most vendors, including some relied upon by the plaintiffs, intended to create an

26

27

28   [3] FAS points to deposition testimony from the plaintiffs' declarants that appear to contradict their declarations' assertions that FAS's prices were not negotiable.  Opp'n 6 n.9 (citing sources).

1    independent contractor relationship with FAS when they first contracted with it.  Opp'n 10 n.22

2    (citing sources).

3            Since 2007, the plaintiffs' own business—B B Home Services, or BBHS—has hired

4    approximately 36 employees, 15 subcontractors, and a number of day laborers to assist with

5    projects.  FB Dep. 123:21-25, Cole Decl. Ex. 32.  Julia Bowerman's LinkedIn profile describes

6    herself as an "Office Manager/Account Manager/Owner" of "B B Home Services."  JB Dep. Ex.

7    11.  As part of her duties, she "[o]rganized and managed crews," "[w]rote and enforced the

8    Employee Handbook," and was "[r]esponsible for all personnel duties, such as staffing, new hire

9    training, and regulatory compliance."  JB Dep. Ex. 11.  B B Home Services negotiated its prices

10   and cap with FAS.  Opp'n 11 (citing sources).

                              **PROCEDURAL HISTORY**

12           The plaintiffs filed this action on January 7, 2013, and amended their complaint on

13   February 15, 2013.  Dkt. Nos. 1, 4.  On March 26, 2013, FAS filed its answer.  Dkt. No. 11.  The

14   plaintiffs filed this motion on June 3, 2014.  Dkt. No. 43.[4, 5, 6]

15           The FAC brings the following causes of action:  (1) breach of contract; (2) breach of the

16   covenant of good faith and fair dealing; (3) willful misclassification of independent-contractor

17   status, CAL. LABOR CODE §§ 226.8 & 2753; (4) failure to pay overtime compensation, CAL.

18   LABOR CODE §§ 510, 1194, & 1198, CAL. CODE REGS. tit. 8, § 11090; (5) failure to pay wages due

19   and owing, CAL. LABOR CODE §§ 200 *et seq.*; (6) failure to indemnify employees for expenses,

20   CAL. LABOR CODE § 2802; (7) violations of the Unfair Competition Law ("UCL"), CAL. BUS. &

---

[4] FAS filed a Request for Judicial Notice of an Order, Decision or Award of the [California Labor Commissioner] and a docket report from the Superior Court of California, County of Tehama. Dkt. No. 50-6.  Because these materials are appropriate for judicial notice, and the plaintiffs have not opposed, the request is GRANTED.

[5] The plaintiffs submitted numerous exhibits in support of their reply brief that do not appear to have been included with their motion brief.  Under Civil Local Rule 7-3(d)(1), FAS had the opportunity to file an objection to the reply evidence within seven days after the reply was filed, but it did not do so.  Therefore, any objections are waived.

[6] In their reply brief, the plaintiffs request that Paragraph 2 and Exhibit 1 to the Declaration of Mel Cole, as well as the chart on pages 12 and 13 of the opposition brief be stricken under Local Rule 7-5(b).  Reply 9 n.5.  I will only consider admissible evidence, but the plaintiffs have not adequately explained why those materials should be struck (nor have they explained how Federal Rule of Civil Procedure 56(e), which they cite, is relevant).

United States District Court
Northern District of California

United States District Court
Northern District of California

1  PROF. CODE §§ 17200 *et seq.*; and (8) failure to comply with Labor Code provisions in violation of

2  the Private Attorney General Act ("PAGA"), CAL. LABOR CODE §§ 2699 *et seq.*

3  The plaintiffs do not seek class certification for the causes of action for breach of contract,

4  breach of the covenant of good faith and fair dealing, and violation of the UCL not predicated on

5  Labor Code violations.  Mot. 12 n.2.  They also assert that class action requirements do not apply

6  to enforcement actions brought under the PAGA because the PAGA authorizes actions on behalf

7  of other individuals.  Mot. 12 n.2 (citing *Gallardo v. AT&T Mobility, LLC*, 937 F. Supp. 2d 1128,

8  1137 (N.D. Cal. 2013) (Wilken, J.) ("every court to reach the issue in this district, have found that

9  representative PAGA claims need not be certified under Rule 23 to proceed")).  FAS does not

10  dispute this point.

**LEGAL STANDARD**

12  I.    **FEDERAL RULE OF CIVIL PROCEDURE 23**

13  Federal Rule of Civil Procedure 23 governs class actions.  "Before certifying a class, the

14  trial court must conduct a 'rigorous analysis' to determine whether the party seeking certification

15  has met the prerequisites of Rule 23."  *Mazza v. Am. Honda Motor Co., Inc.*, 666 F.3d 581, 588

16  (9th Cir. 2012).  The party seeking certification bears the burden of showing that Rule 23 has been

17  met.  *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011); *Conn. Ret. Plans & Trust*

18  *Funds v. Amgen Inc.*, 660 F.3d 1170, 1175 (9th Cir. 2011), *aff'd*, 133 S. Ct. 1184 (2013).  Rule

19  23(a) requires that plaintiffs demonstrate numerosity, commonality, typicality and adequacy of

20  representation in order to maintain a class action.  *Mazza*, 666 F.3d at 588.

21  Rule 23(a) states:  "One or more members of a class may sue or be sued as representative

22  parties on behalf of all members only if:

23  (1) the class is so numerous that joinder of all members is impracticable;

24  (2) there are questions of law or fact common to the class;

25  (3) the claims or defenses of the representative parties are typical of the claims or defenses

26  of the class; and

27  (4) the representative parties will fairly and adequately protect the interests of the class."

28

1   FED. R. CIV. P. 23(a).  Rule 23(b) continues, "A class action may be maintained if Rule 23(a) is

2   satisfied and if" one of three provisions are met.  FED. R. CIV. P. 23(b).  Subpart (b)(3), the

3   provision relevant here, states that a class action may be maintained if "the court finds that the

4   questions of law or fact common to class members predominate over any questions affecting only

5   individual members, and that a class action is superior to other available methods for fairly and

6   efficiently adjudicating the controversy.  The matters pertinent to these findings include:

7          (A) the class members' interests in individually controlling the prosecution or defense of

8          separate actions;

9          (B) the extent and nature of any litigation concerning the controversy already begun by or

10         against class members;

11         (C) the desirability or undesirability of concentrating the litigation of the claims in the

12         particular forum; and

13         (D) the likely difficulties in managing a class action."

14  FED. R. CIV. P. 23(b)(3).

15         While the substantive allegations of the complaint must be accepted as true, issues going to

16  class certification itself are not treated similarly.  *Gomez v. Rossi Concrete, Inc.*, 270 F.R.D. 579,

17  585 (S.D. Cal. 2010); *Hanni v. Am. Airlines, Inc.*, No. 08-cv-732-CW, 2010 WL 289297, at *8

18  (N.D. Cal. Jan. 15, 2010); *see also Jordan v. Paul Fin., LLC*, 285 F.R.D. 435, 447 (N.D. Cal.

19  2012) (Illston, J.) ("The Court is obliged to accept as true the substantive allegations made in the

20  complaint.").  In addition, "the court may consider supplemental evidentiary submissions of the

21  parties." *Hanni v. Am. Airlines, Inc.*, No. 08-cv-732-CW, 2010 WL 289297, at *8 (N.D. Cal. Jan.

22  15, 2010).  "Neither the possibility that a plaintiff will be unable to prove his allegations, nor the

23  possibility that the later course of the suit might unforeseeably prove the original decision to

24  certify the class wrong, is a basis for declining to certify a class which apparently satisfies Rule

25  23." *United Steel, Paper & Forestry, Rubber, Mfg. Energy, Allied Indus. & Serv. Workers Int'l*

26  *Union, AFL-CIO, CLC v. ConocoPhillips Co.*, 593 F.3d 802, 809 (9th Cir. 2010) (citation and

27  brackets omitted).  "[A] district court retains the flexibility to address problems with a certified

28  class as they arise, including the ability to decertify." *Id.*

United States District Court
Northern District of California

## II.      CALIFORNIA LAW GOVERNING EMPLOYMENT STATUS

"Employers have varying responsibilities with respect to persons performing services on their behalf.  These responsibilities depend, in part, on whether those persons are classified as employees or independent contractors under the Labor Code."  *Cristler v. Express Messenger Sys., Inc.*, 171 Cal. App. 4th 72, 76 (2009).  Because the California Labor Code does not expressly define "employee," the common law test for employment applies.  *Estrada v. FedEx Ground Package Sys., Inc.*, 154 Cal. App. 4th 1, 10 (Ct. App. 2007).  "The parties' label is not dispositive and will be ignored if their actual conduct establishes a different relationship."  *Id.*

"The right to control the means by which the work is accomplished is clearly the most significant test of the employment relationship . . . ."  *Tieberg v. Unemployment Ins. App. Bd.*, 2 Cal. 3d 943, 950 (1970).  "An independent contractor is one who renders service in the course of an independent employment or occupation, following his employer's desires only in the results of the work, and not the means whereby it is to be accomplished."  *Varisco v. Gateway Sci. & Eng'g, Inc.*, 166 Cal. App. 4th 1099, 1103 (Ct. App. 2008) (citations and internal punctuation omitted).  "On the other hand, the relationship of master and servant or employer and employee exists whenever the employer retains the right to direct how the work shall be done as well as the result to be accomplished."  *Id.*  "But this rule requires that the right to exercise complete or authoritative control, rather than mere suggestion as to detail, must be shown."  *Id.*  Generally, where an employer is more concerned with the quality of the result rather than the manner in which the work is done, that is evidence of an independent-contractor relationship.  *Missions Ins. Co. v. Workers' Comp. Appeals Bd.*, 123 Cal. App. 3d 211, 224 (Ct. App. 1981).

California courts have emphasized that "the right to control, rather than the amount of control which was exercised, is the determinative factor."  *S.A. Gerrard Co. v. Indus. Acc. Comm'n*, 17 Cal. 2d 411, 414 (1941).  "[T]he fact that a certain amount of freedom of action is inherent in the nature of the work does not change the character of the employment where the employer has general supervision and control over it."  *Toyota Motor Sales U.S.A., Inc. v. Super. Ct.*, 220 Cal. App. 3d 864, 875 (Ct. App. 1990).

1    Because the "control" test "is often of little use in evaluating the infinite variety of service

2    arrangements," *S. G. Borello & Sons, Inc. v. Dep't of Indus. Relations*, 48 Cal. 3d 341, 350 (1989),

3    courts may consider the following factors:

4        (1) whether the worker is engaged in a distinct occupation or business, (2) whether,
         considering the kind of occupation and locality, the work is usually done under the

5        principal's direction or by a specialist without supervision, (3) the skill required, (4)
         whether the principal or worker supplies the instrumentalities, tools, and place of work, (5)

6        the length of time for which the services are to be performed, (6) the method of payment,
         whether by time or by job, (7) whether the work is part of the principal's regular business,

7        and (8) whether the parties believe they are creating an employer-employee relationship.

8    *Estrada*, 154 Cal. App. 4th at 10.  Courts also consider whether the employer has the right to

9    discharge the worker at will without cause.  *Borello*, 48 Cal 3d. at 350.

10   "[T]he individual factors cannot be applied mechanically as separate tests; they are

11   intertwined and their weight depends often on particular combinations."  *Germann v. Workers'*

12   *Comp. Appeals Bd.*, 123 Cal. App. 3d 776, 783 (Ct. App. 1981).  That some factors suggest an

13   employment relationship does not lead to the conclusion that such a relationship necessarily exists.

14   *Varisco*, 166 Cal. App. 4th at 1106.  "Under federal law, as under state law, the existence and

15   degree of each factor regarding the status of a person as an independent contractor or employee is

16   a question of fact while the legal conclusion to be drawn from those facts—whether workers are

17   employees or independent contractors—is a question of law."  *Harris v. Vector Marketing Corp.*,

18   656 F. Supp. 2d 1128, 1136 (citations and punctuation omitted).

19   Where a plaintiff "used her own judgment in determining . . . the time, place, and manner

20   in which she would [work], and the amount of time she spent [working]"; the "appointment [ ]

21   was nonexclusive, and she in fact [worked] for other [ ] companies" where the manager did "not

22   evaluate her performance and did not monitor or supervise her work; and training was voluntary,

23   there is no significant right to control.  *Arnold*, 202 Cal. App. 4th at 589.  An individual who

24   determines his own hours "on most days" exercises "meaningful discretion."  *Beaumont-Jacques*,

25   217 Cal. App. 4th at 1145.  Required meetings and training related to legal compliance do not

26   necessarily indicate an employment relationship.  *Desimone v. Allstate Ins. Co.*, No. 96-cv-3606-

27   CW, 2000 WL 1811385, at *13 (N.D. Cal. Nov. 7, 2000); *Arnold*, 202 Cal. App. 4th at 589;

28

United States District Court
Northern District of California

1    *Missions Ins. Co.*, 123 Cal. App. 3d at 221 (stating that the fact that plaintiff "on occasion attended

2    lectures or classes" is not evidence that the company "controlled *the manner in which the desired*

3    *result was to be achieved*").

4            On the other hand, a company "may retain a broad general power of supervision and

5    control as to the results of the work so as to insure satisfactory performance of the independent

6    contract—including the right to inspect . . . the right to make suggestions or recommendations as

7    to details of the work . . . the right to prescribe alterations or deviations in the work—without

8    changing the relationship from that of owner and independent contractor or the duties arising from

9    that relationship." *McDonald v. Shell Oil Co.*, 44 Cal. 2d 785, 790 (1955).  The ultimate issue in

10   this analysis is whether the company "controlled to any meaningful degree the means by which

11   [the plaintiff] performed and accomplished her duties." *Beaumont-Jacques*, 217 Cal. App. 4th at

12   1145.

13                                   **DISCUSSION**

14           Because predominance is the issue about which I am most concerned, I will not address

15   whether the plaintiffs could satisfy the requirements of Federal Rule of Civil Procedure 23(a).

16   Instead, I will cut to the chase.

17   **I.       RULE 23(b)(3)**

18           The plaintiffs seek to certify the proposed class under Rule 23(b)(3).  A class action may

19   be maintained under Rule 23(b)(3) if "the court finds that the questions of law or fact common to

20   class members predominate over any questions affecting only individual members, and that a class

21   action is superior to other available methods for fairly and efficiently adjudicating the

22   controversy."  FED. R. CIV. P. 23(b)(3).  Certification under Rule 23(b)(3) is appropriate

23   "whenever the actual interests of the parties can be served best by settling their differences in a

24   single action." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011,1022 (9th Cir. 1998) (quoting 7A

25   CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE &

26   PROCEDURE § 1777 (2d ed. 1986)).  This inquiry is more searching than Rule 23(a)'s inquiry.

27   *Wolph v. Acer America Corp.*, No. 09–01314 JSW, 272 F.R.D. 477,  487 (N.D. Cal. 2011).

28

United States District Court
Northern District of California

"[T]he predominance requirement is far more demanding" than the commonality requirement of Rule 23(a). *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 624 (1997). The Rule 23(b)(3) analysis "presumes that the existence of common issues of fact or law have been established pursuant to Rule 23(a)(2); thus, the presence of commonality alone is not sufficient to fulfill Rule 23(b)(3)." *Hanlon*, 150 F.3d at 1022. Unlike the commonality requirement in Rule 23(a), "Rule 23(b)(3) focuses on the relationship between the common and individual issues." *Id.* In other words, "When common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication, there is clear justification for handling the dispute on a representative rather than on an individual basis." *Id.* (quoting 7A CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE & PROCEDURE § 1778 (2d ed. 1986)).

The plaintiffs argue that because FAS controls the proposed class members' work using the same contract terms, questions about misclassification, overtime, and expense reimbursement are common to the class and will predominate over individual issues. Mot. 18-20; Reply 3. They quote *Shepard v. Lowe's HIW, Inc.*, No. 12-cv-3893-JSW, 2013 WL 4488802, at *5 (N.D. Cal. Aug. 19, 2013), for the proposition that where "the contract and standards at issue are substantially identical and provide the legal structure for the relationship and the scope of Defendant's right to control the [class members] . . . class certification is appropriate."

"The central question to be resolved—whether [the defendant] has the right to control the [class members]—[must] be determined based on evidence common to the class." *Guifu Li v. A Perfect Franchise, Inc.*, No. 10-cv-1189-LHK, 2011 WL 4635198, at *12 (N.D. Cal. Oct. 5, 2011). Where the plaintiffs "have submitted evidence indicating that [the defendant] exercises pervasive control over the manner in which Plaintiffs . . . operate," predominance is established. *Smith v. Cardinal Logistics Mgmt. Corp.*, No. 07-cv-2104-SC, 2008 WL 4156364, at *9 (N.D. Cal. Sept. 5, 2008).

In deciding whether the element of predominance was established in a state class action, the Supreme Court of California recently said that the relevant inquiry concerning control is whether "there [is] a common way to show [the defendant] possessed essentially the same legal

right of control with respect to each of [the class members]?  Alternatively, did its rights vary substantially, such that it might subject some [class members] to extensive control as to how they [worked], subject to firing at will, while as to others it had few rights and could not have directed their manner of [work] even had it wanted, with no common proof able to capture these differences?" *Ayala v. Antelope Valley Newspapers, Inc*., 59 Cal. 4th 522, 533-34 (2014).  In that case, the California Supreme Court faulted the trial court for focusing more on variations in how the defendant exercised control rather than the proper question:  "whether there were variations in its underlying *right* to exercise that control that could not be managed by the trial court." *Id.* at 534 (original emphasis).  The court cautioned against "focus[ing] too much on the substantive issue of the defendant's right to control . . . instead of whether that question could be decided using common proof." *Id.* at 537 (quoting *Dalton v. Lee Publ'ns, Inc.*, 270 F.R.D. 555, 564 (S.D. Cal. 2010)).  Similarly, Judge White has observed that examining whether a putative class member's "experience, relationship, and interaction with [the defendant] is unique" improperly reaches the merits of the case rather than simply asking whether Rule 23 has been satisfied. *Shepard*, 2013 WL 4488802, at *5.

The difficult question in this case is whether common questions of law or fact predominate over questions affecting individual vendors with respect to FAS' *right* of control over them.  I conclude they do not.  It follows also that proceeding as a class is not the superior method to resolving this dispute.  But because there may be a class lurking in this overbroad definition that can be defined to avoid the predominance issues, I will give plaintiffs an opportunity to try again.

The plaintiffs claim that all vendors are required to apply to FAS in the same manner; submit to background checks; engage in training covering issues from safety to winterization; use the same equipment; and follow certain rules in completing work order, such as taking photos. Mot. 20 (citing sources).  They assert that the entire vendor network is subject to FAS's right of control—a right that FAS exercises in various ways, from imposing penalties for failing to report certain conditions on the properties to including "a mutual, no-notice, at will termination provision" in its vendor agreements.  Reply 6.  While FAS might have imposed varying amounts of control over certain vendors, that does not affect its right of control, the plaintiffs contend.

16

United States District Court
Northern District of California

1  There is no doubt that plaintiffs assert a common practice regarding the various ways FAS

2  controls the work of its vendors.  In addition to very detailed job specifications, FAS's business

3  model depends on the vendors to do its work and all contracts are at will.  Class actions posing

4  similar questions are often certified.  *See, e.g.*, *Alexander v. FedEx Ground Package Sys.*, 2014

5  U.S. App. LEXIS 16585 (9th Cir. Aug. 27, 2014).

6  But FAS shows significant differences among the putative class members.  Of the more

7  than 490 vendors, almost 300 have EINs, meaning that they pay employment taxes to their own

8  employees.  Opp'n 8 (citing sources).  One has as many as 65 employees.  *Id*. 13.  Many vendors

9  are corporations or LLCs.  *Id*. 9.  Some bid jobs, while others are bound by written contracts.  *Id*.

10  6, 7.  Many contract with competitors of FAS, but many others do not.  *Id*. 8, 9.  Some advertise.

11  FAS does not purport to control whom the vendors employ to perform a contract, how the workers

12  for the vendors are paid, or what hours they work.  Some vendors negotiate over contracts with

13  FAS: what services they will provide in which geographic areas, the number of jobs they will do

14  and the price they will charge.  *Id*. 4-7.[7]  Others do not.

15  In *Alexander v FedEx Ground Package System, Inc*, 2014 U.S. App. LEXIS 16585, the

16  Ninth Circuit found that drivers for FedEx were employees and not independent contractors,

17  largely because of the control FedEx exercised over the drivers.  Critically, the class in that case

18  was limited to drivers that personally drive full time for FedEx.  Therefore, it was clear in that case

19  that FedEx exercised all necessary control over the class: the appearance of its drivers and their

20  vehicles; the times its drivers worked each day; and, aspects of how and when drivers deliver their

21  packages.  Individual vendors in this case are selected by FAS, but even though FAS purports to

22  have no control over them, they may be comparable to the FedEx drivers if they work fulltime for

23  FAS.  Vendors who have employees and do all of their work for FAS may also be comparable to

24  the FedEx drivers who have employees.  But maybe not.  Who controls the employees' hours and

25  supervises their work?  If a vendor operates an independent business and has multiple clients, how

26  much control can FAS really be said to maintain over it?  Further, some vendors bid for jobs and

27

28  _____
[7] At least one FAS vendor has been sued for misclassifying its own employees.  Opp'n 12.

17

others negotiate their contracts.  Each of these factors differentiates the amount of control FAS has over the vendors.  FAS's assertion that it has no control over the employees or sub-contractors of a vendor may be accurate with respect to vendors with several clients and dozens of employees but not vendors with a handful of employees and no source of revenue except from FAS.

Review of the *Borello* factors shows that there is no common answer regarding employment status within the class as currently constituted.  The first factor, the right to terminate at will, is in all contracts.  But whether that cuts in favor of finding an employment relationship may depend on whether the vendor is dependent on FAS, negotiates with FAS, or obtains a contract by bid.

The second factor, distinct occupation or business, will also cause differentiation within the class.  Some vendors have many clients; some only FAS.  Some have many employees and an administrative infrastructure, compete in the marketplace, and advertise.  Others only work for FAS.

The third (whether the work is performed under the principal's direction), fourth (the skill required in the occupation), and fifth (provision of tools and equipment) factors would result in a common answer.  FAS has very detailed criteria for how its vendors perform their work. The work the vendors perform does not require a great deal of experience or skill.  And FAS does not provide tools and equipment.

However, seemingly common practices by FAS may not result in a common answer to the misclassification issue.  The sixth *Borello* factor, length of time for performance of services, is an example.  The contracts are of very short (often 3 days) duration.  But whether a vendor is wholly dependent on FAS matters greatly here, because "the notion that an independent contractor is someone  hired to achieve a specific result that is attainable within a finite period of time …is at odds with carriers who are engaged in prolonged service to [an employer]."  *Alexander*, 2014 U.S. App. LEXIS 16585 at *36 (quoting *Antelope Valley Press v. Poizner*, 75 Cal. Rptr. 3d 887, 900 (2008)).  Accordingly, it is conceivable that a wholly dependent vendor might well argue that despite the fact that the contracts are of short duration, the reality is that the vendor is wholly

United States District Court
Northern District of California

1    dependent on and therefore controlled by FAS.  The argument would be different for a vendor

2    (large or small) with many clients, or one who bids for work.

3         The seventh factor, method of payment, varies depending on the negotiating power of the

4    vendor and type of contract.  A contract won by bid is categorically different than the type of an

5    adhesion contract alleged by plaintiffs.  And depending on the extent to which a contract is

6    negotiated, it may lack the elements of control necessary to form the employment relationship.

7         The eighth factor, whether the work is part of the principal's regular business, would result

8    in a common  answer.  FAS's business model depends on the vendors—none of its acknowledged

9    employees does the contracted work.

10        The final factor, the parties' beliefs that they are employees or independent contractors,

11   may vary by vendor.  All have signed independent contractor agreements, but some may believe,

12   like the Bowermans, that they are employees regardless of their written agreement.

13        Of all the cases cited by the parties, I find that *Narayan v. E.G.L., Inc*., No. 05-04181

14   RMW, 285 F.R.D. 473 (N.D. Cal. 2012) presents the closest analogy, factually, and its analysis is

15   the most persuasive.  After the Ninth Circuit identified the common question that needed to be

16   addressed by the court in its certification decision, Judge Whyte denied certification to a class of

17   truck drivers who had signed "independent contractor agreements" with defendants to provide

18   pick up and delivery services.  There, 127 of 396 class members hired sub-drivers (anywhere from

19   one to more than ten).  Some provided services to other customers and appeared to have been

20   operating distinct businesses.  The court, following the reasoning in *Spencer v. BeavEx, Inc*., 2006

21   US Dist LEXIS 98565 (S.D. Cal. 2006), found that resolving the distinct business factor would

22   require a highly individualized analysis that would prevent a class action from generating a

23   common answer regarding the *Borello* factors.[8]

24        Judge Whyte recognized that "there is a difference between holding multiple jobs and

25   operating a business that provides services to multiple companies, even if both entail personally

26

27   [8] The diversity of the vendors described in this section sets the proposed class here apart from the
     classes in cases like *Jimenez v. Allstate Ins. Co*, 2014 WL 4338841 (9th Cir., Sept. 3, 2014), which
28   plaintiffs brought to my attention after the hearing (certification of a class of Allstate claims
     adjustors who work full time for Allstate affirmed).

United States District Court
Northern District of California

1    providing labor to each employer or customer." *Id*. at 479.  I agree.  And a vendor, no matter the

2    size, who only works for FAS requires a different analysis.  *Narayan* points out the divergence

3    between *Spencer* and *Chun-Hoon v. McKee Foods Corp.*, No. 05-cv-620-VRW, 2006 WL

4    3093764, at *3 (N.D. Cal. Oct. 31, 2006), which reached opposite conclusions on this point.  Like

5    the court in *Narayan*, I find the *Spencer* approach to be more convincing.

6          Judge Whyte also noted that, "To ignore the difference in defendants' operations and

7    certify a class would be tantamount to making a substantive finding that this evidence cannot

8    change the outcome."  *Id*. at 480.  The diversity amongst the vendors here is vast, greater than in

9    the *Narayan* class. It is critical to me that some vendors have independent businesses and do not

10   work full time for FAS.  There may be a common result for businesses that are substantially

11   dependent on FAS for their revenue, but not necessarily ones that compete for other business.  It is

12   critical that some win their jobs by bidding, while others are allegedly forced to sign an FAS-

13   required contract.  There will not necessarily be a common result for those categories of vendors.

14   Size also matters – it is not obvious that vendors with a significant number of employees, none of

15   whom are hired, managed or paid by FAS, are in the same position as an individual vendor who is

16   wholly dependent on FAS for her income.

17          Based on the evidence submitted on the motions, it appears likely that the answer to the

18   common question of whether FAS sufficiently controls its vendors such that they are employees

19   rather than independent contractors will vary depending on the factors described above.  If I grant

20   certification now, I would end up denying recovery for the class because it is overbroad.

21   Accordingly, I deny this motion without prejudice to plaintiffs revising the class definition if they

22   wish.

23          In light of the discussion above, I will not analyze the other criteria necessary for

24   certification.  Nothing in this Order should be taken for agreement with FAS's argument that there

25   is no authority "supporting [plaintiff's] contention that courts may certify a class of corporate and

26   non-corporate entities, especially where the claims at issue are violations of wage and hour laws

27   designed to protect individual employees."  Opp'n 19.  I am unaware of any authority explicitly

28   stating whether a business entity, such as a corporation or limited liability company, can be a

member of a putative class alleging misclassification and labor code violations.  However, the plaintiffs have cited several cases in which classes were certified consisting of members who had hired other employees.  Reply 11-12.  In *Ruiz v. Affinity Logistics Corp.*, 754 F.3d 1093, 1103 (9th Cir. 2014), the Ninth Circuit recently found that a certified class of drivers, some of whom hired their own drivers to work for them, were employees under California law rather than independent contractors.  *Narayan v. E.G.L., Inc.*, 616 F. 3d 895, 902 (9th Cir. 2010) and *Alexander*, 2014 U.S. App. LEXIS 16585 are to the same effect.  Similarly, the District of Massachusetts certified a class of franchisees who were able to hire employees and had alleged that they were misclassified under Massachusetts law as independent contractors rather than employees.  *De Giovanni v. Jani-King Int'l, Inc.*, 262 F.R.D. 71, 85 (D. Mass. 2009); *see also Martins v. 3PD, Inc.*, No. 11-cv-11313, 2013 WL 1320454 (D. Mass. Mar. 28, 2013) (same).  The District of Oregon has also certified a class of drivers who alleged that the defendant had the right to control their hiring of other drivers.  *See Phelps v. 3PD, Inc.*, 261 F.R.D. 548, 557 (D. Or. 2009).[9]

### CONCLUSION

For these reasons, I DENY certification of the class as defined by plaintiffs. They may attempt to redefine the class and file a further motion within 45 days.

**IT IS SO ORDERED.**

Dated: September 17, 2014

WILLIAM H. ORRICK
United States District Judge

---

[9] In addition, although neither party has briefed this issue, I note that the California Labor Code defines "employee" as "every person in the service of an employer under any appointment or contract of hire," and defines "person" as "any person, association, organization, partnership, business trust, limited liability company, or corporation."  CAL. LABOR CODE §§ 18, 3551.  The Code would thus seem to allow business entities to assert rights under its provisions.

United States District Court
Northern District of California