UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FRED BOWERMAN, et al.,<br><br>        Plaintiffs,<br><br>    v.<br><br>FIELD ASSET SERVICES, INC., et al.,<br><br>        Defendants. | Case No. 13-cv-00057-WHO<br><br>**ORDER GRANTING RENEWED MOTION FOR CLASS CERTIFICATION**<br><br>Re: Dkt. Nos. 65, 78 |

## INTRODUCTION

On January 26, 2015, I issued a summary order granting plaintiffs Fred and Julia Bowerman's renewed motion to certify a class under Federal Rule of Civil Procedure 23(b)(3) against defendants Field Asset Services, Inc. and Field Asset Services, LLC[1] (collectively, "FAS"), a business that arranges for the cleaning, maintenance, and restoration of foreclosed properties by hiring third-party "vendors"[2] to perform such services. Dkt. No. 78. This order explains that the modifications plaintiffs made to the proposed class definition allow for common questions of law and fact to predominate over questions affecting only individual class members, and that plaintiffs' motion establishes that the rest of the requirements of Federal Rule of Civil Procedure 23 are satisfied.

---

[1] Field Asset Services, LLC is the successor in interest of Field Asset Services, Inc.

[2] There is some ambiguity in the way the parties use the term "vendors" in their papers. The ambiguity is an outgrowth of FAS requiring the individuals it hires to perform cleaning, maintenance, and restoration services to have or obtain their own business licenses. *See, e.g.,* F. Bowerman Dep. 13 (Duckworth Decl. Ex. 3, Dkt. No. 66); Tr. 6 (Dkt. No. 80). As a result of this requirement, it is not clear whether any given reference to "vendors" by the parties means the businesses that perform services for FAS, or rather the individuals – such as Fred and Julia Bowerman – associated with those businesses. At oral argument, plaintiffs' counsel stated that plaintiffs use the term "vendors" to refer to the "owners" of the businesses, not the businesses themselves. Tr. 6-7. I use "vendors" in the same way in this order.

United States District Court<br>Northern District of California

Plaintiffs allege that FAS misclassifies its vendors as independent contractors instead of employees and systematically undercompensates them as a result.  On September 17, 2014, I denied plaintiffs' initial motion for class certification for lack of predominance, reasoning that because of the significant variations among the approximately 495 vendors included in the putative class, plaintiffs had not shown that common questions predominated over individual ones with respect to FAS's right of control over putative class members.  I highlighted that some vendors negotiate and/or bid for their contracts with FAS, some vendors hire, manage, and pay their own workers, and some vendors are not substantially dependent on FAS for their revenue.

In an effort to address these concerns, plaintiffs now propose the following class definition:

> All persons who at any time from January 7, 2009 up to and through the time of judgment (the "Class Period") (1) were designated by FAS as independent contractors; (2) personally performed property preservation work in California pursuant to FAS work orders; and (3) while working for FAS during the Class Period, did not work for any other entity more than 30 percent of the time.  The class excludes persons who primarily performed rehabilitation or remodel work for FAS.

Plaintiffs contend this new proposed class definition cures the deficiencies in the old one by limiting the class to a group of vendors over which FAS has a uniform right of control.  I agree, and plaintiffs' renewed motion for class certification is GRANTED.

## BACKGROUND

The basic facts are set out in the September 17, 2014 order denying plaintiffs' initial motion for class certification (the "prior order") and I will not repeat them here.  I include additional details regarding the underlying facts where relevant in the "discussion" section below.

Plaintiffs filed this action on January 7, 2013 and filed their first amended complaint on February 15, 2013.  Dkt. Nos. 1, 4.  The first amended complaint brings the following causes of action: (1) breach of contract; (2) breach of the covenant of good faith and fair dealing; (3) willful misclassification of independent contractor status, Cal. Labor Code §§ 226.8, 2753; (4) failure to pay overtime compensation, Cal. Labor Code §§ 510, 1194, 1198; (5) failure to pay wages due and owing, Cal. Labor Code § 200 *et seq.*; (6) failure to indemnify employees for business

expenses, Cal. Labor Code § 2802; (7) violations of the Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200 *et seq.*; and (8) failure to comply with Labor Code provisions in violation of the Private Attorney General Act ("PAGA"), Cal. Labor Code § 2699 *et seq.* Dkt. No. 4 at ¶¶ 36-83.

Plaintiffs filed their initial motion for class certification on June 3, 2014. Dkt. No. 43. The motion sought certification of a class consisting of

> all persons who at any time from January 7, 2009 up to and through the time of judgment (1) performed property preservation and maintenance services for [FAS] in California and (2) were designated and paid by [FAS] as independent contractors rather than as employees.

*Id.* at 1. The motion did not seek certification of the claims for breach of contract, breach of the implied covenant of good faith and fair dealing, or violations of the UCL not predicated on Labor Code violations. *Id.* at 12 n.2. The motion also asserted that the class action requirements of Federal Rule of Civil Procedure 23 do not apply to enforcement actions brought under the PAGA, an assertion that FAS did not dispute. *See* Dkt. No. 61 at 10. On September 17, 2014, I issued the prior order, denying the motion.

Plaintiffs filed their renewed motion for class certification on November 7, 2014. Dkt. No. 65. As in their initial motion for class certification, plaintiffs do not seek certification of the claims for breach of contract, breach of the implied covenant of good faith and fair dealing, or violations of the UCL not predicated on Labor Code violations. *Id.* at 13 n.37. Plaintiffs also assert again that the class action requirements of Federal Rule of Civil Procedure 23 do not apply to enforcement actions brought under the PAGA, an assertion that FAS again does not dispute. *Id.* I heard argument from the parties on January 7, 2015. Dkt. No. 77.

## LEGAL STANDARD

### I.   FEDERAL RULE OF CIVIL PROCEDURE RULE 23

Federal Rule of Civil Procedure 23 governs class actions. "Before certifying a class, the trial court must conduct a rigorous analysis to determine whether the party seeking certification has met the prerequisites of Rule 23." *Mazza v. Am. Honda Motor Co., Inc.,* 666 F.3d 581, 588 (9th Cir. 2012) (internal quotation marks omitted). The burden is on the party seeking

certification to show, by a preponderance of the evidence, that the prerequisites have been met. *See Wal–Mart Stores, Inc. v. Dukes,* 131 S.Ct. 2541, 2551 (2011); *Conn. Ret. Plans & Trust Funds v. Amgen Inc.,* 660 F.3d 1170, 1175 (9th Cir. 2011).

Certification under Rule 23 is a two-step process. The party seeking certification must first satisfy the four threshold requirements of Rule 23(a), numerosity, commonality, typicality, and adequacy. Specifically, Rule 23(a) requires a showing that:

> (1) the class is so numerous that joinder of all members is impracticable;
>
> (2) there are questions of law or fact common to the class;
>
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
>
> (4) the representative parties will fairly and adequately protect the interests of the class.
>
> Fed. R. Civ. P. 23(a).

The party seeking certification must then establish that one of the three grounds for certification applies. *See* Fed. R. Civ. P. 23(b). Plaintiffs invoke Rule 23(b)(3), which provides that a class action may be maintained where

> the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include:
>
> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
>
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
>
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
>
> (D) the likely difficulties in managing a class action.
>
> Fed. R. Civ. P. 23(b)(3).

In considering a motion for class certification, the substantive allegations of the complaint are accepted as true, but "the court need not accept conclusory or generic allegations regarding the suitability of the litigation for resolution through a class action." *Hanni v. Am. Airlines, Inc.*, No. 08-cv-00732-CW, 2010 WL 289297, at *8 (N.D. Cal. Jan. 15, 2010); *see also Jordan v. Paul Fin., LLC*, 285 F.R.D. 435, 447 (N.D. Cal. 2012) ("[Courts] need not blindly rely on conclusory allegations which parrot Rule 23 requirements.").   Accordingly, "the court may consider supplemental evidentiary submissions of the parties." *Hanni*, 2010 WL 289297, at *8.

"A court's class-certification analysis . . . may entail some overlap with the merits of the plaintiff's underlying claim." *Amgen Inc. v. Connecticut Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1194 (2013) (internal quotation marks omitted).  However, "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage." *Id.* at 1194-95.  "Merits questions may be considered to the extent – but only to the extent – that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Id.* at 1195.

## II.     CALIFORNIA LAW GOVERNING CLASSIFICATION OF WORKERS AS EMPLOYEES OR INDEPENDENT CONTRACTORS

"Employers have varying responsibilities with respect to persons performing services on their behalf.  These responsibilities depend, in part, on whether those persons are classified as employees or independent contractors under the Labor Code." *Cristler v. Express Messenger Sys., Inc.*, 171 Cal. App. 4th 72, 76 (2009).  "Whether a worker is classified as an employee or an independent contractor has great consequences.  California law gives many benefits and protections to employees; independent contractors get virtually none." *Cotter v. Lyft, Inc.*, No. 13-cv-04065-VC, 2015 WL 1062407, at *5 (N.D. Cal. Mar. 11, 2015).  Of particular relevance here, employees are generally entitled to overtime compensation, Cal. Labor Code §§ 510, 1194, and indemnification for business expenses, Cal. Labor Code § 2802.  Independent contractors are not.

"[U]nder California law, once a plaintiff comes forward with evidence that he provided services for an employer, the employee has established a prima facie case that the relationship was one of employer/employee." *Narayan v. EGL, Inc.*, 616 F.3d 895, 900 (9th Cir. 2010).  "[T]he rule is that the fact that one is performing work [ ] for another is prima facie evidence of

5

employment and such person is presumed to be a servant in the absence of evidence to the contrary." *Id.* (internal quotation marks and modifications omitted).  "Once the employee establishes a prima facie case, the burden shifts to the employer, which may prove, if it can, that the presumed employee was an independent contractor." *Id.*

Because the California Labor Code does not define "employee," courts generally apply the common law test to distinguish between employees and independent contractors.[3]  *See Estrada v. FedEx Ground Package Sys., Inc.*, 154 Cal. App. 4th 1, 10 (2007).  Under this test, the defendant's right to control the manner and means by which the plaintiff's work is accomplished, rather than the amount of control actually exercised, is the principal factor in assessing whether a plaintiff is an employee or an independent contractor.  *See Ayala v. Antelope Valley Newspapers, Inc.*, 59 Cal. 4th 522, 533-34 (2014) ("What matters under the common law is not how much control a hirer *exercises,* but how much control the hirer retains the *right* to exercise.") (emphasis in original).  Courts have consistently emphasized the significance of this factor.  *See, e.g., S.G. Borello & Sons, Inc. v. Dep't of Indus. Relations*, 48 Cal.3d 341, 350 (1989) ("The principal test of an employment relationship is whether the person to whom service is rendered has the right to control the manner and means of accomplishing the result desired.") (internal quotation marks and modifications omitted); *Estrada*, 154 Cal. App. 4th at 10 ("The essence of the test is the 'control of details' – that is, whether the principal has the right to control the manner and means by which the worker accomplishes the work."); *see also Ruiz v. Affinity Logistics Corp.*, 754 F.3d 1093, 1100 (9th Cir. 2014) ("[T]he right to control work details is the most important or most significant consideration.") (emphasis omitted).

The defendant's right to control need not extend to every possible aspect of the plaintiff's work for this factor to indicate the existence of an employee/employer relationship.  The relevant question is whether the defendant retains "all necessary control" over the plaintiff's performance of his job duties.  *Borello*, 48 Cal.3d at 357.  In other words, "the fact that a certain amount of

[3] Because I find that plaintiffs' proposed class is certifiable under the common law test for distinguishing between employees and independent contractors, I do not consider plaintiffs' argument that certification is warranted under the California Industrial Welfare Commission Wage Orders Nos. 16-2001 and/or  2-2001.  *See* Mot. 14, 16-17, 24; Reply 10-11.

United States District Court
Northern District of California

freedom is allowed or is inherent in the nature of the work involved does not change the character of the relationship, particularly where the employer has general supervision and control." *Air Couriers Int'l v. Employment Dev. Dep't*, 150 Cal. App. 4th 923, 934 (2007) (internal quotation marks omitted); *see also Toyota Motor Sales U.S.A., Inc. v. Superior Court*, 220 Cal. App. 3d 864, 875 (1990).  The right to terminate at will, without cause, provides "strong evidence" of a right to control and an employment relationship.  *Borello*, 48 Cal.3d at 350 (internal quotation marks omitted); *see also Ayala*, 59 Cal.4th at 533 ("Whether a right of control exists may be measured by asking whether or not, if instructions were given, they would have to be obeyed on pain of at will discharge for disobedience.") (internal quotation marks and modifications omitted).

Because the right to control factor "is often of little use in evaluating the infinite variety of service arrangements," *Borello*, 48 Cal.3d at 350, courts applying the common law test may also consider the following "secondary" factors:

> (1) whether the worker is engaged in a distinct occupation or business, (2) whether, considering the kind of occupation and locality, the work is usually done under the principal's direction or by a specialist without supervision, (3) the skill required, (4) whether the principal or worker supplies the instrumentalities, tools, and place of work, (5) the length of time for which the services are to be performed, (6) the method of payment, whether by time or by job, (7) whether the work is part of the principal's regular business, and (8) whether the parties believe they are creating an employer-employee relationship.

*Estrada*, 154 Cal. App. 4th at 10.  "Regarding the final secondary factor, the California Court of Appeal has noted that the label that parties place on their employment relationship 'is not dispositive and will be ignored if their actual conduct establishes a different relationship.'" *Ruiz*, 754 F.3d at 1101 (quoting *Estrada*, 154 Cal. App. 4th at 10-11).

The secondary factors "cannot be applied mechanically as separate tests; they are intertwined and their weight depends often on particular combinations." *Germann v. Workers' Comp. Appeals Bd.*, 123 Cal. App. 3d 776, 783 (1981).  "[T]o determine whether a worker is an employee or independent contractor, a court should evaluate each service arrangement on its facts, and the dispositive circumstances may vary from case to case." *Ruiz*, 754 F.3d at 1100 (internal quotation marks and modifications omitted).

United States District Court
Northern District of California

United States District Court
Northern District of California

**DISCUSSION**

FAS raises three arguments against class certification: first, that the new proposed class definition is not ascertainable; second, that plaintiffs cannot satisfy Rule 23(b)(3)'s predominance requirement; and third, that plaintiffs cannot satisfy Rule 23(b)(3)'s superiority requirement.  I address each argument in turn and then address Rule 23(a)'s numerosity, commonality, typicality, and adequacy requirements.

**I.      ASCERTAINABILITY**

"As a threshold matter, and apart from the explicit requirements of Rule 23(a), the party seeking class certification must demonstrate that an identifiable and ascertainable class exists." *Mazur v. eBay Inc.*, 257 F.R.D. 563, 567 (N.D. Cal. 2009).  "A class is ascertainable if it identifies a group of unnamed plaintiffs by describing a set of common characteristics sufficient to allow a member of that group to identify himself or herself as having a right to recover based on the description." *Hanni*, 2010 WL 289297, at *9; *see also, Marsh v. First Bank of Delaware*, No. 11-cv-05226-WHO, 2014 WL 554553, at *5 (N.D. Cal. Feb. 7, 2014).

In addition, "[t]he class definition must be sufficiently definite so that it is administratively feasible to determine whether a particular person is a class member." *Wolph v. Acer Am. Corp.*, 272 F.R.D. 477, 482 (N.D. Cal. 2011).  "Administrative feasibility means that identifying class members is a manageable process that does not require much, if any, individual factual inquiry." *Lilly v. Jamba Juice Co.*, No. 13-cv-02998-JST, 2014 WL 4652283, at *3 (N.D. Cal. Sept. 18, 2014) (internal quotation marks omitted).  The determination of administrative feasibility presents "a question of degree" as to whether the identification of class members is "sufficiently facile" to allow the class to proceed, or "excessively complex" so that denial of the class is warranted. *Joyce v. City & County of San Francisco*, No. 93-cv-04149, 1994 WL 443464, at *6 (N.D. Cal. Aug. 4, 1994).  The burden is on the party seeking certification to demonstrate ascertainability by a preponderance of the evidence. *See Xavier v. Philip Morris USA Inc.*, 787 F. Supp. 2d 1075, 1089 (N.D. Cal. 2011).

As stated above, the new proposed class definition is limited to:

All persons who at any time from January 7, 2009 up to and through

8

1

2

3

> the time of judgment (the "Class Period") (1) were designated by FAS as independent contractors; (2) personally performed property preservation work in California pursuant to FAS work orders; and (3) while working for FAS during the Class Period, did not work for any other entity more than 30 [percent] of the time.   The class excludes persons who primarily performed rehabilitation or remodel work for FAS.

4

Mot. 1.   FAS argues that this definition fails the ascertainability requirement because it contains

5

6

ambiguous terms and because it would require a complex, individualized fact-finding proceeding

7

to determine the class membership of each particular vendor.   Opp. 1, 15-18.   I disagree.

8

The new proposed class definition "identifies a group of unnamed plaintiffs by describing a

9

set of common characteristics sufficient to allow a member of that group to identify himself or

10

herself as having a right to recover based on the description."   *Marsh*, 2014 WL 554553, at *5.

11

The first requirement of the definition – i.e., that the person have been designated by FAS as an

12

independent contractor – is an objective characteristic that immediately confines the class to a

13

subset of the approximately 495 vendors that FAS has already identified as having worked for it

14

during the class period.   *See* Hunter Decl. Ex. 1 (Dkt. No. 69-3).   The fact that the proposed class

15

is a subset of a predefined (and not particularly large) group of persons distinguishes this case from

16

a number of decisions in this district denying class certification for lack of ascertainability.   *See,*

17

*e.g., In re Hulu Privacy Litig.*, No. 11-cv-03764-LB, 2014 WL 2758598, at *2, *13-16 (N.D. Cal.

18

June 17, 2014) (finding unascertainable class consisting of "[a]ll persons residing in the United

19

States and its territories who, from April 21, 2010 through June 7, 2012, were registered . . . Hulu

20

users who at least once during the class period watched a video on hulu.com having used the same

21

computer and web browser to log into Facebook in the previous four weeks using default

22

settings"); *Xavier*, 787 F. Supp. 2d at 1088-91 (finding unascertainable class defined as all

23

California residents who (i) was fifty or older, (ii) had smoked "one pack of Marlboro cigarettes

24

per day for twenty years or the equivalent;" (iii) had smoked Marlboro cigarettes within California;

25

and (iv) had not been diagnosed with lung cancer"); *Hanni v. Am. Airlines, Inc.*, No. 08-cv-00732-

26

CW, 2010 WL 289297, at *4, *9 (N.D. Cal. Jan. 15, 2010) (finding unascertainable class defined

27

as "[a]ll domestic travelers who traveled on an American Airlines flight scheduled to land at DFW

28

on December 29, 2006, that was diverted to another airport, who did not reach his/her final

United States District Court
Northern District of California

United States District Court
Northern District of California

1    destination on the scheduled date of arrival, and who incurred unreimbursed out-of-pocket

2    expenses as a result of the delay"); *Deitz v. Comcast Corp.*, No. 06-cv-06352-WHA, 2007 WL

3    2015440, at *8 (N.D. Cal. July 11, 2007) (finding unascertainable class of "[a]ll present and

4    former Comcast customers in California that have or had a cable-ready television set or a video

5    cassette or DVD recorder or player and subscribe or subscribed to basic programming, expanded

6    basic, standard programming, or other comparable basic service provided by defendants").

7          The other three criteria for class membership are likewise objective characteristics that will

8    enable the identification of those vendors who qualify as class members and those who do not.

9    FAS contends that determining whether an individual "personally performed property preservation

10   work" for FAS is "ambiguous" and "confusing."  Opp. 18.  FAS submits several vendor

11   declarations in which the declarants state that they are unfamiliar with or confused by the phrase.

12   *See* Opp. 18 n.41 (citing sources); Berg Supp. Decl. ¶ 6 (Cole Decl. Ex. 42, Dkt. No. 70-6) ("I'm

13   not sure what 'personally performed' means.  Does the phrase include administrative work?");

14   Elabed Supp. Decl. ¶ 5 (Cole Decl. Ex. 44, Dkt. No. 70-6) ("The phrase 'personally performed

15   property preservation work' is an ambiguous phrase, and  if someone asked me how much [my

16   business] 'personally performed property preservation work,' I would have to give an ambiguous

17   answer"); Young Supp. Decl. ¶ 10 (Cole Decl. Ex. 45, Dkt. No. 70-6)("[T]he phrase 'personally

18   performed property preservation work' is confusing because it is unclear whether the 'property

19   preservation work' referenced includes," e.g., "administrative work.").

20         However, as plaintiffs point out, each of these declarants will likely be excluded from the

21   class because he or she has admitted to working for other entities more than thirty percent of the

22   time while working for FAS.  *See* Reply 1-2 n.1 (citing sources); Berg Decl. ¶ 6 (Dkt. No. 50-5)

23   (FAS made up approximately ten percent of business's workload); Elabed Decl. ¶ 15 (Dkt. No. 50-

24   5) (FAS "generally averages" between ten and twenty percent of business's workload and

25   currently accounts for approximately twenty percent of workload); Young Decl. ¶¶ 5-6 (Dkt. No.

26   50-5) (stating that his business has worked with FAS since 2006 and that, while about six months

27   ago FAS grew to about ninety-five percent of business's workload, FAS previously accounted for

28   only about fifty percent of workload).

Each of plaintiffs' vendor declarants, meanwhile, was able to plainly identify whether he or she "personally performed preservation work" for FAS during the class period. *See* Reply 7 n.7 (citing sources); Dunham Decl. ¶ 2 (Duckworth Decl. Ex. 69, Dkt. No. 66-14) ("My basic job duties included removing trash and debris from properties, janitorial services, lawn care, maid services, board-ups, rekeys, and some evictions . . . I personally performed work on a daily basis."); Jacques Decl. ¶¶ 3, 11 (Duckworth Decl. Ex. 70, Dkt. No. 66-14) ("While working for FAS I was the sole owner and proprietor of Jacques of All Trades. I actually performed the work assigned to me by FAS . . . I performed the following tasks for FAS: cut grass, maid services, trash outs, rekeys, evictions, hot water heater and smoke detector installations, light plumbing repair, painting, and deconstruction of grow rooms."); Hart Decl. ¶ 2 (Duckworth Decl. Ex. 72, Dkt. No. 66-14) ("My basic job duties included removing trash and debris from properties, snow removal, winterization, pool cleaning, minor repairs, board-ups, rekeys, yard maintenance, [and] janitorial work . . . I personally performed work on a daily basis during my tenure at FAS."); Denny Decl. ¶ 2 (Duckworth Decl. Ex. 73, Dkt. No. 66-14) ("My basis job duties included removing trash and debris from properties, rekeys, yard maintenance, and janitorial work . . . I personally performed work on a daily basis."). Further, in response to FAS's concern over whether the personal performance of "property preservation work" extends to the personal performance of administrative tasks, plaintiffs clarified that administrative tasks mandated by FAS work orders, such as uploading before and after photographs of job sites, qualify as "property preservation work" under the new proposed class definition. *See* Reply 7; Tr. 6-8.

FAS also finds fault with the requirement that class members, "while working for FAS during the Class Period, did not work for any other entity more than 30 percent of the time." *See* Opp. 18. FAS argues that because it requires its vendors to obtain business licenses, each of its vendors concurrently works for his or her own business while working for FAS and thus "work[s] for [another] entity more than 30 percent of the time." Opp. 18. This is, at best, a hypertechnical concern – a reasonable reader will understand in this context that "work[ing] for [another] entity" means working for some entity other than either FAS or the vendor's own business. The phrase does not warrant a finding of unascertainability.

In addition to consisting of objective criteria, the proposed class definition is "sufficiently definite so that it is administratively feasible to determine whether a particular person is a class member." *Wolph*, 272 F.R.D. at 482.  The class will consist of a subset of the approximately 495 vendors that FAS has already identified as having worked for it during the class period.  *See* Hunter Decl. Ex. 1.  The task of ascertaining the class will thus entail selecting from that group those vendors who satisfy the other three requirements for class membership.

Based on the present record, this task does not appear as Herculean as FAS makes it out to be.  FAS's assertion that "no [ ] evidence exists" from which class members may be identified is simply wrong.  *See* Opp. 17.  The vendor declarations submitted by both plaintiffs and FAS indicate that many if not most vendors will be able to self-identify as being in or out of the class.  Where corroboration is necessary, FAS's work order records will likely shed additional light on which vendors did property preservation work for FAS, and which primarily did rehabilitation or remodel work.  FAS states that it does not track or record which of its vendors have "personally performed" property preservation work, or whether or to what extent each of its vendors performs work for other entities.  Opp. 17; Hunter Supp. Decl. ¶ 3.  But this merely indicates that FAS itself does not track or record this information; it does not indicate that the information cannot be obtained.

Where vendor testimony proves insufficient to establish the "personally performed" and "no more than 30 percent" requirements for class membership, documents produced by the vendors themselves will likely be able to provide additional corroboration.  That the class may have to be ascertained through a combination of evidentiary sources does not necessarily mean that ascertaining it is administratively infeasible.  *Cf. Saltzman v. Pella Corp.*, 257 F.R.D. 471, 475-76 (N.D. Ill. 2009) (rejecting ascertainability challenge where "the class can be relatively easily ascertained through a combination of the use of sales records, publication of notice, and verification by photograph"); *Pelletz v. Weyerhaeuser Co.*, 255 F.R.D. 537, 544 (W.D. Wash. 2009) (claims process in defective products case was reasonable were "it only requires that class members answer two reasonable claim forms and submit a total of 10 photographs of the [alleged product defect].  This is far less than the class members would have to produce in order to pursue

1    individual litigation of their claims.").

2           FAS raises the concern that some vendors may lack records of how much time they spent

3    working for FAS versus other entities.  Opp. 17 n.40.  However, most of the declarations and

4    deposition testimony that FAS cites in support of this proposition are from vendors who, on the

5    face of their testimony, do not qualify as class members.  *See* Eck Decl. ¶10 (Dkt. No. 50-5) ("My

6    work with FAS made up only about 10 percent of my business . . . FAS was just another client in

7    the middle of all my other clients, and I certainly did not rely on them for all my work."); *see also*

8    Berg Decl. ¶ 6 (Dkt. No. 50-5); Elabed Decl. ¶ 15; Young Decl. ¶¶ 5-6 (Dkt. No. 50-5).  The other

9    evidence cited by FAS is similarly unconvincing.  Vendor John Davis merely stated that records

10   showing which entities he was working for on a daily basis "would have to be assembled."  Davis

11   Dep. 142 (Cole Decl. Ex. 38, Dkt. No. 70-5).  Vendor Janet Hart testified that she "destroyed"

12   records showing when she hired workers but said nothing about records showing how often she

13   herself worked for FAS.  Hart Dep. 70 (Cole Decl. Ex. 40, Dkt. No. 70-5).  Vendor Cara Denny

14   did state that she lost records relevant to the percentage of time she spent working for FAS versus

15   other entities, but only after testifying that she worked for FAS "eighty-five percent of the time."

16   Denny Dep. 104-05 (Cole Decl. Ex. 39, Dkt. No. 70-5).  On this record, I cannot say that the

17   specter of some vendors lacking time records is sufficiently threatening to preclude class

18   certification.  This is particularly so given that class membership will not depend on an exact

19   determination of the amount of time the vendor spent working for FAS versus other entities – so

20   long as the seventy percent threshold is passed, the requirement will be satisfied.

21          Plaintiffs' new proposed class is ascertainable.

22   **II.     FEDERAL RULE OF CIVIL PROCEDURE 23(b)(3)**

23          **A.     Predominance**

24          Plaintiffs' renewed motion for class certification, like their initial class certification

25   motion, seeks to certify a class under Rule 23(b)(3).  A court may certify a Rule 23(b)(3) class

26   where it finds that "the questions of law or fact common to class members predominate over any

27   questions affecting only individual members, and that a class action is superior to other available

28   methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Certification under Rule 23(b)(3) is appropriate "whenever the actual interests of the parties can be

2    served best by settling their differences in a single action." *Hanlon v. Chrysler Corp.*, 150 F.3d

3    1011, 1022 (9th Cir. 1998) (internal quotation marks omitted). "When common questions present

4    a significant aspect of the case and they can be resolved for all members of the class in a single

5    adjudication, there is clear justification for handling the dispute on a representative rather than on

6    an individual basis." *Id.* (internal quotation marks omitted).

7            The test for predominance under Rule 23(b)(3) asks "whether proposed classes are

8    sufficiently cohesive to warrant adjudication by representation." *Amchem Products, Inc. v.

9    Windsor*, 521 U.S. 591, 623 (1997). In contrast with commonality under Rule 23(a)(2),

10   predominance focuses on the relationship between common and individual issues. *Hanlon*, 150

11   F.3d at 1022. The test for predominance is "far more demanding" than that for commonality.

12   *Amchem*, 521 U.S. at 623-24.

13           In deciding whether predominance was satisfied in a state class action, the California

14   Supreme Court recently stated that the relevant inquiry regarding control (for the purpose of

15   establishing employee status under California law) is whether there is "a common way to show

16   [the defendant] possessed essentially the same legal right of control with respect to each of [the

17   class members]." *Ayala*, 59 Cal.4th at 533-34. The California Supreme Court faulted the trial

18   court for denying certification on the basis of variations in how the defendant *exercised* control

19   over class members, instead of focusing on variations in the defendant's *right* to exercise that

20   control. The court emphasized: "Whether [the defendant] varied in how it exercised control does

21   not answer whether there were variations in its underlying *right* to exercise that control that could

22   not be managed by the trial court." *Id.* (emphasis in original). The court also cautioned against

23   "focusing too much on the substantive issue of the defendant's right to control [class members],

24   instead of whether that question could be decided using common proof." *Id.* at 537 (internal

25   quotation marks and modifications omitted).

26           Similarly, in *Shepard v. Lowe's HIW, Inc.*, No. 12-cv-03893-JSW, 2013 WL 4488802

27   (N.D. Cal. Aug. 19, 2013), Judge White found that examining each class member's particular

28   "experience, relationship, and interaction" with the defendant would improperly delve into the

14

United States District Court
Northern District of California

1   merits of the underlying misclassification claims.  *Id.* at *5.  Judge White stated: "Although

2   [defendant] may be correct that some of the factual inquiries will vary by individual store and

3   individual [class member], the Court finds that the primary legal issue – [defendant's] right to

4   control [class members] – as well as many of the secondary indicia of classification of the

5   employment relationship – will involve common inquiries."  *Id.*

6          In the prior order, I recognized that much of the evidence going to FAS's right to control

7   was common to all vendors.  Dkt. No. 17.  The record indicated then, as it does now, that FAS's

8   business model is dependent on vendors performing the services that FAS provides, that all

9   vendors execute the same or similar independent contractor agreements with at-will termination

10  provisions,[4] and that vendors performing property preservation work are expected to comply with

11  highly detailed job specifications.  *See id.*

12         Nevertheless, I denied class certification upon finding that individualized questions

13  regarding FAS's right to control predominated over common ones.  Dkt. No. 61 at 16-21.  In so

14  holding, I highlighted the significant differences among FAS's approximately 495 vendors.  Many

15  of them run corporations or LLCs rather than sole proprietorships.  Almost 300 of them have their

16  own employees and pay their own employment taxes.  Some vendors negotiate the terms of their

17  contracts with FAS, including what services they will provide in which geographic areas, how

18  much FAS will pay them for their services, and the number of jobs they will perform within a

19  given time period.  Other vendors accept without negotiation the terms offered by FAS.  Vendors

20  spend varying amounts of time working for FAS – some work fulltime or approximately fulltime,

21  while others work for multiple entities and perform jobs for FAS only occasionally.  I found that

22  these differences created substantial variation in the extent to which FAS has a right to control

23

24  _____

      [4] FAS asserts that its "most recent" independent contractor agreement does not contain an at-will
25  termination provision but rather "specifies a one-year term subject to cancellation by either party
    with thirty-days' notice, and further allows termination for breach by either party subject to a five-
26  day cure provision."  Opp. 3; Hunter Supp. Decl. ¶ 9, Ex. 7.  Whether or not this agreement is
    materially different from FAS's previous independent contractor agreements insofar as the right to
27  control is concerned, it is not clear when FAS first began to use the agreement or how many, if
    any, putative class members executed it.  Accordingly, on the present record, I do not find that the
28  agreement creates sufficient variation among putative class members to materially impact the
    predominance analysis.

each of its vendors.  I also found that several of the secondary factors would require individualized inquiries.  These factors were: (i) distinct business, because many vendors operate their own businesses and/or work for entities other than FAS; (ii) length of time for performance, because while job contracts between FAS and vendors are generally of short duration, e.g., three days, a wholly or substantially dependent vendor might argue that, in effect, it is controlled by FAS for an extended period of time; (iii) method of payment, because this varies according to the negotiating power of the individual vendor and the actual contract entered into; and (iv) the parties' beliefs, because while all vendors signed independent contractor agreements, some may nevertheless believe they are employees.  *Id.* at 18-19.  Overall, I emphasized that it was critical that (i) some vendors negotiate and/or bid for their contracts with FAS, (ii) some vendors hire, manage, and pay their own workers, (iii) and some vendors are not "substantially dependent on FAS for their revenue."  *Id.* at 20.

Plaintiffs' new proposed class definition sufficiently cures these deficiencies.  First, by limiting the class to vendors who "personally performed property preservation work pursuant to FAS work orders" and who did not "primarily perfor[m] rehabilitation or remodel work," the new class definition greatly diminishes the variation among class members with respect to how often and to what extent they negotiate and/or bid for their contracts with FAS.  Plaintiffs have produced evidence showing that FAS distributes to vendors pricelists containing the compensation rates for property preservation work performed under FAS work orders.  *See, e.g.,* Karger Decl. ¶ 6 (Duckworth Decl. Ex. 67, Dkt. No. 66-16); Lopez Decl. ¶ 7 (Duckworth Decl. Ex. 68, Dkt. No. 66-16); Jacques Decl. ¶¶ 7-8 (Duckworth Decl. Ex. 70, Dkt. No. 66-16); Davis Decl. ¶ 6 (Duckworth Decl. Ex. 71, Dkt. No. 66-17).  Although FAS contends that these rates are negotiable and that vendors regularly negotiate them, Opp. 4-5, the record indicates that vendors' power of negotiation with respect to the pricelists is minimal at best, s*ee, e.g.,* Jacques Decl. ¶¶ 7-8 ("I was told the pricelist was set and nonnegotiable . . . I tried on numerous occasions to negotiate an increase in rates, but FAS would not negotiate."); Davis Decl. ¶ 6 ("I initially requested a change in the standard pricing to reflect the travel I would have to do to perform work for FAS.  Initially, FAS agreed to some of my suggested changes to the pricelist, but unfortunately FAS frequently

United States District Court
Northern District of California

1    returned to using the standard pricing.").

2          More importantly for the purposes of this motion, FAS does not identify any evidence

3    indicating significant variation among class members' power of negotiation over the pricelists.

4    The relevant question at class certification is not whether class members' power to negotiate will

5    help or harm plaintiffs' claims, but rather how their power to negotiate will impact whether their

6    claims may be resolved "using common proof." *Ayala*, 59 Cal. 4th at 533-34; *see also Dalton v.*

7    *Lee Publications, Inc.*, 270 F.R.D. 555, 564 (S.D. Cal. 2010) (certifying Rule 23(b)(3) class

8    asserting misclassification claims where "the question of defendant's right to control can be

9    resolved using, for the most part, common proof").  I am satisfied that the new proposed class

10   definition limits the class to a group of vendors whose powers of negotiation and bidding are

11   sufficiently similar to militate in favor of class certification.

12         The new class definition also addresses the problem that some vendors are not

13   "substantially dependent on FAS for their revenue." Dkt. No. 61 at 20.  Simply put, by limiting

14   the class to vendors who work for FAS at least 70 percent of the time, the new class definition

15   effectively limits the class to vendors who *are* substantially dependent on FAS for their revenue.

16   FAS contends that there will still be considerable variation among class members in terms of

17   whether they operate "distinct businesses."  Opp. 9.  FAS observes that even under the new class

18   definition, the class will include some vendors who operate corporations or LLCs and others who

19   operate sole proprietorships, some vendors who rely on hired help and others who do not, and

20   some vendors who provide services for multiple entities and others who work exclusively for

21   FAS.  *See* Opp. 20-21; *see also* Cohick Dep. 20-21 (Cole Decl. Ex. 6, Dkt. No. 70-1)

22   (corporation); Dunham Decl. ¶ 3 (Duckworth Decl. Ex. 69, Dkt. No. 66-16) (sole proprietorship).

23         While this observation appears to be factually accurate, I am not convinced that it matters.

24   In the prior order, I relied in part on *Narayan v. EGL, Inc.*, 285 F.R.D. 473 (N.D. Cal. 2012), in

25   which the court denied certification to a putative class of truck drivers asserting misclassification

26   claims.  Of the 396 putative class members, 127 had hired "sub-drivers." *Id.* at 478.  Some of the

27   putative class members had transitioned to "owner only" roles, meaning that only their sub-drivers

28   continued to perform services for the defendants. *Id.*  Some of the putative class members

provided services for other entities. *Id.* Other putative class members had not hired any sub-drivers and/or provided services exclusively for the defendants. *Id.* The court found that these differences were relevant to the distinct business factor and that to ignore them "would be tantamount to making a substantive finding that [they] cannot change the outcome," a conclusion the court determined was unwarranted by the record. *Id.* at 480.

The new proposed class definition distinguishes this case from *Narayan*. Under the initial proposed class definition, which included essentially all FAS vendors, the variation among vendors with respect to the distinct business factor presented a serious obstacle to establishing predominance. Not so under the new class definition. By limiting the class to vendors who work for FAS at least 70 percent of the time and are thus substantially dependent on FAS for their revenue, the new class definition minimizes the significance of the distinct business factor to the point that variations with respect to that factor are unlikely to materially impact the determination of whether class members are employees or independent contractors. This separates this case from *Narayan* and brings it line with cases in which differences among class members with respect to certain secondary factors did not interfere with a showing of predominance. *See, e.g., Shepard*, 2013 WL 4488802, at *5 (certifying class asserting misclassification claims despite potential variation among class members where "the primary legal issue – [defendant's] right to control the installers – as well as many of the secondary indicia of classification of the employment relationship – will involve common inquiries"); *Norris-Wilson v. Delta-T Grp., Inc.*, 270 F.R.D. 596, 608 (S.D. Cal. 2010) (dismissing variations among class members as not "meaningful" where, "[a]t best, they touch on just three of the [ ] secondary factors," the other secondary factors "are more than likely susceptible to common proof," and "the degree of [defendant's] control over [class members] is susceptible to common proof"); *Dalton*, 270 F.R.D. at 563 (S.D. Cal. 2010) (certifying class where some secondary factors were "less susceptible to common proof" but "the primary factor, the right to control, [was] susceptible to common proof"); *see also Scovil v. FedEx Ground Package Sys., Inc.*, 886 F. Supp. 2d 45, 55 (D. Me. 2012) ("I cannot know with certainty what combination of [ ] factors will drive the final decision on the merits. But it is highly unlikely that the few factors involving individualized evidence will be the

driving determination, especially given [defendant's] business model.").

Similarly, although the new class definition continues to encompass some vendors who hire, manage, and pay their own workers and some who do not, this variation does not defeat predominance in light of the substantial commonalities among the subset of vendors who continue to qualify for class membership. Moreover, plaintiffs have presented evidence indicating that FAS instructs vendors to hire workers, and that FAS retains (and exercises) the right to train and control the workers that vendors hire. *See, e.g.,* Bowerman Dep. 100 (Duckworth Decl. Ex. 5, Dkt. No. 66-1) ("[FAS] instructed us to get more people to help on the work orders."); Gowan Dep. 95 (Duckworth Decl. Ex. 23, Dkt. No. 66-5) ("[FAS] would tell us, you know, it was their words, '[L]egitimize your business.' . . . [T]hey'd tell us, ramp up, you know, get more trucks, get more trailers, get more crews, you know, hire people."); Cohick Dep. 71 (Duckworth Decl. Ex. 26, Dkt. No. 66-6) ("I don't personally train [my employees or subcontractors] . . . [FAS] trained all of the people that I had working for me."). This evidence further minimizes the significance of any distinction between class members who have hired their own workers and those who have not. *See Ruiz*, 754 F.3d at 1103 (finding that class of drivers were employees under California law where, "[a]lthough [defendant] did not require [class members] to obtain additional drivers, the testimony at trial indicated that the impetus for doing so came from [defendant] whenever it had additional need for such drivers," and that "any additional drivers were subject to the same degree of control exerted by [defendant] over [class members] generally").

In sum, plaintiffs' new class definition successfully addresses the concerns regarding predominance set out in the prior order. Under the new class definition, the principle factor of right to control is susceptible to common proof. So are nearly all of the secondary factors. I have already recognized that four of the eight secondary factors are likely to generate common answers for all vendors: (i) whether the work is usually done under the principal's direction; (ii) the skill required; (iii) who supplies the tools and equipment; and (iv) whether the work is part of the principal's regular business. Dkt. No. 61 at 18-19. Under the new class definition, the length of time for performance and method of payment factors are also likely to generate common answers, because all class members are now substantially dependent on FAS for their revenue, and the

19

1   extent to which class members have varying powers of negotiation and bidding appears to have

2   been dramatically reduced, if not eliminated.  And while the distinct business and parties' beliefs

3   factors will continue to vary between class members, neither of these factors is sufficiently

4   probative in this case for the variation within them to defeat predominance.

5        Accordingly, plaintiffs have shown that questions common to the class predominate over

6   individual ones.  This requirement is satisfied.

7        **B.**    **Superiority**

8        Certification under Rule 23(b)(3) requires a showing that class treatment is "superior to

9   other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P.

10  23(b)(3).  Factors relevant to this determination include: "(A) the class members' interests in

11  individually controlling the prosecution or defense of separate actions; (B) the extent and nature of

12  any litigation concerning the controversy already begun by or against class members; (C) the

13  desirability or undesirability of concentrating the litigation of the claims in the particular forum;

14  and (D) the likely difficulties in managing a class action."  *Id.*  "A consideration of these factors

15  requires the court to focus on the efficiency and economy elements of the class action so that cases

16  allowed under [Rule 23(b)(3)] are those that can be adjudicated most profitably on a representative

17  basis."  *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1190 (9th Cir. 2001) (internal

18  quotation marks omitted).

19       FAS focuses on the fourth factor, "the likely difficulties in managing a class action."  *See*

20  Opp. 23-25.  "Commonly referred to as 'manageability,' this consideration encompasses the whole

21  range of practical problems that may render the class action format inappropriate for a particular

22  suit."  *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 164 (1974).  The manageability inquiry

23  includes issues such as "the potential difficulties in notifying class members of the suit, calculation

24  of individual damages, and distribution of damages."  *Six (6) Mexican Workers v. Arizona Citrus*

25  *Growers*, 904 F.2d 1301, 1304 (9th Cir. 1990).  "Manageability concerns must be weighed against

26  the alternatives and will rarely, if ever, be sufficient to prevent certification of a class."  *Trosper v.*

27  *Styker Corp.*, No. 13-cv-00607-LHK, 2014 WL 4145448, at *17 (N.D. Cal. Aug. 21, 2014)

28  (internal quotation marks and modifications omitted).

United States District Court
Northern District of California

1        FAS argues that there is a manageability problem here because plaintiffs' proposed trial

2   plan amounts to the sort of "Trial by Formula" rejected by the Supreme Court in *Wal-Mart Stores,*

3   *Inc. v. Dukes*.  Opp. 23-25.  That characterization is not accurate.  Plaintiffs' proposed trial plan

4   involves two principal phases.  Mot. 24.  In the first phase, FAS's liability for misclassification

5   and associated claims will be tried according to "common proof that goes to FAS's liability to the

6   class as a whole," including FAS documents, testimony from FAS employees, testimony from

7   class members, and expert testimony on the subject of whether class members worked

8   uncompensated overtime or incurred business expenses for which FAS did not indemnify them.

9   *Id.*  If liability is established in this first phase, the parties will proceed to the second phase, in

10  which damages will be determined.  *Id.*  Plaintiffs propose several possible means of determining

11  damages, including through "individual hearings" if necessary.  Reply 14.

12       This is not the sort of "Trial by Formula" rejected in *Dukes*.  There, the trial plan involved

13  selecting a sample set of class members as to whom liability and the resulting backpay award

14  would be determined through individual depositions supervised by a special master.  131 S. Ct. at

15  2561.  "The percentage of claims determined to be valid would then be applied to the entire

16  remaining class, and the number of (presumptively) valid claims thus derived would be multiplied

17  by the average backpay award in the sample set to arrive at the entire class recovery – without

18  further individualized proceedings."  *Id.*

19       In contrast, under plaintiffs' proposed trial plan, FAS's liability will be determined not by

20  reference to the individual claims of a sample set of class members, but, in plaintiffs' words, by

21  "common proof that goes to FAS's liability to the class as a whole."[5]  Mot. 24.  During trial, FAS

22  will have the opportunity to cross examine plaintiffs' witnesses and to present its own evidence to

23  rebut the presumption that the class as a whole should be classified as employees.  Further, unlike

24  the trial plan in *Dukes*, under plaintiffs' proposed trial plan, damages will be considered only once

25  liability is established, at which point FAS will have the opportunity to present individual defenses

26  where appropriate.  This is precisely the sort of trial plan that has been approved on numerous

27

28  [5] I describe plaintiffs' proposed trial plan only to show that defendants' manageability concerns
    are unfounded.  I do not decide here what the actual trial plan for this case will be.

1   occasions in this circuit and elsewhere, both before *Dukes* and after. *See, e.g., Jimenez v. Allstate*

2   *Ins. Co.*, 765 F.3d 1161, 1167-68 (9th Cir. 2014) (affirming bifurcation of class action proceedings

3   into liability phase and damages phase; stating that "[t]his split preserved both [the defendant's]

4   due process right to present individualized defenses to damages claims and the plaintiffs' ability to

5   pursue class certification on liability issues based on the common questions of whether [the

6   defendant] violated California labor law"); *Butler v. Sears, Roebuck & Co.*, 727 F.3d 796, 800 (7th

7   Cir. 2013) ("[A] class action limited to determining liability . . . , with separate hearings to

8   determine – if liability is established – the damages of individual class members, or homogeneous

9   groups of class members, is permitted by Rule 23(c)(4) and will often be the sensible way to

10   proceed"); *Ellis v. Costco Wholesale Corp.*, 285 F.R.D. 492, 539 (N.D. Cal. 2012) (certifying Rule

11   23(b)(3) class where, under plaintiffs' proposed trial plan, "individual class members will present

12   their claims for relief in a second phase of trial if liability is established, and defendant will have

13   an opportunity to present individualized defenses with respect to each class member").

14         FAS argues that the potential need for individualized hearings to determine damages

15   presents a further manageability problem. Opp. 21-22. This argument also fails. The Ninth

16   Circuit has made clear that "[t]he presence of individualized damages cannot, by itself, defeat

17   class certification under Rule 23(b)(3)." *Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 514 (9th Cir.

18   2013). Other circuit courts have reached similar conclusions. *See Butler v. Sears, Roebuck & Co.*,

19   727 F.3d 796, 801 (7th Cir. 2013) ("It would drive a stake through the heart of the class action

20   device . . . to require that every member of the class have identical damages."); *In re Whirlpool*

21   *Corp. Front-Loading Washer Products Liab. Litig.*, 722 F.3d 838, 854 (6th Cir. 2013) ("[N]o

22   matter how individualized the issue of damages may be, determination of damages may be

23   reserved for individual treatment with the question of liability tried as a class action.") (internal

24   quotation marks omitted). Moreover, as the Ninth Circuit recently observed, "[d]amages

25   determinations are individual in nearly all wage-and-hour class actions." 716 F.3d at 513-14.

26   FAS does not offer any persuasive reason why the determination of damages in this case is likely

27   to present a more acute manageability problem than other comparable class actions. Accordingly,

28   I find that "should it become necessary to determine the amount of damages owed to individual

United States District Court
Northern District of California

United States District Court
Northern District of California

1   class members, such an endeavor would not be so cumbersome as to render the case

2   unmanageable." *Trosper*, 2014 WL 4145448, at *18.

3          FAS's manageability concerns are unpersuasive.  The other factors relevant to superiority

4   also indicate that class treatment of this case is "superior to other available methods for fairly and

5   efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  There is no indication that any

6   class members have any significant interest in individually prosecuting their claims against FAS, I

7   am unaware of any other pending litigation concerning the controversy, and it is desirable to

8   concentrate the California state law claims of these class members – most if not all of whom are

9   based in California – in this California forum.  Plaintiffs have established superiority.

10  **III.     FEDERAL RULE OF CIVIL PROCEDURE 23(a)**

11         FAS does not raise any arguments with respect to Rule 23(a)'s numerosity, commonality,

12  typicality, and adequacy requirements, and I find that they are satisfied.

13         **A.     Numerosity**

14         Rule 23(a)(1) requires that the "the class is so numerous that joinder of all members is

15  impracticable."  Fed. R. Civ. P. 23(a)(1).  The party seeking certification "do[es] not need to state

16  the exact number of potential class members, nor is a specific number of class members required

17  for numerosity."  *In re Rubber Chemicals Antitrust Litig.*, 232 F.R.D. 346, 350 (N.D. Cal. 2005).

18  However, courts generally find that numerosity is satisfied if the class includes forty or more

19  members.  *Villalpando v. Exel Direct Inc.*, 303 F.R.D. 588, 605-06 (N.D. Cal. 2014)*; In re

20  Facebook, Inc., PPC Adver. Litig.*, 282 F.R.D. 446, 452 (N.D. Cal. 2012).

21         Here, plaintiffs state that approximately seventy percent of the approximately 495 vendors

22  identified by FAS will qualify for class membership.  Mot. 14-15.  Seventy percent of 495

23  (rounded to the nearest whole number) is 347.  Plaintiffs appear to have generated the 70 percent

24  figure by asking a subset of vendors whether they did not work for any other entity more than 30

25  percent of the time while working for FAS during the class period.  *See* Mot. 15; Petersen Decl.

26  Ex. 1 ¶ 18 (Dkt. No. 65-5).  The figure does not appear to take into account vendors who will be

27  excluded from the class under the other requirements for class membership – i.e., vendors who

28  will be excluded either because they did not personally perform property preservation work in

United States District Court
Northern District of California

1   California pursuant to FAS work orders, or because they primarily performed rehabilitation or

2   remodel work for FAS.  The actual class is thus likely to consist of less than 347 members.

3   Nevertheless, because 347 is well over the minimum number of class members necessary to make

4   joinder impracticable, and because there is no indication that factoring in the other requirements

5   for class membership will dramatically reduce the class size, I find that plaintiffs have established

6   numerosity.

7        **B.**        **Commonality**

8          Even a single common question is sufficient to establish commonality under Rule

9   23(a)(2).  *Dukes*, 131 S. Ct. at 2556; *see also Mazza*, 666 F.3d at 589 ("[C]ommonality only

10  requires a single significant question of law or fact.").  That single common question, however,

11  must be capable of a single common resolution for the class as a whole, meaning that its resolution

12  "will resolve an issue that is central to the validity of each one of the claims in one stroke."  *Dukes*,

13  131 S. Ct. at 2551.  In other words, common questions only support a finding of commonality

14  where they "will generate common answers apt to drive the resolution of the litigation."  *Id.*

15  (emphasis omitted).

16         Commonality is satisfied here.  The key legal issue underlying this case is whether

17  putative class members were misclassified under California law as independent contractors instead

18  of employees.  As discussed above in connection with the predominance requirement, this is a

19  common question that is capable of a common resolution for the class.  Accordingly, it is sufficient

20  to establish commonality.  *See Villalpando v. Exel Direct Inc.*, 303 F.R.D. 588, 606 (N.D. Cal.

21  2014) (holding that "threshold issue" of whether plaintiffs' were employees or independent

22  contractors was sufficient to establish commonality); *Norris-Wilson*, 270 F.R.D. at 604 (finding

23  commonality satisfied where "all members of the putative class were hired by [defendant] and

24  classified as independent contractors pursuant to the same [agreement]," and "the merits of that

25  classification turn on the same set of considerations"); *Smith v. Cardinal Logistics Mgmt. Corp.*,

26  No. 07-cv-02104-SC, 2008 WL 4156364, at *5 (N.D. Cal. Sept. 5, 2008) (finding commonality

27  satisfied on the basis of the question of "whether [ ] putative class members were improperly

28  classified as independent contractors in violation of California law").

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

### C.     Typicality

The typicality requirement of Rule 23(a)(3) assures that the interests of the named representatives align with the interests of the rest of the class. *Hanon*, 976 F.2d at 508. "Under the rule's permissive standards, representative claims are 'typical' if they are reasonably co-extensive with those of absent class members; they need not be substantially identical." *Hanlon*, 150 F.3d at 1020. "The test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Hanon*, 976 F.2d at 508 (internal quotation marks omitted). Class certification may be "inappropriate where a putative class representative is subject to unique defenses which threaten to become the focus of the litigation." *Id.* (internal quotation marks omitted). "[C]lass certification should not be granted if there is a danger that absent class members will suffer if their representative is preoccupied with defenses unique to it." *Id.* (internal quotation marks omitted).

There is no such danger here. FAS makes no argument that the Bowermans are subject to unique defenses, and the record does not indicate that they are. The record does indicate that the Bowermans' claims arise from the same conduct that provides the basis for all class members' claims – namely, FAS's alleged misclassification of vendors as independent contractors and consequent failure to pay overtime wages and indemnify costs. *See Smith*, 2008 WL 4156364, at *5 (finding typicality satisfied where plaintiffs "presented evidence that [defendant] had a corporate practice of classifying delivery drivers as independent contractors and that this practice was common to the overwhelming majority of [defendant's] delivery drivers," including the named plaintiffs). The Bowermans are typical class members. *See Marsh*, 2014 WL 554553, at *8-9 (finding named plaintiff typical where defendants failed to show that she was subject to unique defenses or that her claims were not reasonably co-extensive with those of absent class members).

### D.     Adequacy

"To determine whether named plaintiffs will adequately represent a class, courts must resolve two questions: (1) do the named plaintiffs and their counsel have any conflicts of interest

with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?"  *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 985 (9th Cir. 2011).

Both elements of adequacy are satisfied here.  Like all other class members, the Bowermans are vendors classified by FAS as independent contractors during the putative class period.  There is no indication that either the Bowermans or their counsel have any conflicts of interest with other class members.  Nor is there any indication that the Bowermans and their counsel will fail to vigorously prosecute this action on behalf of the class.  FAS does not argue otherwise.  Plaintiffs have established adequacy.

### CONCLUSION

For the foregoing reasons, the renewed motion for class certification is GRANTED.[6]

**IT IS SO ORDERED**.

Dated: March 24, 2015

WILLIAM H. ORRICK
United States District Judge

---

[6] Plaintiffs' request to strike portions of the evidence submitted by FAS in opposition to plaintiffs' motion is DENIED.  *See* Reply 1-3.

United States District Court
Northern District of California