1  ROBERT G. HULTENG, Bar No. 071293
   rhulteng@littler.com
2  AURELIO PEREZ, Bar No. 282135
   aperez@littler.com
3  ALISON J. CUBRE, Bar No. 257834
   ACubre@littler.com
4  DANTON W. LIANG, Bar No. 303487
   DLiang@littler.com
5  LITTLER MENDELSON, P.C.
   333 Bush Street, 34th Floor
6  San Francisco, CA  94108.2693
   Telephone:     415.433.1940
7  Facsimile:     415.399.8490

8  KEVIN R. VOZZO, Bar No. 288550
   kvozzo@littler.com
9  LITTLER MENDELSON, P.C.
   900 Third Avenue,
10 New York, NY  10022-3298
   Telephone:     212.583.9600
11 Facsimile:     212.832.2719

12 Attorneys for Defendants
   FIELD ASSET SERVICES, INC. and
13 FIELD ASSET SERVICES, LLC

REDACTED
VERSION
OF DOCUMENT
SOUGHT TO BE
SEALED

14

15                    UNITED STATES DISTRICT COURT

16                   NORTHERN DISTRICT OF CALIFORNIA

17                      SAN FRANCISCO DIVISION

18 FRED BOWERMAN and JULIA              Case No.  3:13-CV-00057-WHO
   BOWERMAN, on behalf of themselves
19 and all others similarly situated,      **NOTICE OF MOTION AND
                                           MEMORANDUM OF POINTS AND
20               Plaintiffs,                AUTHORITIES IN SUPPORT OF
                                           DEFENDANTS' MOTION FOR
21        v.                               SUMMARY JUDGMENT [FED. R. CIV. P.
                                           56]**
22 FIELD ASSET SERVICES, INC., FIELD
   ASSET SERVICES, LLC, a successor in    **[PURPORTED CLASS MEMBERS JULIA
23 interest,                               MAGDALENO, MATTHEW COHICK,
                                           AND ERIC ACKEL]**
24               Defendants.
                                          Hon. William H. Orrick
25                                        Complaint Filed:     February 15, 2013
26

27

28

LITTLER MENDELSON, P.C.
333 Bush Street
34th Floor
San Francisco, CA  94104
415.433.1940

NOTICE OF MTN AND MPA ISO DEFS' MSJ                    CASE NO. 3:13-CV-00057-WHO

**TO PLAINTIFFS AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that on February 22, 2017, at 2:00 p.m., or as soon thereafter as the matter may be heard, in Courtroom 2 of the United States District Court for the Northern District of California, located at 450 Golden Gate Avenue, San Francisco, CA 94102, the Honorable William H. Orrick presiding, Defendants Field Asset Services, Inc. and Field Asset Services, LLC (collectively "Defendants"), will, and hereby do, move the Court for summary judgment ("Motion"), as to potential Class Members Julia Magdaleno (previously Bowerman), Matthew Cohick, and Eric Ackel's (i.e., the "Class Members") claims on the following grounds:

First, Ms. Magdaleno's claims should be dismissed as she is not a member of the certified class. The certified class is explicitly limited to individuals "designated by FAS as independent contractors." While Plaintiffs assert that Ms. Magdaleno meets this definition, undisputed evidence shows that this is not the case. Ms. Magdaleno never executed a contract with FAS – either in her personal capacity or on behalf of BB Home Services (a *sole* proprietorship run by Plaintiff Fred Bowerman). As such, there is no evidence that FAS ever "designated" Ms. Magdaleno – as opposed to BB or, at most, Fred Bowerman – as an independent contractor.

However, even if Ms. Magdaleno were a proper class member, summary judgment on her first two claims – for breach of contract and breach of the covenant of good faith and fair dealing – is still proper. Ms. Magdaleno cannot sustain these claims because, again, she never executed a contract with FAS. The only contract FAS entered was with BB Home Services – a company wholly owned and operated by Fred Bowerman. Further, California law is clear that there is no independent claim for breach of the implied covenant of good faith and fair dealing in the employment context, as there is simply no such thing as a claim for "bad faith breach of an employment contract."

Defendants are entitled to judgment on the issue of whether Class Members Cohick and Ackel have been misclassified, because they have insufficient evidence to establish a triable issue of fact on their claims that they were improperly classified as independent contractors under the California Labor Code.

///

LITTLER MENDELSON, P.C.
333 Bush Street
34th Floor
San Francisco, CA 94104
415.433.1940

NOTICE OF MTN AND MPA ISO DEFS' MSJ          1.                    CASE NO. 3:13-CV-00057-WHO

1    Judgment on this issue is proper with respect to Mr. Cohick's claims for all of the

2  following reasons:

3    • Mr. Cohick operated a REDACTED             business, Monster Mowers, that he used to

4    provide property preservation services to a variety of clients before, during, and after

5    the time Monster Mowers contracted with FAS.

6    • Monster Mowers sought, hired, and deployed dozens of its own employees and

7    subcontractors to provide property preservation services to thousands of properties;

8    and

9    • Monster Mowers invested REDACTED           in materials, equipment, labor, and

10    advertising.

11    Judgment on this issue is proper with respect to Mr. Ackel's claims for all of the

12  following reasons:

13    • Class member Eric J. Ackel is an established businessman.

14    • His company engaged 20 people state wide to perform FAS work, 16 of whom he

15    never met.

16    • Mr. Ackel's business was not controlled by FAS.  Mr. Ackel acknowledges that he

17    only accepted FAS work that was profitable to him and his company.

18    For these reasons, Defendants are entitled to summary judgment in their favor.  This

19  motion is made pursuant to Rule 56 of the Federal Rules of Civil Procedure on the ground that there

20  is no genuine issue of material fact as to any of potential Class Members Magdaleno, Cohick, or

21  Ackel's claims, and therefore Defendants are entitled to summary judgment.  This motion is based

22  upon the Memorandum of Points and Authorities, the Declarations of Sarah Hunter and Aurelio

23  Pérez, all records and pleadings on file in this action, and such other evidence or argument as may be

24  properly presented to the Court.

25  Dated: January 4, 2017                    */s/ Aurelio J. Perez*
                                            AURELIO J. PEREZ
26                                          LITTLER MENDELSON, P.C.
                                            Attorneys for Defendants
27                                          FIELD ASSET SERVICES, INC. and
                                            FIELD ASSET SERVICES, LLC
28

LITTLER MENDELSON, P.C.
333 Bush Street
34th Floor
San Francisco, CA  94104
415.433.1940

**NOTICE OF MTN AND MPA ISO DEFS' MSJ**        2.        **CASE NO. 3:13-CV-00057-WHO**

# TABLE OF CONTENTS

**PAGE**

I.     INTRODUCTION TO MOTION ........................................................................... 1

II.    SUMMARY OF ARGUMENT AS TO MS. MAGDALENO'S CLAIMS ........................... 1

III.   FACTS RELEVANT TO MS. MAGDALENO'S CLAIMS ................................... 2

    A.   In Order To Work With FAS, Vendors Contract With FAS Through A Variety Of Contracts And Agreements ....................................................... 2

    B.   Ms. Magdaleno Did Not Contract With FAS ............................................ 2

    C.   There Is No Evidence That Ms. Magdaleno Had An Ownership Interest In BB Home Services ...................................................................................... 3

IV.    ARGUMENT AS TO MS. MAGDALENO'S CLAIMS ........................................... 3

    A.   Ms. Magdaleno Is Not A Proper Class Member ...................................... 3

    B.   Even Assuming Ms. Magdaleno Is A Proper Class Member, Her Contract Claims Still Fail ..................................................................................... 5

        1.   Ms. Magdaleno's First Cause of Action For Breach of Contract Fails Because There Was No Contract Between Ms. Magdaleno and FAS ............ 5

    C.   Ms. Magdaleno's Second Cause of Action for Breach of the Implied Covenant of Good Faith and Fair Dealing Also Fails As A Matter of Law ............... 6

V.     SUMMARY OF ARGUMENT AS TO MR. COHICK'S CLAIMS .................................... 6

VI.    FACTS RELEVANT TO MR. COHICK'S CLAIMS ................................................ 7

    A.   Monster Mowers Business – An Overview ................................................ 7

    B.   Monster Mowers' Relationship With FAS ............................................... 9

        1.   The Vendor Qualification Packets ......................................... 9

    C.   Monster Mowers' Growth With FAS ..................................................... 10

        1.   Monster Mowers' Significant Investment In Equipment............................. 11

        2.   Monster Mowers' Employees and Subcontractors ...................................... 11

    D.   Monster Mowers' Interactions With FAS ................................................ 13

    E.   Monster Mowers' Work After FAS ......................................................... 13

    F.   Monster Mowers Post-FAS Operations .................................................. 14

LITTLER MENDELSON, P.C.
333 Bush Street
34th Floor
San Francisco, CA 94104
415.433.1940

**TABLE OF CONTENTS**
(CONTINUED)

PAGE

VII.     ARGUMENT AS TO MR. COHICK'S CLAIMS ...................................................... 14

     A.    Summary Judgment Standard ................................................................ 14

     B.    Class Member Matthew Cohick Is A Bona Fide Independent Contractor ............... 14

     C.    The Vendor Qualification Packages Between Monster Mowers and FAS ............... 15

     D.    Compared To The Expansive Nature Of Cohick's Operations, FAS Exerted Minimal, If Any, Control .......................................................... 17

     E.    The Secondary Factors Also Support A Finding of Independent Contractor Status ............................................................................ 17

VIII.    SUMMARY OF ARGUMENT AGAINST MR. ACKEL'S CLAIMS ............................. 22

IX.     FACTS RELEVANT TO MR. ACKEL'S CLAIMS .......................................... 23

     A.    Mr. Ackel's Many Business Ventures ...................................................... 23

     B.    Kurb Appeal Inc. ................................................................................ 24

          1.    Kurb Appeal Inc.'s Office And Equipment .................................. 25

          2.    Kurb Appeal's Statewide Personnel .......................................... 25

     C.    Kurb Appeal Inc. and FAS. .................................................................. 26

X.      ARGUMENT AS TO MR. ACKEL'S CLAIMS .............................................. 28

     A.    Standard For Summary Judgment And Independent Contractor Status .................. 28

     B.    The Secondary Factors Also Support A Finding of Independent Contractor Status .......................................................................... 29

XI.     CONCLUSION ............................................................................ 34

LITTLER MENDELSON, P.C.
333 Bush Street
34th Floor
San Francisco, CA 94104
415.433.1940

# TABLE OF AUTHORITIES

PAGE(S)

**Cases**

*Ali v. U.S.A. Cab Ltd.*,
   176 Cal. App. 4th 1333 (2009) .........................................................................14, 15, 29

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986)........................................................................................................14

*Arnold v. Mutual of Omaha Ins. Co.*,
   202 Cal. App. 4th 580 (2011) ............................................................................... *passim*

*Ayala v. Antelope Valley Newspapers, Inc.*,
   59 Cal. 4th 522 (2014) ...........................................................................................15, 21

*Briggs v. California Emp't Comm'n*,
   28 Cal. 2d 50 (1946) ....................................................................................................21

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986)........................................................................................................14

*Elijahjuan v. Superior Court*,
   210 Cal. App. 4th 15 (2012) ..........................................................................................22

*Estrada v. FedEx Ground Package System, Inc.*,
   154 Cal. App. 4th 1 (2007) ............................................................................................22

*Fireman's Fund Ins. Co. v. Davis*,
   37 Cal. App. 4th 1432 (1995) ..................................................................................15, 29

*Garcia v. Seacon Logix, Inc.*,
   238 Cal. App. 4th 1476 (2015) ......................................................................................21

*Germann v. Workers' Comp. Appeals Bd.*,
   123 Cal. App. 3d 776 (Ct. App. 1981)............................................................................29

*Grant v. Woods*,
   71 Cal. App. 3d 647 (1977) ...........................................................................................15

*Guz v. Bechtel*,
   24 Cal. 4th 317 (2000) ....................................................................................................6

*Hennighan v. Insphere Ins. Solutions, Inc.*,
   38 F. Supp. 3d 1083 (N.D. Cal. 2014) ...............................................................18, 19, 20

*Lara v. Workers' Comp. Appeals Bd.*,
   182 Cal. App. 4th 393 (2010) ........................................................................................19

LITTLER MENDELSON, P.C.
333 Bush Street
34th Floor
San Francisco, CA  94104
415.433.1940

NOTICE OF MTN AND MPA ISO DEFS' MSJ            iii            CASE NO. 3:13-CV-00057-WHO

# TABLE OF AUTHORITIES
### (CONTINUED)

PAGE(S)

*McDonald v. Shell Oil Co.*,
44 Cal. 2d 785 (1955) ...................................................................................................15

*Millsap v. Federal Express Corp.*,
227 Cal. App. 3d 425 (1991) ........................................................................................20

*Narayan v. E.G.L., Inc.*,
No. 05-04181 RMW, 285 F.R.D. 473 (N.D. Cal. 2012)................................................30

*Performance Team Freight Sys., Inc. v. Aleman*,
241 Cal. App. 4th 1233 (2015), *reh'g denied* (Nov. 30, 2015) ....................................21

*Real v. Driscoll Strawberry Associates, Inc.*,
603 F.2d 748 (9th Cir. 1979) ........................................................................................17

*Ruiz v. Affinity Logistics Corp.*,
887 F. Supp. 2d 1034 (S.D. Cal. 2012), rev'd and remanded, 754 F.3d 1093 (9th
Cir. 2014) ..............................................................................................................19, 21

*S.G. Borello & Sons, Inc. v. Dep't of Indus. Relations*,
48 Cal. 3d 341 (1989) ........................................................................................ *passim*

*Santa Cruz Transportation, Inc. v. Unemp't Ins. Appeals Bd.*,
235 Cal. App. 3d 1363 (1991) ......................................................................................20

*State Comp. Ins. Fund v. Brown*,
32 Cal. App. 4th 188 (1995) .........................................................................................20

*Tieberg v. Unemp't Ins. Appeals Bd.*,
2 Cal. 3d 943 (1970) ....................................................................................................15

*United Acoustics, Inc. v. Trepte Construction Co.*,
14 Cal. App. 3d 887 (1971) ........................................................................................5, 6

*Varisco v. Gateway Science & Eng'g, Inc.*,
166 Cal. App. 4th 1099 (2008) .....................................................................................15

**Statutes**

Cal. Civ. Code § 1549.....................................................................................................5
Cal. Civ. Code § 1550.....................................................................................................5

**Other Authorities**

Fed. R. Civ. P. 56......................................................................................................14, 28

LITTLER MENDELSON, P.C.
333 Bush Street
34th Floor
San Francisco, CA 94104
415.433.1940

1

### MEMORANDUM OF POINTS AND AUTHORITIES

2

## I.    INTRODUCTION TO MOTION

3
4
5
6
7
8
9
10
11
12

By close of discovery, Plaintiffs had identified forty eight separate individuals who they assert are class members ("Group of 48").   Above and beyond issues related to class membership and the propriety of class adjudication – which are addressed in FAS' motion for decertification – there are many individuals within the Group of 48 whose claims fail as a matter of law.   Some of the Group of 48 never contracted to provide services to FAS, or were listed as a "primary contact" of a vendor, but never received class notice.   Others ran ongoing independent businesses – before and after contracting with FAS – such that no reasonable factfinder could ever determine that they were actually employees of FAS.   As set forth below, FAS moves for summary judgment on the claims of three individuals:   named plaintiff Julia Magdaleno[1], Matthew Cohick, and Eric Ackel.

13
14
15
16
17
18
19
20
21

FAS's motion for summary judgment is made to dispose of the claims of these three individuals.   However, these three individuals have not been chosen because they are the only cases that FAS believes warrant summary adjudication.   Rather these three individuals illustrate the variety of factual obstacles that Plaintiffs face in their misguided effort to prove misclassification.   Stated differently, the claims of these three individuals fail not because they 'all operate big businesses,' but rather because of a constellation of interdependent factors that – while different for each – demand the same summary result.   Summary judgment would be appropriate for many others in the group of 48.   These three are simply illustrative.   For purposes of this motion, each of the three individual's claims will be addressed in turn.[2]

22

## II.    SUMMARY OF ARGUMENT AS TO MS. MAGDALENO'S CLAIMS

23
24

Ms. Magdaleno's claims should be dismissed as she is not a member of the certified class.   The certified class is explicitly limited to individuals "designated by FAS as independent

25
26

[1] Julia Magdaleno was formerly known as Julia Bowerman but changed her name following her divorce from named Plaintiff Fred Bowerman.

27
28

[2] Defendants originally proposed that Plaintiffs stipulate to permitting Defendants to submit three separate summary judgment motions to the Court.   Plaintiffs refused but did agree to stipulate to Defendant's request, granted by the Court, for an extra ten pages to move against the three purported Class Members.

LITTLER MENDELSON, P.C.
333 Bush Street
34th Floor
San Francisco, CA  94104
415.433.1940

**NOTICE OF MOTION AND MPA ISO DEFS'
MSJ [CLASS MEMBER M. COHICK]**                    1.                    **CASE NO. 3:13-CV-00057-WHO**

contractors." While Plaintiffs assert that Ms. Magdaleno meets this definition, undisputed evidence shows that this is not the case. Ms. Magdaleno never executed a contract with FAS – either in her personal capacity or on behalf of BB Home Services (a *sole* proprietorship run by Plaintiff Fred Bowerman). As such, there is no evidence that FAS ever "designated" Ms. Magdaleno – as opposed to BB Home Services or, at most, Fred Bowerman – as an independent contractor.

However, even if Ms. Magdaleno were a proper class member, summary judgment on her first two claims – for breach of contract and breach of the covenant of good faith and fair dealing – is still proper. Ms. Magdaleno cannot sustain these claims because, again, she never executed a contract with FAS. The only contract FAS entered was with BB Home Services, which in turn was wholly owned by Fred Bowerman. Further, California law is clear that there is no independent claim for breach of the implied covenant of good faith and fair dealing in the employment context, as there simply no such thing as a claim for "bad faith breach of an employment contract." Since Ms. Magdaleno must prove the existence of a contract in order to establish her contract claims, and Ms. Magdaleno has admitted she did not enter into a contract with FAS, there are no genuine issues of material fact as to whether FAS breached a contract or any implied duty to Ms. Magdaleno.

## III.    FACTS RELEVANT TO MS. MAGDALENO'S CLAIMS

### A.    In Order To Work With FAS, Vendors Contract With FAS Through A Variety Of Contracts And Agreements.

FAS contracts with independent businesses around the country that have the capability and resources to perform a wide array of property preservation, renovation, and/or rehabilitation services ("vendors") for FAS' clients, which include private and governmental mortgage holders and financial institutions. (Declaration of Sarah Hunter In Support Of Defendants' Motion For Summary Judgment ("Hunter Decl."), ¶ 2.) Vendors contract with FAS by submitting or agreeing to a variety of vendor packets and written contracts. (Hunter Decl., ¶ 3.)

### B.    Ms. Magdaleno Did Not Contract With FAS.

In September 2007, Plaintiff Fred Bowerman began contracting with FAS. As part of this process, Mr. Bowerman completed, signed, and submitted a variety of documents in order to contract and work with FAS as an independent contractor, doing business as "BB Home Services."

LITTLER MENDELSON, P.C.
333 Bush Street
34th Floor
San Francisco, CA  94104
415.433.1940

**NOTICE OF MTN AND MPA ISO DEFS' MSJ**          2.          **CASE NO. 3:13-CV-00057-WHO**

1   (*See*, Deposition of Fred Bowerman, Exh. 1; 20:15-25; 23:21-23; 25:14-24; 39:23-25; 40:1-25; 41:1;

2   43:2-8.)[3]   In contrast, Ms. Magdaleno admits that she never signed or submitted any contractual

3   documents to FAS or any documents identifying her as an owner of BB Home Services.  (Deposition

4   of J. Bowerman (Magdaleno), Exh. 1; 12:23-25; 28:11-13; 174:17-19; 182:22-24; 184:8-13; 185:1-

5   16.)

6         **C.**      **There Is No Evidence That Ms. Magdaleno Had An Ownership Interest In BB**

7                       **Home Services.**

8         On numerous documents that he submitted in 2007, Mr. Bowerman indicated that his

9   business was a "sole proprietorship."  Although Mr. Bowerman married Ms. Magdaleno in 2008, BB

10  Home Services submitted documents to FAS in mid-2009 that continued to identify Mr. Bowerman

11  as the sole owner of BB Home Services.  (Declaration of A. Pérez, ¶ 2, at Exh. 1 [FAS0022944].)

12  Indeed, even on the W-9 form that BB Home Services submitted to FAS in 2012, BB Home Services

13  still held itself out to FAS (and, ostensibly, the Internal Revenue Service) as a sole proprietorship.

14  (*Id.* at ¶ 3, at Exh. 2 [P040667].)

15  **IV.**      **ARGUMENT AS TO MS. MAGDALENO'S CLAIMS**

16        **A.**      **Ms. Magdaleno Is Not A Proper Class Member**

17        Plaintiffs filed a renewed motion for class certification on November 7, 2014, seeking

18  to certify a class limited, inter alia, to : "persons who… were designated by FAS as independent

19  contractors"  (Dkt # 65, 1:7-10.)   In its order granting the motion, the Court concluded that "[t]he

20  first requirement of the definition — i.e., that the person have been designated by FAS as an

21  independent contractor — is an objective characteristic that immediately confines the class to a

22  subset of the approximately 495 vendors that FAS has already identified."  (Dkt # 85, 9:10-14.)   The

23  Court noted that it "use[d] the term 'vendors' to refer to the 'owners' of the businesses, not the

24  businesses themselves."  (Dkt # 85, 1:27:28 (fn. 2).)

25  ///

26

27        [3] True and correct copies of appropriate underlined excerpts of cited deposition transcripts are all

28  attached at Pérez Decl. Exh 25 [F. Bowerman]; Exh. 26 [J. Bowerman, Vol. 1]; Exh. 27 [J. Magdaleno (Bowerman), Vol 2]; Exh. 28 [M. Cohick], and Exh. 29 [E. Ackel].

LITTLER MENDELSON, P.C.
333 Bush Street
34th Floor
San Francisco, CA 94104
415.433.1940

NOTICE OF MTN AND MPA ISO DEFS' MSJ      3.      CASE NO. 3:13-CV-00057-WHO

Plaintiffs' counsel has asserted in open court that Ms. Magdaleno is a class member because she "jointly owned the company [i.e., BB Home Services]" (Dkt # 80, 7:1.) [4]   The implication is that Ms. Magdaleno's purported ownership interest made her a "vendor," and because she was a "vendor," she was designated by FAS as an independent contractor.  This syllogism is factually deficient and logically flawed.

First, discovery has closed and Ms. Magdaleno has failed to provide any documentary evidence that she owned any interest in BB Home Services at any point.  There is no dispute that, from 2007 through 2012, BB Home Services held itself out to FAS as a sole proprietor (Pérez Decl. ¶¶ 2-4, Exhs. 1-3.)  Nor is there any dispute that the term "sole proprietor" is synonymous with "single owner," or that Fred Bowerman – and not Ms. Magdaleno – was the sole proprietor of BB Home Services.

Indeed, if anything, Ms. Magdaleno's initial position in this litigation was that she was *not* an owner of BB Home Services.  In late 2013, FAS served Ms. Magdaleno with discovery asking her to "[a]dmit PLAINTIFFS owned and operated BB HOME SERVICES from at least 2006 through 2012."  (Pérez Decl. Exh. 4).[5]  Ms. Magdaleno categorically "denied [the request] for the answering party," (i.e., herself).   (*Id.*).   Further, during her deposition in early 2014, Ms. Magdaleno's position was clear and unequivocal:

Q. Did you ever consider yourself to be an owner of BB HOME SERVICES?

A. No.  (28:11-17)

Indeed, as late as a month ago, Ms. Magdaleno agreed that she was "an employee of BB Home Services," and that, though she married Mr. Bowerman in November 2008, she continued to receive paychecks from BB Home Services in 2009.  (J. Bowerman (Magdaleno) Depo., Vol. 2, 174:3-22.)  Ms. Magdaleno is no longer married to Fred Bowerman (J. Bowerman (Magdalena) Depo., Vol. 2, 169:15-19.)

---

[4] *See id*. at 8:20-24. (THE COURT: And as the vendors -- the Bowermans -- are class members, but not their employees?  MS. OLIVIER: That's correct, Your Honor. And that piece of the class definition is the definition -- the part that says they're designated by FAS as independent contractors.")
[5] *See also*, Ms. Magdaleno's response to RFA #5.

LITTLER MENDELSON, P.C.
333 Bush Street
34th Floor
San Francisco, CA  94104
415.433.1940

**NOTICE OF MTN AND MPA ISO DEFS' MSJ**          4.          **CASE NO. 3:13-CV-00057-WHO**

1    Even if Ms. Magdaleno believed then or at some point that she was a part owner of

2  BB Home Services, there is no evidence that she ever actually acquired an ownership interest.[6]

3  Ultimately, there is no evidence that Ms. Magdaleno was more than an employee of BB Home

4  Services.  In that respect, she is no different than the *36 (or more) other employees, approximately*

5  *15 subcontractors,* or uncounted number of day laborers that BB Home Services hired – i.e., the very

6  individuals who Plaintiffs' have asserted are <u>not</u> part of this class.  (F. Bowerman Depo., 85:3-4;

7  123:21-25; Pérez Decl., Exh. 5 [Plaintiffs' Responses to Defendant's Special Interrogatories Set

8  One].)

9    **B.    Even Assuming Ms. Magdaleno Is A Proper Class Member, Her Contract
       Claims Still Fail.**
10

11    **1.    Ms. Magdaleno's First Cause of Action For Breach of Contract Fails
            Because There Was No Contract Between Ms. Magdaleno and FAS.**

12    The operative complaint alleges that Plaintiffs and class members entered into a

13  written contract with FAS to perform services for FAS in exchange for payment of those services,

14  and that FAS breached that written agreement.  (Dkt # 4, FAC at ¶¶ 37-38.)  In order to recover on a

15  breach of contract claim under California law, a plaintiff must establish the existence of a contract.

16  Cal. Civ. Code §§ 1549-1550; *United Acoustics, Inc. v. Trepte Construction Co.*, 14 Cal. App. 3d

17  887, 913 (1971).  Here there is no evidence that Ms. Magdaleno entered into a contract with FAS –

18  either personally or on behalf of BB Home Services.  On the contrary, Ms. Magdaleno admitted that

19  she could not recall whether she executed any of the documents that memorialized the contractual

20  relationship between BB Home Services and FAS.  (J. Bowerman (Magdaleno) Depo., Vol. 2,

21  185:12-15; 186:1-13; 189:16-190:1; *cf:* Fred Bowerman Depo., Exh. 1; 20:15-25; 23:21-23; 25:14-

22  24; 39:23-25; 40:1-25; 41:1; 43:2-8).[7]  Thus, by Ms. Magdaleno's own testimony, she cannot meet

23

24  ---

[6] But *see id.* at 195:14-197:18 (asserting that she told *someone* at FAS that she was married and now
an owner of the BB Home Services, but unable to recall whom she told or when the conversation
happened); *cf:* Pérez Decl. Exh. 2 [P040667 (BB Home Services W-9 from April 2012 [i.e., three
25  and half years after the marriage], identifying BB Home Services as a sole proprietorship.)]  FAS
further notes that even between the two named Plaintiffs in this action – individuals who worked for
26  the same business, and who presumably would present the best case for commonality – there are a
number of distinctions that must be considered in order to arrive at a determination as to whether
27  either or both is a class member, let alone misclassified.
[7] In fact, Ms. Magdaleno testified she had never even seen the vendor packet submitted by Fred
28  Bowerman, including BB Home Services' Vendor Packet Checklist, Vendor Qualification Package,

LITTLER MENDELSON, P.C.
333 Bush Street
34th Floor
San Francisco, CA  94104
415.433.1940

NOTICE OF MTN AND MPA ISO DEFS' MSJ          5.          CASE NO. 3:13-CV-00057-WHO

her initial burden of establishing that a contract existed between herself and FAS.  *United Acoustics, supra,* 14 Cal. App. 3d at 913.  It is thus impossible that Ms. Magdaleno will be able to establish FAS breached any contractual obligation it allegedly owed her.  Accordingly, no genuine issue of material fact exists as to Ms. Magdaleno's breach of contract claim and FAS is entitled to judgment as a matter of law.

**C.      Ms. Magdaleno's Second Cause of Action for Breach of the Implied Covenant of Good Faith and Fair Dealing Also Fails As A Matter of Law.**

In her Second Cause of Action, Ms. Magdaleno contends that FAS "breached the covenant of good faith and fair dealing" by not paying Ms. Magdaleno in accordance with California law and by unfairly preventing Ms. Magdaleno from obtaining overtime, expense reimbursements, and other benefits.  (FAC at ¶¶ 42-43.)

FAS is entitled to summary judgment on this claim because no such claim exists in the employment context.  As explained by the California Supreme Court in *Guz v. Bechtel*, 24 Cal. 4th 317, 377 (2000), to the extent an implied covenant claim attempts to enforce terms that were not agreed to between the parties the claim is invalid; to the extent it seeks to enforce terms that are actually part of the contract, it is superfluous.  Either way, there is no independent claim for breach of the implied covenant of good faith and fair dealing in the employment context, as there is simply no such thing as a claim for "bad faith breach of an employment contract."  *Id*.  Ms. Magdaleno's claim not only lacks factual merit as explained above, but is legally invalid and must be dismissed for this reason as well.

## V.      SUMMARY OF ARGUMENT AS TO MR. COHICK'S CLAIMS

Starting in 2003, Matthew Cohick built a REDACTED  property preservation business he called Monster Mowers, Inc. ("Monster Mowers"). Between 2008 and 2013, FAS was one of his clients.  Monster Mowers Inc., had 15-30 employees at any one time, a fleet of trucks, and REDACTED

Monster Mowers

Acknowledgement of Receipt and Compliance with Insurance Coverage Requirements For Independent Contractors, W-9, Vendor Services and Geographic Areas Checklist, or Fred Bowerman's Consumer Report Release Authorization, Driver's License, Letters of Recommendation or Background Check.  (Magdaleno Depo., Vol. 2, 182:22-24; 183:16-22; 184:8–185:4.)

LITTLER MENDELSON, P.C.
333 Bush Street
34th Floor
San Francisco, CA 94104
415.433.1940

NOTICE OF MTN AND MPA ISO DEFS' MSJ            6.            CASE NO. 3:13-CV-00057-WHO

1   even created t-shirts and hooded sweatshirts bearing its name that it sent to FAS and, presumably, its

2   other clients as well.   No reasonable jury could find that FAS exercised such control over Mr.

3   Cohick that he was their employee even as he ran his REDACTED         property preservation

4   business.   For this reason, FAS moves the Court to grant summary judgment as to Mr. Cohick's

5   status as a bona fide independent contractor.

6   **VI.   FACTS RELEVANT TO MR. COHICK'S CLAIMS**

7       **A.   Monster Mowers Business – An Overview**

8       Mr. Cohick opened his business Monster Mowers as a sole proprietorship in 2003.

9   (Cohick Questionnaire p. 4; Cohick Depo., 21:9-12; 21:15-23; 27:7-8.)   "[T]he opportunity arose"

10  for Mr. Cohick to enter the landscaping business after he was introduced to the industry through a

11  neighbor, and Mr. Cohick seized that opportunity.   (Cohick Depo., 25:4-12.)   When he started the

12  business, he offered his clients a complete range of landscaping services, "from installation to

13  maintenance."   (Cohick Depo., 22:11-23:12.)   Monster Mowers advertised its landscaping services

14  in classified ads (the Pennysaver).   (Cohick Depo., 51:18-53:8.)   Monster Mowers' clients were

15  private homeowners, and the company provided both one-time and recurring services.   (Cohick

16  Depo., 27:9-29:14.)

17      On June 24, 2010, Monster Mowers re-organized as a corporation by, inter alia,

18  executing articles of incorporation, electing Mr. Cohick as a director of the corporation, authorizing

19  the issuance of shares of the corporation, and filing the paperwork with California's secretary of

20  state for endorsement.   (Pérez Decl., Exh. 6 [P065720-65722]).   The corporation was still active as

21  of July 2016.   (*Id.,* Exh. 7 [Cohick Questionnaire p.4, 17].)   In 2011, Monsters Mowers was issued a

22  California State contractor's license.   (Pérez Decl. Exh. 20 [P065706].)

23      From 2006 to 2013, Monster Mowers first provided property preservation services in

24  the following counties: Los Angeles, Kern, and San Bernardino.   (Cohick Depo., 35:14-36:20.)

25  After Monster Mowers stopped contracting with FAS in 2013, the company expanded its service

26  area to cover both Ventura County and Orange County.   (Cohick Depo., 36:21-38:2.)   The company

27  maintained Vehicle Liability Insurance, Errors & Omissions Insurance, and Workers Compensation

28  insurance.   (Cohick Depo., 17:6-18:2.)

LITTLER MENDELSON, P.C.
333 Bush Street
34th Floor
San Francisco, CA  94104
415.433.1940

NOTICE OF MTN AND MPA ISO DEFS' MSJ       7.       CASE NO. 3:13-CV-00057-WHO

1    Mr. Cohick has not disclosed the amount his business earned during its first years of

2    operations (i.e., from 2003 to 2007) or for the years after it quit contracting with FAS (i.e., 2014-

3    2016). However, during the interim period, Monster Mowers generated income REDACTED

4    (Pérez Decl., Exh. 8 [P065660-65].) Over the six-year period for

5    which data was REDACTED

6    ), had average annual labor costs in excess of a REDACTED

7    and had average annual net earnings of REDACTED

8    Initially, Mr. Cohick declared that he had "worked exclusively for FAS from 2006

9    until late 2012."[8] However, Mr. Cohick later modified his position – again under oath – to note that

10   "from 2006 to August 1st, 2012, 99.9 percent of the time all [his] work was [from] Field Asset

11   Services." (Cohick Depo., 31:9-31:23.) Mr. Cohick has described Monster Mowers' work for FAS'

12   competitors as "just a few work orders." (*Id.* at 31:14-32:14.) For purposes of this motion, FAS will

13   not dispute Mr. Cohick's representation. Yet irrespective of Mr. Cohick's contentions regarding the

14   amount of work orders, Monster Mowers' own documents indicate that the company earned

15   REDACTED                          from sources that were not FAS. For example, in 2009 Monster

16   Mowers earned REDACTED

17                                                                                          Further, in

18   both 2010 and 2012, the discrepancy between the REDACTED

19

20   (*Id.* at Exhs. 10-11 [P656811CONFIDENTIAL; P656812CONFIDENTIAL]; *cf*;

21   Exh. 8)[9] A tabulation of Monster Mowers' iREDACTED

22                              demonstrates both the scope and growth of the business.

23

24   [8] *See* [Dkt # 43-13, ¶2 (signed 5.22.14)]. Notably, Plaintiffs' relied on this very paragraph of Mr.
     Cohick's declaration in their 6.3.14 Motion for class certification (Dkt # 43, 11:12). More
25   surprisingly, they relied on this same paragraph in their renewed motion even after it had been
     discredited (Dkt # 65, 3: 26-27, n. 3, in support of the assertion that "[a]ll class members [including
26   Mr. Cohick] were or are dependent upon FAS for their livelihood.")
     [9] Monster Mowers has not provided complete records detailing the source of REDACTED
27   However, in 2009 Monster Mowers REDACTED
                                                                                          (Pérez
28   Decl., Exh. REDACTED

LITTLER MENDELSON, P.C.
333 Bush Street
34th Floor
San Francisco, CA  94104
415.433.1940

# REDACTED

**B.      Monster Mowers' Relationship With FAS**

      **1.      The Vendor Qualification Packets.**

      Monster Mowers first completed a vendor qualification packet with FAS in April, 2007.  The purpose of the packet was clear:  "[u]pon completion of the required documentation, your company will be added to our approved vendor list."  By this point, Mr. Cohick's business had been in operation for a number of years and, apparently, was already significant.    The Vendor Qualification Packet asked Monster Mowers to disclose the "Number of Properties Able To

---

[10] This table is compiled from documents produced by Mr. Cohick.  (*See* Pérez Decl. Exhs. 8-12.)
[11] This difference counts only the years in which Mr. Cohick produced both a 1099 showing his income from FAS and business records showing his total income.

LITTLER MENDELSON, P.C.
333 Bush Street
34th Floor
San Francisco, CA  94104
415.433.1940

Handle"; Monster Mowers wrote in "1000+." (Pérez Decl., Exh. 13, [FAS003766-3769, specifically FAS03769]).  In July of 2007, Monster Mowers completed another vendor packet to expand the range of services it could offer to include rekeys, board ups, debris removal, janitorial services, winterizations, vehicle removal, repairs (such as plumbing and roofing), demolition, and evictions. (Pérez Decl., Exh. 14, [FAS003774-3791]).  Monster Mowers even took the opportunity to write in another service – "drain pools" – that it was willing to provide.  (*Id.* at FAS003791)

Following its incorporation, Monster Mowers completed another service packet.  This agreement included the following language:

**Independent Contractor**

In fulfilling its obligations under this Agreement, you or your company will be acting as an independent contractor.  You understand and agree that this Vendor Qualification Packet does not create any agency, partnership, joint venture or similar relationship between the parties...  You acknowledge that your personnel are (i) not eligible for any compensation from, or other employee benefits of, FAS by reason of your engagement under this Vendor Qualification Packet....

(Pérez Decl., Exh. 15, [FAS022234-49, especially FAS022239].)  Mr. Cohick recognizes that the agreement was intended to create "a contract between a business (FAS) and an independent contractor ([Cohick])."  (Pérez Decl., Exh. 7 [Cohick Questionnaire p. 5].)

Once Monster Mowers entered the realm of property preservation with FAS, the company expanded the services offered from just landscaping to offering a whole range of services related to bank-owned properties such as trash outs, winterizations, rekeys (replacing the locks so the bank has access), and other types of repairs.  (Cohick Depo., 22:11-24:10.)

C.     **Monster Mowers' Growth With FAS**

According to Mr. Cohick's testimony and the documents provided, Monster Mowers grew significantly while providing services to FAS.  During that time period, Monster Mowers made significant investment in equipment and personnel.  Over the course of the six years contractual relationship, Monster Mowers spent over REDACTED                        .[12]

---

[12] Mr. Cohick refers to these expenditures as: "(Advertising) Christmas gift to all FAS coworkers," FAS disputes Mr. Cohick's characterization of FAS employees as "coworkers," and notes the irony given that these 'coworker gifts' apparently all bore the name of Cohick's company.  (Pérez Decl. Exh. 8, Declaration of Sarah Hunter [Dkt # 50-2, ¶ 24, Exh. C].)

LITTLER MENDELSON, P.C.
333 Bush Street
34th Floor
San Francisco, CA  94104
415.433.1940

NOTICE OF MTN AND MPA ISO DEFS' MSJ          10.          CASE NO. 3:13-CV-00057-WHO

### 1.    Monster Mowers' Significant Investment In Equipment

Up until 2006, Monster Mowers operated with a single truck, a lawnmower, a weed whacker, a leaf blower, and a chainsaw.  (Cohick Depo., 78:6-79:2.)  However, once the company began working with FAS, Monster Mowers acquired computers, cell phones, computer software, cameras, fax machine and a printer.  (Cohick Depo., 45:9-48:5.)  When Monster Mowers expanded its range of services, it acquired further equipment such as an air compressor and hedge trimmer. (Cohick Depo., 79:3-17.)  Overall, from 2006 through 2013, Monster Mowers continued to grow to the point that *every year* the company acquired "another truck or dump trailer" in addition to those already in its fleet.  (Cohick Depo., 79:18-81:1.)  At its peak, Monster Mowers owned 13 trucks, three of which were flatbed trucks with dump lifts on them, and three additional dump trailers. (Cohick Depo., 81:2-21.)  At the time of his deposition, i.e., more than a year after Monster Mowers stopped contracting with FAS, the company was still using three to five of these trucks to provide property preservation services on a daily basis.  (Cohick Depo., 82:8-22.)

### 2.    Monster Mowers' Employees and Subcontractors

When Monster Mowers first started, it had no employees besides Mr. Cohick.  (Perez Decl., Exh. 7 [Cohick Questionnaire p. 11]; Cohick Depo., 58:6-23.)   But from 2006 to 2014, Monster Mowers employed no fewer than 15 individuals at any one time, and that number may have been as high as 30 people.  (Cohick Depo., 60:14-61:3.)[13]  While most of the company's employees worked in the field, beginning in approximately 2010 Mr. Cohick hired at least one individual to complete the administrative work associated with his business, including the invoicing of non-FAS clients.  (Cohick Depo., 56:24-57:13; 61:9-62:4.)   Monster Mowers' employees received checks from Monster Mowers for their work, in the same manner, regardless of the client.  (Cohick Depo., 74:19-76:7.)

In addition to these employees, from 2006 to 2011, Monster Mowers also utilized the services of 15-30 subcontractors.  (Cohick Depo., 64:8-65:8.)  Monster Mowers continued to rely on subcontractors, albeit less (i.e., fewer than 10), from 2011 through at least mid-2014.   These

---

[13] Mr. Cohick's REDACTED                                                 demonstrates the scope of the workforce Monster Mowers engaged. (Pérez Decl., Exh. 8.)

LITTLER MENDELSON, P.C.
333 Bush Street
34th Floor
San Francisco, CA  94104
415.433.1940

subcontractors did everything from "lawn maintenance, initial services, trash, cleaning, winterization, repairs, rekeys.  And then just other home repairs from plumbing to roofing to whatever the repairs on the property needed." (Cohick Depo., 65:16-67:5.)  Mr. Cohick estimates that since 2012, subcontractors had completed up to 10% of Monster Mowers' work.  (Cohick Depo., 67:6-68:13.)    Monster Mowers' self-reported REDACTED

REDACTED (Pérez Decl., Exh. 8 [P656815; P656810 – CONFIDENTIAL].)[14]

No one at FAS forced Mr. Cohick to hire employees.  (77:19-78:5.)  Indeed, when asked whether "any representative from FAS [had] ever instruct[ed Mr. Cohick] or anyone else at Monster Mowers to hire employees," Mr. Cohick admitted that FAS left it up to him to determine how to complete work:  "And they [FAS representatives] explained to me that: If you can't do it, we'll find somebody else, you know.  If you want to try to go out and get some help, you can go out and get some help to get these properties taken care of, you know." (Cohick Depo., 77:14-78:4.)  Monster Mowers found these employees and subcontractors through advertisements.  (Cohick Depo., 62:5-13; 65:9-15.)  Monster Mowers' employees sometimes completed property preservation work outside Mr. Cohick's presence.  (Cohick Depo., 110:7-15.)

Notably, several of Monster Mowers' former workers have sued the company alleging that they were misclassified.  (Cohick Depo., 122:21-125:13.)[15]  For example, in 2010, Patrick McGinty sued Monster Mowers and Mr. Cohick alleging misclassification.  (Pérez Decl., Exh. 16 [McGinty lawsuit], ¶¶ 8, 18)  Mr. McGinty specifically alleges that, as part of his work as a "general laborer" he "used a company [i.e., Monster Mowers] truck, the company credit card to fill the truck with gas, dressed in a company uniform, used company tools and… that Defendants [i.e., Monster Mowers and Mr. Cohick] dictated [Mr. McGinty's] work schedule, directed [Mr. McGinty] on job sites, and each day [provided Mr. McGinty] instructions for the day, the list of job sites, and directions necessary to perform each job. (*Id.* at ¶ 9; *see also Id.* at Exh. 17 [Anderson lawsuit [filed

---

[14]  These expenses are described as "[r]epairs and maintenance that I could not do for FAS, found another contactor to do the repairs for FAS."
[15]  Mr. Cohick has failed to produce any documents related to any of these lawsuits, although at least one of the lawsuits was still pending at the time of his 2014 deposition.  When completing the Discovery Vendor Questionnaire in this case, Mr. Cohick chose to omit the name s of three former employees who have filed employment lawsuits against Monster Mowers, Inc.

LITTLER MENDELSON, P.C.
333 Bush Street
34th Floor
San Francisco, CA  94104
415.433.1940

NOTICE OF MTN AND MPA ISO DEFS' MSJ                    12.                    CASE NO. 3:13-CV-00057-WHO

3.3.11]], ¶¶10-11 32, 92 [similar allegations of misclassification and control]; *Id.* at Exh. 18 [Almanza lawsuit [filed 8.20.13]], ¶¶ 9-10, 12 [same, further alleging that plaintiff Manuel Munoz was hired as a "Field Supervisor" of a "crew"].)

**D.    Monster Mowers' Interactions With FAS**

Monster Mowers completed thousands of work orders for FAS over a period of seven years.  (Cohick Depo., 116:11-15.)   Of those thousands of work orders, FAS only physically inspected a "couple" a year. (Cohick Depo., 110:24-111:18.)  Mr. Cohick further testified that only "a couple times" over seven years did FAS representatives provide input regarding who was to complete the work or ask Mr. Cohick to be present for specific jobs.  Relatedly, only "probably a couple times" over "seven years and thousands and thousands of work orders" did FAS ask Monster Mowers to send certain employees to a job.  (Cohick Depo., 114:14-24; 115:15-116:15.)

**E.    Monster Mowers' Work After FAS**

Between August of 2012 and the end of its relationship with FAS in May of 2013, Monster Mowers did 10-20% of its work for other property preservation companies, such as Asset Management Specialists ("AMS").  (Pérez Decl., Exh. 7 [Cohick Questionnaire p.6]; Cohick Depo., 32:15-33:21.[16])  Importantly, during the time that Monster Mowers was providing services to FAS, FAS lost its contract with Fannie Mae, which significantly decreased the amount of work available to Monster Mowers.  (Cohick Depo., 117:13-118:21.)  However, instead of seeking other work with FAS, Monster Mowers followed the Fannie Mae business.  Mr. Cohick testified that once the Fannie Mae business went to AMS, Monster Mowers began contracting with them as a vendor.[17] (*Id* at 117:13-118:21; 119:11-120:1; 120:25-121:8.)  In July 2013, FAS ended its contractual relationship with Monster Mowers after ongoing issues with the quality of the work Monster Mowers provided. (Pérez Decl., Exh. 21 [FAS020788].)

///

---

[16] Mr. Cohick testified at deposition he did not remember the percentages, and would need to look them up.  As a result, Defendant relies on his Questionnaire, which was completed on his own time on July 11, 2016.
[17] Notably, Mr. Cohick has failed to provide specific information about the amount of income his business received from its work with AMS.

LITTLER MENDELSON, P.C.
333 Bush Street
34th Floor
San Francisco, CA 94104
415.433.1940

NOTICE OF MTN AND MPA ISO DEFS' MSJ          13.          CASE NO. 3:13-CV-00057-WHO

### F.   Monster Mowers Post-FAS Operations

Following the end of its contract with FAS, Monster Mowers has continued to provide the same property preservation services – "landscape maintenance, trash outs[, a]nything that needs to be repaired at a bank-owned property" – for other clients including  real estate brokers and agents.  (Cohick Depo., 24:2-10;  34:3-9.)  Further, at the time of Mr. Cohick's deposition, Monster Mowers coordinated these services from the same office location that it had used to provide services to FAS.  (*Id.* at 43:13-45:8; 50:4-51:17.)

At the time of Mr. Cohick's deposition, Monster Mowers was still providing property preservation services to clients in the same industry as FAS, including AMS, Cyprexx, MSI, and National Field Network ("NFN").  (Cohick Depo., 38:38:3-39:1.)  At that same time, AMS made up 40-60% of the company's business.  (Cohick Depo., 41:12-42:17.)

## VII.   ARGUMENT AS TO MR. COHICK'S CLAIMS

### A.   Summary Judgment Standard

Summary judgment is an integral part of the Federal Rules designed "to secure the just, speedy and inexpensive determination of every action."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).  Under Federal Rule Civil Procedure 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(c).  The Rule is clear in "provid[ing] that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

### B.   Class Member Matthew Cohick Is A Bona Fide Independent Contractor

Under California law, "the principal test of an employment relationship is whether the person to whom service is rendered has the right to control the manner and means of accomplishing the result desired."  *S.G. Borello & Sons, Inc. v. Dep't of Indus. Relations*, 48 Cal. 3d 341, 350 (1989) ("*Borello*").  "[T]he right to exercise complete or authoritative control must be shown, rather than mere suggestion as to detail."  *Ali v. U.S.A. Cab Ltd.*, 176 Cal. App. 4th 1333, 1347 (2009).  "A worker is an independent contractor when he or she follows the employer's desires only in the result

LITTLER MENDELSON, P.C.
333 Bush Street
34th Floor
San Francisco, CA  94104
415.433.1940

NOTICE OF MTN AND MPA ISO DEFS' MSJ          14.                    CASE NO. 3:13-CV-00057-WHO

1    of the work, and not the means by which it is achieved." *Id.*; *see, also, Varisco v. Gateway Science*

2    *& Eng'g, Inc.*, 166 Cal. App. 4th 1099, 1103 (2008); *Fireman's Fund Ins. Co. v. Davis*, 37 Cal. App.

3    4th 1432, 1442-43 (1995) (one who hires an independent contractor may still retain a general power

4    of supervision and control as to the results of the work so as to ensure satisfactory performance of

5    the contract).  Specifically,

> [T]he owner may retain a broad general power of supervision and control as to the results of the work so as to insure satisfactory performance of the independent contract—including the right to inspect, the right to make suggestions or recommendations as to details of the work, the right to prescribe alterations or deviations in the work — without changing the relationship from that of owner and independent contractor.

10    *McDonald v. Shell Oil Co.*, 44 Cal. 2d 785, 790 (1955).

11        Here, Monster Mowers completely controlled its own operations.  On its own

12    initiative, Monster Mowers grew to be a REDACTED with dozens of employees and

13    subcontractors, extensive equipment, and a fleet of vehicles, that it used to provide property

14    preservation services to a number of clients – before, during, and after the time period it provided

15    services to FAS.

16       **C.**      **The Vendor Qualification Packages Between Monster Mowers and FAS**

17        Where the parties have entered into a written contract, determining the extent of the

18    alleged employer's legal right to control "without full examination of the contract will be virtually

19    impossible." *Ayala v. Antelope Valley Newspapers, Inc.*, 59 Cal. 4th 522, 535 (2014); *See also*

20    *Tieberg v. Unemp't Ins. Appeals Bd.*, 2 Cal. 3d 943, 952 (1970) (written agreements are a

21    "significant factor" in assessing the right to control); *Grant v. Woods*, 71 Cal. App. 3d 647, 653

22    (1977) ("Written agreements are of probative significance" in evaluating the extent of a hirer's right

23    to control.).  Here, Mr. Cohick signed three agreements with FAS, one of which contained

24    unequivocal language establishing the relationship as that of contractors:

**Independent Contractor**

> In fulfilling its obligations under this Agreement, you or your company will be acting as an independent contractor.  You understand and agree that this Vendor Qualification Packet does not create any agency, partnership, joint venture or similar relationship between the

LITTLER MENDELSON, P.C.
333 Bush Street
34th Floor
San Francisco, CA 94104
415.433.1940

**NOTICE OF MTN AND MPA ISO DEFS' MSJ**      15.      **CASE NO. 3:13-CV-00057-WHO**

> parties... You acknowledge that your personnel are (i) not eligible for any compensation from, or other employee benefits of, FAS by reason of your engagement under this Vendor Qualification Packet… .

(Pérez Decl., Exh. 13 [FAS022234-51].)  This paragraph merely memorialized the existing and ongoing rights and limitations between the parties.  Though signed in 2012, Mr. Cohick can point to no evidence that his relationship with FAS was any different before or after that date. Mr. Cohick intended that his relationship with FAS be that of a principal/independent contractor when he signed the agreement, and that is in fact the relationship FAS and Monster Mowers maintained. (Pérez Decl., Exh. 7 [Cohick Questionnaire p. 5].)

Mr. Cohick built his business fervently and effectively with regard to the area in which FAS had *no* right to control: personnel.  None of the agreements with FAS places any limitations on whether or how many employees or subcontractors Monster Mowers could use.  This freedom permitted Monster Mowers to represent that it could handle "1000+" properties and, later, to perform property preservation work that was even outside the abilities of its employees.  (Pérez Decl., Exh. 13, at FAS003769.)  It was Mr. Cohick, and not FAS, who decided to grow his business from one landscaper (himself) to dozens of employees and subcontractors – an expansion that allowed Monster Mowers to REDACTED (Cohick Depo., 105:21-106:6; Pérez Decl., Exh. 8.)  When Mr. Cohick started Monster Mowers in 2003, the business had limited equipment.  (Cohick Depo., 78:6-79:2.)  By the time Mr. Cohick decided to follow FAS's client, Fannie Mae, to one of FAS's competitors in 2013, Monster Mowers had 15-30 employees, and owned 13 vehicles.  (Cohick Depo., 60:14-61:3; 81:2-21.)  From 2008 through 2013, Monster Mowers REDACTED

(Pérez Decl. Exh. 8.)  No reasonable jury could find that Mr. Cohick was just a puppet of FAS, forced to maintain and grow a profitable business by increasing its assets, hiring a larger workforce,  incorporating, seeking licensure, and advertising for further business, all the while providing property preservation services to FAS and its competitors.

///

///

///

LITTLER MENDELSON, P.C.
333 Bush Street
34th Floor
San Francisco, CA 94104
415.433.1940

NOTICE OF MTN AND MPA ISO DEFS' MSJ        16.        CASE NO. 3:13-CV-00057-WHO

**D.  Compared To The Expansive Nature Of Cohick's Operations, FAS Exerted Minimal, If Any, Control.**

Monster Mowers completed thousands of work orders for FAS over a period of seven years.  (Cohick Depo., 116:11-15.)  Of those thousands of work orders, Mr. Cohick admits that FAS only physically inspected a "couple" a year.  (Cohick Depo., 110:24-111:18.)  Further, only "a couple times" did FAS representatives ask Mr. Cohick to personally be present for any specific jobs.  (Cohick Depo. 114:14-24.)  In addition, Mr. Cohick testified that FAS provided input only "probably a couple of times" as to which of Monster Mowers' employees should or should not complete a specific work order.  (Cohick Depo., 115:15-116:15.)  Taken together it is clear that Mr. Cohick – or Monster Mowers' other workers – maintained and exercised day-to-day supervision over the work that Monster Mowers' workers and subcontractors performed.

**E.  The Secondary Factors Also Support A Finding of Independent Contractor Status.**

In determining independent contractor status, courts also look to a variety of secondary factors set forth in *Borello*.  These secondary factors include, but are not limited to: (a) whether the one performing services is engaged in a distinct occupation or business; (b) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the principal or by a specialist without supervision; (c) the skill required in the particular occupation; (d) whether the principal or the worker supplies the instrumentalities, tools, and the place of work for the person doing the work; (e) the length of time for which the services are to be performed; (f) the method of payment, whether by the time or by the job; (g) whether or not the work is a part of the regular business of the principal; (h) whether or not the parties believe they are creating the relationship of employer-employee; (i) the alleged employee's opportunity for profit or loss depending on his managerial skill; (j) the alleged employee's investment in equipment or materials required for his task, or his employment of helpers; (k) the degree of permanence of the working relationship; and (l) whether the relationship was exclusive.  *Borello* at 351 (citing *Real v. Driscoll Strawberry Associates, Inc*., 603 F.2d 748, 754 (9th Cir. 1979)); *Arnold v. Mutual of Omaha Ins. Co.*, 202 Cal. App. 4th 580 (2011) ("*Arnold*").

LITTLER MENDELSON, P.C.
333 Bush Street
34th Floor
San Francisco, CA  94104
415.433.1940

NOTICE OF MTN AND MPA ISO DEFS' MSJ          17.          CASE NO. 3:13-CV-00057-WHO

The Court must weigh these factors as a whole, rather than apply them mechanically as separate tests. *Borello* at 351. These "'individual factors' [are] not to be 'applied mechanically as separate tests' but [are] 'intertwined' and often given weight depending on the particular combination of factors." *Arnold* at 584 (2011) (quoting *Borello* at 351). "Even if one or two of the individual factors might suggest an employment relationship, summary judgment is nevertheless proper when, as here, all the factors weighed and considered as a whole establish that [Plaintiffs were] independent contractor[s] and not [] employee[s]… ." *Id.* at 590.

Here, all twelve factors weigh in favor of independent contractor status:

- **Distinct Occupation Or Business**[18] – Mr. Cohick started Monster Mowers in 2003 – at least three years before he started providing property preservation services to FAS. Mr. Cohick later incorporated his business. Monster Mower's obtained a contractor's license for its business and provided property preservation services to FAS as well as its competitors. (Pérez Decl. Exh. 19-20.)

- **Whether The Work Is Usually Done Without Supervision** – At best "a couple" out of "thousands and thousands" of work orders were physically reviewed by FAS. Notably this review likely would have occurred *after* the work was completed and not while Monster Mowers' employees or subcontractors were performing the work. In short, the work Monster Mowers performed – whether by Mr. Cohick or the dozens of other workers or subcontractors – was not supervised by FAS.

- **The Skill Required In The Particular Occupation** – Beyond lawn services and janitorial work, Monster Mowers indicated its willingness to perform the following types of services: vehicle removal, repairs (such as plumbing and roofing), demolition, evictions, and pool draining. Further, with respect to work that was arguably more menial, the *skill* that Monster Mowers brought was not its ability to mow a lawn but rather the company's professed ability to handle lawn care services for "1000+" properties – including all the equipment needs and logistics arising from this workload.

---

[18] "If a worker is engaged in a distinct occupation or business, then that would suggest that the worker is an independent contractor rather than an employee." *Hennighan v. Insphere Ins. Solutions, Inc.*, 38 F. Supp. 3d 1083, 1145 (N.D. Cal. 2014).

LITTLER MENDELSON, P.C.
333 Bush Street
34th Floor
San Francisco, CA 94104
415.433.1940

- **Who Supplies The Instrumentalities, Tools, And The Place Of Work** – Monster Mowers supplied all the tools needed to perform the work – from the office space and office equipment, to the lawn care equipment and the vehicles that transported the equipment, to the dozens of employees and subcontractors who actually performed the overwhelming majority of the work.

- **The Method Of Payment, Whether By The Time Or By The Job** – Monster Mowers was paid by the job, not the hour.  (Pérez Decl. Exh. 13-15.)

- **Whether The Work Is A Part Of The Regular Business Of FAS** – While FAS coordinates the provision of property preservation services, it does not, itself provide property preservation services.

- **The Intent Of The Parties** – Mr. Cohick intended to create an independent contractor relationship when he signed the original agreement with FAS.  (Pérez Decl., Exh. 7 [Cohick Questionnaire p. 5].)  The documents that Mr. Cohick signed further reference his company being a vendor for FAS and detail the parties' intent to enter into an independent contractor relationship.  (*Id.* at Exh. 15 [especially FAS022239])

- **Opportunity For Profit Or Loss** – One trait that almost no employees have – and which, conversely, is central to a true independent contractor/principal relationship – is "the opportunity for entrepreneurial profit or loss depending upon his/her managerial skills."  *Borello* at 351.  An individual whose business "ha[s] the potential for profit, and [the individual's] operation of their businesses… potentially influenced this profit," that person is more likely to be an independent contractor.  *Ruiz v. Affinity Logistics Corp.*, 887 F. Supp. 2d 1034, 1050 (S.D. Cal. 2012), rev'd and remanded, 754 F.3d 1093 (9th Cir. 2014); *see also Lara v. Workers' Comp. Appeals Bd.*, 182 Cal. App. 4th 393, 401 (2010) (concluding plaintiff was an independent contractor where "profit or loss depended on his scheduling, the time taken to perform the services, and his investment in tools and equipment.").  For example, "controlling the amount of time, effort, and financial investment" makes one much less likely to be an employee.  *Hennighan*, 38 F. Supp. 3d at 1092 (concluding independent insurance agent was independent contractor).  The undisputed facts show that Monster Mowers – and Mr. Cohick as its sole owner – had opportunities for profit and loss REDACTED

Specifically, the growth of Monster Mowers into a REDACTED

1    REDACTED

2

3         all point to the profit opportunities that Monster Mowers enjoyed.

4         • **Investment In Equipment Or Materials** – "Where the defendant 'did not furnish

5    the majority of the tools and instrumentalities' nor 'a place to work' this fact weighs in favor of

6    finding an independent-contractor relationship." *Hennighan*, 38 F. Supp. 3d at 1047. *See Arnold* at

7    589 (granting summary judgment for defendant in part because plaintiff "was responsible for her

8    own instrumentalities or tools with the exception of limited resources offered by Mutual to enhance

9    their agents' successful solicitation of Mutual's products"). *See also State Comp. Ins. Fund v.*

10   *Brown,* 32 Cal. App. 4th 188, 203 (1995); *Millsap v. Federal Express Corp.,* 227 Cal. App. 3d 425,

11   431 (1991) (evidence of an independent contractor relationship where the driver used his own

12   vehicle and paid for his own business expenses) *cf. Santa Cruz Transportation, Inc. v. Unemp't Ins.*

13   *Appeals Bd.,* 235 Cal. App. 3d 1363, 1368 (1991) (driver leased vehicle from Yellow Cab).

14        Here, as already explained in depth, Monster Mowers invested REDACTED              to

15   supply the vehicles, equipment, and supplies to complete property preservation work for FAS and its

16   competitors.  From 2006 through 2013, Monster Mowers grew to the point where *every year* the

17   company was acquiring "another truck or dump trailer" in addition to those already in its fleet.

18   (Cohick Depo., 79:18-81:1.)  At its peak, Monster Mowers owned 13 trucks, three of which were

19   flatbed trucks with dump lifts on them, and then three additional dump trailers.  (Cohick Depo.,

20   81:2-21.)  At the time of Mr. Cohick's deposition, Monster Mowers was still reaping the benefits of

21   some of these investments, such as by still using three to five of these trucks from the original fleet

22   on a daily basis.  (Cohick Depo., 82:8-22.)

23        Lastly, Monster Mowers invested in its business relationship with FAS, such as by

24   buying t-shirts and hooded sweatshirts for FAS employees, which added up toREDACTED

25        (Pérez Decl., Exh. 8.)  Claims Management Supervisor Sarah Hunter received these t-

26   shirts and even a hooded sweatshirt, which she still has in her possession, a photo of which is

27   included in her declaration.  Declaration of Sarah Hunter [Dkt # 50-2, ¶ 24, Exh. C].)

28   ///

LITTLER MENDELSON, P.C.
333 Bush Street
34th Floor
San Francisco, CA 94104
415.433.1940

NOTICE OF MTN AND MPA ISO DEFS' MSJ          20.          CASE NO. 3:13-CV-00057-WHO

- **Employment Of Helpers –** The hiring of others to complete the accepted work is "strong evidence suggesting that [a defendant does] not have the requisite level of control over the manner and means of [the individual's] work." *Ruiz v. Affinity Logistics Corp.*, 887 F. Supp. 2d 1034, 1041 (S.D. Cal. 2012), rev'd and remanded, 754 F.3d 1093 (9th Cir. 2014); *Borello* at 355; *see, also, Ayala*, 59 Cal. 4th at 549 (repeatedly referencing the use of helpers in determining whether the independent contractor test was correctly applied.); *Performance Team Freight Sys., Inc. v. Aleman*, 241 Cal. App. 4th 1233 (2015), *reh'g denied* (Nov. 30, 2015) (finding drivers were independent contractors rather than employees in part because drivers could hire their own employees); *Garcia v. Seacon Logix, Inc.*, 238 Cal. App. 4th 1476, 1481 (2015) (finding respondents were employees where appellant "did not permit respondents to hire other drivers."); *Briggs v. California Emp't Comm'n*, 28 Cal. 2d 50, 54 (1946) ("He did all of the work himself or hired helpers whom he paid… [u]nder these circumstances, in every respect, the distributor was an independent contractor." ).

Here, Monster Mowers sought out and hired dozens of employees and subcontractors who drove the dozen plus vehicles to the thousand plus properties and performed the overwhelming majority of work. (Cohick Depo., 116:11-15; 60:14-61:3; 64:8-65:8.) There is no evidence that FAS told Monster Mowers whom it should hire, how many individuals it should hire, how it should find these individuals, how it should compensate or payroll these workers, which workers should be 'general laborers', 'field supervisors', or handle Monster Mowers' administrative work, including the invoicing of non-FAS clients, whether and when to drug test its employees, or what should be in the employment agreement that a number of former workers alleged they signed. (Cohick Depo., 56:24-57:13; 61:9-62:4; 74:19-76:7; (Pérez Decl., Exhs. 16-18 [McGinty lawsuit, ¶ 7-16; Almanza lawsuit, ¶¶ 9-13; Anderson lawsuit, ¶¶ 10-16].) Mr. Cohick's entire business model depended on Monster Mowers' freedom to grow and staff his business as he saw appropriate – making him a true independent contractor.

- **Whether The Relationship Was Exclusive** – FAS never limited Mr. Cohick's ability to work with other companies, and Monster Mowers did in fact work for competitors of FAS. This is not consistent with employment. *Arnold* at 589 (that the plaintiff's relationship "was

LITTLER MENDELSON, P.C.
333 Bush Street
34th Floor
San Francisco, CA  94104
415.433.1940

NOTICE OF MTN AND MPA ISO DEFS' MSJ          21.          CASE NO. 3:13-CV-00057-WHO

nonexclusive, and she in fact solicited for other insurance companies during her appointment" supported her status as an independent contractor); *Elijahjuan v. Superior Court*, 210 Cal. App. 4th 15, 32 (2012) (finding there was substantial evidence that plaintiffs were independent contractors because "Plaintiffs were also free to contract with other companies."); *See, also, Estrada v. FedEx Ground Package System, Inc.,* 154 Cal. App. 4th 1, 7 (2007) (if drivers must work exclusively for one company, that factor weighs in favor of employee relationship).

Monster Mowers provided property preservation services to other clients for years before contracting with FAS, worked with FAS's competitors while contracting with FAS, and worked with FAS's competitors and other clients after its relationship with FAS ended.  Overall, Monster Mowers' own financial reports demonstrate that the company regularly earned REDACTED beyond what it received from FAS.  For example, in 2009 Monster Mowers REDACTED

(*see, also*, Table 1, and note. 10, *supra*.)

Beyond the substantial income Monster Mowers received from FAS's competitors was the discretion Monster Mowers exercised in transferring its business from FAS to its competitor. In mid-2012, FAS lost its contract with Fannie Mae, one of its biggest clients.  (Cohick Depo., 117:13-118:21.)  When this happened, Monster Mowers began contracting with AMS even as it continued contracting with FAS.  (Cohick Depo. 117:13-118:21; 119:11-120:1; 120:25-121:8.)  In other words, FAS lost a client to a competitor and Monster Mowers *followed the client while still contracting with FAS*.  Such action represents the independent choices of a business looking out for its own interests – not the controlled loyalty of an employee.

## VIII.   SUMMARY OF ARGUMENT AGAINST MR. ACKEL'S CLAIMS

Eric J. Ackel has owned and operated six different companies over the last twenty years.  His property preservation company, Kurb Appeal, Inc., succeeded in recruiting FAS as a client.  Throughout that relationship, Mr. Ackel and his business partner curated the work they would do for FAS, accepting only that work that had the largest profit margins, such as landscaping. Mr. Ackel also smartly accepted work across California, and then subbed it out to individuals he had never met, keeping a cut of the revenue for himself.  After all, as Mr. Ackel himself concedes, "why

LITTLER MENDELSON, P.C.
333 Bush Street
34th Floor
San Francisco, CA  94104
415.433.1940

NOTICE OF MTN AND MPA ISO DEFS' MSJ          22.          CASE NO. 3:13-CV-00057-WHO

do work if you don't make any money?"  (Ackel Depo., 69:17-70:9.)  And when the relationship with FAS was no longer profitable, Mr. Ackel simply stopped returning the company's calls.  No reasonable jury could find that Mr. Ackel's relationship with FAS, which was undisputedly driven by his own business acumen, could rise to the level of employment.

## IX.   FACTS RELEVANT TO MR. ACKEL'S CLAIMS

### A.   Mr. Ackel's Many Business Ventures.

At the time of his deposition in November of 2016 (and presumably now), Mr. Ackel owns and operates a nationwide high-pressure pipeline inspection company called California Pipeline Inspection Corp. ("CPI").  (Ackel Depo., 13:13-15:5.)  In fact, Mr. Ackel attended his deposition wearing a CPI shirt with the logo on the front.  (Ackel Depo., 13:13-20.)  CPI currently has 45-50 active employees who operate all over the United States.  (Ackel Depo., 13:13-15:5.)  Mr. Ackel and his business partner are the only officers of California Pipeline Inspection Corp.  (Ackel Depo., 14:2-9.)  Before CPI, which Mr. Ackel incorporated in 2015, Mr. Ackel owned and operated five other businesses.  (Ackel Depo., 13:6-7; 15:7-17:1.)

Mr. Ackel opened his first business in 1996 or 1997, a sole proprietorship called E&J Waterworks that performed street cleaning with company-owned water trucks.  (Ackel Depo., 17:5-18:2; 19:14-20:10.)  E&J Waterworks had three employees.  (Ackel Depo., 17:19-21.)  From 1998 to 1999, Mr. Ackel incorporated and ran Ackel Corp, another water truck company with approximately three employees.  (Ackel Depo., 18:1-17.)  After Ackel Corp, Mr. Ackel owned and operated Ultra Kleen, which lasted approximately seven years and employed approximately 50 people for half of that time.  (Ackel Depo., 18:18-19:11.)  Ultra Kleen performed street cleaning with company-owned water trucks, but also washed windows and cleaned up new construction projects.  (Ackel Depo., 19:14-20:10; 24:5-15.)  After Ultra Kleen, Mr. Ackel's next venture was Kurb Appeal Inc., the company that contracted with FAS and was in operation from 2008 to approximately 2012.  (Ackel Depo., 20:12-19.)  After Kurb Appeal Inc., Mr. Ackel incorporated Kong Motor Sports, an off-road "shell company" that Mr. Ackel created so that he could get discounts on parts for his personal off-road vehicles.  (Ackel Depo., 20:24-22:11.)  While Kong Motor Sports was in place, Mr. Ackel and

///

LITTLER MENDELSON, P.C.
333 Bush Street
34th Floor
San Francisco, CA  94104
415.433.1940

NOTICE OF MTN AND MPA ISO DEFS' MSJ            23.            CASE NO. 3:13-CV-00057-WHO

1   his business partner incorporated CPI, first as an LLC and later as a corporation.   (Ackel Depo.,
2   22:12-15.)

3        E&J Watersports, Ackel Corp, and Ultra Kleen, were all in the "water truck"
4   business, while Ultra Kleen took on the additional challenge of new construction clean up.   (Ackel
5   Depo., 19:14-20:10.)   Mr. Ackel got into the water truck business because it was "easy income… I
6   had an in to use water trucks, so I bought one for income."   (Ackel Depo., 23:13-22.)

7        **B.   Kurb Appeal Inc.**

8        Mr. Ackel incorporated Kurb Appeal Inc. in 2008 and ran it until approximately
9   2012.   (Ackel Depo., 20:12-19.)   Kurb Appeal Inc.'s corporate Statement of Information, filed in
10  November 2008, "describe[d] the type of business of the corporation" as "real estate clean up."
11  (Pérez Decl., at Exh. 22.)[19]   Mr. Ackel confirmed in deposition that his business partner, Jay Heaton,
12  and he started the business specifically for the purpose of entering the property preservation industry
13  – hence the name, a play on the real estate term "curb appeal."   (Ackel Depo., 25:5-26:9.)   Mr.
14  Ackel's Ultra Kleen company gave him extensive background in the property preservation industry,
15  so that Kurb Appeal "ha[d] a lot of experience in new-home prep and debris removal."   (Ackel
16  Depo., 87:18-88:25; Depo. Exh. 3 p. FAS20578.)   The company was not created to contract with
17  FAS.   (Ackel Depo., 45:16-46:5.)   Specifically, Mr. Ackel sought to enter the industry, and when he
18  went "looking for clients," he found FAS.   (Ackel Depo., 45:16-46:5.)

19       Regarding the formation of Kurb Appeal Inc., Mr. Ackel relied on his prior business
20  experience to incorporate and establish the company, knowing incorporation would protect him from
21  individual liability.   (Ackel Depo., 27:20-28:11.)   Kurb Appeal Inc. sought to work with other
22  property preservation companies.   (Ackel Depo., 76:23-77:2 ["We tried to go after everybody."]).
23  But FAS was the only property preservation customer Kurb Appeal landed.   (Ackel Depo., 26:9-14;
24  28:24-29:4; 77:3-11.)   In addition to property preservation, Kurb Appeal also did repair work for the
25  Big Lots chain.   (Ackel Depo., 28:21-23; 29:5-24.)   Kurb Appeal carried errors & omissions

26

27  _____
   [19] The same filing identifies a non-residential address for the corporation in Riverside, California and
28  identified Mr. Ackel's business partner – Jay Heaton – as the corporation's chief executive officer
   and sole director.

LITTLER MENDELSON, P.C.
333 Bush Street
34th Floor
San Francisco, CA  94104
415.433.1940

**NOTICE OF MTN AND MPA ISO DEFS' MSJ**        24.        **CASE NO. 3:13-CV-00057-WHO**

1   insurance and workers' compensation insurance.   (Ackel Depo., 44:16-45:5; FAS023848;

2   FAS023852).   Mr. Ackel believes the company "probably" used an accountant for its taxes (he

3   knows he did not do them), and that his business partner, Mr. Heaton, did the majority of the

4   administrative work related to running the business.  (Ackel Depo., 36:9-13; 36:25-37:15.)

### 1.  Kurb Appeal Inc.'s Office And Equipment.

6          Kurb Appeal Inc. had an approximate 1500-square-foot office in Riverside,

7   California, which it leased for $1,200 per month.  (Ackel Depo., 32:7-22.)  The office had multiple

8   phone lines, a fax line, two computers, a copy/print/fax machine, three desks, bookshelves, and filing

9   cabinets. (Ackel Depo., 32:25-35:1.)  The company may have also had a website and business cards.

10  (Ackel Depo., 35:4-9.)  Kurb Appeal also had four weed whackers, four "lawn mowers, trash cans,

11  rakes, brooms, trimmers, tools to turn water off and on, things to bust locks with, air fresheners… A

12  lot of things." (Ackel Depo., 41:4-10; 44:5-10.)  This equipment was stored at Kurb Appeal's office

13  space.  (Ackel Depo., 44:5-15.)  Kurb Appeal also had access to Ultra Kleen's vehicles, including a

14  Bobcat, and three diesel trucks.   (Ackel Depo., 41:20-42:10; 89:10-90:9, Depo. Exh. 3 p.

15  FAS20578.)  One of the vehicles the Kurb Appeal used likely had a magnetic Kurb Appeal logo that

16  included the company's name.  (Ackel Depo., 35:13-36:3.)

### 2.  Kurb Appeal's Statewide Personnel.

18          Mr. Ackel estimates that Kurb Appeal hired twenty different people to help with

19  property preservation work.  (Ackel Depo., 37:16-38:5.)   The company found these individuals

20  through Craigslist ads, and paid them "piece work."  (Ackel Depo., 38:6-16.)  Of these twenty

21  individuals, Mr. Ackel has only met four of them in person.  (Ackel Depo., 73:15-20.)  Mr. Ackel

22  would accept work all over the state of California.  (Ackel Depo., 30:22-31:21.)  For any jobs that

23  were north of Orange County, Kurb Appeal would post an advertisement for the work on craigslist,

24  accept the first individual who responded and could supply his or her own equipment, and explain

25  the work to the person over the phone.  (Ackel Depo., 72:1-22; 74:12-21.)  Mr. Ackel would verify

26  that the subcontract had completed the work "by [reviewing] pictures," Just "like FAS."  (Ackel

27  Depo., 72:23-25.)  Mr. Ackel would determine the rate the subcontractors would be paid per job.

28  (Ackel Depo., 69:17-70:9.)  When asked if he paid these individuals the same amount his company

LITTLER MENDELSON, P.C.
333 Bush Street
34th Floor
San Francisco, CA  94104
415.433.1940

NOTICE OF MTN AND MPA ISO DEFS' MSJ          25.          CASE NO. 3:13-CV-00057-WHO

received from FAS for the work, Mr. Ackel replied "[t]hat wouldn't make much sense, No… why do the work if you don't make any money?"  (Ackel Depo., 70:3-9.)  Kurb Appeal never told FAS, and FAS never asked Mr. Ackel, whether the Kurb Appeal was hiring others to help with FAS work orders.  (Ackel Depo., 63:8-15.)

### C.    Kurb Appeal Inc. and FAS.

Mr. Ackel executed a "Vendor Qualification Package," on behalf of Kurb Appeal Inc., on November 21, 2008.  (Pérez Decl., Exh. 23 [FAS023855-67].)  Mr. Ackel's intent when he signed the document with FAS was that he would be an independent contractor.  (Ackel Depo., 48:4-8; *see also* Pérez Decl., Exh. 23 (at FAS023867 [11.20.08 acknowledgment by Mr. Ackel on behalf of business of "Insurance Coverage Requirements for Independent Contractors"]))  FAS received a W-9 for Kurb Appeal Inc. around the same time.  (Pérez Decl., Exh. 24 [FAS023851].)

In his deposition, Mr. Ackel asserted that ninety-eight percent of the work Kurb Appeal Inc. accepted from FAS was lawn and yard work, because it was most profitable.  (Ackel Depo., 39:10-40:2.)  Mr. Ackel's testimony demonstrates the discretion his business maintained:

> Q.  Okay.  Did FAS ever ask you if you could do, like, inside cleaning, non-lawn work?
>
> A.  Yes.
>
> Q.  And what did you say?
>
> A.  Yes.
>
> Q.  So every time they offered it to you, you would take it?
>
> A.  Every time they'd offer it to us, they would give us a price, and if we wanted the price, we would take it.
>
> Q.  And if you didn't like the price, you wouldn't take it?
>
> A.  Which was 99 percent of the time.
>
> Q.  That you didn't like the price?
>
> A.  Yes.  (Ackel Depo., 39:13-40:2.)

Mr. Ackel employed this same strategy with rehab work.  He testified to only doing a couple of rehab jobs, and rejecting most of what was offered because "the prices weren't feasible."  (Ackel Depo., 52:10-53:1.)  When asked why Kurb Appeal accepted yard work and landscaping jobs, but

LITTLER MENDELSON, P.C.
333 Bush Street
34th Floor
San Francisco, CA  94104
415.433.1940

NOTICE OF MTN AND MPA ISO DEFS' MSJ          26.          CASE NO. 3:13-CV-00057-WHO

not rehab jobs, Mr. Ackel testified: "Well, because the rehab jobs, you had to put all this money out of pocket first and hope to get paid. The landscape was a lawn mower and a gallon of gas, so do the math." (Ackel Depo., 54:20-25.)

Kurb Appeal provided property preservation services to FAS throughout the state of California, from Yreka to Riverside and potentially further. (Ackel Depo., 30:22-31:21.) The company also serviced locations outside of California, though this was only 1-2% of the business. (Ackel Depo., 30:23-32:6.) Kurb Appeal chose the zip codes in which it would do work. (Ackel Depo., 58:9-13.) When offered jobs outside of his selected area, Mr. Ackel applied the same discretion as he would with non-lawn work when deciding whether or not to accept. Specifically, Kurb Appeal only accepted far flung jobs after looking at "personnel, feasibility, [and] cost." (Ackel Depo., 58:9-24.)

FAS never trained Mr. Ackel. (Ackel Depo., 80:11-13.) Once, Mr. Ackel and his business partner, Mr. Heaton, flew to Austin, Texas to attend one of FAS's conventions. (Ackel Depo., 78:20-79:11.) However, once there Mr. Ackel did not attend any part of the convention, and instead chose to party with other FAS vendors. (Ackel Depo., 79:7-80:5.) No one at FAS commented on Mr. Ackel's absence. (Ackel Depo., 80:14-17.)

Out of "hundreds and hundreds of jobs a month," Kurb Appeal Inc. performed for FAS between late 2008 and March, 2012 (i.e., 40 months), Mr. Ackel estimates that FAS representatives only visited job sites around 30 times total. (Ackel Depo., 56:25-57:3; 74:6-11.)

Mr. Ackel consistently testified that the amount offered for a job determined whether or not Kurb Appeal would accept the work. (Ackel Depo., 58:1-8.) With regard to about 10-20% of the jobs offered by FAS in a month, Mr. Ackel would go back to FAS and ask for more money. (Ackel Depo., 56:15-57:7.) If FAS would not agree to pay more for the job, Mr. Ackel would sometimes decline the job. (Ackel Depo., 57:20-58:8.)

The only alleged consequence for turning down FAS work was getting less work. (Ackel Depo., 59:21-60:14; 61:12-23.) FAS would offer work orders to Kurb Appeal in batches, and Mr. Ackel either accepted or rejected the entire batch. (Ackel Depo., 59:21-60:14.) FAS never

///

LITTLER MENDELSON, P.C.
333 Bush Street
34th Floor
San Francisco, CA 94104
415.433.1940

NOTICE OF MTN AND MPA ISO DEFS' MSJ          27.          CASE NO. 3:13-CV-00057-WHO

1  charged Kurb Appeal for declining work orders, nor could Mr. Ackel describe any other
2  consequence for declining work.  (Ackel Depo., 61:12-23.)

3  FAS never put any limitation on Kurb Appeal's ability to work for competitors.
4  (Ackel Depo., 77:18-24.)  Kurb Appeal sought work from other companies, usually by cold calling
5  them ("[w]e tried to go after everybody."), but only succeeded in obtaining business with FAS.
6  (Ackel Depo., 76:23-77:11; 81:17-24.)  As with FAS, whether Kurb Appeal Inc. would have done
7  work for a competitor, had it been more successful in its ventures, would have depended on "money,
8  location, time, [and] availability."  (Ackel Depo., 77:12-17.)

9  Kurb Appeal ended its relationship with FAS "because of the money."  (Ackel Depo.,
10  84:24-85.9.)  Specifically, Kurb Appeal simply stopped communicating with FAS because it was no
11  longer profitable.  (Ackel Depo., 84:24-85.9.)

12  **X.   ARGUMENT AS TO MR. ACKEL'S CLAIMS**

13    **A.   Standard For Summary Judgment And Independent Contractor Status**

14  As detailed further in Section VII(A), *supra*, "[t]he court shall grant summary
15  judgment if the movant shows that there is no genuine dispute as to any material fact and the movant
16  is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(c).

17  Here, FAS's relationship with Kurb Appeal Inc. was dictated by the vendor
18  qualification package executed by Kurb Appeal Inc.  (Pérez Decl., Exh. 23 [FAS023855-65].)
19  Notably, the qualification package does not dictate who must complete any accepted work orders,
20  the prices at which any work must be accepted, or even whether a vendor must accept any work at
21  all.  (*Id.*)  Mr. Ackel understood Kurb Appeal Inc.'s discretion to refuse work and testified openly
22  about the exercise of that discretion.  For example, Kurb Appeal chose to accept and perform lawn
23  and landscaping work because it was the most profitable work for Kurb Appeal Inc.  When asked
24  why Kurb Appeal Inc. accepted yard work and landscaping jobs, but not rehab jobs, Mr. Ackel
25  testified:  "Well, because the rehab jobs, you had to put all this money out of pocket first and hope to
26  get paid.  The landscape was a lawn mower and a gallon of gas, so do the math."  (Ackel Depo.,
27  54:20-25.)  The price was also not right for cleaning jobs: "Every time they'd offer [cleaning, non-
28  lawn work] to us, they would give us a price, and if we wanted the price, we would take it.  Q.  And

LITTLER MENDELSON, P.C.
333 Bush Street
34th Floor
San Francisco, CA 94104
415.433.1940

NOTICE OF MTN AND MPA ISO DEFS' MSJ            28.            CASE NO. 3:13-CV-00057-WHO

1   if you didn't like the price, you wouldn't take it?  A.  Which was 99 percent of the time."  Q.  That

2   you didn't like the price?  A.  Yes.  (Ackel Depo., 39:13-40:2.)

3          Further, Kurb Appeal hired individuals all over the state, three-quarters of which he

4   had never even met, to complete FAS jobs.  (Ackel Depo., 72:1-22; 73:15-20; 74:12-21.)  FAS never

5   prohibited this, nor did it comment on the practice.  (Ackel Depo., 63:8-15.)  To put it plainly, FAS

6   had no right to do so.  (Pérez Decl., Exh. 23 [FAS023855-65].)

7          FAS relied on Kurb Appeal to deliver a satisfactory end result. The fact that FAS

8   asked for proof that the work was adequately completed does not constitute control.  *Fireman's*

9   *Fund Ins. Co.*, 37 Cal. App. 4th at 1442-43 (one who hires an independent contractor may still retain

10  a general power of supervision and control as to the results of the work so as to ensure satisfactory

11  performance of the contract).  Further, FAS simply asked for photos of the job site, which by their

12  nature show the *result* of the work – not who completed it, when it was completed, or how it was

13  completed.  (Ackel Depo., 72:23-25.)  Ultimately, Mr. Ackel estimates that FAS representatives

14  personally visited properties at which he was present only 30 times total notwithstanding the

15  "hundreds and hundreds of jobs a month,"  Kurb Appeal performed for FAS over three plus years.

16  (Ackel Depo., 56:25-57:3; 74:6-11.)  And those visits also were limited to inspection of the final

17  product, not supervision of work in progress.  In short, 30 inspection visits over thousands of jobs is

18  not sufficient to raise any inference of employment.  *See Ali*, 176 Cal. App. 4th at 1347 ("[T]he right

19  to exercise complete or authoritative control must be shown, rather than mere suggestion as to

20  detail.").

21      **B.    The Secondary Factors Also Support A Finding of Independent Contractor
                Status.**

22

23          As detailed in Sections VII(B), (E), *supra*, in *Borello* the Supreme Court of California

24  developed an interdependent multi-factor balancing test to determine whether a provider of service is

25  an employee or an independent contractor under California law.  As this Court has recognized,

26  *Borello*'s multitude of secondary factors "cannot be applied mechanically as separate tests," but

27  rather "they are intertwined and their weight depends often on particular combinations."  (Dkt # 61,

28  13:11-12 (order denying Plaintiffs' initial motion for certification; *citing Germann v. Workers' Comp.*

LITTLER MENDELSON, P.C.
333 Bush Street
34th Floor
San Francisco, CA  94104
415.433.1940

NOTICE OF MTN AND MPA ISO DEFS' MSJ          29.          CASE NO. 3:13-CV-00057-WHO

*Appeals Bd.*, 123 Cal. App. 3d 776, 783 (Ct. App. 1981)); *accord Narayan v. E.G.L., Inc*., No. 05-04181 RMW, 285 F.R.D. 473, 477 (N.D. Cal. 2012).  Again, "[e]ven if one or two of the individual factors might suggest an employment relationship, summary judgment is nevertheless proper when, as here, all the factors weighed and considered as a whole establish that [Plaintiffs were] independent contractor[s] and not [] employee[s]… ."  *Arnold at* 590 (2011).

Here, once again, all twelve factors weigh in favor of independent contractor status:

- **Distinct Occupation Or Business** – Mr. Ackel and his business partner started Kurb Appeal Inc. – Mr. Ackel's fourth business (after E&J Waterworks; Ackel Corp, and Ultra Kleen) – not in order to contract with FAS, but rather to enter the property preservation industry:

> Q: So how did you get into property preservation?
>
> A. I'm not sure.  It just happened…Well, I think when we had the foreclosures hit, all these properties were ugly and distorted-looking, and I read about a law called curb appeal, with a C, not a K, and I started a company called Kurb Appeal.  And I think when I came along FAS's sign looking for somebody to do curb appeal, with a C, I called them up, and that's how we became property preservation. (25:19-26:8)

Mr. Ackel further clarified that he didn't create his business to work with FAS:

> Q. So did you create Kurb Appeal so that you could do FAS work?
>
> A. No.
>
> Q. So why did you create Kurb Appeal?
>
> A. Because I saw a bunch of houses that needed curb appeal.  Thought it was a cool name.
>
> Q. And then how did you hear about FAS for the first time?
>
> A. Saw a sign.
>
> Q. And was that after you had created Kurb Appeal?
>
> A. It was.  When I was looking for work.
>
> Q. Okay.  Looking for clients?
>
> A. I was looking for clients.  Hadn't found any yet.
>
> Q. And so how did you first communicate with FAS?
>
> A. I guess by telephone, since they were in Texas and I was out here. (45:19-46:8.)

LITTLER MENDELSON, P.C.
333 Bush Street
34th Floor
San Francisco, CA  94104
415.433.1940

NOTICE OF MTN AND MPA ISO DEFS' MSJ                30.                CASE NO. 3:13-CV-00057-WHO

1    Notably, Kurb Appeal Inc.'s focus on its own interests did not change once it started

2    contracting with FAS.  Kurb Appeal, Inc. still attempted to contract with other property preservation

3    companies.  (Ackel Depo., 76:23-77:2.).  Further, even with FAS, Kurb Appeal continued to focus

4    on its bottom line.  Specifically, it accepted work orders from FAS in faraway locations, located and

5    hired subcontractors to complete the work, and took a cut of the profits – in short, Kurb Appeal, Inc.

6    was itself brokering property preservation work.  (Ackel Depo., 30:22-31:21; 69:17-70:9; 70:3-9;

7    72:1-22; 73:15-20; 74:12-21.)  When asked why he took a cut, he responded "why do the work if

8    you don't make any money?"  (Ackel Depo., 69:17-70:9.)

9        •  **Whether The Work Is Usually Done Without Supervision** – Mr. Ackel estimates

10   that FAS representatives personally visited properties at which he was present only 30 times total

11   notwithstanding the "hundreds and hundreds of jobs a month" Kurb Appeal performed for FAS over

12   three plus years.  (Ackel Depo., 56:25-57:3; 74:6-11.)  Those visits were limited to inspection; there

13   is no evidence of supervision.  Notably, Kurb Appeal used a similar process to subcontract work

14   north of Orange County to other independent contractors.  Kurb Appeal would advertise work orders

15   it wanted to subcontract on Craigslist, would explain the work to whichever subcontractor accepted,

16   and, just like FAS, would verify the work had been completed "by pictures."  (Ackel Depo., 72:1-25;

17   74:12-21.)  Indeed, of the 20 individuals Kurb Appeal engaged, Mr. Ackel only ever met four of

18   them in person.  (Ackel Depo., 73:15-20.)  Tellingly, Kurb Appeal never classified any of these

19   individuals as employees (Ackel Depo., 36:25-37:4 [noting that Kurb Appeal never issued W-2s to

20   anyone and had no payroll].)

21       •  **Who Supplies The Instrumentalities, Tools, And The Place Of Work** – Kurb

22   Appeal – or the subcontractors it engaged throughout California and beyond – supplied all the tools

23   needed to perform the work.  Specifically, Kurb Appeal Inc. had an approximate 1500-square-foot

24   office in Riverside, California.  (Ackel Depo., 32:7-22.)  The office had multiple phone lines, a fax

25   line, two computers, a copy/print/fax machine, three desks, bookshelves, and filing cabinets.  (Ackel

26   Depo., 32:25-35:1.)  Kurb Appeal Inc. may have also had a website and business cards.  (Ackel

27   Depo., 35:4-9.)  Kurb Appeal also had four weed whackers, four "lawn mowers, trash cans, rakes,

28   brooms, trimmers, tools to turn water off and on, things to bust locks with, air fresheners… A lot of

LITTLER MENDELSON, P.C.
333 Bush Street
34th Floor
San Francisco, CA 94104
415.433.1940

NOTICE OF MTN AND MPA ISO DEFS' MSJ          31.          CASE NO. 3:13-CV-00057-WHO

things," that it stored in its offices.  (Ackel Depo., 41:4-10; 44:5-15.)  Kurb Appeal also had access to Ultra Kleen's vehicles, including a Bobcat, and three diesel trucks.  (Ackel Depo., 41:20-42:10; 89:10-90:9, Ackel Depo. Exh. 3 p. FAS20578.)  This level of equipment, from office space and equipment to vehicles and lawn mowers is wholly inconsistent with a finding of employee status.

- **Investment In Equipment Or Materials** – As stated above, Kurb Appeal Inc., or subcontractors it engaged, provided all of the equipment and materials necessary to perform the agreed-to property preservation services.  While Mr. Ackel has failed to produce a single document related to his business, it is still clear that the business bore expenses for incorporation and administration of the business as well as the costs of paying approximately 20 subcontractors it hired.  These investments were addition to the costs associated with the office supplies, vehicles, and lawn care equipment that Kurb Appeal also bore.

- **The Method Of Payment, Whether By The Time Or By The Job** – Kurb Appeal Inc. was paid by the job, not the hour, irrespective of whether it performed the work or subcontracted it.  (Ackel Depo., 55:1-2; 55:6-8.)

- **Whether The Work Is A Part of The Regular Business Of FAS** – While FAS coordinates the provision of property preservation services, it does not, itself provide property preservation services.

- **The Intent Of The Parties** – Mr. Ackel intended to create an independent contractor relationship between Kurb Appeal Inc. and FAS.  (Ackel Depo., 48:4-8; *see also* Pérez Decl., Exh. 23 at FAS023867 [11.20.08 acknowledgment by Mr. Ackel on behalf of business of "Insurance Coverage Requirements for Independent Contractors"]).

- **Opportunity For Profit Or Loss** – One trait that almost no employees have – and which, conversely, is central to a true independent contractor/principal relationship – is "the opportunity for entrepreneurial profit or loss depending upon his/her managerial skills."  *Borello* at 351.  It is clear that Kurb Appeal Inc. consistently focused on profitability when choosing what work orders to accept from FAS and which to reject.  Mr. Ackel only accepted far-flung jobs after looking at "personnel, feasibility, [and] cost."  (Ackel Depo., 58:9-24.)  With regard to about 10-20% of the jobs offered by FAS in a month, Mr. Ackel would go back to FAS and ask for more money.  (Ackel

32.

Depo., 56:15-57:3.)  If FAS would not agree to pay more for the job, Mr. Ackel would sometimes decline the job.  (Ackel Depo., 57:20-58:8.)  Further, Kurb Appeal focused on lawn and yard maintenance because the low overhead meant the most profit, unlike rehabilitation work.  As Mr. Ackel explained, with "the rehab jobs, you had to put all this money out of pocket first and hope to get paid.  The landscape was a lawn mower and a gallon of gas, so do the math."  (Ackel Depo., 54:20-25.)  For jobs that were too far away, Kurb Appeal would engage other independent contractors to complete that work and pay them less than what they received from FAS to have the work accomplished.  Further, when Kurb Appeal's relationship with FAS was no longer profitable, Mr. Ackel simply quit communicating with the company.  (Ackel Depo., 84:24-85.9.)

- **Employment Of Helpers –** FAS never limited Kurb Appeal ability to hire employees and subcontractors.  In fact, an entire portion of Mr. Ackel's business model depended on his freedom to hire individuals to complete work so that he himself did not have to personally perform the services – making him a true independent contractor.  Kurb Appeal hired individuals all over the state, three-quarters of which Mr. Ackel had never even met, to complete FAS jobs, and took a cut for Kurb Appeal in the process.  (Ackel Depo., 72:1-22; 73:15-20; 74:12-21.)  FAS had no role in selecting or compensating the workers employed by Kurb Appeal.  (Ackel Depo., 63:8-15.)

**Whether The Relationship Was Exclusive** – FAS never limited Mr. Ackel's ability to work with other companies.  Indeed, Mr. Ackel admittedly sought work with FAS's competitors by cold-calling them.  (Ackel Depo., 76:23-77:11; 81:17-24.)  In sum, Mr. Ackel cultivated and maintained broad discretion over how to run the property preservation services company that he helped incorporate before contracting with FAS.  No reasonable jury could conclude, based on the undisputed evidence, that Mr. Ackel was an employee of FAS.

///

///

///

///

///

///

LITTLER MENDELSON, P.C.
333 Bush Street
34th Floor
San Francisco, CA  94104
415.433.1940

NOTICE OF MTN AND MPA ISO DEFS' MSJ          33.          CASE NO. 3:13-CV-00057-WHO

1    **XI.      CONCLUSION**

2            For the foregoing reasons, Defendants respectfully request that this Court determine

3    that Ms. Magdaleno is not a Class Member or, alternatively, grant summary judgment on her two

4    contract causes of action.  Defendants further request that the Court grant Defendants' Motion for

5    Summary Judgment as to the independent contractor status of Class Members Matthew Cohick and

6    Eric Ackel.

7

8    Dated: January 4, 2017                              /s/ Aurelio J. Perez
                                                         AURELIO J. PEREZ
9                                                        LITTLER MENDELSON, P.C.
                                                         Attorneys for Defendants
10                                                       FIELD ASSET SERVICES, INC. and
                                                         FIELD ASSET SERVICES, LLC
11

12

13   Firmwide:144730257.5 066383.1035

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LITTLER MENDELSON, P.C.
333 Bush Street
34th Floor
San Francisco, CA  94104
415.433.1940

**NOTICE OF MTN AND MPA ISO DEFS' MSJ**          34.          **CASE NO. 3:13-CV-00057-WHO**