1   ROBERT G. HULTENG, Bar No. 071293
    rhulteng@littler.com
2   AURELIO PEREZ, Bar No. 282135
    aperez@littler.com
3   ALISON J. CUBRE, Bar No. 257834
    ACubre@littler.com
4   DANTON W. LIANG, Bar No. 303487
    DLiang@littler.com
5   LITTLER MENDELSON, P.C.
    333 Bush Street, 34th Floor
6   San Francisco, CA 94108.2693
    Telephone:    415.433.1940
7   Facsimile:    415.399.8490

8   KEVIN R. VOZZO, Bar No. 288550
    kvozzo@littler.com
9   LITTLER MENDELSON, P.C.
    900 Third Avenue,
10  New York, NY 10022-3298
    Telephone:    212.583.9600
11  Facsimile:    212.832.2719

12  Attorneys for Defendants
    FIELD ASSET SERVICES, INC. and
13  FIELD ASSET SERVICES, LLC

14                          UNITED STATES DISTRICT COURT

15                     NORTHERN DISTRICT OF CALIFORNIA

16                          SAN FRANCISCO DIVISION

17

18  FRED BOWERMAN and JULIA            Case No. 3:13-CV-00057-WHO
    BOWERMAN, on behalf of themselves
    and all others similarly situated,  **DEFENDANTS' OPPOSITION TO**
19                                      **PLAINTIFFS' MOTION FOR PARTIAL**
                                        **SUMMARY JUDGMENT**
                    Plaintiffs,
20                                      Date:     February 22, 2017
            v.                          Time:     2:00 p.m.
21                                      Dept:     Courtroom 2, 17th Floor
    FIELD ASSET SERVICES, INC., FIELD   Judge:    Hon. William H. Orrick
22  ASSET SERVICES, LLC, a successor in
    interest,                           Complaint Filed: January 7, 2013
23
                    Defendants.
24

25

26

27

28

LITTLER MENDELSON, P.C.
333 Bush Street
34th Floor
San Francisco, CA 94104
415.433.1940

**OPPOSITION TO PLAINTIFFS' MSJ**                    **CASE NO. 3:13-CV-00057-WHO**

**TABLE OF CONTENTS**

**PAGE**

I.   INTRODUCTION ................................................................................................ 1

II.  OPPOSITION TO PLAINTIFFS' STATEMENT OF UNDISPUTED FACTS /
     STATEMENT OF ADDITIONAL MATERIAL FACTS........................................ 2

     A.   FAS's Operations............................................................................................ 2

     B.   Vendors Can And Do Negotiate The Terms And Conditions Of Their Vendor
          Qualification Packets, And Their Performance Of The Contracted Services.............. 4

     C.   Vendors Retain And Exercise The Right To Control Their Performance Of
          The Contracted Services ................................................................................ 6

          1.   Vendors Control If, When, And Where They Work...................................... 6

          2.   Vendors Determine How To Perform The Contracted Services ................... 7

     D.   Vendors Operate As Independent Businesses........................................................ 11

III. PLAINTIFFS CANNOT MEET THEIR BURDEN FOR SUMMARY JUDGMENT ........ 15

     A.   Summary Judgment Standard .................................................................... 15

     B.   Independent Contractor Status Under California Law............................................. 16

     C.   Summary Judgment Must Be Denied Because The Record Strongly Favors
          Independent Contractor Status ................................................................... 17

          1.   Right To Control ........................................................................... 18

          2.   The Secondary Factors Strongly Favor Independent Contractor Status........ 20

     D.   Summary Judgment As To Plaintiffs' Expense Reimbursement And Overtime
          Claims Must Be Denied .............................................................................. 25

IV.  CONCLUSION................................................................................................. 25

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alexander v. FedEx Ground Package Sys.*,
   765 F.3d 981 (9th Cir. 2014) ............................................................................... *passim*

*Ali v. U.S.A. Cab Ltd.*,
   176 Cal. App. 4th 1333 (2009) ......................................................................................16

*Arnold v. Mutual of Omaha Ins. Co.*,
   202 Cal. App. 4th 580 (2011) .........................................................................17, 19, 21

*Ayala v. Antelope Valley Newspapers, Inc.*,
   59 Cal. 4th 522 (2014) (Baxter, concurring).........................................................18, 23

*Beaumont-Jacques v. Farmers Group, Inc.*,
   217 Cal.App.4th 1138 (2013)........................................................................................24

*Briggs v. California Emp't Comm'n*,
   28 Cal. 2d 50 (1946) .....................................................................................................23

*Celotex Corp v Catrett*,
   477 U.S. 317 (1986).......................................................................................................16

*Cotter v. Lyft*,
   60 F. Supp. 3d 1067 (N.D. Cal. 2015) ...................................................16, 17, 18, 20

*Elijahjuan v. Superior Court*,
   210 Cal. App. 4th 15 (2012) .........................................................................................20

*Fichman v. Media Ctr.*,
   512 F.3d 1157 (9th Cir. 2008) ......................................................................................16

*Fireman's Fund Ins. Co. v. Davis*,
   37 Cal. App. 4th 1432 (1995) ................................................................................16, 19

*Garcia v. Seacon Logix, Inc.*,
   238 Cal. App. 4th 1476 (2015) .....................................................................................23

*Harris v. Vector Mktg. Corp.*,
   656 F. Supp. 2d 1128 (N.D. Cal. 2009) ......................................................................20

*Hennighan v. Insphere Insurance Solutions, Inc.*,
   38 F. Supp. 3d 1083 (N.D. Cal. 2014) ...........................................................21, 23, 24

*Lara v. Workers' Comp. Appeals Bd.*,
    182 Cal. App. 4th 393 (2010) ......................................................................................23

*McDonald v. Shell Oil Co.*,
    44 Cal. 2d 785 (1955) .............................................................................................16, 19

*Millsap v. Federal Express Corp.*,
    227 Cal. App. 3d 425 (1991) .......................................................................................21

*Morgan v. Wet Seal Inc.*,
    210 Cal. App. 4th 1341 (2012) ....................................................................................25

*NLRB v. Friendly Cab Co., Inc.*,
    512 F. 3d 1090 (9th Cir. 2008) .....................................................................................19

*Performance Team Freight Sys., Inc. v. Aleman*,
    241 Cal. App. 4th 1233 (2015), *reh'g denied* (Nov. 30, 2015) ....................................23

*Ruiz v. Affinity Logistics Corp.*,
    754 F.3d 1093 (9th Cir. 2014) ........................................................................17, 18, 20, 21

*Ruiz v. Affinity Logistics Corp.*,
    887 F. Supp. 2d 1034 (S.D. Cal. 2012), rev'd and remanded, 754 F.3d 1093 (9th
    Cir. 2014) ..................................................................................................................22, 23

*S.G. Borello & Sons, Inc. v. Dep't of Indus. Relations*,
    48 Cal. 3d 341 (1989) ........................................................................................... *passim*

*Santa Cruz Transportation, Inc. v. Unemp't Ins. Appeals Bd.*,
    235 Cal. App. 3d 1363 (1991) .....................................................................................22

*SIDA of Hawaii, Inc. v. NLRB*
    512 F. 2d 354 (9th Cir. 1975) ......................................................................................19

*Sotelo v. MediaNews Group*,
    207 Cal. App. 4th 639 (2012) ......................................................................................25

*Southwest Research Institute v. UIAB*
    81 Cal. App. 4th 705 (2000) ........................................................................................19

*State Comp. Ins. Fund v. Brown*,
    32 Cal. App. 4th 188 (1995) ........................................................................................21

*Varisco v. Gateway Science & Eng'g, Inc.*,
    166 Cal. App. 4th 1099 (2008) ....................................................................................16

1

2

3  **Other Authorities**

4
Fed. R. Civ. P. 56 .................................................................................................................. 15

5
Fed. R. Civ. P. 56(a) ............................................................................................................ 16
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

## I.    INTRODUCTION

Plaintiffs' Motion for Summary Judgment is fatally flawed for a simple reason: the facts of this case don't back it up. Plaintiffs disregard that some class members are proprietors of multi-million dollar businesses, with operations in several states and dozens of employees of their own. Instead, Plaintiffs rely on sweeping and unsupported allegations about FAS's purported control over independent businesses. Rather than rely on common proof, Plaintiffs cherry-pick individualized testimony and inaccurately assert that it applies to the entirety of the class (the composition of which *still* remains unknown).

For example, though Fred Bowerman personally negotiated over pricing and the terms of BB Home Service's ("BBHS") vendor packet (i.e., "take a look at these prices and let me know if we can do bussiness [sic]."), Plaintiffs assert that *no* vendors could negotiate. Although the record demonstrates that many vendors were not even offered, much less required to complete "training," Plaintiffs contend *all* vendors were required to participate. Notwithstanding the fact that the "scorecard" system was discontinued *over four years ago*, Plaintiffs erroneously contend that FAS "monitors the work of *all Vendors* by using scorecards for *each Vendor*." Again and again, Plaintiffs overstate certain facts and ignore others. This is not acceptable practice, particularly at the summary judgment stage.

Regardless, even if Plaintiffs' "factual" assertions were truly undisputed, summary judgment would still be unwarranted. Could a *reasonable person* – viewing the facts in the light most favorable to FAS – find that Matthew Cohick, the sole owner of Monster Mowers, Inc., which (i) engaged dozens of employees and subcontractors, (ii) spent over sixty-thousand dollars on advertising, (iii) regularly earned *over $1,000,000.00* in annual revenue, (iv) was repeatedly sued by his own workers for misclassifying them as independent contractors, and (v) performed property preservation services for FAS competitors *before*, *during*, and *after* the time period in which it performed services arranged by FAS, was properly classified as an independent contractor?

What about Jack Young, the owner of JD Young & Associates, Inc., who (i) picks and chooses which jobs he accepts from various asset management companies (including direct

**OPPOSITION TO PLAINTIFFS' MSJ**                    **CASE NO. 3:13-CV-00057-WHO**

competitors of FAS) depending upon how profitable they are for his business, (ii) has successfully negotiated over the "base price" for various kinds of work FAS offers to his business, (iii) maintains physical office space for his business, and (iv) personally decides what tools and equipment he uses, and how to perform the work he accepts from FAS, based on his years of experience working in the property preservation industry?

And Steve Mezin, the owner of Mezin's REO & Pool Service, which provided property preservation services in California, Idaho, Washington, Hawaii, and Nevada, and employed as many as **65** individuals, who regularly completed jobs around the nation without Mr. Mezin present at the job-site?

Is a factfinder compelled to find each of these individuals (and an unknown number of others) as employees?  Of course not.  On the contrary, a reasonable person could – and should – find these individuals, and other putative class members, to be independent contractors under the governing legal standard.  Accordingly, Plaintiffs' Motion must be denied in its entirety.

## II.    OPPOSITION TO PLAINTIFFS' STATEMENT OF UNDISPUTED FACTS / STATEMENT OF ADDITIONAL MATERIAL FACTS

Plaintiffs' Motion contains both overstatements and glaring omissions.  Although Plaintiffs provide approximately twelve pages of purportedly "undisputed facts," many of them are not only disputed, but disproven by the record.  Worse yet, Plaintiffs omit an array of material facts that bear directly on – and strongly support – potential class members' independent contractor status.  Under these circumstances, summary judgment on the threshold question of independent contractor status must be denied.

### A.    FAS's Operations

FAS, which is based in Texas, is one of several national property preservation companies that serve hundreds of mortgage holders and financial institutions. (Declaration of Sarah Hunter ["Hunter Decl."], ¶¶ 2, 8.)  FAS does not itself provide any property preservation services.[1]  (*Id.*)  Rather, the

---

[1]  "Property preservation" includes the following: hazardous materials transportation, home winterization; re-keying; boarding/board ups;  debris removal; plumbing; roofing; tree trimming; pressure washing; inspections; lawn maintenance; evictions; rehabilitation; code compliance; chimney caps; extermination; dead animal removal; garage door repair, dryer vent cover

LITTLER MENDELSON, P.C.
333 Bush Street
34th Floor
San Francisco, CA  94104
415.433.1940

OPPOSITION TO PLAINTIFFS' MSJ                                    CASE NO. 3:13-CV-00057-WHO

2

1  actual preservation and renovation work is conducted by a network of independent businesses with

2  which FAS contracts ("vendors").  (*Id*. at ¶ 5.)  FAS acts as an intermediary between its clients and

3  the network of vendors with which it contracts.  (*Id*. at ¶ 6.)  The vendors, which range from sole

4  proprietors to long-established corporate entities with employees in multiple states, supply the labor

5  and equipment to perform the contracted services.  (*Id*. at ¶ 5.)

6      Vendors contract with FAS through a variety of contracts and vendor agreements, often

7  called "vendor packets."  During the close to eight-year class period, FAS has used numerous

8  different versions of vendor packets and contracts.  (Supplemental Declaration of Sarah Hunter

9  ["Hunter Supp. Decl."], ¶¶ 8-10, Exs. 6-7; Declaration of Thomas Duckworth in Support of Partial

10  Summary Judgment ["Duckworth Decl."], Exs. 34-38.)  Vendors are paid "by the job" for each work

11  order they complete.[2]

12      In order to ensure compliance with legal obligations and its clients' requirements,[3] FAS takes

13  steps to verify that the vendors complete the preservation services they have contracted to perform.

14  (Hunter Decl. ¶ 7.)  FAS's concern is only that the work has been properly done, not how it has been

15  done (or who has done it).  (*Id*; Buccola Decl. ¶ 4.)  Because FAS's clients' properties are spread

16  throughout the nation and because FAS is located in Texas, review occurs through inspection of

17  photographs that vendors electronically transmit to FAS.  (Hunter Decl. ¶ 8.)  FAS also maintains a

18  limited number of "Field Quality Control" specialists, who provide in-person review of the

19  thousands of properties that vendors service for FAS's clients.  (Hunter Decl. ¶ 9.)

20

21

22  installation/repair; gutter cleaning; gutter repair/reattach; handrail installation/repair; padlock & hasp installation; pool maintenance/securing; refrigerator/freezer cleaning; personal property relocation;

23  roof repair/patch; security door installation; slider/window lock repair; sump pump maintenance; toilet cleaning; water/gas/sewer line capping; wire capping; lock box placement.     (Hunter Decl. ¶ 12.)

24  [2] Hunter Depo. : 194:22-195:1; F. Bowerman Depo. 70:3-4; Govan Depo. 23:9-11; Gowan Depo.:

25  52:11-25; Hart Depo. 133:19-23; Haskill Depo. 63:8-9; Hopper Depo. 52:5-9;  Murray Depo. 86:2-9; Parra Depo. 37:13-20; Purkett Depo. 49:8-13.

26  [3] Job specifications are often mandated by law.  For example, Fannie Mae, under the auspices of its Federal Housing Finance Agency conservatorship, publishes a "Property Preservation Matrix and

27  Reference Guide" containing guidelines that all servicing companies must follow.  (Hunter Decl. ¶ 3.)  Similarly, the Department of Housing and Urban Development ("HUD") has its own property

28  preservation requirements.  At points within the class period Fannie Mae was a direct client of FAS and HUD was an indirect client, whose requirements FAS still had to follow.  (Hunter Decl. ¶ 4.)

LITTLER MENDELSON, P.C.
333 Bush Street
34th Floor
San Francisco, CA  94104
415.433.1940

**OPPOSITION TO PLAINTIFFS' MSJ**                    **CASE NO. 3:13-CV-00057-WHO**

3

1

    **B.**    **Vendors Can And Do Negotiate The Terms And Conditions Of Their Vendor Qualification Packets, And Their Performance Of The Contracted Services**

2

3        Plaintiffs open their statement of "undisputed facts" by misrepresenting the content and

4    variation of vendor qualification packets.[4]   Most notably, Plaintiffs erroneously assert that the

5    packets[5] are "standardized, non-negotiable documents," and that vendors "have no meaningful

6    ability to negotiate their wages or working conditions."   But the record plainly demonstrates that the

7    ***entire packet is negotiable*** (with pricing and geographic coverage areas being the two most

8    frequently negotiated portions),[6] and that potential class members can and do negotiate over the

9    terms of the packets, and other terms related to their businesses' performance of the contracted

10    services.   Indeed, vendors bid for jobs and regularly negotiate over pricing,[7] the particular services to

11

[4] Plaintiffs assert that vendor qualification packets have only varied "slightly" over time, and that "all key … terms" have remained the same. (Plaintiff's Motion, fn. 8.)  However, the packets have varied significantly over time in material ways, such as with respect to contract termination (i.e., some packets did not contain a termination provision, others provided that the contract could be terminated at any time, and others contained a notice provision), independent contractor acknowledgments (i.e., some packets include an express acknowledgement of independent contractor status, while others do not), indemnification provisions, background check provisions, tax information, security provisions, non-exclusivity provisions, and the inclusion of job specifications within the packets.  (*See* Hunter Supp. Decl. ¶¶ 6, 8-9, *cf*: Exs. 2-3, 6-7; Duckworth Decl. Exs. 37-38.)

[5] Plaintiffs suggest that the packets universally contain "detailed instructions for performing tasks," but this is also incorrect.  Only some of the packets even incorporate job specifications. (*See, e.g.,* Hunter Supp. Decl. ¶¶ 6, 8 Exs. 2-3, 6; Duckworth Decl. Exs. 34-36 (detailed job specifications); *compared with* Duckworth Decl. Exs. 37-38 (less detailed specifications); *compared with* Hunter Supp. Decl. ¶ 9, Ex. 7 (no specifications).)  In suggesting that the packets uniformly contain "detailed directions … relating to payment; quality control; photo requirements," penalties, and procedures, Plaintiffs again miss the mark.  Only some of the packets contain detailed provisions regarding these aspects of the relationship. (*See, e.g.,* Hunter Supp. Decl. ¶¶ 6, 8 Exs. 2-3, 6; Duckworth Decl. Exs. 34-36 (detailed provisions); *compared with* Duckworth Decl. Exs. 37-38 (less detailed provisions); *compared with* Hunter Supp. Decl. ¶ 9, Ex. 7 (even less detail).)

[6] Hunter Decl. ¶¶ 17-18; Hunter Depo. Vol I. 48:4-50:4; Hunter Depo. Vol. II 149:25-151:8.

[7] Bess Depo. 26:13-22 (negotiated prices within his December 28, 2007 contract); Carlson Decl. ¶ 6; Cino Depo. 66:16-67:13; 82:14-84:20 (negotiated or bid for non-reoccurring jobs but does not know if he could negotiate the vendor packet); Cohick Decl. ¶ 4; Cohick Depo. 96:2-22; 99:18-100:12; Dasmacci Decl ¶ 12; Eck Decl. ¶¶ 11-14; Elabed Decl. ¶ 11; Gonzalez Depo. 42:4-23 (bid); Govan Depo.  25:7-18 (bid); Hopper Depo. 53:11-54:10 (negotiated); Hunter Decl. ¶ 17; Jones Depo. 84:15-85:17 (negotiated); S. Lopez Depo. 44:3-14; 55:13-56:21 (negotiated or bid); McMillen Depo. 35:2-36:1 (5-10% of work orders had negotiated prices for reoccurring services; initial services had 50-60% negotiated prices); Rangel Depo. 205:11-206:11 (FAS told them to negotiate the pricing); Robb Depo. 55:16-56:4; 63:1-21; 64:22-67:1 (negotiated pricing for lawn cuts only because did not negotiate other rates "because [he] did not know what [he] was doing" and after the fact contract negotiations failed); Smith Depo. 68:16-25; 86:4-11 (vendors could negotiate before the price lists and then anything outside the normal scope); Valentino Depo. 22:9-23:9; 70:21-71:7; 117:10-118:1,

1    be performed,[8] and their geographic coverage areas.[9]

2        Jack Young, the owner of JD Young & Associates, Inc., for example, successfully negotiated

3    with FAS over the prices for "winterizations," snow removal, and "board-ups." (Young Decl. ¶ 11.)

4    Matt Jaques, of Jacques of All Trades, focused on lawn cutting and trash removal, did not offer to

5    perform evictions or pool services, and declined to perform winterizations and hazardous material

6    removal.    (Jaques Depo. 47:24-49:25.)    John Rosario, the proprietor of Rosario Property

7    Preservation, Inc., selected the geographic areas his business would service and then personally

8    decided to change the coverage zone for financial reasons. (Rosario Depo. 45:1-18.)

9        Plaintiffs' representations regarding vendors' purported inability to negotiate in these areas

10   are particularly troubling given that they themselves negotiated with FAS over the prices BBHS

11   would receive, and other terms and conditions related to BBHS's performance of the contracted

12   services.  (F. Bowerman Depo., Ex. 1; pp. 12; 22:20-23:1; 25:14-24.)  More specifically, the price

13   list on BBHS' initial vendor packet shows that BBHS rejected and made counteroffers to FAS's

14   proposed prices for eleven different types of property preservation services. (Id.)  FAS accepted

15   seven of BBHS's counteroffers, and ultimately negotiated a compromise on the four others.  (Id; F.

16   Bowerman Depo., 41:17-44:14.)  Mr. Bowerman further offered to have BBHS take on projects not

17

18   125:13-126:7  Ex. 3 (vendors could negotiate prices on price list); Young Decl. ¶ 11; Young Depo. 51:1-14; 51:23-53:3 (negotiated); Martell Decl. ¶ 12 (only accepted job outside of area if compensated for it); Mezin Questionnaire Response No. IV.3. (negotiated for services rendered, sometimes successfully and sometimes not successfully); Gallego Questionnaire Response No. IV. 3

19   (negotiated when agreed to go beyond territory); Dasmacci Questionnaire Response No. IV. 3; Berg Decl. ¶ 9-10; Bronstrup Decl. ¶ 10; Carlson Decl. ¶ 7 (bid); Dasmacci Decl. ¶ 12; Eck Decl. ¶¶ 12-14

20   (bid using special software); Elabed Decl. ¶ 11 (bid); Martell Decl. ¶¶ 8-10 (bid); Myers Decl. ¶ 15; Oropeza Decl. ¶ 10 (bid); Peterson Decl. ¶ 7 (bid); Samuels Decl. ¶ 14 (negotiated prices and if

21   could not reach an agreement did not accept); *see also* Denny Decl. ¶ 4 (claiming could not negotiate vendor packet) *compared with* Denny Depo. 110:2-17; 112:22-113:11, Ex. 2 (did not attempt to

22   negotiate agreement).
     [8] Berg Decl. ¶ 7; Burt Robb Depo. 62:12-64:8; 95:3-7; Hunter Decl. ¶¶ 11-13; Hunter Depo. 49:22-

23   50:4; Frankian Depo. 12:24-13:13, Ex. 2 (did not offer to do demolition, eviction services, winterizations, rehab, ongoing snow services, or repair work); Jaques Depo., 47:24-49:25; Jennifer

24   Decl. ¶ 7; Bronstrup Decl. ¶ 8; Henderson Decl. ¶¶ 6, 7; Martell Decl. ¶ 7; Omans Decl. ¶ 7 (did not complete any remodeling, construction, or winterizations); Oropeza Decl. ¶ 7; Peterson ¶ 6.

25   [9] Berg Decl. ¶ 8; Eck Decl. ¶ 21; Montes Depo. 49:18-20 (selected geographic areas); Robb Depo.

26   74:12-21 (selected geographic areas); Rosario Depo. 45:1-18; Bess Depo.51:18-52:16 (made decision regarding coverage area); Hopper Depo. 15:12-25; 57:20-58:14 (chose area and could

27   decline any jobs in area); Barnes Depo. 62:7-63:9 (attempted to expand geographic area, but never got work in the expanded area); Omans Decl. ¶ 9; Ortega Depo. 30:13-24; Berg Decl. ¶ 7; Bronstrup

28   Decl. ¶ 8; Spencer Decl. ¶ 6 (chose all geographic areas).

LITTLER MENDELSON, P.C.
333 Bush Street
34th Floor
San Francisco, CA  94104
415.433.1940

**OPPOSITION TO PLAINTIFFS' MSJ**                    **CASE NO. 3:13-CV-00057-WHO**

5

even listed on the proposed pricing list, and asked FAS to "take a look at these prices [he proposed] and let me know if we can do bussiness [sic]."  (*Id.*)[10]  In addition, similar to other vendors, BBHS also negotiated the types and amount of services it wished to provide, and the location in which it wished to provide services.  (*Id.*, 43:4-17; 44:4-45:16; 64:22-65:2; 90:4-91:3; 125:17-21.)

Against this backdrop, Plaintiffs' assertion that vendors had no "meaningful" ability to negotiate over their "wages" and "working conditions" must be rejected.

**C.    Vendors Retain And Exercise The Right To Control Their Performance Of The Contracted Services**

**1.    Vendors Control If, When, And Where They Work**

Upon accepting a work order, vendors have a 72-hour window in which to ensure that the contracted services are completed.  (Hunter Decl. ¶ 19.)  The vendor may arrange to perform the services at any point within that 72-hour period, be it early morning or late at night. (*Id.*)[11]  Despite Plaintiffs' contention that vendors have "no flexibility" with respect to scheduling, the record plainly demonstrates that potential class members have a large amount of discretion as to how to schedule and complete their work, so long as it is completed within the specified (or otherwise negotiated and agreed upon) timeline for the job.[12]  To take one example, when performing work at multiple

---

[10]  Plaintiffs assert that the bidding process for additional work not addressed in a work order is a "misnomer" because those tasks are "governed by a set price list."  This is again incorrect.  Vendors do not need to use the price list to generate bids. (*See, e.g.*, Berg Decl. ¶¶ 9-10; Bronstrup Decl. ¶ 10; Hunter Depo. 264:24-266:7 (any standardized pricing does not determine the approval or denial of a bid because client must approve or deny the bid); Kleiser Decl. ¶ 14;  E. Lewis Depo. 41:4-42:10 (made bid based on labor hours and cost of materials); S. Lopez Depo. 44:3-10 (bid on work and determined price by geographic location); Montes Depo. 87:8-91:15 (about 50% of his bids were accepted); Murray Depo. 120:16-121:20 (determined bids by looking at labor hours and material); Spencer Depo. 52:25-53:17; Spencer Decl. ¶ 7 (bids outside of standard price list were based on whether company made a profit or not and were either accepted or rejected).)

[11]  F. Bowerman Depo. 73:21-25; Cloud Depo. 120:4:15.

[12]  Berg Decl. ¶ 10 (could negotiate time frame to complete a job); Bess Depo. 62:22-63:23; 73:7-15 (no requirement to be at a particular property on a particular day; could leave any time if no time requirement); F. Bowerman Depo. 73:15-25; 73:22-74:2; 115:8-21 (could complete work order at any time during three-days the work order was open); Eck Decl. ¶ 20; Govan Depo. 14:5-15 (could get approval to complete work longer than three days); Hopper Depo. 44:23-45:16 (set own schedule, where he worked, did not have anyone "looking over [his] shoulder"); Kleiser Decl. ¶ 13; S. Lopez Depo. 64:1-8; 65:3-13 (determined order of jobs); McLain Depo. 108:10-25; 109:4-18 (made decisions about the order of the work); Myers Decl. ¶ 16 (no requirements as to when work done as long as within deadline); Omans Decl. ¶ 12 (could negotiate time frames to complete work beyond three days, sometimes negotiations were successful); Parra Depo. 47:16-22; 51:12-16 (decided order of work, as long as completed on time and not supervised); Purkett Depo. 101:22-103:3; Robb Depo. 84:13-85:1 (could determine what work order to work on); Young Decl. ¶ 9.

LITTLER MENDELSON, P.C.
333 Bush Street
34th Floor
San Francisco, CA  94104
415.433.1940

**OPPOSITION TO PLAINTIFFS' MSJ**    6    **CASE NO. 3:13-CV-00057-WHO**

1    different properties in the same day, Susie Lopez preferred to start with the job-site furthest away

2    from her home and work backwards.  (S. Lopez Depo. 64:1-8; 65:3-13.)

3        Plaintiffs contend it is undisputed that "FAS retains the right to assign work outside the

4    territory" and "beyond that which the Vendor selected."  Although FAS may, on occasion, *ask* some

5    vendors (though not all) to perform work outside of their selected geographic areas, potential class

6    members retain the right to decline any and all such work on behalf of their businesses.[13]

7        More generally, vendors retain (and routinely exercise) the right to decline work for other

8    reasons (e.g., busy with other work, outside areas of expertise, low profit-margin, etc.), or no reason

9    at all.[14]   For instance, some potential class members, such as Richard Hopper, decided their

10    businesses would not accept any work on Sundays.  (Hopper Depo. 25:9-15.)   Others, such as

11    Marshawn Govan, declined work if they determined it would not be profitable for their business.

12    (Govan Depo. 28:6-12.)

13        **2.     Vendors Determine How To Perform The Contracted Services**

14        Plaintiffs state that as a result of "exacting work orders" and the distribution of "instructional

15    memoranda," vendors have "no discretion on how to perform the jobs." This assertion is also

16    disputed by FAS and disproven by the record.  While FAS does provide vendors with specifications

17    for certain jobs, vendors determine, among other things, (i) who performs the work, (ii) what tools

---

[13] Carlson Decl. ¶ 8; Denny Depo. 36:21-37:2 (occasionally asked to go outside coverage areas); Govan Depo. 27:3-16 (selected coverage area, but on a case by case basis would go outside area); Henderson Decl. ¶ 11 (declined work outside area without any consequence); Young Depo. 38:8-40:1; 40:18-42:1; Young Decl. ¶ 8 (could accept or decline work within and outside of coverage area); *see also* S. Lopez 42:23-43:14 (declined work orders because of distance and inability to make money); Berg Decl. ¶¶ 7, 8 (accept/decline all work orders); Carlson Decl. ¶¶ 5, 8 (could reject work orders and determine geographic area).

[14] Berg Decl. ¶¶ 7-8; Buccola Depo. 150:5-23 (vendors have a right to decline work and can "cherry-pick" work orders); Bronstrup Decl. ¶ 9 (rejected 10% of jobs); Carlson Decl. ¶ 5; Dasmacci Decl. ¶ 11 (decline 30-50% work); Elabed Decl. ¶¶ 12-13 (could accept or decline any work and would occasionally do work later); F. Bowerman Depo., 49:11-25; Govan Depo. 25:4-6 (declined jobs because price insufficient); Hart Depo. 91:7-15 (declined work orders); Gowan Depo., 62:20-25; Henderson Decl. ¶¶ 7, 10-11 (declined work outside area without any consequence); Haskill Depo. 65:4-17; 66:7-18; 70:4-7 (declined work orders due to distance and pricing); Hopper Depo. 15:12-25 (declined work due to distance and pricing); Hunter Depo. 162:5-11 (vendor has option to decline work); Jaques Depo. 19:8-11; 57:19-58:10 (turned down jobs with high dump fees); Kleiser Decl. ¶ 9; Martell Decl. ¶ 11; Myers Decl. ¶ 14 (declined work in particular locations); Omans Decl. ¶ 10; Ortega Depo. 54:22-57:1 (free to decline work); Peterson Decl. ¶ 9 (declined work); Purkett Depo., 95:21-96:1.S. Lopez Depo. 42:23-43:14 (declined work orders due to distance, pricing); Spencer Decl. ¶ 8 (can decline jobs); Tufford Decl. ¶ 7; Young Decl. ¶ 8.

LITTLER MENDELSON, P.C.
333 Bush Street
34th Floor
San Francisco, CA 94104
415.433.1940

1    and equipment are used, and (iii) how best to meet the specifications for each work order.[15]  As Jack

2    Young attests, FAS provides vendors with a list of the desired end results, but does not tell them

3    "how to get there."  (Young Decl. ¶ 13.)  These decisions are made by the vendors.[16]

4         In addition, FAS does not "exercise control over which crew[s] … Vendor[s]" use, nor does

5    it require them (expressly or otherwise) to engage others to assist them with their work.[17]  Susie

[15] Ortega Depo. 58:17-22 (FAS told vendors how work should look at the end, but had the ability to decide how to do the work to get the result wanted); Spencer Depo. 61:1-8 (discretion to use products); S. Lopez Depo. 85:21-85:24 (FAS never told what brand equipment to use); Parra Depo. 56:4-12 (not required to use certain types of equipment, but needed equipment); Rosario Depo. 57:3-20 (not told what type of equipment to use); Young Decl. ¶14; Young Depo. 53:16-55:14 (just did "what worked" even if FAS listed specific requirements); A. Buccola Depo. 79:12-80:18 (never trained vendors or told them how to execute their job; for example, "Again, a gas cap. I shared with them they needed to put that on, but I did not tell them how to put it on or what they need to use to put it on themselves."); Berg Decl. ¶¶ 12, 13 (never supervised by FAS; never provided instructions); A. Buccola Decl. ¶¶ 4-5 (does not care how the task gets done, just that it gets done); Bronstrup Decl. ¶ 12; Carlson Decl. ¶ 7 (FAS does not care how the repair gets done); Dasmacci Decl. ¶¶ 15-17 (makes decisions regarding how to do work and tools to use; FAS has no control over employees); Eck Decl. ¶¶ 15, 17 (had complete control over how to perform construction work except weight and type of carpet and paint used; almost no communication with FAS during job); Elabad Decl. ¶ 16 (FAS had no control over work); Elabed Supp. Decl. ¶ 7 (FAS had no control over who does work); Kleiser Decl. ¶ 12 (FAS does not supervise employees); Martell Decl. ¶¶ 14, 18 (FAS never instructed how to complete a job; no requirement regarding equipment); Myers Decl. ¶¶ 10, 14, 17 (FAS has no control over employees or when and where worked); Omans Decl. ¶¶ 8, 13 (FAS did not require use of specific products, no supervision); Oropeza Decl. ¶ 9 (FAS did not provide instruction as to how the work was to be completed, or the particular tools and equipment to be used); Peterson Decl. ¶ 11 (no supervision); Ramirez Decl. ¶ 15 (Bowerman's company independent); Reed Decl. ¶¶ 4-20 (Bowermans had complete control over work with Reed); Spencer Decl. ¶¶ 11-12 (no supervision; no expectation as to how to execute).

[16] Ortega Depo. 58:17-22 (FAS told vendors how work should look at the end, but had the ability to decide how to do the work to get the result wanted); *see also* Bess Depo. 62:22-63:23; 73:7-15 (no requirement to be at a particular property on a particular day; could leave any time if no time requirement); Berg Decl. ¶ 13; F. Bowerman Depo. 73:15-25; 73:22-74:2; 115:8-21 (could complete work order at any time during three-days the work order was open); Hopper Depo. 44:23-45:16 (set own schedule, where he worked, did not have anyone "looking over [his] shoulder"); Kleiser Decl. ¶ 8; S. Lopez Depo. 64:1-8; 65:3-13 (determined order of jobs); Martell Decl. ¶ 14; McLain Depo. 108:10-25; 109:4-18 (made decisions about the order of the work); Myers Decl. ¶¶ 10, 16, 17;  Parra Depo. 47:16-22; 51:12-16 (decided order of work, as long as completed on time and not supervised); Purkett Depo. 101:22-103:3; Berg Decl. ¶ 10 (could negotiate deadlines); Robb Depo. 84:13-85:1 (could determine what work order to work on); Young Decl. ¶ 9; Myers Decl. ¶ 16 (no requirements as to when work done as long as within deadline); Omans Decl. ¶ 12 (could negotiate time frames to complete work beyond three days, sometimes negotiations were successful).

[17] Bates Depo. 118:17-19 (never told to hire employees); Barnes Depo., 83:10-15; 89:3-12; 87:17-22 (no instruction regarding hiring/control/use of employees or subcontractors); Berg Supp. Decl. ¶ 4; Bronstrup Decl. ¶ 11; Cino Depo. 119:7-11 (never instructed to hire employees or subcontractors); Dasmacci Decl. ¶ 15; Elabed Supp. Decl. ¶ 7; Galindo Depo. 35:20-21 (never directed to hire employees); Hart Depo. 133:8-133:13 (not told who to hire and fire); Karger Depo 69:3-71:1 (Karger, not FAS, decided which subcontractors to send out to which properties; never told by FAS to hire individuals to perform work); Kleiser Supp. Decl. ¶ 5;  McLain Depo., 123:20-24; 124:4-11 (never instructed to hire employees; discretion to hire); Montes Depo. 107:14-108:1 (FAS never instructed to hire employees or contractors); Kleiser Supp. Decl. ¶ 5;  Parra Depo. 66:15-18 (never

LITTLER MENDELSON, P.C.
333 Bush Street
34th Floor
San Francisco, CA  94104
415.433.1940

Lopez, for example, testified that although her business hired employees for work it performed for others, it did not ever use any employees to perform work for FAS.  (S. Lopez Depo. 42:4-19; 66:1-67:3.)  The evidence Plaintiffs rely upon to support their assertions to the contrary only suggests, at most, that a few vendors may have hired workers to enable them to take on more work, and to earn more revenue – just as any other independent business would do to increase its profits.  In short, the record demonstrates that vendors exclusively determine who performs the work they accept from FAS.

Plaintiffs' assertion that FAS "requires Vendors to engage in mandatory training directly related to the work they perform" is also at odds with the record.  Many potential class members were not even **offered** "training" or "ride alongs," much less **required** to participate.[18]  Plaintiffs' assertion that FAS "requires training not only for Vendors, but also *for their helpers*" is likewise misleading and inaccurate.  Several workers that BBHS engaged attest that they were trained by Fred

---

instructed to hire workers); Robb Depo. 50:1-25; 94:5-9 (hired employees to work for his business, and he determined when to hire them and how much to pay them; never instructed to hire workers); Smith Depo., 84:12-20; 89:22-90:3 (FAS did not control whether or how vendors used crews to perform work or complete work orders); Spencer Depo. 62:3-7 (never instructed to hire workers); Berg Supp. Decl. ¶ 4; Bronstrup Decl. ¶ 11; Dasmacci Decl. ¶ 15-17; Dasmacci Supp. Decl. ¶ 15 (FAS has no control over employees); Elabed Supp. Decl. ¶ 7; Kleiser Decl. ¶ 10; Kleiser Supp. Decl. ¶ 5; Martell Decl. ¶ 19 (worked alone but could have hired help if needed); Myers Decl. ¶¶ 10, 14, 17; Omans Decl. ¶ 10 (free to hire employees or subcontractors but chose not to); Spencer Decl. ¶¶ 10-12; Young Supp. Decl. ¶ 8; Dasmacci Response to Class Member Questionnaire Nos. III.11, 12, 13; Yager Response to Class Member Questionnaire Nos. III.10, 11, 12.

18 Ackel Depo. 79:20-17 (never offered training and partied with other vendors rather than attending the FAS convention in Austin [with no consequences]); Berg Decl. ¶ 12; Bronstrup Decl. ¶ 13; Elabed Decl. ¶ 18; Parra Depo. 76:12-13 (FAS never offered him training); Spencer Depo. 68:8-14 (no training); Galindo Depo. 37:17-24 (no training); Martell Decl. ¶ 17; Murray Depo. 114:22-155:9 (no training); Omans Decl. ¶ 15; Trask Depo. 31:19-23 (no training); A. Buccola Depo.104:3-16 (not all people made meetings even if they said "mandatory"); Hunter Depo. 250:3-9; 279:25-2; 282:17-283:4; 288:3-16 (FAS does not offer training; it provides informational documents; vendor meetings are not mandatory); P. Buccola Depo. 133:4-134:8 (other than learning the Fastrak system; there was no training required); Bronstrup Decl. ¶ 13 (no training); Berg Decl. ¶ 12 (never trained by FAS); Eck Decl. ¶ 22 (no training on construction work; training consisted of how to use FAS system and take photographs, but never completed the webinars); Martell Decl. ¶ 17 (no training); Myers Decl. ¶ 18 (no training); Omans Decl. ¶ 15 (no training); Peterson Decl. ¶ 12 (no training on how to complete work, although attended online class regarding the system and a year-end blow-out); Samuels Decl. ¶ 16 (no training except how to use FAS system). Plaintiffs also state that failure to attend "a mandatory training" will result in termination, but fail to provide any admissible evidence to support that contention.  The vendor profile notes for Jared Frankian confirm that his business's contract was terminated, but do not suggest that it was due to his purported failure to attend a training.

**OPPOSITION TO PLAINTIFFS' MSJ**                              **CASE NO. 3:13-CV-00057-WHO**

1   Bowerman, not FAS.[19]

2          FAS also does not "supervise" vendors.  The evidence Plaintiffs cite in support of their

3   assertion to the contrary demonstrates – at most – that *some* potential class members met with FAS

4   representatives and/or were "shadowed" on a *few* occasions.   Moreover, many potential class

5   members have confirmed they were *never* "supervised" or "monitored" by FAS.[20]  Joe Cino, for

6   example, testified that there was no one from FAS to supervise his work.[21]  Vendors are also not

7   required to submit updates on their progress "throughout the day."[22]  Nor are they subject to the

8   scorecard system, which was phased out in in late 2012.[23]  (Hunter Decert. Decl. ¶ 3.)

9          Further, "vendor profile notes" merely house information relating to the vendors' businesses;

10  they are not used as a monitoring system. (Hunter Depo. 99:3-22.)  The Quality Control department

11  also does not "monitor" vendors.   It only seeks to confirm that work is done, and completed

12  ────────────────

13  [19] Gonzalez Depo. 26:20-22; 89:11-15 (trained employees; FAS did not train employees); Greenfield Depo. Vol. I, 23:23-25:10) (Mr. Bowerman provided Mr. Greenfield with training); Hopper Depo.

14  73:18-20 (FAS never trained employees); Omans Decl. ¶ 13; Ramirez Decl. ¶ 5 (trained by Bowermans, not by FAS); Robb Depo. 51:7-52:14 (Robb trained crews); Rosario Depo. 25:9-17;

15  60:6-9 (Rosario trained workers; no one at FAS trained or supervised workers) Barnes Depo. 36:24-37:4; Cino Depo. 40:11-25; Galindo Depo. 37:19-24; Govan Depo. 30: 19-25; Jaques Depo. 29:18-24; Murray Depo. 46:10-15 (never trained helpers at all); Parra Depo. 68:7-9 (FAS never trained);

16  Yager Depo. 85:4-86:1. Plaintiffs' assertion that FAS "provides training guides to all Vendors … [with] step-by-step instruction[s]" is similarly misleading.  The record demonstrates that FAS makes

17  optional resources available to vendors, which they may choose to utilize at their discretion.  (Hunter Depo. 85:4-15.)

18  [20] Bronstrup Decl. ¶ 13; Dasmacci Decl. ¶ 16;  Eck Decl. ¶¶ 15, 17; Gonzalez Depo. 66:13-17 (FAS never supervised his work while performing) Govan Depo: 31:22-32:8 (no one from FAS supervised

19  his work in person); Henderson Depo. 34:34-3 (never supervised and never met face to face); Hopper Depo. 66:6-8; 73:22-24 (work never supervised); Karger Depo. 73:16-18;McLain Depo.

20  129:20-130:9 (FAS never supervised employees); Martell Decl. ¶ 15; Montes Depo. 99:17-23 (never supervised); Myers Decl. ¶ 18;  Parra Depo. 51:12-16 (never supervised); Rosario Depo. 56:1-24

21  (FAS never supervised work, but may have called to see how things were going and he said fine); Omans Decl. ¶¶ 8, 13 (no supervision); Oropeza Decl. ¶ 9 (no supervision); Peterson Decl. ¶ 11 (no

22  supervision); Spencer Decl. ¶¶ 11-12 (no supervision; no expectation as to how to execute); Young Decl. ¶ 13 (no supervision).

23  [21] Cino Depo. 111:1-21 *see also* N. Lewis Depo. 91:12-18 (not supervised, indeed, *never* once met an FAS representative in person.)

24  [22]  Hunter Depo. 181:23-182:1;  183:2-19 (daily updates required on delayed work orders only);

25  Rangel Depo. 138:18-139:1 (same); Cino Depo. 129:18-131:2 ("you're trying to see if we had to give daily updates on progress, which we did not"); Govan Depo. 42:9-16 (FAS would request

26  updates, "I wouldn't say daily. It's. whenever as needed"); N. Lewis Depo. 105:11-106:9 (some work orders did not have daily communications).

27  [23] Plaintiffs completely ignore this distinction, and instead erroneously assert that FAS "monitors the work of *all Vendors* by using scorecards for *each Vendor*."   In addition, all of the "evidence"

28  Plaintiffs reference regarding "discipline" deactivation, and reductions in work due to low scorecard ratings is inadmissible hearsay, or otherwise does not support the proposition for which it is cited.

LITTLER MENDELSON, P.C.
333 Bush Street
34th Floor
San Francisco, CA  94104
415.433.1940

**OPPOSITION TO PLAINTIFFS' MSJ**                                    **CASE NO. 3:13-CV-00057-WHO**

according to client specifications.  (Hunter Depo. 195:18-196:13;  196:20-197:1;  197:15-198:20; 318:15-318:21.)  Although Plaintiffs go to great lengths to characterize FAS's "photo requirements" as the exertion of supervision and control, FAS uses the photographs to verify that the work a vendor accepts has been completed, and meets the client's specifications, before payment is made.[24] (Hunter Depo.  194:16-195:11; A. Buccola Depo. 75:10-75:14; Valentino Depo. 49:17-49:24; *see also* Berg Decl. ¶ 11; Eck Decl. ¶ 16 (not required to submit action shots because worked alone); Kleiser Decl. ¶ 13.)

In sum, the record demonstrates that vendors – not FAS – retain and exercise the right to control most every aspect of their performance of the contracted services.

### D.   Vendors Operate As Independent Businesses

As stated above, vendors exclusively control who performs the work they accept from FAS. Some vendors, such as Janeen Cloud, choose to personally perform all or most of the work they accept, whereas others, such as Mezin's REO, engage upwards of 60 employees and/or subcontractors to perform the work, enabling them to expand their operations into multiple states and increase their revenue.[25]  Vendors even hire employees to perform administrative work on their behalf.[26]

---

[24] Vendors are not "required" to use FAStrack Mobile for photographs (or for any other purpose). (Hunter Depo. 177:14-179:4; P. Buccola Depo. 61:14-16; 101:12-20.)

[25] Cloud Depo. 51:18-19; 80:20—81:4; 58:3-60:23; Mezin Depo. 37:18—38:21; 40:10-42:21; Ackel Depo. 37:16-38:24 (hired 20 people); Bates Depo. 31:24-32:13; 107:24-108:16; 119:25-120:9 (allegedly hired 10 people and he along with workers performed work); Bess Depo. 14:5-16 (5 to 12 workers); A. Buccola Depo. 165:2-20 (one vendor had 45 different crews); F. Bowerman Depo. 50:4-12 (hired between 0 and 7 employees); Bronstrup Decl. ¶ 11 (possibly 11 employees); Cino Depo. 34:19-37:7 (used between 30 to 80 subcontractors; and only his wife was an employee); Cohick Depo. 56:24-58:5; 60:14-62:4; 63:21-65:8; 109:10-110:15 (hired field and administrative workers ranging from up to 30 employees and up to 30 contractors); Dasmacci Decl. ¶ 13 (in 2010 had 200 employees); Dasmacci Response to Class Member Questionnaire Nos. III.9-10; Davis Decl. ¶ 2; Davis Depo. 89:6-24 (had 6 workers); Denny Depo. 47:8-48:11; 51:17-23 (had a right-hand man who oversaw workers and up to 7 workers); Dunham Decl. ¶ 2 (employed husband and two children, day laborers and others); Eck Decl. ¶ 3 (since 2009, he worked on his own in the field); Frankian Depo. 112: 1-11 (5 to 8); Frankian Response to Class Member Questionnaire Nos. III.9-10 (11 individuals);Freeborn Decl. ¶ 2 (wife and two sons); Galindo Depo. 11:4-6; 17:20-18:8 (15 employees); Gallego Response to Class Member Questionnaire Nos. III.9-10 (8 employees, 3 independent contractors, 4 subcontractors); Gonzalez Depo. 23:20-23:24; 24:6-19, 25:3-20; 58:25-59:13 (hired employees and subcontractors, hired 8 people and personally performed work); Govan Depo. 12:22-25 (possibly 10 to 15 employees); Gowan Depo. 72:15—73:24 (at least five subcontractors); Hart Depo. 35:18—36:24 (one subcontractor and friends and family); Haskill Depo. 90:13-22; 93:9-94:4 (hired day laborers less than ten times); Haskill Response to Class Member Questionnaire Nos. III.9-10 (1 to three day laborers and 2 subcontractors); Henderson Depo. 32:17-

LITTLER MENDELSON, P.C.
333 Bush Street
34th Floor
San Francisco, CA 94104
415.433.1940

OPPOSITION TO PLAINTIFFS' MSJ                                          CASE NO. 3:13-CV-00057-WHO

11

Larger vendors, such as Monster Mowers, generate **over $1,000,000.00** in annual revenue through their work with FAS.  (Hunter Decert. Decl. ¶ 6; Dkt # 154-2.)  What's more, vendors – even those generating millions of dollars in revenue from FAS alone – can and do perform services for other entities.  It is undisputed that a substantial percentage of vendors have provided property preservation services to other clients, including competitors of FAS,[27] prior to, after, or even while contracting with FAS.[28] In fact, Bennet Vinson, one of Plaintiffs' declarants and the President of CD-McIntosh-Vinson Inc., a "family owned business" with years of "REO foreclosure experience," filed a putative class action independent contractor misclassification suit against AMS in 2014.  The

22 (frequently hired day laborers); Hopper Depo. 16:14—17:15 (wife, son, five day laborers); Jaques Depo. 24:7-19 (half a dozen helpers); Karger Decl. ¶ 4; Karger Depo. 107:7-17 (hired 5-7 crews of workers consisting of 1 to 2 workers per crew); Kleiser Decl. ¶ 10 (10-12 employees); E. Lewis Depo. 69:9-70:4, 70:13-25 (had discretion to hire workers and hired two workers); L. Lopez Decl. ¶ 5 (2-3 crews of workers, 1-2 workers per crew); S. Lopez Depo. 31: 20-32:9; 34:5-16; 35:21-36: 11; 36:21-37:1 (has one employee, but no subcontractors); Martell Decl. ¶ 19 (worked on his own); McLain Depo. 33:1-6; 34:1-11 (at most 10 to 20); Purkett Depo. 62:16-63:13 (at most two day laborers); Pyzer Depo. 40:9-16 (2 helpers); Robb Depo. 43:7-9; 44:3-16 (10 employees); Rosa Decl. ¶ 5 (three employees); Rosario Depo. 23:22-24:15 (between 1-5 workers); Samuels Decl. ¶ 12 (occasionally hires day laborers but otherwise performs himself); Torres Response to Class Member Questionnaire Nos. III.9-10 (10-15 individuals assisted); Vinson Depo. 42:22-43:8; 43:19-44:5; 45:14-24; 46:14-48:15; 51:11-52:2; 67:24-69:3 (subcontracted out 10% of work for FAS and separately hired 8-10 helpers to perform work); Yager Depo. 82:1-5 (10 to 12 individuals); Young Supp. Decl. ¶¶ 4, 8; Young Depo. 18:18-19:17; 24:4-13 (had multiple crews at any given time).

26 Barnes Depo. 23:25-24:7; Bates Depo. 31:2-5; Bronstrup Decl. ¶ 11; Cohick Depo. 59:3-23; Dasmacci Decl. ¶ 14; Denny Depo. 25:1-3; 74:1-13; Jones Depo. 92:9-93:5; Kleiser Decl. ¶ 10; Myers Decl. ¶ 7; Yager Depo.: 78:5-20.

27  These direct competitors include, without limitation: Asset Management Specialists ("AMS"), National Field Network ("NFN"), Safeguard, CoreLogic, MSI, Five Brothers, Cyprexx, Good Choice Preservation and Aim Your Way, LLC ("Aim Your Way").

28 Bagley Decl. ¶¶ 2, 4; Bates Depo. 18:5-23 (during class period, 5 other clients); Berg Decl. ¶ 6; Bess Depo. 9:1-12; 10:25—11:21; Bronstrup Decl. ¶¶ 4, 5, 6; Carlson Decl. ¶ 3; Cino Depo.  24:5-8; 145:6-18; 145:22-146:4; Cohick Depo. 27:18-24; 28:19-21; 29:9-14; 31:8-32: 14; 33:6-21; Cohick Response to Class Member Questionnaire No. II.4; Dasmacci Decl. ¶ 7-9; Dasmacci Response to Class Member Questionnaire No. II.4; Davis Depo. 53:4-22; 77:6-78:10; Davis Response to Class Member Questionnaire No. II.5; Denny Depo. 15:9-20; 98:19-99:20; Eck Decl. ¶¶ 7, 10; Elabed Decl. ¶¶ 3, 15; Frankian Depo. 55:9-23; 57:15-59:4; Frankian Response to Class Member Questionnaire No. II.4; Galindo Depo. 24:20-25:1; Govan Depo. 10:22-24; 11:12-22; Gowan Depo. 30:1-21; 31:10-16; Gowan Response to Class Member Questionnaire No. II.5; Hart Depo. 24:1-20; 27:1-19; Haskill Depo. 120:20-121:3; 121:17-24; Haskill Response to Class Member Questionnaire No. II.5; Jaques Depo. 50:13—51:4; Jones Depo. 60:8-61:13; Karger Depo. 71:24—72:18; Kleiser ¶¶ 4, 5; N. Lewis Depo. 16:11-14; 16:21—17:8; Lopez S. Depo. 16:16-24; Machado Decl. ¶ 2; Martell Decl. ¶¶ 7, 21; McLain Depo. 48:6-49:12; Montes Depo. 20:21-25; 21:21-22:5; Murray Depo. 33:2-14; Myers Decl. ¶ 11 ; Omans Decl. ¶¶  2, 4; Oropeza Decl. ¶ 13; Ortega Depo. 27:19-28:10; Parra Depo. 68:14—69:7; Purkett Depo. 24:8—25:2; Robb Depo. 26:7—27:17; 28:16-23; Rosario Depo. 17:17-20; Spencer Depo. 30:19—31:6; Torres Response to Class Member Questionnaire No. II.4; Vinson Depo. 34:23—35:19; Yager Depo. 35:22—36:13; Yager Response to Class Member Questionnaire No. II.5.

LITTLER MENDELSON, P.C.
333 Bush Street
34th Floor
San Francisco, CA  94104
415.433.1940

**OPPOSITION TO PLAINTIFFS' MSJ**          **CASE NO. 3:13-CV-00057-WHO**

12

1    complaint is strikingly similar to the operative complaint in this case,[29] and Mr. Vinson is

2    represented by Plaintiffs' counsel in that case.  (Vinson Depo. 117:15-24, Ex. 3; Request for Judicial

3    Notice ("RJN"), Exs. A-B.)[30]

4         A significant number of vendors have incorporated their businesses, while others operate as

5    sole proprietorships,[31] and many vendors had already established their businesses before contracting

6    with FAS.[32] In addition, many vendors have expressly acknowledged their intent to create an

7    independent contractor relationship with FAS.[33]

8         As Plaintiffs concede, vendors are also responsible for all costs associated with their

9    businesses, including administrative equipment, such as computers, printers, cameras and

10   telephones, and extensive (and sometimes specialized) field equipment, including trucks, trailers,

11   construction equipment, lawn mowers, and, generators, and for obtaining that equipment.[34]  Some

---

12   [29] *Compare* FAC [Dkt #4], ¶ 11, with *Vinson v. AMS*, FAC, ¶ 13 [Case 5:14-cv-00369-DDP-AGR] (4.10.14) ("*Vinson lawsuit*"); FAC [Dkt #4], ¶ 13, with *Vinson lawsuit* at ¶ 15.

13   [30] FAS notes that while Mr. Vinson has alleged that he had a written contract with AMS, Mr. Vinson has failed to produce any such contract in his litigation with FAS either at his June 18, 2014 deposition, or in the nearly three years that followed.  (*See* RJN, Ex. A: *Vinson lawsuit*, ¶ 37 ["Plaintiff and Class members entered into contracts with AMS… [t]hese agreements were in writing and governed the respective responsibilities of the parties."].)

14-15   [31] *See* Dkt #61, p. 17; **Sole proprietorships:** (F. Bowerman Depo. 13:1-6 (used BB Home services when performing services for FAS); J. Magdelena (Bowerman) Depo. 12:23-25; Dasmacci Decl. ¶ 4 Denny Depo. 30:6-9; Denny Decl. ¶ 3; Dunham Decl. ¶ 3; Eck Decl. ¶ 36; Frankian Depo. 22:3-4; Freeborn Decl. ¶ 2; Gonzalez Depo. 13:6-13; Gowan Depo. 19:3-9; Hart Depo. 38:24-39:11; Haskill Depo. 22:5-24:3; Hopper Depo. 13:25-14:7; Jaques Depo. ¶ 3; Jaques Depo. 12:10-14; Liana Lopez Decl. ¶ 2; Susannah Lopez Depo. 16:3-5; ; Martell  Decl. ¶ 2; Murray Depo. 26:17-27:21; Parra Depo. 12:8-9; Purkett Depo. 21:7-11; 22:21-23:14; Travis Pyzer Depo. 12:23-13:7; Robb Depo. 26:4-6); **Corporations:** (Ackel Depo.20:16-19; 26:21-24; Bronstrup Decl. ¶ 2Cino Depo. 22:10-21; Dasmacci Decl. ¶ 4; Elabed Decl. ¶ 36; Karger Depo. 29:11-22; Kleiser Decl. ¶ 2;  Mezin Depo. 21:11-16; Rosario Depo. 17:1-2; Young Decl. ¶ 2; Young Depo. 16:24-17:3; 17:19-18:14; 25:10-26:16 (corporation operating two different dbas under the same name).

16-23   [32] *See, e.g.,* Ackel Depo. 45:6-46:3; Bates Depo. 9:8-16; Bronstrup Decl. ¶¶ 2, 5; Carlson Decl. ¶¶ 2-3;  Cino Depo. 51:16-21; Davis Depo. 38:4-15; Eck Decl. ¶ 3; Gowan Depo. 19:10-25; 43:4-13; Karger Depo. 29:21-30:7; 47:8-13; S. Lopez Depo. 11:8-10; Omans Decl. ¶¶ 2-3; Oropeza Decl. ¶¶ 6-7; Purkett Depo. 22:21-22:23; 24:1-16; Robb Depo. 23:21-24:3; 28:11-13 (operated business since 1988, but started with FAS in 2007) Plaintiffs fail to cite to any evidence to support their erroneous assertion that FAS requires vendors to obtain an EIN prior to contracting with FAS.

24-27   [33] Barnes Depo. 49:12-19; Bess Depo. 101:13-23; Bronstrup Decl. ¶ 5; Cino Depo. 54:7-11; Dasmacci Decl. ¶ 10; Davis Depo. 116:2-13; Eck Decl. ¶ 9; Elabed Decl. ¶ 7;Govan Depo. 20:10-15; Gowan Depo. 47:6-48:4; Haskill Depo. 48:17-25; Henderson Decl. ¶ 5; Hopper Depo. 44:3-12; J. Kleiser Decl. ¶ 7; Lewis Depo. 67:8-16; Mari Depo. 13:12-15; Martell Decl. ¶ 6; McLain Depo. 73:11-22; Montes Depo. 79:19-80:16; Murray Depo. 54:24-55:6; Parra Depo. 25:1-26:1; Purkett Depo. 9:23-40:24; Pyzer Depo. 27:15-28:7; Spencer Depo. 46:16-47:7; Yager Depo. 100:21-24; *see also* Hunter Supp. Decl. ¶¶ 8-9; Exs. 6-7.

28   [34] Acevedo Depo. 36:5-37:21; 99:6-101:2; Acevedo Response to Class Member Questionnaire Nos. V.1-2; F. Acevedo Response to Class Member Questionnaire Nos. V.1-2; Ackel Depo. 32:16-22;

LITTLER MENDELSON, P.C.
333 Bush Street
34th Floor
San Francisco, CA  94104
415.433.1940

**OPPOSITION TO PLAINTIFFS' MSJ**                                    **CASE NO. 3:13-CV-00057-WHO**

vendors have even obtained physical office space from which they manage their businesses.[35]

Further, consistent with their right to perform services for others, vendors advertise their businesses

in a variety of ways ranging from websites, to business cards, t-shirts, and magnetic vehicle decals.[36]

33:12-23; 34:13-21; 41:4-10; 44:5; Barnes Depo. 21:1-18; Bates Depo. 25:23-26:7; 45:16-46:24; Bess Depo. 85:15-92:8; J. Magdelena (Bowerman) Depo. 121:15-18; 142:10-22; *see also* Reed Decl. ¶¶ 11, 15; F. Bowerman Depo. 132:16-23; Bronstrup Decl. ¶ 14; Carlson Decl. ¶ 10; Cino Depo. 30:6-31:2; 42:13-18; Cohick Depo., 47:3-16; 78:6-79:24; 81:10-21; 82:8-22; Cohick Response to Class Member Questionnaire Nos. V.1-2; Davis Depo. 64:20-25; 65:10-13; 103:13-104:17; Davis Response to Class Member Questionnaire Nos. V.1-2; Dasmacci Decl. ¶ 17; Denny Depo. 38:16-39:23; 41:2-19; 44:23-45:16; 46:9-13; Dunham Decl. ¶ 18; Dunham Response to Class Member Questionnaire Nos. V.1-2; Eck Decl. ¶ 4; Elabed Decl. ¶ 21; Frankian Depo. 102:19-25; 103:21-25; 104:3-19; 105:8-25; 106:2-11; Frankian Response to Class Member Questionnaire Nos. V.1-2; Gallego Response to Class Member Questionnaire Nos. V.1-2; Gonzalez Depo. 27:18-28:20; Gowan Depo. 130:10-16; 131:5-11; Gowan Response to Class Member Questionnaire Nos. V.1-2; Hart Depo. 30:20-24; 50:15-22; 51:5-17; 52:18-23; Haskill Depo. 39:16-25; 40:1-8; 40:18-21; 99:18-100:2; Haskill Response to Class Member Questionnaire Nos. V.1-2; Hopper Depo. 16:9-13; 33:17-23; 34:1-23; Jaques Depo. 19:19-23; 21:12-15; 21:23-22:10; 23:12-16; Jones Depo. 67:17-68:3; E. Kleiser Decl. ¶ 17; Lewis Depo. 67:18-68:20; 80:23-81:23; L. Lopez Decl. ¶ 19; S. Lopez Depo. 48:16-25; Martell Decl. ¶ 18; McLain Depo. 50:14-52:14; 64:1-4; 64:9-12; 65:2-8 166:1-8; Mezin Depo. 52:20-53:11; Mezin Response to Class Member Questionnaire Nos. V.1-2; Murray Depo. 47:6-48:6; Myers Decl. ¶ 7;  Omans Decl. ¶ 16; Parra Depo. 28:13-29:3;  29:13-18; Purkett Depo. 28:16-23; 32:25—33:24; R. Pyzer Decl. ¶¶ 27, 28; T. Pyzer Depo. 15:4-16:12; 20:9-22:23; Robb Depo. 29:23-30:25; 31:25-32:8; 37:5-38:20; Rosario Depo. 16:9-25, 20:22-21:7, 21:24-22:8, 24:2-20, 26:5-19; Torres Response to Class Member Questionnaire Nos. V.1-2; Vinson Depo. 70:19-71:16; Yager Depo. 75:5-8; 98:20-24; 99:2-5; Yager Response to Class Member Questionnaire Nos. V.1-2; Young Depo. 42:5-44:16.

[35] *See, e.g.,* Ackel Depo. 32:7-18 (1500-square-foot commercial office space); Bronstrup Decl. ¶ 14; Dasmacci Decl. ¶ 18; Elabed Decl. ¶ 20;  Govan Depo.;  44:17-25, Ex. 2; Kleiser Decl. ¶ 16;  N. Lewis Depo. 53:12-21; McLain Depo. 50:6-52:25 (started as a home office, but expanded to commercial office space possibly in 2008); Myers Decl. ¶ 8;  Ortega Depo. 31:2-8; 31:14-22; Robb Depo. 30:1-8 (office in warehouse); Young Decl. ¶ 16.

[36]  Ackel Depo. 35:7-18 (possibly business cards and logo on vehicle); Barnes Depo. 37:13-38:14; 41:21-42:4 (employees wore shirts with logo and phone number and had business cards); Bates Depo. 15:11-15; 28:22:29:12 (advertised on Craigslist in 2010); F. Bowerman Depo. 106:19-25; 53:11-54:22 (business cards and disputed email signature line); Bronstrup Decl. ¶ 15; Cino Depo. 31:9-32:5; Cohick Depo. 51:7-13; Davis Depo. 20:15-18; 22:9-13; 66:2-14; 67:2-69:12; 197:4-15) (website, business cards, t-shirts, Craigslist); Dasmacci Decl. ¶ 3; Denny Depo. 109:9-17 (sending out emails); Eck Decl. ¶ 5; Elabed Decl. ¶ 6; Frankian Depo. 26:3-22; Frankian Response to Class Member Questionnaire No. II.8 (business cards); Gowan Depo. 25:24-27:24; Gowan Response to Class Member Questionnaire No. II.9 (business cards, website magnetic decal); Hart Depo. 45:3-25 (business cards); Haskill Depo. 23:21-24:3; Haskill Response to Class Member Questionnaire No. II.9 (business cards); Hunter Decl. ¶ 24, Ex. C; 14 (stating that Cohick had apparel featuring his company's name); Jaques Depo. 14:20—16:25 (website); N. Lewis Depo. 55:11-56:11 (word of mouth, business cards); S. Lopez Depo. 29:12-17 (advertised through website, business cards, and newspaper, and signs on truck); Martell Decl. ¶ 21; McLain Depo. 52:15-54:3 (regular advertising on Facebook, local chamber lunches, business cards, flyers, ads, and attending conferences); Myers Decl. ¶ 9;  Omans Decl. ¶ 2; Parra Depo. 83:11-17 (advertised with t-shirts, business cards, and flyers); Purkett Depo. 29:13-25; Ramirez Decl. ¶ 4 (found job for Bowermans on Craigslist); Robb Depo. 41:22-42:8; 52:25-53:17 (yellow pages and possibly shirts); Rosario Depo. 21:10-13 (business cards); Torres Response to Class Member Questionnaire No. II.8 (claims no advertising but had business cards); Vinson Depo. 38:16-39:4; 39:7-11 (website, Facebook page, business cards); Young Decl. ¶ 17; Yager Depo. 99:16-100:20; 73:3-10; 74:21-75:4; 75:11-22 (business cards); Prentiss

LITTLER MENDELSON, P.C.
333 Bush Street
34th Floor
San Francisco, CA  94104
415.433.1940

**OPPOSITION TO PLAINTIFFS' MSJ**                                    **CASE NO. 3:13-CV-00057-WHO**

14

Vendors that choose to engage other individuals (e.g., employees or independent contractors) are also responsible for all personnel decisions, and for paying their staff.[37]  To that end, some vendors, such as David Bates and Fred Bowerman, distribute their own Employee Handbooks to their workers.  (Bates Depo. 40:3-19; Ex. 5; Bowerman Depo. 103:25-104:8.)  Some vendors handle personnel matters without issue, while others, such as Monster Mowers and Pacific Property Preservation LLC dba Cowell Creekside Home Maintenance, have been sued by their own workers for various claims, including independent contractor misclassification.  (Dkt No. 152, pp. 12-13; *see also* Cohick Depo., 122:21-125:13; RJN, Exs. C-G.

Unlike Plaintiffs, who make sweeping generalizations based on individualized testimony, FAS does not contend that *all* vendors operate their businesses in the same manner.  In other words, FAS acknowledges that not all vendors engage dozens of employees and subcontractors, generate millions of dollars in revenue, and perform services for several different clients.  On the contrary, because vendors are free to operate their businesses in any manner they deem fit, there is significant variation in this area.  (*See* Defendants' Motion to Decertify [Dkt #154].)  That said, it is undisputed that *all* vendors have the right to (and many do) expand their businesses to the fullest extent possible.

## III.   PLAINTIFFS CANNOT MEET THEIR BURDEN FOR SUMMARY JUDGMENT

### A.   Summary Judgment Standard

Summary judgment is governed by Rule 56 of the Federal Rules of Civil Procedure.

Depo. 209:6-24 (received business cards); J. Bowerman Depo. 32:22-33:9, Ex. 11; Dkt #152 (discussing Monster Mowers advertising expenses).

[37]   Ackel Depo. 69:17-70:9 (set pay so he would make money); Bates Depo. 117:17-19; 122:11-13 (chose how to pay employees; never told to hire employees); J. Bowerman Depo. 29:2-29:5; 37:11-17; 120:10-12; 123:2-8 (hired and fired employees; advertised for employees; made decisions regarding how to pay employees); Bowerman Depo. 103:25-104:21; 111:19-112:10 (FAS never told who to hire and fire; provided an employee handbook); Cino Depo. 119:7-11 (never told by FAS who to hire); Cloud Depo. 81:5-7 (FAS never instructed regarding the hiring of workers); Davis Depo. 133:7-9 (chose how to pay employees); Galindo Depo. 35:20-36:8 (never told to hire workers); Gonzalez Depo. 91:10-25 (no instruction and decided how to pay); Hart Depo. 60:5-10 (agreed with day laborers on the amount); Hart Depo. Vol. II 153:8-12 (FAS never told who to hire and fire); Henderson Depo. 33:12-16 (never instructed as to who to hire); S. Lopez Depo. 31:25-32:6 (tells bank how much to pay employee); Murray Depo. 42:3-43:3 (determined how to pay helpers); N. Lewis Depo. 102:13-20 (never told who to hire/fire); Hooper Depo. 72:15-22; 74:4-13 (payment for day laborers decided by Hooper; complete control over personnel decisions); McLain Depo. 124:1-11; 125:1-5 (never told to hire/fire employees or how to pay); Montes Depo. 71:22-72:5; 107:14-108:1 (FAS had no control over personnel decisions; made decisions regarding pay); Parra Depo. 66:15-21 (not instructed to hire employees and chose pay); Robb Depo. 94:8-95:2 (FAS had no control over personnel decisions).

LITTLER MENDELSON, P.C.
333 Bush Street
34th Floor
San Francisco, CA  94104
415.433.1940

**OPPOSITION TO PLAINTIFFS' MSJ**                    **CASE NO. 3:13-CV-00057-WHO**

15

Summary judgment is only appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of showing no genuine issue of material fact exists. *Celotex Corp v Catrett*, 477 U.S. 317, 322-23 (1986). Courts must determine whether the moving party has met its burden by viewing the facts in the light most favorable to the nonmoving party. *Fichman v. Media Ctr.*, 512 F.3d 1157, 1159 (9th Cir. 2008).

In independent contractor misclassification cases, "if reasonable people could differ on whether a worker is an employee or an independent contractor based on the evidence in the case, the question is not for a court to decide; it must go to the jury." *Cotter v. Lyft*, 60 F. Supp. 3d 1067, 1076 (N.D. Cal. 2015) (citing *Angelotti v. Walt Disney Co.*, 192 Cal. App. 4th 1394 (2011).

## B.   Independent Contractor Status Under California Law

Under California law, "the principal test of an employment relationship is whether the person to whom service is rendered has the right to control the manner and means of accomplishing the result desired." *S.G. Borello & Sons, Inc. v. Dep't of Indus. Relations*, 48 Cal. 3d 341, 350 (1989). "[T]he right to exercise complete or authoritative control must be shown, rather than mere suggestion as to detail." *Ali v. U.S.A. Cab Ltd*., 176 Cal. App. 4th 1333, 1347 (2009). "A worker is an independent contractor when he or she follows the employer's desires only in the result of the work, and not the means by which it is achieved." *Id.*; *see, also, Varisco v. Gateway Science & Eng'g, Inc.*, 166 Cal. App. 4th 1099, 1103 (2008); *Fireman's Fund Ins. Co. v. Davis*, 37 Cal. App. 4th 1432, 1442-43 (1995) (one who hires an independent contractor may still retain a general power of supervision and control as to the results of the work so as to ensure satisfactory performance of the contract). Specifically:

> [T]he owner may retain a broad general power of supervision and control as to the results of the work so as to insure satisfactory performance of the independent contract—including the right to inspect, the right to make suggestions or recommendations as to details of the work, the right to prescribe alterations or deviations in the work—without changing the relationship from that of owner and independent contractor.

*McDonald v. Shell Oil Co*., 44 Cal. 2d 785, 790 (1955).

Courts also look to a variety of secondary factors, including: (a) whether the one performing

LITTLER MENDELSON, P.C.
333 Bush Street
34th Floor
San Francisco, CA 94104
415.433.1940

OPPOSITION TO PLAINTIFFS' MSJ                    CASE NO. 3:13-CV-00057-WHO

16

services is engaged in a distinct occupation or business; (b) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the principal or by a specialist without supervision; (c) the skill required in the particular occupation; (d) whether the principal or the worker supplies the instrumentalities, tools, and the place of work for the person doing the work; (e) the length of time for which the services are to be performed; (f) the method of payment, whether by the time or by the job; (g) whether or not the work is a part of the regular business of the principal; (h) whether or not the parties believe they are creating the relationship of employer-employee; (i) the alleged employee's opportunity for profit or loss depending on his managerial skill; (j) the alleged employee's investment in equipment or materials required for his task, or his employment of helpers; (k) the degree of permanence of the working relationship; and (l) whether the relationship was exclusive.  *Borello*, 48 Cal. 3d at 351 (citing *Real v. Driscoll Strawberry Associates, Inc.*, 603 F.2d 748, 754 (9th Cir. 1979)); *Arnold v. Mutual of Omaha Ins. Co.*, 202 Cal. App. 4th 580 (2011).

Courts must weigh these factors as a whole, rather than apply them mechanically as separate tests. *Borello*, 48 Cal. 3d at 351.  These "'individual factors' [are] not to be 'applied mechanically as separate tests' but [are] 'intertwined' and often given weight depending on the particular combination of factors." *Arnold*, 202 Cal. App. 4th at 584 (quoting *Borello* at 351).

### C.    Summary Judgment Must Be Denied Because The Record Strongly Favors Independent Contractor Status

Plaintiffs rely heavily upon the Ninth Circuit's decisions in *Alexander v. FedEx Ground Package Sys.*, 765 F.3d 981 (9th Cir. 2014) and *Ruiz v. Affinity Logistics Corp.*, 754 F.3d 1093 (9th Cir. 2014) to support their argument that summary judgment is warranted here.  But as the Northern District previously recognized, "those rulings [and two decisions finding workers to be independent contractors as a matter of law] were based on a conclusion that the arrow pointed so strongly in the direction of one status or the other that no reasonable juror could have pointed the arrow in the opposite direction after applying California's multi-factor test." *Cotter*, 60 F. Supp. 3d at 1078.

As noted in *Cotter*, "*Alexander* turned on FedEx's '***control over every exquisite detail of the drivers' performance***,' including: (i) their appearance; (ii) the appearance and specifications of their

LITTLER MENDELSON, P.C.
333 Bush Street
34th Floor
San Francisco, CA 94104
415.433.1940

**OPPOSITION TO PLAINTIFFS' MSJ**                                    **CASE NO. 3:13-CV-00057-WHO**

17

vehicles; (iii) their work schedules; and (iv) their services areas." 60 F. Supp. 3d at 1081 (internal citations omitted) (emphasis supplied).   The Ninth Circuit focused on these aspects of the relationship, as well as FedEx's operating agreement, which clearly "creat[ed] the constraints of an employment arrangement." *Alexander*, 765 F.3d at 998.

In *Ruiz*, the Ninth Circuit found that truck drivers were employees because Affinity controlled drivers' rates (there was no negotiation), set their schedules and routes, and controlled their appearance. 754 F.3d at 1101. Affinity also required drivers to report to the warehouse every morning, and to call "their Affinity supervisor after every two or three stops." *Id.* at 1102. Affinity even went so far as to provide drivers with "the main tool [] used to conduct their business" – their delivery trucks. *Id.* at 1104.

In this case, it cannot be said that the undisputed facts point "so strongly" towards a classwide[38] finding of employee status such that no reasonable juror could reach a different conclusion, like in *Alexander* and *Ruiz*. In fact, the *Borello* factors either strongly favor independent contractor status,[39] or are neutral at the very least, and the indicia of control present in *Alexander* and *Ruiz* are entirely absent from this case.

## 1.     Right To Control

Where the parties have entered into a written contract that specifies the terms of the relationship, "such a contract is generally the most significant determinant of whether an employer-employee relationship has arisen." *Ayala v. Antelope Valley Newspapers, Inc.*, 59 Cal. 4th 522, 540 (2014) (Baxter, concurring). Here, many potential class members executed vendor packets that confirmed their right to control the manner and means of performance as independent contractors. (See Section II.A, *supra*.) Further, none of the packets includes any limitations with respect to *who* can perform the work. Potential class members are free to send their businesses' employees and

---

[38] As set forth in FAS's motion to decertify, FAS does not contend that every single potential class member would necessarily qualify as an independent contractor under the *Borello* test. Of course, this begs the question of who actually falls within the certified class, a question that has not yet been – and likely never will be – answered.

[39] Indeed, the record demonstrates that the arrows point unequivocally towards *independent contractor status* with respect to several potential class members. (*See, e.g.,* Defendants' Motion for Summary Judgment [Dkt #152].)

LITTLER MENDELSON, P.C.
333 Bush Street
34th Floor
San Francisco, CA  94104
415.433.1940

**OPPOSITION TO PLAINTIFFS' MSJ**                          **CASE NO. 3:13-CV-00057-WHO**

18

1  subcontractors out to the job-site to perform all the work they accept from FAS, and they are also

2  free to personally perform all of the work themselves.  Given their complete freedom to control the

3  most critical aspect of the performance of the contracted services, it cannot be said that vendors do

4  not retain the right to control the manner and means of performance.

5       In addition, vendors are subject to minimal – if any – oversight from FAS, which is based in

6  Texas.  Indeed, the procedures that Plaintiffs contend qualify as the exertion of "employer control"

7  (e.g., photograph verification, job specifications, inspections, etc.) are all directed towards

8  confirming that the work a vendor accepts has been completed to the client's specifications (see

9  Section II.C, *supra*), which is entirely consistent with a business-to-business relationship.  *See*

10  *Fireman's Fund Ins. Co.*, 37 Cal. App. 4th at 1442-43; *McDonald*, 44 Cal. 2d at 790; *cf. Alexander*,

11  765 F.3d at 990 ("Most obviously, no reasonable jury could find that the 'results' sought by FedEx

12  includes detailed specifications as to the delivery driver's fashion choices and grooming.  And no

13  reasonable jury could find that the 'results' FedEx seeks include having all of its vehicles containing

14  shelves built to exactly the same specifications. Other aspects of FedEx's control— such as limiting

15  drivers to a specific service area with specific delivery locations— also are not merely control of

16  results under California law.")

17       In addition, many vendors have confirmed they were never "supervised" or "monitored" by

18  FAS, let alone to such an extent that it altered their right to control the manner and means of

19  performance.  (See Section II.C.2, *supra*.)  Plaintiffs also completely ignore that many job

20  specifications are designed to ensure compliance with applicable law (see Section II.A, *supra*),

21  thereby precluding Plaintiffs from relying upon them as evidence of control.  *See Southwest*

22  *Research Institute v. UIAB* 81 Cal. App. 4th 705, 710 (2000) (although the company "provided

23  [employee] with the 'instrumentalities'…these items were federally mandated and not indicia of an

24  employment relationship."); *Arnold*, 202 Cal. App. 4th at 589 (noting that employer training was

25  voluntary "except as required for compliance with state law" in finding independent contractor

26  status; *NLRB v. Friendly Cab Co., Inc.*, 512 F. 3d 1090, 1098 n.7 (9th Cir. 2008) ("[r]estricting cab

27  leases to ten hours per day … does not constitute any degree of control since it is mandated by

28  government regulation"); *SIDA of Hawaii, Inc. v. NLRB* 512 F. 2d 354, 359 (9th Cir. 1975) ("fact

**OPPOSITION TO PLAINTIFFS' MSJ**        **CASE NO. 3:13-CV-00057-WHO**

that a putative employer incorporates into its regulations controls required by a government agency does not establish an employer-employee relationship.")

And unlike in *Ruiz* and *Alexander*, where the principals exercised control over "***every exquisite detail***" of the work, Plaintiffs do not submit any evidence demonstrating that FAS has exerted uniform control over areas that are not directly tied to the "results," such as (i) the vendors' appearance or apparel; (ii) the brands or appearance of the equipment they use; (iii) their schedules, days of work, and hours; or (iv) their geographic coverage areas.

As a whole, the record therefore demonstrates that vendors, not FAS, retain and exercise the right to control the manner and means of their performance. Regardless, as set forth below, even if FAS did "retai[n] a good deal of control over how [vendors] proceed" with their work, summary judgment would still be unwarranted in light of the other evidence that favors independent contractor status. *Cotter*, 60 F. Supp. 3d at 1078.

### 2. The Secondary Factors Strongly Favor Independent Contractor Status

#### a. Distinct Occupation Or Business

The record demonstrates that vendors are fully independent businesses. Vendors operate corporations, LLCs, and sole proprietorships. (*See* note 30, *supra.*) Unlike in *Ruiz*, where the class members' "businesses were in name only" and drivers could not work for others, *all* vendors here have the right to provide services to others (including FAS competitors), and many have done so before, during, and after contracting with FAS. (See Section II.D, *supra.*) *Ruiz*, 754 F.3d at 1104; *see also Harris v. Vector Mktg. Corp.*, 656 F. Supp. 2d 1128, 1138 (N.D. Cal. 2009) (non-exclusive relationship and worker's soliciting of other customers supported independent contractor status); *Elijahjuan v. Superior Court*, 210 Cal. App. 4th 15, 32 (2012) (finding there was substantial evidence that plaintiffs were independent contractors because "Plaintiffs were also free to contract with other companies."). In addition, many vendors have contracted with FAS only after having already established their businesses.[40] (See Section II.D, *supra.*) Further, vendors (i) advertise their services in a variety of ways, (ii) invest in extensive field and office equipment (including physical

---

[40] Unlike in *Ruiz*, where drivers were *required* to create their businesses (and Affinity even helped them fill out the necessary paperwork), Plaintiffs do not offer any evidence demonstrating that FAS required vendors to establish business entities. Nor could they.

LITTLER MENDELSON, P.C.
333 Bush Street
34th Floor
San Francisco, CA 94104
415.433.1940

office space), and (iii) manage crews of employees and subcontractors.  (See Section II.D, *supra*.)  Accordingly, this factor overwhelmingly favors independent contractor status.

### b.      Whether The Work Is Usually Done Without Supervision

The record demonstrates that vendors regularly complete their work without any supervision from FAS, *which is based in Texas*.  Many vendors confirmed they have never even met an FAS representative in person.  (See Section II.C.2, *supra*.)  And as discussed above, the procedures Plaintiffs contend qualify as "supervision" (work orders, photo documentation, property visits) are solely used to verify that work has been completed, and to the client's specifications, before payment is made.  In other words, Plaintiffs inaccurately conflate verification with supervision.

### c.      The Skill Required In The Particular Occupation

Property preservation work encompasses tasks – such as hazardous materials transportation, home winterization, roofing, etc. – that many lay persons may not be able to safely and/or properly complete.  (See Section II.A, *supra*.)  As evidenced by the fact that many successful vendors have operated in the property preservation industry for several years, experience and skill in this area is critical.  Further, even with respect to the tasks that were arguably more menial (e.g., mowing lawns), vendors often need to utilize logistics and management skills to coordinate the performance of the work.  This factor therefore weighs in favor of independent contractor status.

### d.      Provision Of Instrumentalities And Tools / Investment

"Where the defendant 'd[oes] not furnish the majority of the tools and instrumentalities' nor 'a place to work' this fact weighs in favor of finding an independent-contractor relationship." *Hennighan v. Insphere Insurance Solutions, Inc.*, 38 F. Supp. 3d 1083, 1103 (N.D. Cal. 2014); *see also Arnold* at 589 (granting summary judgment for defendant in part because plaintiff "was responsible for her own instrumentalities or tools with the exception of limited resources offered by Mutual to enhance their agents' successful solicitation of Mutual's products"); *State Comp. Ins. Fund v. Brown,* 32 Cal. App. 4th 188, 203 (1995); *Millsap v. Federal Express Corp.,* 227 Cal. App. 3d 425, 431 (1991) (evidence of an independent contractor relationship where the driver used his own vehicle and paid for his own business expenses); *cf. Ruiz*, 754 F.3d at 1104 (Affinity provided drivers with "the main tool [] used to conduct their business" – their delivery trucks); *Alexander*, 765

**OPPOSITION TO PLAINTIFFS' MSJ**                                    **CASE NO. 3:13-CV-00057-WHO**

F.3d at 986, 995 (although drivers provided trucks, FedEx was deeply involved in the purchasing process, including through the provision of funds, and provided a support package with other necessary equipment); *Santa Cruz Transportation, Inc. v. Unemp't Ins. Appeals Bd.,* 235 Cal. App. 3d 1363, 1368 (1991) (driver leased vehicle from Yellow Cab).

In this case, it is undisputed that vendors provide all the equipment and tools needed to perform the contracted services – from office space and office equipment, to extensive field equipment and the vehicles that transport same, to the crews of employees and subcontractors who often perform the work on the vendors' behalf – and heavily invest in their businesses.  (See Section II.C, D, *supra*.)  This factor thus weighs strongly in favor of independent contractor status.

### e.      Method Of Payment

Again, it is undisputed that vendors are paid "by the job," not by the hour.  (See Section II.A, *supra*.)  In addition, despite Plaintiffs' representations to the contrary, the record demonstrates that vendors can and do negotiate over the pricing of the work (see Section II.B, *supra*), which further favors independent contractor status.

### f.      Whether The Work Is A Regular Part Of The Business Of FAS

While FAS coordinates the provision of property preservation services, it does not itself provide property preservation services. (See Section II.A, *supra*.)

### g.      Intent Of The Parties

Many vendors execute packets and contracts memorializing their intent to operate as independent contractors (see Section II.A, *supra*), and many potential class members already testified to entering into those contracts for this purpose.  (See Section II.D, *supra*.)  Accordingly, this factor favors independent contractor status.

### h.      Opportunity For Profit Or Loss

One trait that almost no employees have – and which, conversely, is central to a true independent contractor/principal relationship – is "the opportunity for entrepreneurial profit or loss depending upon his/her managerial skills."  *Borello*, 48 Cal. 3d at 351.  An individual whose business "ha[s] the potential for profit, and [the individual's] operation of their businesses … potentially influenced this profit," that person is more likely to be an independent contractor.  *Ruiz v.*

LITTLER MENDELSON, P.C.
333 Bush Street
34th Floor
San Francisco, CA 94104
415.433.1940

**OPPOSITION TO PLAINTIFFS' MSJ**                                   **CASE NO. 3:13-CV-00057-WHO**

22

1  *Affinity Logistics Corp.*, 887 F. Supp. 2d 1034, 1050 (S.D. Cal. 2012), rev'd and remanded, 754 F.3d

2  1093 (9th Cir. 2014); *see also Lara v. Workers' Comp. Appeals Bd.*, 182 Cal. App. 4th 393, 401

3  (2010) (concluding plaintiff was an independent contractor where "profit or loss depended on his

4  scheduling, the time taken to perform the services, and his investment in tools and equipment."). For

5  example, "controlling the amount of time, effort, and financial investment" makes one much less

6  likely to be an employee. *Hennighan*, 38 F. Supp. 3d at 1092 (finding independent contractor

7  status).

8       In this case, the undisputed facts show that vendors have opportunities for profit and loss *in

9  the millions of dollars* based upon their managerial skill, including by: (i) determining whether, and

10  to what extent, to hire employees and/or subcontractors (including administrative assistance), which

11  crews to send out to which properties, who to hire, and how much to pay them; (ii) selecting their

12  coverage areas; (iii) determining the specific property preservation services to offer; (iv) deciding

13  upon which jobs to accept or decline; (v) making decisions regarding the types and brands of

14  equipment utilized; and (vi) deciding whether to expand their businesses to perform services for

15  others. (See Section II.B, C, D, *supra*.) All of these decisions directly impact the amount of revenue

16  vendors generate, leaving no doubt they have significant opportunity for profit and loss.

17                          **i.      Employment Of Others**

18       The hiring of others to complete the accepted work is "strong evidence suggesting that [a

19  defendant does] not have the requisite level of control over the manner and means of [the

20  individual's] work." *Ruiz v. Affinity Logistics Corp*., 887 F. Supp. 2d 1034, 1041 (S.D. Cal. 2012),

21  rev'd and remanded, 754 F.3d 1093 (9th Cir. 2014); *Borello*, 48 Cal. 3d at 355; *see, also, Ayala*, 59

22  Cal. 4th at 549 (repeatedly referencing the use of helpers in determining whether the independent

23  contractor test was correctly applied.); *Performance Team Freight Sys., Inc. v. Aleman*, 241 Cal.

24  App. 4th 1233 (2015), *reh'g denied* (Nov. 30, 2015) (finding drivers were independent contractors

25  rather than employees in part because drivers could hire their own employees); *Garcia v. Seacon

26  Logix, Inc.*, 238 Cal. App. 4th 1476, 1481 (2015) (finding respondents were employees where

27  appellant "did not permit respondents to hire other drivers."); *Briggs v. California Emp't Comm'n*,

28  28 Cal. 2d 50, 54 (1946) ("He did all of the work himself or hired helpers whom he paid… [u]nder

**OPPOSITION TO PLAINTIFFS' MSJ**                                    **CASE NO. 3:13-CV-00057-WHO**

1    these circumstances, in every respect, the distributor was an independent contractor." ).

2        In this case, vendors hire, manage, and pay their own employees and subcontractors.  Some

3    vendors have hired administrative staff.  Many vendors send their employees to properties without

4    accompanying them to the job-site.  (See Section II.C, *supra*.)  Although Plaintiffs suggest the hiring

5    was done at the behest of FAS, the evidence Plaintiffs rely upon to support this proposition only

6    suggests – at most – that a few vendors may have hired workers to enable them to take on more

7    work, and to earn more revenue.    Thus, the record demonstrates that this factor, again,

8    overwhelmingly favors independent contractor status.

9                    **j.      Degree Of Permanence**

10       FAS's most recent template contract specifies a one-year term, subject to cancellation by

11   either party with 30-days' notice, and further allows termination for breach by either Party subject to

12   a five-day cure provision.  (Hunter Supp. Decl. ¶ 9, Ex. 7; Hunter Decert. Decl. ¶ 2.)  Prior versions

13   included mutual termination provisions and/or were of an unspecified or indefinite period.  These

14   facts are not indicative of an employer-employee relationship.[41]  On the contrary, when "the right to

15   terminate their arrangement was a mutual one[,] … these circumstances show an association, rather

16   than the relation of employer and employee."  *Beaumont-Jacques v. Farmers Group, Inc.,* 217

17   *Cal.App.4th 1138*, 1147 (2013) (citation omitted); *Hennighan*, 38 F. Supp. 3d at 1105 ("A mutual

18   termination clause is evidence of an independent contractor relationship").

19                    **k.      Whether The Relationship Was Exclusive**

20       Despite Plaintiffs having gone to great lengths to attempt to exclude individuals from the

21   class whose businesses provided services for others, the record demonstrates that vendors are

22   entirely free to, and regularly do, provide services to others, including direct competitors of FAS,

23   before, during, and after the time period in which they contract with FAS.  (See Section II.D, *supra*.)

24   As discussed above, this is strong evidence of independent contractor status.

___

25
26   [41] Although Plaintiffs argue that mutual at-will termination provisions are strong evidence of control,
     they fail to acknowledge the importance of context.  A mutual right to terminate at will might mean
27   one thing to a putative independent contractor who (i) has never before performed the work subject
     to the underlying agreement, and (ii) has no right to perform services for others, but something
28   completely different to a long-established corporation, which regularly provides services to multiple
     clients, including the principal's competitors.

LITTLER MENDELSON, P.C.
333 Bush Street
34th Floor
San Francisco, CA  94104
415.433.1940

**D.     Summary Judgment As To Plaintiffs' Expense Reimbursement And Overtime Claims Must Be Denied**

While FAS does not reimburse vendors for their business expenses as a matter of policy, vendors can and do negotiate over payment for some of the very same costs Plaintiffs seek to recover by way of their expense reimbursement claim, such as dump fees and mileage.[42]  In addition, the fact that FAS does not pay overtime to vendors does not render FAS liable for overtime premium pay as a matter of law, particularly where, as here, the record demonstrates that some vendors do not work more than 8 hours in a given day or more than 40 hours in a week.[43]

Accordingly, classwide summary judgment in favor of Plaintiffs with respect to FAS's liability for these claims must be denied. *See Morgan v. Wet Seal Inc.*, 210 Cal. App. 4th 1341, 1358 (2012) (proving liability for failure to reimburse expenses would involve answering: (1) what, if anything, the employee was told regarding reimbursement of expenses; (2) whether each expense was necessary and a direct consequence of the discharge of the employees' job duties; (3) whether the employee sought reimbursement of that expense; and (4) whether the employee was in fact reimbursed); *Sotelo v. MediaNews Group*, 207 Cal. App. 4th 639, 654 (2012) (recognizing that "simply having the status of an employee does not make the employer liable to a claim for overtime compensation." Such misclassification, even if true, is "only part of the equation… Plaintiffs must prove that putative class members in fact worked sufficient days and/or hours [for each putative class member] to be entitled to overtime.").

**IV.     CONCLUSION**

For all of the foregoing reasons, FAS respectfully requests that the Court deny Plaintiffs'

---

[42] Dump Fees: Cohick Depo. 96:7-19; Vinson Depo. 93:3-11; McClain Depo. 97:19-98:14; Robb Depo. 69:12-70:9; Govan Depo. 26:5-27:1; Bess Depo., 50:18-51:17; Murray Depo. 86:2-87:2; Mileage: Cohick Depo. 95:26-96:6; McClain Depo. 97:9-17; Cino Depo. 87:14-88:20; Bess Depo. 50:7-17; Hart Depo. 87:23-88:18; Mezin Depo. 62:25-63:8; Gonzalez Depo. 43:22-44:19 (Gonzalez would negotiate with FAS over distance/mileage fees "almost every day"); Spencer Depo. 54:7-15; Hart Depo. 61:15-62:8; Hopper Depo. 55:19-56:4 (Hopper would negotiate distance/mileage fees before accepting a property out of his area); Acevedo Depo. 77:15-78:13; Frankian Depo.158:18-24; Ortega Depo. 53:11-22.

[43] Parra Depo. 50:5-14 (worked on average 4 days a week, 7 hours a day); Henderson Depo. 41:11-24 (spent 2-3 hours a day performing services for FAS); Hopper Depo. 64:10-19 (estimates of 6-8 hours per day); Ortega Depo. 66:15-21 (had one 8 hour day of work); Spencer Depo. 57:3-11 (worked approximately 1-2 hours a week on FAS jobs).

LITTLER MENDELSON, P.C.
333 Bush Street
34th Floor
San Francisco, CA  94104
415.433.1940

1  Motion in its entirety.

2  Dated: February 1, 2017

3

4                                              */s/ Aurelio Perez*
                                               ROBERT G. HULTENG
5                                              AURELIO PEREZ
                                               ALISON J. CUBRE
6                                              KEVIN R. VOZZO
                                               DANTON W. LIANG
7                                              LITTLER MENDELSON, P.C.
                                               Attorneys for Defendants
8                                              FIELD ASSET SERVICES, INC. and
                                               FIELD ASSET SERVICES, LLC

9

10

11
   Firmwide:145581896.1 066383.1035
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**OPPOSITION TO PLAINTIFFS' MSJ**                    **CASE NO. 3:13-CV-00057-WHO**