1

2

3

4                           UNITED STATES DISTRICT COURT

5                          NORTHERN DISTRICT OF CALIFORNIA

6

7    FRED BOWERMAN, et al.,                    Case No.   3:13-cv-00057-WHO

8                 Plaintiffs,
                                               **ORDER DENYING DEFENDANT'S**
9         v.                                   **MOTION TO DECERTIFY THE**
                                               **CLASS; GRANTING PLAINTIFF'S**
10   FIELD ASSET SERVICES, INC., et al.,       **MOTION FOR PARTIAL SUMMARY**
                                               **JUDGMENT; GRANTING**
11                Defendants.                  **DEFENDANT'S MOTION FOR**
                                               **SUMMARY JUDGMENT AS TO**
12                                             **MAGDALENO AND DENYING AS TO**
                                               **COHICK AND ACKEL**
13
                                               Re: Dkt. Nos. 152, 154, 155
14

15                                **INTRODUCTION**

16        This is a classwide misclassification case involving vendors who perform property

17   preservation services in California for Field Asset Services, Inc.  I previously granted plaintiffs'

18   renewed motion for class certification after they "limit[ed] the class to a group of vendors over

19   which FAS has a uniform right of control."  Certification Order at 2 (Dkt. No. 85).  FAS now

20   moves to decertify the class, and for summary judgment as to one of the named plaintiffs and two

21   absent class members.  Plaintiffs move for partial summary judgment as to their status as

22   employees under the law, and their resulting entitlement to expenses and overtime pay.

23        While FAS again highlights manageability concerns that complicate class treatment, as it

24   has throughout this litigation, those concerns are not substantial enough to justify decertifying the

25   class.  The class meets the requirements of Rule 23 and discovery has not revealed otherwise.  The

26   overwhelming weight of the evidence supports a finding that FAS retained and, more often than

27   not, *actually exercised* a right to control the manner and means of the vendors' work.  While some

28   of the secondary factors for evaluating proper classification fall in FAS's favor, they cannot

1    overcome the powerful evidence of control that establishes that the vendors are employees as a

2    matter of law.  A reasonable jury could not return a verdict for FAS on that issue.  Accordingly,

3    plaintiffs' motion for partial summary judgment is GRANTED as to FAS's affirmative defense

4    that the vendors are independent contractors and as to its liability for failing to pay overtime and

5    business expenses.  FAS's motion for summary judgment is GRANTED as to purported class

6    member Julia Magdaleno, but DENIED as to Matthew Cohick and Eric Ackel.

7                                    **BACKGROUND**

8    **I.    FACTUAL BACKGROUND**[1]

9         **A.    FAS's Business Model**

10        FAS is a property preservation, maintenance, and repair services company for foreclosed

11   and real-estate-owned properties.[2]  Hunter Decl. ¶¶ 2, 8 (Cubre Decl. ¶ 46, Ex. 45, Dkt. No. 189-6,

12   50-2).  It maintains a network of "vendors"[3] to perform work at the properties for the clients.

13   Hunter Decl. ¶ 5; Hunter Dep. at 354:5–10 (FAS's "Person Most Knowledgeable")(Duckworth

14   Decl. Ex. 2, Dkt. No. 155-3).  Vendors may range in size from sole proprietors to large

15   corporations.  Cubre Decl. ¶ 4 (Dkt. No. 156).

16        FAS owns the contracts with its property-owner clients and serves as the intermediary

17   between clients and vendors—forbidding clients from contacting Vendors and hiring them

18   directly.  Hunter Decl. ¶ 6; Hunter Dep. at 66:3–5 ("Generally the point of contact for the vendor

19   would be FAS, as FAS is facilitating the vendor relationship on behalf of the client."); Pl.'s Mot.

20

---

21   [1] The disputed nature of many of the facts are identified when material.  Plaintiffs note that certain
22   portions of FAS's cited deposition testimony were not included in FAS's exhibits, FAS corrected
     this omission with a Notice of Errata, filed on February 12, 2017.  Dkt. No. 198.

23   [2] FAS argues that it does not provide property preservation services, but it identifies itself as "the
24   premier Property Preservation, REO Maintenance, and Repair Services company in the United
     States, servicing more than $2 billion in residential assets on behalf of our clients."  FAS
25   Marketing material (Duckworth Decl. ¶ 4, Ex. 1, Dkt. No. 155-2 at 5).  The argument appears to
     be based on semantics.  It is addressed in the discussion of the secondary factors.  It does not
26   create a genuine dispute.

27   [3] According to plaintiffs, "the parties always have read and treated the class member definition
     ["vendors"] as being the owner of the business entity."  Opp'n to Def.'s Mot. to Decertify at 2
28   (Dkt. No. 191).

United States District Court
Northern District of California

United States District Court
Northern District of California

for Partial Summary J. at 3 ("MPSJ")(Dkt. No. 155).   A "company"[4] applies to become a vendor

by submitting a complete Vendor Qualification Packet ("VQP"), which sets out the terms of the

relationship between the parties.[5]   Hunter Decl. ¶¶ 8–10; 2009 VQP with attachments (Duckworth

Decl. ¶ 20, Ex. 17, Dkt. No. 155-18); 2009–2013 VQPs (Duckworth Decl.¶ 38, Exs. 34–38, Dkt.

Nos. 155-35–155-39); 2013 VQP (Duckworth Decl. ¶ 9, Ex. 6, Dkt. No. 155-7).[6]   In addition to

the main agreement, the VQP includes a Release Authorization; a Vendor Checklist, on which

vendors indicate which type of services they offer[7]; Insurance Requirements sheet; Errors and

---

[4] While FAS insists that it does not require vendors to obtain business licenses, the Vendor Qualification Packets reference the applicant's "company."  *See* Vendor Qualification Packets 2009–2013 (Dkt. Nos. 34–38).  An opening letter attached to one of the 2013 VQPs states, "All documents and Certificate of Insurance must EXACTLY match the company or sole proprietor name listed on your W-9."  2013 VQP (Duckworth Decl. ¶ 9, Ex. 6, Dkt. No. 155-7 at 2)

[5] Plaintiffs urge that "[t]here is no meaningful opportunity for applicants to modify any of the terms of the Packet, and indeed, no Vendor has done so."  Pls.' MPSJ at 4 (citing DD ¶ 5, Ex. 2 [PMK Depo. at 25:6-11; 27:19-28:1; 30:23-31:20; 35:5-38:19; 40:17-21; 42:6-43:10; 78:18-79:2; 150:13-151:12; 152:22-153:23]; ¶ 38, Ex. 34-38; ¶ 70, Ex. 71 [Davis Decl. ¶ 5]; ¶ 68, Ex. 69 [Dunham Decl. ¶ 4]; ¶ 71, Ex. 72 [Hart Decl. ¶ 4]; ¶ 67, Ex. 68 [Lopez Decl. ¶ 7]; ¶ 66, Ex. 67 [Karger Decl. ¶ 6]; ¶ 69, Ex. 70 [Jaques Decl. ¶ 5]; ¶ 80, Ex. 81 [Hart Depo. 57:1-6]; ¶ 82, Ex. 83 [Karger Depo 52:12-19]; ¶ 81, Ex. 82 [Davis Depo. 115:18-22]; ¶ 79, Ex. 80 [Denny Depo. 60:18-61:6].  FAS insists that the terms, including the rates for services, are negotiable.  *See, e.g.*, Hunter Decl. ¶ 10 ("While FAS offers templates, every term of each contract is negotiable and many terms have changed over time in various contracts."); *id.* ¶ 11 ("Significantly, a large number of the contractual terms are negotiated (and often renegotiated) between FAS and every vendor."); Hunter Dep. at 48:16–23 (noting on the price schedule where a vendor "crossed out some of the pricing and proposed their own pricing.").  Plaintiffs counter with vendor testimony that they either "did not know" or thought that they could not negotiate, or that "negotiation" consisted of vendors asking and FAS rejecting.  *E.g.*, Cino Dep. at 67:5 (Dkt. No. 198-4); Cohick Decl. ¶ 4 ("The pricing was set by FAS and was not negotiable unless additional work needed to be done.")(Dkt. No. 155-60).  Although vendors were permitted to "bid" on additional work that they discovered needed to be performed on a property, plaintiffs contend that "bidding" is a misnomer because the price had to match up with FAS's bid sheet, or it would not get approved.  *E.g.*, Cohick Dep. at 93:19–94:10 (Dkt. No. 188-4).

[6] Plaintiffs contend "[t]here are no material differences in any of the versions of the Packets, and FAS points to none."  Opp'n to Class Decertification at 6.  But FAS maintains that the vendor packets have varied significantly over time in material ways, such as with respect to contract termination (i.e., some packets did not contain a termination provision, others provided that the contract could be terminated at any time, and others contained a notice provision), independent contractor acknowledgments (i.e., some packets include an express acknowledgement of independent contractor status, while others do not), indemnification provisions, background check provisions, tax information, security provisions, non-exclusivity provisions, and the inclusion of job specifications within the packets."  Opp'n to MPSJ at 4 n.4 (citing Hunter Supp. Decl. ¶¶ 6, 8-9, *cf.* Exs. 2-3, 6-7; Duckworth Decl. Exs. 37-38.)

[7] The checklist also has a blank for vendors to input their contractor's license number.  Dkt. No. 155-18 at 15.  FAS's PMK represents that the VQPs do not require vendors to obtain a general

3

1   Omissions Insurance Acknowledgement; Vendor Packet Checklist; Vendor Checklist for Photos

2   Needed; Lock Change/Securing Service Requirements and Cost Schedule; Plywood Boarding

3   Panel Detail; Request for Taxpayer Identification Number; a Letter detailing the importance of

4   quality control[8]; Approved Vendor Quality Policy; and Personal Property Policy and

5   Acknowledgment.  2009 VQP (Dkt. No. 155-18); 2013 VQP (Dkt. No. 155-7).

6          The Vendor Qualification Packets contain instructions for the standard services performed

7   by vendors,[9] including re-keys, board-ups, debris removal, hazardous material removal, yard

8   services, janitorial/maid services, roof tarps, pool service, snow removal, mold/water damage, and

9   winterization/de-winterization.  Duckworth Decl.¶ ¶ 9, 38, Exs. 6, 34–38.  The VQPs also dictate

10  insurance requirements, photo documentation specifications, pricing and invoicing procedures,

11  timelines for completing services, and penalties for failing to comply with FAS's terms.  *Id*.  By

12  signing, vendors attest that they will carry General Liability and Errors and Omissions (E & O)

13  Insurance, and will list FAS as an additional insured.  *E.g.*, 2013 VQP (Dkt. No. 155-7 at 5); 2009

14  VQPs (Dkt. Nos. 155-35 at 5; 155-36 at 5; 155-37 at 5); *see also* Insurance Requirements attached

15  to 2009 VQP (setting specific coverage requirements)(Dkt. No. 155-18 at 16–17).  The 2011

16  version expands these requirements, "FAS requires and you agree that you will carry general

17  liability, errors & omissions, workers compensation, and auto insurance."  2011 VQP (Dkt. No.

18  155-38 at 6); *see also* 2013 VQP (Dkt. No. 155-7 at 5).  It offers a Master E & O policy to all

19  approved vendors.  Hunter Dep. at 43:22–44:5.  FAS instructs that "[v]endors are the eyes and

20  ears at a property; therefore it is necessary that vendors report any damages, hazardous, or unsafe

---

contractor's license, but if a vendor offers to provide a service that requires one, then it attests that
it has one.  Hunter Dep. at 30:10–14.  The Insurance Requirements attached to the 2009 VQP has
a subsection entitled "Contractor's License (Only if required in your state)."  Dkt. No. 155-18 at
17; Dkt. No. 155-7 at 6.  It states, "Each vendor and contractor must be a licensed contractor to
perform work on FAS assignment. … We must have a copy on file before FAS can issue work."
*Id*.

[8] The letter notes that FAS requires high quality work, and "[t]o do so, we [FAS] have developed a
systematic method for identifying and correcting service deficiencies."  Dkt. No. 155-18 at 27.

[9] The VQPs state, "A work order will be issued each time a service is needed.  Please read each
work order carefully.  You must complete the requested services as outlined on the work order."
2009 VQP Dkt. Nos. 155-35 at 6; 155-37 at 6

conditions at a property… . Failure to do so will result in the vendor's liability to correct the issues at no cost to FAS."  2013 VQP (Dkt. No. 155-39 at 5).  Through the VQPs, FAS also retains the "Right to Set-Off" and vendors must agree to indemnify FAS.  2009–2013 VQPs (Dkt. Nos. 155-35 at 10; 155-36 at 10; 155-37 at 10; 155-39 at 5–6).

Later versions of the VQP explicitly designate vendors as "independent contractors," and include additional provisions.  *E.g.*, 2011 VQP (Dkt. No. 155-38 at 7).  A Lien Provision precludes vendors from filing liens on "FAS maintained propert[ies]."  *Id*. (Dkt. No. 155-38 at 6).  A Termination Provision states, "[t]he relationship between you or your company and FAS may be terminated by either you or FAS at any time and for any reason, with or without notice."  *Id*. (Dkt. No. 155-38 at 8).  The Master Services Agreement, which FAS began using in 2014, provides an agreement term of one year, which automatically renews for one year periods, "unless either party provides thirty (30) days prior written notice of its intent to terminate the Agreement."  2014 Master Services Agreement § 11.1 (Duckworth Decl. ¶ 38.f, Ex. 39, Dkt. No. 155-40 at 8).  It also includes a mutual right to terminate the agreement, with a notice provision.  *Id*. § 11.2.

After FAS receives a complete VQP and the terms are finalized, it performs a background check[10] and insurance verification.  Hunter Dep. at 84:10–13.  Plaintiffs cite to vendor testimony to support their claim that FAS requires them to obtain a business license and an Employer Identification Number or EIN.  *E.g.*, Bowerman Dep. at 13:7–11; 40:24–41:5 (Duckworth Decl. Ex. 3, Dkt. No. 155-4); Lopez Decl. ¶ 4 (Duckworth Decl. Ex. 68, Dkt. No. 155-69); Hart Dep. at 65:21–22 (Dkt. No. 196-31).   FAS disputes that it required any vendors to obtain an EIN prior to contracting with it, and points to the fact that the VQPs do not request it.  *Id*. at 13 n. 32; *see* Hunter Dep. at 30:10–14.  *But see* 2013 VQP ("Please ensure the name on Line 1 (Taxpayer) and the corresponding EIN matches exactly your information on file with the IRS.")(Dkt. No. 155-7 at

---

[10] FAS requires Vendors to administer background screening for any employee, contractor or consultant that includes verification of social security numbers, criminal background checks, work authorization verification, confirmed work references, and verification of any certifications, and FAS also requires Vendors to authorize FAS or a third-party to conduct background checks as determined by FAS in its sole discretion.  2011 VQP (Duckworth Decl. Ex. 37, Dkt. No. 155-38 at 6–7); 2013 VQP (Dkt. No. 155-7 at 11–12).

6).  Once a vendor is approved, FAS issues a username and password for vendors to interface with

its proprietary software, FAStrack.  Hunter Dep. at 84: 17–19; see also 2013 VQP (Dkt. No. 155-7

at 3).  It  requires Vendors to be trained on the software (FAStrack, My FAStrack, and FAStrack

Mobile) before they can accept work orders and begin working.  Hunter Dep. at 87:2–15; *see also*

2013 VQP ("**Completion of training is required prior to receiving work orders**.")(emphasis in

original)(Dkt. No. 155-7 at 3); FAStrack Mobile Training Guide (Duckworth Decl. ¶ 6, Ex. 13,

Dkt. No. 155-14); 1/17/12 Prentiss Email and Authenticating Dep. ("Our vendors are NOT

utilizing the __mandatory__ FAStrack Mobile program.")(emphasis in original)(Miller Decl. ¶ 5, Ex.

2, Dkt. No. 196-3) .  FAS creates a "Vendor Profile," which includes vendor contact information,

zip codes for service areas, list of services, agreed upon price sheet, and a signed VQP.  Hunter

Dep. at 99:6–22; 2013 VQP (Dkt. No. 155-7 at 3).

Vendors purchase their own tools and equipment[11] and choose which services they will

provide.  Hunter Dep. at 27:25–28:1.  They are not required to have prior experience and

frequently did not have any.  *E.g.*, McLain Dep. at 149:11–16 (Dkt. No. 196-25); Pyzer Dep. at

30:3–13 (Dkt. No. 196-26); Bowerman Dep. at 50:1–3 (Dkt. No. 196-27); Montes Dep. at 22:9–21

(Dkt. No. 196-28).  FAS then assigns work to vendors through work orders on FAStrack which

vendors must accept or reject within 24 hours.  Hunter Dep. at 126:20–22; 174:15–20; see also

2011 (Dkt. No. 155-38 at 2).  FAS reserves the right to reassign work orders if vendors fail to

respond within 24 hours.  *E.g.*, 2013 VQP ("We expect acceptance or decline responses within a

few hours, but will reassign a work order to another vendor, with or without notification, if a

response has not been received within 24 hours.").  Work orders include the name of the vendor,

the amount the vendor will be paid, the address of the property, the FAS contacts for the property,

and a set of "work instructions," which include detailed tasks to complete per client specifications.

Hunter Dep. at 37:10–13; *see e.g.*, FAS Work Order (Duckworth Decl. ¶ 10, Ex. 7, Dkt. No. 155-

---

[11] Plaintiffs point to vendor testimony that they were required to purchase specific tools and
equipment.  *E.g*., Cohick Dep. at 47:1–24; 79:3–18; 134:1–4 (Dkt. No. 196-14); Bates Dep. at
116:18–118:16 (Dkt. No. 196-19); Purkett Dep. at 106:22–108:16 (Dkt. No. 196-20); Murray Dep.
at 106:6–107:12 (Dkt. No. 196-22); Frankian Dep. at 104:9 – 12 ("I had to buy a third [vehicle]
because Alex and Paul Buccola at a training seminar advised me that I had to buy another one to
get more work and expand my coverage area.")(Dkt. No. 196-33).

United States District Court
Northern District of California

8).  Once a vendor accepts a work order, the work must be completed within three days.  Hunter Dep. at 175:22–24; *see also* VQPs "Vendor Service Schedule" (Dkt. Nos. 155-35 at 13; 155-36 at 13; 155-37 at 13).  Vendors performing certain services are required to post a notice, provided by FAS through a work order, that the property is maintained by FAS.  *Id.* at 115:9–23; *see also* Vinson Dep. at 40:11–18 (Dkt. No. 196-21).

Once the work is completed, the invoice and required photo documentation must be uploaded to the FAS system within 24 hours.  FAS Work Order (Dkt. No. 155-8 at 3); *see also* 2013 VQP (Dkt. No. 155-39 at 3).  "Failure to do so will result in loss of payment[,] but if a vendor is providing more than one service, "[l]ate invoices will result in a 10% penalty assessed to the full invoice amount."  2013 VQP (Dkt. No. 155-39 at 3).  Payment is approved only after FAS has reviewed all before, during, and after photos.  FAS Work Order (Dkt. No. 155-8 at 3). Work orders inform vendors that if work is "not completed in accordance with the instructions provided and conditions set forth in the work order, no fee will be paid[.]"  FAS Work Order (Duckworth Decl. ¶ 10, Ex. 7, Dkt. No. 155-8 at 2).

Vendors set a cap on the number of work orders they can handle, but FAS can lower it. Hunter Dep. at 164–165; *see also* Pilisko Email and Authenticating Dep. (Miller Decl. ¶ 4, Ex. 1, Dkt. No. 196-2)).  Plaintiffs contend that vendors "[i]n theory" can decline a work order, but FAS will penalize them by, "among other things, providing less work in the future."[12]  MPSJ at 6; *see, e.g.*, FAS Email Exchange and Authenticating Dep. ("[H]e [the vendor] is continuing to decline many work orders on or past day 3 and not communicating with FAS on a daily basis.  … he has been placed on hold and been removed from preferred vendor status.")(Miller Decl. ¶ 10, Ex. 7, Dkt. No. 196-8 at 2); Bowerman Dep. at 39:9–22; 152:20–153:10 (Duckworth Decl. ¶ 6, Ex. 3, Dkt. No. 155-4); Purkett Vendor Profile Notes (Duckworth Decl. ¶ 37, Ex. 33, Dkt. No. 155-34 at 3)("The declining of jobs that are listed in your coverage area can result in the lowering of your

---

[12] Plaintiffs submitted an email correspondence in which a vendor attempted to decline a work order "the last couple of times" due to concerns about the condition of the property and lacking the proper equipment.  Email Exchange between Vendor Dunham and FAS coordinator McMillan and Authenticating Dep. (Miller Decl. ¶ 9, Ex. 6, Dkt. No. 196-7).  FAS responds, "If I have to pay another vendor to complete this I will have to charge you back for the increase. … This needs to be take [sic] care of ASAP."  *Id.*

status as a top tier vendor."); Kleisner Vendor Profile Notes (Duckworth Decl. ¶ 44, Ex. 45, Dkt.

No. 155-46 at 4)("When I [FAS vendor administrator] send out emails like the ones I did today

[warning against 'cherry-picking' work orders] to CA vendors, usually they'll respond that they

can accept the order, once they realize the ramifications they started by declining."). FAS asserts

that vendors are permitted to select amongst the work orders. Hunter Dep. at 168:14–25. FAS's

PMK maintains that FAS does not track how often vendors decline work, "however, it is captured

as one of the factors on the scorecard." *Id*. at 187:13–21.

FAS uses "vendor blasts … to communicate information that could apply to a large group

of vendors." Hunter Dep. at 295:5–7; *see also* Valentino Dep. at 71:16–23 (Miller Decl., Ex. 10,

Dkt. No. 196-11). Examples of "vendor blasts" include a pricing guideline for submitting invoices

for lawn service, Valentine Email (Miller Decl. ¶ 13, Ex. 10, Dkt. No. 196-11), and a Letter

regarding changes to Vendor Scorecards. Duckworth Decl., Ex. 16 (Dkt. No. 155-17). The

"metrics" captured in the scorecards includes: on time completion percentage, inspections scores,

broker signoff score, work order response time, vendor work order acceptance, QC approval

percentage, and photo request percentage. *Id*. FAS's PMK frames the scorecards as "primarily a

tool for the vendor to use and being able to manage their businesses and to see how certain areas

they were doing." Hunter Dep. at 225:16–18. But the vendor blast notifying vendors of changes

to the scorecard system discloses that FAS is "increasing the number of metrics we will look at to

assess your performance." Ex. 16 (Dkt. No. 155-17). While FAS maintains that it stopped using

the scorecard system sometime in 2013, Hunter Dep. at 226:8–10, plaintiffs point to evidence that

the system was used as late as December 2016. Olivier Decl. ¶ 82, Ex. 70, Dkt. No. 191-

71[placeholder]; Dkt. No. 190-4 [unredacted version filed under seal].

FAS also supervises vendors' work through frequent updates,[13] photo documentation

requirements,[14] and quality control site inspections. MPSJ at 8–11. Clients are not part of the

---

[13] Plaintiffs provide testimony that vendors were required to check in daily. *E.g.*, Magdaleno Dep. at 197:11; Cohick Dep. at 112:13–14 (Dkt. No. 188-4).

[14] The photo documentation requirements are quite stringent, mandating before, during, and after photos "from the same perspective, frame, and angle." Hunter Dep. at 197:2–9; *see also* 2013 VQP (Dkt. No. 155-39 at 4). One vendor described a particular example,

United States District Court
Northern District of California

quality process.  Hunter Dep. at 238:3–4.  FAS's "quality control program [] ensures all service work is performed according to specifications and done in a timely, competent manner."  *See, e.g.*, 2009 VQP (Dkt. No. 155-35 at 12).  The program includes "frequent random inspections" inspections, after which FAS's "QC department will contact [a vendor] immediately if [the vendor's] invoice is insufficient and will give 24 hours for a resolution." *Id.*; 2013 VQP (Dkt. No. 155-39 at 4).  Vendors are required to correct "unacceptable or incomplete work" at no cost.  *Id.* If vendors fail to respond to quality control representatives, FAS  reserves the right to use another vendor to remedy the problem at the expense of the original vendor.  *Id.*; *see also* Hunter Dep. at 195:4–11.  This section of the VQP also dictates, "Your score and standing with FAS will, in no small part, depend on the reviews completed by our Field QC team."  *Id.*

The Approved Vendor Quality Policy attached to the 2009 VQP provides,

> **Vendor Status Recommendations and Reporting:** Through the findings and results of FieldQC Inspections, each Field QC Team member is responsible for providing recommendation(s) to Vendor Management pertaining to promotions, adjustments, or denial of Vendor use and/or Vendor status. Furthermore, Field QC Team members are charges with the task of recommending whether or not a non compliant offense is significant repetition or magnitude to be considered for stages of progressive discipline, as defined and outlined below.

Approved Vendor Quality Policy (Dkt. No. 155-18 at 28).  The policy  details the progressive discipline scale, which includes: stage one (10 percent or $100 penalty, verbal warning, and requirement to submit written description of in house quality control program), stage two (15 percent or $150 penalty, reduction in work order capacity, and written warning placed in vendor's

---

> [T]o show that I was cleaning windows, I would have to take a before picture of the window, a picture showing that I was using Windex-brand glass cleaner, a picture that showed the spray coming out of the Windex bottle, a picture of the Windex product on the surface of the window, a picture of a clean rag, a picture of a hang wiping the rag across the dirty window, a picture of the dirty rag at the end of the cleaning to show the dirt on it, and a picture of the clean window….Some of these pictures were pretty difficult to take, as I would often have to snap several pictures trying to get one that actually captured the spray coming out of the Windex bottle.

R. Pyzer Decl. ¶ 17 (Duckworth Decl. ¶ 124, Ex. 125, Dkt. No. 157-25).  FAS frames its photo requirements as merely "verify[ing] that the work a vendor accepts has been completed, and meets the client's specifications, before payment is made."  Opp'n to MPSJ at 11.

United States District Court
Northern District of California

permanent FAS vendor profile), stage three (25 percent or $250 penalty, loss of preferred vendor status, revocation of payment, reduction in work order capacity, immediate 30 day probationary period and mandatory field meeting with FAS representatives), stage four (50 percent or $500 penalty, immediate 90 day suspension of approved status, mandatory inspection of all work orders, chargeback for correction costs, reduction in work order capacity, and follow up conference at end of suspension), and stage five (immediate termination without recourse and no eligibility for rehire). *Id*. (Dkt. No. 155-18 at 29–30); *e.g.*, Rangel (FAS Operations Supervisor) Recommendation to Proceed with Stage 3 Discipline for a particular vendor (Miller Decl. ¶ 11, Ex. 8, Dkt. No. 196-9); *see generally* Hunter Dep. at 211–238 (describing general quality control program).

"In approximately 2010," FAS reduced the Five Stage program to Three Stages, "in order to be more effective in recommending action due to quality deficiencies." Hunter Dep. at 218:21–22; FAS Vendor Blast and Authenticated Dep. (Miller Decl. ¶ 7, Ex. 4, Dkt. No. 196-5). The new stages are no longer numbered, but labeled initial notification of non compliance, final notification of non compliance, and non compliance termination. *Id*. When an invoice is declined for quality control reasons, it is automatically captured in a vendor's "scorecard." *Id*. at 211:3–8.

Plaintiffs point to "mandatory training" provided by FAS—pertaining to FAS proprietary software and also to the specific tasks performed by vendors. 2013 VQP ("**Completion of training is required prior to receiving work orders**.")(emphasis in original)(Dkt. No. 155-7 at 3); *see also* FASTrack Mobile Training (Duckworth Decl. Ex. 13, Dkt. No. 155-14); Winterization Training (Duckworth Decl. Ex. 14, Dkt. No. 155-15); Email Exchange Re: Mandatory Training Follow Up and Authenticating Dep. (Dkt. No. 196-34); Mezin Dep. at 91:1–22. FAS counters with vendor testimony that they were never offered any training. Opp'n to MSPJ at 9 n.18. However, FAS's own marketing material indicates that it provides "initial and ongoing training." Our National Vendor Network (Duckworth Decl. ¶ 7, Ex. 4, Dkt. No. 155-5).[15] Its PMK states

---

[15] This document also notes that FAS "handle[s] every detail of the vendor relationship," and "[o]ur technology and our expertise enable us to scrutinize every order from placement to completion. This enables us to measure every vendor on every step of every job." Our National Vendor Network (Duckworth Decl. ¶ 7, Ex. 4, Dkt. No. 155-5).

that "FAS offers certain informational sessions to the vendors which we call REO Training Wagons."  Hunter Dep. at 282:7–9 (Dkt. No. 198-4).  These training wagons are offered "approximately a dozen [times] per year per region."  *Id*. at 282:12–13.  Although FAS insists that these trainings were not mandatory, they are labeled as "**MANDATORY**."  *Id*. at 282:17–25; *see* Personal Invitation to the REO Training Wagon and Authenticating Dep. (Dkt. No. 196-35).  It also hosts a vendor convention in Texas, but the parties dispute whether attendance was mandatory.  *Compare* Mezin Dep. at 69:12–70:2, 92:8–18 (Dkt. No. 155-26), *with* Ackel Dep. at 78:24–80:5.

**B.    Particular Class Members**

**1.    Julia Magdaleno (f.k.a. Bowerman)[16]**

In 2008, Julia Magdaleno married plaintiff Fred Bowerman, owner of "sole proprietorship" BB Home Services ("BBHS"), a company that contracted with FAS beginning in 2007.  *See* BBHS 2012 W-9 (Perez Decl. ¶ 2, Ex. 2, Dkt. No. 152-2 at 7);  Magdaleno Dep. at 12:23–25 (Dkt. No. 152-4 at 57).  Prior to that, Magdaleno was an employee of BBHS.  Magdaleno Responses to FAS RFA (Perez Decl. ¶ 6, Ex. 5 (Dkt. No. 152-2 at 17).  After the marriage, Magdaleno ceased collecting paychecks from BBHS, and considered herself a "manager" but not an "owner" of BBHS.  Magdaleno Dep. at 28:11–16.  Subsequent testimony states that she considered herself an owner of BBHS when she married Bowerman.  *Id*. at 174:13–16.  She became a co-signor on BBHS's bank account, entered into contracts on BBHS's behalf, and received work orders from FAS with her name.  Magdaleno Dep. at 186:1–9; 193:22–24.

**2.    Matthew Cohick**

In 2003, Cohick started Monster Mowers as a sole proprietorship dedicated to a range of landscaping services, "from installation to maintenance."  Cohick Dep. at 21, 22:11–23:12 (Dkt. No. 152-4 at 98).  Cohick worked for homeowners and operated the company with a single truck, a lawnmower, a weed whacker, a leaf blower, and a chainsaw.  Cohick Dep. at 29:12–14; 78:13–79:2.  He started servicing properties for FAS in 2006, and soon grew into "a full-service vendor

---

[16] I will reference Magdaleno's testimony as "Magdaleno," even though her name was Bowerman at the time.

1    … from trash outs to initials to winterizations to landscape to other repairs… ." *Id*. at 23:6–12.

2    He reportedly ran one advertisement during the time frame from 2003 to present, "but nothing to

3    do with property preservation work." *Id*. at 51:22–25.  He later clarified that the advertisement

4    had to do with landscaping services, targeted at homeowners. *Id*. at 52:1–14.  He operated a home

5    office and reportedly "bought office equipment for Field Asset Services." *Id*. at 46:11–13.  FAS

6    required him to "have a cell phone, download their program, their software, cameras, cell phones,

7    computers, fax and printer… ." *Id*. at 47:3–16.

8         Between 2006 and 2014, Monster Mowers employed between 15 and 30 people, and

9    sometimes used 15 to 30 subcontractors.[17]  *Id*. at 60:14–61:3, 64:8–65:8.  He testified that he had

10   to secure workers to help him meet FAS's work orders.  *Id*. at 70:20–21; 77:14–78:4.  According

11   to Cohick, "Field Assets trained [his] employees." *Id*. at 70:15–16.

12        In 2010, Monster Mowers incorporated and elected Cohick as a director.  Articles of

13   Incorporation  (Perez Decl., Ex. 6, Dkt. No. 152-2 at 29).  It received its California State

14   contractor's license in 2011.  Cohick initially declared that he "worked exclusively for FAS from

15   2006 until late 2012," but later stated he worked 99.9 percent of the time for FAS.[18]  Cohick Decl.

16   ¶ 2; Cohick Dep. at 31:9–31:23.  He recalled a specific period between August 2012 and May

17   2013 in which he worked for Asset Management Specialists, another property preservation

18   company.  *Id*. at 33:10–15.  Between 2006 and 2008, he worked for FAS seven days a week for 12

19   to 19 hours a day.  *Id*. at 138:16–139:11 (Dkt. No. 188-4).  A "[c]ouple of times a year or more"

20   FAS inspectors would inspect the way work was done, how it was done, the quality of the work,

21   and to make sure it was done to completion.  *Id*. at 110:24–111:18.  FAS terminated Cohick

22   around May 2013.  Monster Mowers Profile Notes (Perez Decl. ¶ 17, Ex. 21, Dkt. No. 152-4 at 1).

23

24   [17] FAS asserts that some of Cohick's employees have sued him over a variety of concerns,
     including misclassification.  That evidence is irrelevant to the issues in this case.

25   [18] While FAS points to Monster Mower's 1099s to challenge the veracity of Cohick's

26   representation, "any discrepancy between the annual income Monster Mowers reports and the
     income the company received from FAS" is irrelevant to the analysis.  Besides, plaintiffs point out

27   that "if FAS had looked through its own records, it would have realized that it had issued Cohick
     not just one, but two, 1099s in 2009, one to Matthew Cohick and one to Matthew Jay Cohick,

28   which fully explains the supposed 'discrepancy.'"  Opp'n to MSJ at 15 (Dkt. No. 188).

### 3.      Eric Ackel

Ackel's company Kurb Appeal, Inc., began doing work for FAS around 2008 or 2009, and continued for about two to three years.  Ackel Dep. at 44:13–15; 53:9–11 (Perez Decl. Ex. 29, Dkt. No. 152-4 at 169).  Before that, Ackel operated several other corporations.  *Id.* at 15:21–17:1.  When Kurb Appeal entered the property preservation business, it only provided services for FAS.  *Id.* at 26:9–18.  Kurb Appeal had its own office space where it stored its equipment.  *Id.* at 32:17–35:1.  It did not advertise, but may have had business cards.  *Id.* at 35:2–12.  Kurb Appeal hired twenty different people to help with property preservation work, but Ackel only met four of them in person.  *Id.* at 37:25–38:12; 73:15–17.   He would post an advertisement for work on craigslist and explain the work over the phone.  *Id.* at 72:3–4.  FAS did not tell Ackel to hire people, nor did they ask him if he had.  *Id.* at 63:8–15.

Ackel personally performed property preservation work on average 14 to 16 hours a day, seven days a week.  *Id.* at 62:6:9; 64:21 (Dkt. No. 188-5).  He recalls about 30 occasions when FAS came to properties unannounced to inspect the work.  *Id.* at 66:12–16; 74:6–11.  FAS representatives might spend anywhere from 20 minutes to three hours on a property.  *Id.* at 67:1–3.  FAS profile notes indicate that it ended its relationship with Kurb Appeal due to "lack of communication."  *Id.* at 84:24–85:2.  Ackel reports that he decided not to do FAS work anymore "[b]ecause of the money."  *Id.* at 85:5–9.

## II.      PROCEDURAL BACKGROUND

Plaintiffs filed this class action complaint against FAS on January 7, 2013 (Dkt. No. 1), and filed an amended complaint on February 15, 2013.  First Amended Compl. ("FAC")(Dkt. No. 4).  The first amended complaint brings causes of action for: (1) breach of contract; (2) breach of the covenant of good faith and fair dealing; (3) willful misclassification of independent contractor status, Cal. Labor Code §§ 226.8, 2753; (4) failure to pay overtime compensation, Cal. Labor Code §§ 510, 1194, 1198; (5) failure to pay wages due and owing, Cal. Labor Code § 200 *et seq.*; (6) failure to indemnify employees for business expenses, Cal. Labor Code § 2802; (7) violations of the Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200 *et seq.*; and (8) failure to comply with Labor Code provisions in violation of the Private Attorney General Act

1    ("PAGA"), Cal. Labor Code § 2699 *et seq.*  FAC ¶¶ 36-83.

2         On September 17, 2014, I denied plaintiffs' motion for class certification, but left open the

3    possibility "that a better defined, narrower class would be certifiable."  Order on Mot. for Class

4    Certification  ("Prior Order")(Dkt. No. 61).  Within 60 days, plaintiffs filed a renewed motion to

5    certify a class under Federal Rule of Civil Procedure 23(b)(3), which proposed narrowing the class

6    definition.  Pls.' Renewed Mot. (Dkt. No. 65).  On January 26, 2015, I supplied a summary order

7    granting plaintiffs' renewed motion, Summary Order (Dkt. No. 78), and on March 24, 2015, I

8    issued a reasoned decision "explain[ing] that the modifications plaintiffs made to the proposed

9    class definition allow for common questions of law and fact to predominate over questions

10   affecting only individual class members[.]"  Order Granting Renewed Mot. for Class Certification

11   at 1 ("Certification Order")(Dkt. No. 85).  The certified class is defined as:

12              All persons who at any time from January 7, 2009 up to and
              through the time of judgment (the "Class Period") (1) were
13              designated by FAS as independent contractors; (2) personally
              performed property preservation work in California pursuant to
14              FAS work orders; and (3) while working for FAS during the Class
              Period, did not work for any other entity more than 30 percent of
15              the time.  The class excludes persons who primarily performed
              rehabilitation or remodel work for FAS.
16

17   Pl.'s Renewed Mot. at 1: 7–10.

18        On May 25, 2015,[19] the class administrator mailed notice to 628 individuals at 729

19   addresses, based on a list of 680 vendors identified by FAS as having provided services in

20   California during the class period.[20]  Cubre Decl. ¶ 14; Olivier Decl. ¶ 4 (Dkt. No. 191-1).  To aid

21   in discovery,[21] I identified a group of "Discovery Vendors" as "(1) vendor declarants in this case;

22

23   [19] Defendants' motion to decertify, and declaration in support thereof, incorrectly identified this
     date as May 25, 2016.  *See* Mot. to Decertify at 5; Cubre Decl. ¶ 14.  FAS previously indicated
24   that class notice occurred in May 2015.  *See, e.g.*, Aurelio Decl. ¶ 3 (Dkt. No. 96).

25   [20] Of the 680 vendors, plaintiffs claim that 48 are clearly in the class, while 30 are excluded.  Mot.
     to Decertify at 7.  According to defendants, this leaves approximately 90 percent of vendors with
26   an unknown status of whether they meet the class definition.  *Id.*  Plaintiffs state that, to date, they
     are aware of 125 individuals who meet the class definition.  Opp'n to Mot. to Decertify at 4.

27   [21] The parties have brought numerous discovery disputes to my attention.  *See* Dkt. Nos. 111, 113,
28   114, 115, 125, 127, 135, 140, 141, 143.

1    (2) vendor deponents in this case; and (3) an additional ten percent of vendors to whom the class

2    notice was sent." Further Order on Discovery Disputes at 1:24–25 (Dkt. No. 118). The parties

3    agreed upon a list of 107[22] Discovery Vendors (Discovery Vendor Group or "DVG"). Mot. to

4    Decertify at 6; Cubre Decl. ISO Mot. to Decertify ¶ 15; Cubre Decl. ISO Defs.' Opp'n to Pls.'

5    MPSJ ¶ 2 (Dkt. No. 189-2). Plaintiffs assert that 47 have self-identified as class members, 40 have

6    self-identified as non-class members, while the remaining 21 had either confidentially settled

7    claims with FAS, or were unreachable. Opp'n at 4; Olivier Decl. ¶ 6.

8        On June 2, 2016, class administrator mailed a copy of the "Class Member Questionnaire"

9    to the 107 discovery vendors; verified responses were received from just thirteen vendors.[23] Mot.

10   to Decertify at 6; Cubre Decl. ¶ 2; Olivier Decl. ¶ 9. According to FAS, only 27 of the 65 noticed

11   depositions of Discovery Vendors took place.[24] Mot. to Decertify at 6. Plaintiffs contend that 45

12   individuals in the DVG were deposed, and 39 submitted declarations (with some overlap between

13   deponents and declarants). Olivier Decl. ¶ 8. Eighteen Discovery Vendors produced responsive

14   documents, but none of them provided information on the number of hours or percentage of time

15   they contracted with FAS. Mot. to Decertify at 6. Fact discovery closed on December 5, 2016.[25]

16   *Id*. at 8.

17       On January 4, 2017, FAS moved for class decertification, Mot. to Decertify (Dkt. No.

18   154), and summary judgment as to potential class members Julia Magdaleno (f/k/a Bowerman),

19   Matthew Cohick, and Eric Ackel, Mot. for Summary J. ("FAS MSJ")(Dkt. No. 152[redacted],

20   Dkt. No. 151-4[under seal]). The same day, plaintiffs moved for summary judgment on (1)

21

22   ────────────────
     [22] Plaintiffs indicate that the DVG consists of 108 individuals—106 initially identified and an
23   additional two self-identified as Class Members. Olivier Decl. ¶ 5.

24   [23] Claims administrator received six responses, Dang Decl. ¶ 5, while seven were reportedly sent
     directly by plaintiffs' counsel. Cubre Decl. ¶ 17, 19.

25   [24] Of the 65 noticed deponents, plaintiffs now assert that 19 are in the class and 29 are not. Mot.
26   to Decertify at 7.

27   [25] Class counsel has continued interviewing potential class members as part of damages discovery.
     Opp'n at 4; Olivier Decl. ¶ 10. Of 177 individuals who performed property preservation work for
     FAS during the class period, 78 have self-identified as class members and 99 have self-identified
28   as non-class members. *Id*.

1    "FAS's affirmative defense that Plaintiffs and Class Members are independent contractors"; (2)

2    "FAS's liability under California law for failing to pay the Class overtime"; and (3) "FAS's

3    liability under California law for failing to reimburse the Class for reasonable and necessary

4    business expenses." Pls.' Mot. for Partial Summary J. ("Pls.' MPSJ")(Dkt. No. 155).

5            I heard argument from the parties on February 22, 2017, during which I asked the parties

6    to submit a joint table of identified class members, listing FAS's objections and plaintiffs'

7    response.  Dkt. No. 199.  The parties submitted that table, listing 126 class members, on March 2,

8    2017.  Dkt. No. 201.

9                                        **LEGAL STANDARD**

10   **I.      FEDERAL RULE OF CIVIL PROCEDURE 23**

11           Federal Rule of Civil Procedure 23 governs class actions. "Before certifying a class, the

12   trial court must conduct a rigorous analysis to determine whether the party seeking certification

13   has met the prerequisites of Rule 23." *Mazza v. Am. Honda Motor Co., Inc.,* 666 F.3d 581, 588

14   (9th Cir. 2012) (internal quotation marks omitted). The burden is on the party seeking certification

15   to show, by a preponderance of the evidence, that the prerequisites have been met. *See Wal–Mart*

16   *Stores, Inc. v. Dukes,* 131 S.Ct. 2541, 2551 (2011); *Conn. Ret. Plans & Trust Funds v. Amgen Inc.,*

17   660 F.3d 1170, 1175 (9th Cir. 2011).

18           Certification under Rule 23 is a two-step process. The party seeking certification must first

19   satisfy the four threshold requirements of Rule 23(a), numerosity, commonality, typicality, and

20   adequacy. Specifically, Rule 23(a) requires a showing that:

21           (1) the class is so numerous that joinder of all members is impracticable;

22           (2) there are questions of law or fact common to the class;

23           (3) the claims or defenses of the representative parties are typical of the claims or defenses
             of the class; and

24

25           (4) the representative parties will fairly and adequately protect the interests of the class.

     Fed. R. Civ. P. 23(a).

26           The party seeking certification must then establish that one of the three grounds for

27   certification applies. *See* Fed. R. Civ. P. 23(b). Plaintiffs invoke Rule 23(b)(3), which provides

28

United States District Court
Northern District of California

that a class action may be maintained where the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
>
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
>
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
>
> (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3).

An order certifying a class "may be altered or amended before final judgment."  Fed. R. Civ. P. 23(c)(1).  "In considering the appropriateness of decertification, the standard of review is the same as a motion for class certification: whether the Rule 23 requirements are met."  *Ridgeway v. Wal-Mart Stores, Inc.*, 2016 WL 4529430, at *12 (N.D. Cal. Aug. 30, 2016).   The burden of proof remains on the plaintiff.  *Marlo v. UPS*, 639 F.3d 942, 947 (9th Cir. 2011).  Parties should be able to rely on a certification order and "in the normal course of events it will not be altered except for good cause," such as "discovery of new facts or changes in the parties or in the substantive or procedural law."  *O'Connor v. Boeing N. Am., Inc.*, 197 F.R.D. 404, 409-10 (C.D. Cal. 2000).

## II.      SUMMARY JUDGMENT

Summary judgment on a claim or defense is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In order to prevail, a party moving for summary judgment must show the absence of a genuine issue of material fact with respect to an essential element of the non-moving party's claim, or to a defense on which the non-moving party will bear the burden of persuasion at trial.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the movant has made this showing, the burden then shifts to the party opposing summary judgment to identify

"specific facts showing there is a genuine issue for trial." *Id.* The party opposing summary judgment must then present affirmative evidence from which a jury could return a verdict in that party's favor. *Anderson v. Liberty Lobby,* 477 U.S. 242, 257 (1986).

On summary judgment, the Court draws all reasonable factual inferences in favor of the non-movant. *Id.* at 255. In deciding a motion for summary judgment, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Id.* However, conclusory and speculative testimony does not raise genuine issues of fact and is insufficient to defeat summary judgment. *See Thornhill Publ'g Co., Inc. v. GTE Corp.,* 594 F.2d 730, 738 (9th Cir. 1979).

## III.   CALIFORNIA LAW GOVERNING CLASSIFICATION OF WORKERS AS EMPLOYEES OR INDEPENDENT CONTRACTORS

"Employers have varying responsibilities with respect to persons performing services on their behalf. These responsibilities depend, in part, on whether those persons are classified as employees or independent contractors under the Labor Code." *Cristler v. Express Messenger Sys., Inc.*, 171 Cal. App. 4th 72, 76 (2009). "Whether a worker is classified as an employee or an independent contractor has great consequences. California law gives many benefits and protections to employees; independent contractors get virtually none." *Cotter v. Lyft, Inc.*, No. 13-cv-04065-VC, 2015 WL 1062407, at *5 (N.D. Cal. Mar. 11, 2015). Of particular relevance here, employees are generally entitled to overtime compensation, Cal. Labor Code §§ 510, 1194, and indemnification for business expenses, Cal. Labor Code § 2802. Independent contractors are not.

"[U]nder California law, once a plaintiff comes forward with evidence that he provided services for an employer, the employee has established a prima facie case that the relationship was one of employer/employee." *Narayan v. EGL, Inc.*, 616 F.3d 895, 900 (9th Cir. 2010). "[T]he rule is that the fact that one is performing work [ ] for another is prima facie evidence of employment and such person is presumed to be a servant in the absence of evidence to the contrary." *Id.* (internal quotation marks and modifications omitted). "Once the employee establishes a prima facie case, the burden shifts to the employer, which may prove, if it can, that the presumed employee was an independent contractor." *Id.*

United States District Court
Northern District of California

1    Because the California Labor Code does not define "employee," courts generally apply the

2    common law test to distinguish between employees and independent contractors.  *See Estrada v.*

3    *FedEx Ground Package Sys., Inc.*, 154 Cal. App. 4th 1, 10 (2007).  Under this test, the defendant's

4    right to control the manner and means by which the plaintiff's work is accomplished, rather than

5    the amount of control actually exercised, is the principal factor in assessing whether a plaintiff is

6    an employee or an independent contractor.  *See Ayala v. Antelope Valley Newspapers, Inc.*, 59

7    Cal. 4th 522, 533-34 (2014)("What matters under the common law is not how much control a hirer

8    *exercises,* but how much control the hirer retains the *right* to exercise.")(emphasis in original).

9    Courts have consistently emphasized the significance of this factor.  *See, e.g., S.G. Borello &*

10   *Sons, Inc. v. Dep't of Indus. Relations*, 48 Cal.3d 341, 350 (1989)("The principal test of an

11   employment relationship is whether the person to whom service is rendered has the right to control

12   the manner and means of accomplishing the result desired.")(internal quotation marks and

13   modifications omitted); *Estrada*, 154 Cal. App. 4th at 10 ("The essence of the test is the 'control

14   of details' – that is, whether the principal has the right to control the manner and means by which

15   the worker accomplishes the work."); *see also Ruiz v. Affinity Logistics Corp.*, 754 F.3d 1093,

16   1100 (9th Cir. 2014) ("[T]he right to control work details is the most important or most significant

17   consideration.") (emphasis omitted).

18        The defendant's right to control need not extend to every possible aspect of the plaintiff's

19   work for this factor to indicate the existence of an employee/employer relationship.  The relevant

20   question is whether the defendant retains "all necessary control" over the plaintiff's performance

21   of his job duties.  *Borello*, 48 Cal.3d at 357.  In other words, "the fact that a certain amount of

22   freedom is allowed or is inherent in the nature of the work involved does not change the character

23   of the relationship, particularly where the employer has general supervision and control."  *Air*

24   *Couriers Int'l v. Employment Dev. Dep't*, 150 Cal. App. 4th 923, 934 (2007) (internal quotation

25   marks omitted); *see also Toyota Motor Sales U.S.A., Inc. v. Superior Court*, 220 Cal. App. 3d 864,

26   875 (1990).  The right to terminate at will, without cause, provides "strong evidence" of a right to

27   control and an employment relationship.  *Borello*, 48 Cal.3d at 350 (internal quotation marks

28   omitted); *see also Ayala*, 59 Cal.4th at 533 ("Whether a right of control exists may be measured by

19

asking whether or not, if instructions were given, they would have to be obeyed on pain of at will discharge for disobedience.") (internal quotation marks and modifications omitted).

Because the right to control factor "is often of little use in evaluating the infinite variety of service arrangements," *Borello*, 48 Cal.3d at 350, courts applying the common law test may also consider the following "secondary" factors:

> (1) whether the worker is engaged in a distinct occupation or business, (2) whether, considering the kind of occupation and locality, the work is usually done under the principal's direction or by a specialist without supervision, (3) the skill required, (4) whether the principal or worker supplies the instrumentalities, tools, and place of work, (5) the length of time for which the services are to be performed, (6) the method of payment, whether by time or by job, (7) whether the work is part of the principal's regular business, and (8) whether the parties believe they are creating an employer-employee relationship.

*Estrada*, 154 Cal. App. 4th at 10. "Regarding the final secondary factor, the California Court of Appeal has noted that the label that parties place on their employment relationship 'is not dispositive and will be ignored if their actual conduct establishes a different relationship.'" *Ruiz*, 754 F.3d at 1101 (quoting *Estrada*, 154 Cal. App. 4th at 10-11).

The *Borello* court listed additional factors developed by other jurisdictions considering the issue "in light of the remedial purposes of the legislation":

> (1) the alleged employee's opportunity for profit or loss depending on his managerial skill; (2) the alleged employee's investment in equipment or materials required for his task, or his employment of helpers; (3) whether the service rendered requires a special skill; (4) the degree of permanence of the working relationship; and (5) whether the service rendered is an integral part of the alleged employer's business.

*Borello*, 48 Cal. 3d at 355.

The secondary factors "cannot be applied mechanically as separate tests; they are intertwined and their weight depends often on particular combinations." *Germann v. Workers' Comp. Appeals Bd.*, 123 Cal. App. 3d 776, 783 (1981). "[T]o determine whether a worker is an employee or independent contractor, a court should evaluate each service arrangement on its facts, and the dispositive circumstances may vary from case to case." *Ruiz*, 754 F.3d at 1100 (internal quotation marks and modifications omitted).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**DISCUSSION**

I will first address FAS's attacks against certification of the class, and then move on to a discussion of both parties' motions for summary judgment.

**I.      MOTION TO DECERTIFY**

   **A.      Decertification**

As an initial matter, plaintiffs disagree with FAS's contention that "[d]isputes still exist as to who is even part of the class." Mot. at 1(Dkt. No. 154); Opp'n at 1 (Dkt. No. 191); Reply (Dkt. No. 194 at 16).[26]  The joint table of class members lists 126 vendors.  Dkt. No. 201.  The parties do not dispute the membership of 31 of those individuals, but FAS objects to the remaining 95 on one or more of the following grounds: late entrant, which includes persons disclosed after 12/2, no evidence of a contract signed with FAS, underdetermined whether individual signed a contract with FAS, no discovery received, and affirmative dispute regarding class status.  *Id.*

The disputed nature of over two-thirds of the identified class members is the genesis for this motion to decertify.  In the Order Granting Class Certification, I stated:

> On this record, I cannot say that the specter of some vendors lacking time records is sufficiently threatening to preclude class certification.  This is particularly so given that class membership will not depend on an exact determination of the amount of time the vendor spent working for FAS versus other entities – so long as the seventy percent threshold is passed, the requirement will be satisfied.

Certification Order at 13.  FAS now argues that "even following extensive discovery—Plaintiffs have failed establish [*sic*] any manageable way to proceed to trial on a class basis."  Mot. to Decertify at 1.

While defendant frames its attack on grounds of commonality, predominance, and superiority, its arguments boil down to one core: the nature of a multi-factor test and factual variations amongst the vendors preclude class treatment because neither side can say that every vendor is an employee or every vendor is an independent contractor.  Hr'g Tr. at 12:6–13:10 (Dkt. No. 203[sealed]).  Though distinctions are relevant to the various inquiries, they alone are

---

[26] Because the page numbers on FAS's Reply brief repeat "iii," citations will reference the page number associated with the ECF docket number.

1 insufficient to negate class certification.  Throughout its motion, FAS fails to carry its line of

2 attack through the requisite legal tests.  Accordingly, it has not undermined the sufficiency of class

3 certification.

### 1.  Commonality

5      This marks the third time that FAS has identified its "concern that vendors' business

6 operations were so varied that there could be no common answer regarding independent contractor

7 status under the multi-factored, interdependent *Borello* test."  Mot. to Decertify at 19.  I found

8 before that "[c]ommonality is satisfied here."  Certification Order at 24.  I explained, "[t]he key

9 legal issue underlying this case is whether putative class members were misclassified under

10 California law as independent contractors instead of employees[,]" and "this is a common question

11 that is capable of a common resolution for the class."  *Id*.  Although FAS urges that "the more

12 fulsome record [post-discovery] demonstrates far broader variation among potential class

13 members…," its arguments are not persuasive.  *Id*.  Nonetheless, I will address its points in turn.

14      FAS begins its argument against finding commonality with the most critical factor—the

15 right to control.  It identifies some class members who assert that they had the right to control their

16 own work, while others felt that FAS retained various rights.[27]  Mot. to Decertify at 19.  FAS also

17 highlights the distinct business factor as counseling against a finding of commonality here.  It

18 notes that some vendors personally completed work for FAS, while others used crews of

19 subcontractors, employees, and/or day laborers and never personally performed any property

20 preservation work.  *Id*. at 20.  This argument is easily dispelled when one focuses on the class

21 definition.  The only vendors who fall into the class definition (1) were designated by FAS as

22 independent contractors; (2) personally performed property preservation work; and (3) worked for

23 FAS at least 70 percent of the time.  Certification Order at 2.

24      It is "the defendant's right to control the manner and means by which the plaintiff's work

---

[27] FAS cites to various class members' testimony to support its position, but many of the examples FAS provides pertain to the amount of control actually exercised, not the right to exercise control. *See* Mot. at 19.  This includes information such as the right to turn down work, with or without repercussion; whether FAS directly supervised the work; whether vendors were required to complete training; and whether FAS dictated work schedules.

United States District Court
Northern District of California

is accomplished, rather than the amount of control actually exercised [that] is the principal factor in assessing whether a plaintiff is an employee or an independent contractor." *Id.* at 6 (citing *Ayala v. Antelope Valley Newspapers, Inc.*, 59 Cal. 4th 522, 533–34 (2014)). Of particular relevance to FAS's *right* to control is the agreement defining the relationship between the parties. *See, e.g.*, VQPs (Dkt. Nos. 155-18; 155-35 – 155-40)." While FAS insists that "there is no single contract at issue during the class period[,]" I have already found "that all vendors execute the same or similar independent contractor agreements with at-will termination provisions, and that vendors performing property preservation work are expected to comply with highly detailed job specifications." Certification Order at 15 (footnote omitted). I recognized that the most recent agreement "does not contain an at-will termination provision but rather specifies a one-year term subject to cancellation by either party within thirty-days' notice, and further allows termination for breach by either party subject to a five-day cure provision." *Id.* at 15 n.4 (internal quotation marks omitted). FAS fails to raise any new charges against commonality.

## 2.      Predominance

In the Certification Order, I summarized the Prior Order's findings[28] and found that "plaintiffs' new class definition successfully addresses the concerns regarding predominance set out in the prior order." Certification Order at 16. I highlighted how the new definition limited the variations among class members' ability to negotiate and dependence on FAS for revenue. *Id.* at 15–19. I concluded that the principal factor and "nearly all of the secondary factors" were susceptible to common proof. *Id.* at 19.

For purposes of class certification, the issue is whether these factors may be applied on a classwide basis, generating a classwide answer on the issue of employee status, or whether the

---

[28] "In the prior order, I recognized that much of the evidence going to FAS's right to control was common to all vendors. Dkt. No. 17. The record indicated then, as it does now, that FAS's business model is dependent on vendors performing the services that FAS provides, that all vendors execute the same or similar independent contractor agreements with at-will provisions, and that vendors performing property preservation work are expected to comply with highly detailed job specifications." Certification Order at 15 (footnote omitted). I then explained my reasons for initially denying certification because "individualized questions regarding FAS's right to control predominated over common ones." *Id.* (listing the differences and noting the secondary factors).

United States District Court
Northern District of California

1 | determination requires too much individualized analysis.  *Narayan v. EGL, Inc.*, 285 F.R.D. 473,

2 | 478 (N.D. Cal. 2012).  Plaintiffs emphasize "the most significant consideration," *Ruiz*, 754 F.3d at

3 | 1100, and insist that "[e]xtensive evidence confirms that [FAS] maintains a right of control

4 | through uniform policies and practices detailing how work is to be done and consequences when it

5 | is not done the way FAS wants."  Opp'n at 6.  Plaintiffs cite to (1) work orders dictating the

6 | precise manner in which specific tasks are to be performed and the price to be paid; (2) mandatory

7 | training on FAS's proprietary software, as well as "step-by-step instruction on how to perform

8 | particular types of work[;]" (3) standardized methods of supervising vendors' work, including

9 | through email updates, photo documentation, and quality control site inspections; and (4) uniform

10 | right to discipline vendors whose performance does not meet FAS standards.[29]  Opp'n at 7–12.

11 | I agree with plaintiffs that "[n]one of the 'new evidence' proffered by FAS changes my

12 | prior ruling.  As plaintiffs recognize, FAS improperly focuses on its actual exercise of control over

13 | vendors, rather than its right to exercise that control.  Opp'n at 15 (citing Certification Order at

14 | 19).  In the Certification Order, I mentioned as much:

> Under this test, the defendant's right to control the manner and means by which the plaintiff's work is accomplished, rather than the amount of control actually exercised, is the principal factor in assessing whether a plaintiff is an employee or an independent contractor.  *See Ayala v. Antelope Valley Newspapers, Inc.*, 59 Cal. 4th 522, 533-34 (2014) ("What matters under the common law is not how much control a hirer exercises, but how much control the hirer retains the right to exercise.") (emphasis in original).

Certification Order at 6.

I also found in that order that "all vendors execute the same or similar independent contractor agreement with at-will termination provisions... ." *Id*. at 15:8-9.  FAS fails to identify any evidence to convince me otherwise.  And while FAS again points to differences among vendors' corporate form, I have twice discounted that argument's relevance to certification.  Prior Order at 20:23–21:13; Certification Order at 17:17–23 ("While [FAS's] observation [noting considerable variation in whether class members operate distinct businesses] appears to be factual

---

[29] Discipline may include "charges/deductions to the Vendors' payables, verbal and written reprimands, suspension, and termination of a Vendor's employment."  Opp'n at 10 n.34 (citing Hunter Dep.).

24

United States District Court
Northern District of California

1   accurate, I am not convinced that it matters."), 20:2–4 ("And while the distinct business and

2   parties' beliefs factors will continue to vary between class members, neither of these factors is

3   sufficiently probative in this case for the variation within them to defeat predominance.").  FAS

4   merely identifies some instances where it may not have exercised its right to control in a manner

5   consistent with an employee relationship, but that is not the relevant inquiry here.  In all cases,

6   FAS retained "all necessary control" over vendors' work.  *Borello*, 48 Cal.3d at 357.  FAS has

7   failed to convince me that the post-discovery evidentiary record warrants a different analysis of

8   the secondary factors.  Accordingly, it remains true that "questions common to the class

9   predominate over individual ones."  Certification Order at 20.

10           **3.      Superiority**

11          FAS's argument devoted to attacking the superiority of class treatment lists a page of legal

12   authority focused on "ascertainability and/or administrative feasibility (rather than Rule 23's

13   superiority and manageability requirement)," but it contends, "the rationale is equally applicable

14   here."  Mot. to Decertify at 11.  I disagree.  The fact that FAS could not identify precedent

15   tracking its reasons against certification is telling.  As plaintiffs point out, Opp'n at 18, FAS

16   strategically manipulates its argument given the Ninth Circuit's recent reminder that class

17   certification should not be denied solely due to manageability concerns.  *Briseno v. ConAgra*

18   *Foods, Inc.*, No. 15-55727, 2017 U.S. App. LEXIS 20, at *11 (9th Cir. Jan. 3, 2017).

19   Unperturbed, FAS devotes the majority of its briefing to identifying factual variances that go to

20   the manageability of this class action.  Even plaintiffs cannot dispute that this case presents

21   manageability issues, but *Briseno* declined to adopt an administrative feasibility prerequisite and

22   affirmed "the well-settled presumption that courts should not refuse to certify a class merely on

23   the basis of manageability concerns."  *Briseno*, 2017 U.S. App. LEXIS 20, at *11.

24          While administrative feasibility is not a prerequisite to class certification, manageability is

25   still a factor to be considered in a court's superiority analysis.  "Manageability concerns must be

26   weighed against the alternatives and will rarely, if ever, be sufficient to prevent certification of a

27   class."  *Trosper v. Stryker Corp.*, No. 13-cv-00607-LHK, 2014 U.S. Dist. LEXIS 117453, at *17

28   (internal quotation marks omitted); *see also Briseno*, 2017 U.S. App. LEXIS 20, at *12 (holding

25

courts must "balance the benefits of class adjudication against its costs.").  FAS raised the same arguments two years ago when the class was certified.  In rejecting FAS's contentions, I found that "under plaintiffs' proposed trial plan, FAS's liability will be determined not by reference to the individual claims of a sample set of class members, but, in plaintiffs' words, by 'common proof that goes to FAS's liability to the class as a whole.'"  Certification Order at 21.  The same reasoning holds true.  Nonetheless, I will address FAS's concerns, and then conduct the requisite balancing.

FAS argues that "[p]roceeding on a classwide basis is not superior to individual adjudication if each class member would be forced to litigate several individualized issues in order to establish his or her right to recover."  Mot. to Decertify at 9.  It points to problems with self-identifying class members, the "likelihood [that] the class member will vary from business to business[,]" and it asserts that "[t]he only way to figure out the identity of the class member is to drill down on how the business is structured and managed."  *Id*. at 11.  For some vendors, the class member could be the "contact person," the "signatory to the FAS contract," "the person who runs the business," or "***the person who actually performs the property preservation work***."  *Id*. (emphasis added).   But the class definition easily answers defendant's question: the class member must have personally performed property preservation work.  Because of the additional limitation that the class member must have also been "designated by FAS as independent contractors," the class member will typically be the Vendor-owner.  *See* Certification Order at 1 n.2.

FAS also argues that some individuals identified by plaintiffs as class members were "not listed as contact persons for any vendor identified by FAS[,]" "were not sent Class Notice[,]" and did not execute a vendor agreement with FAS.  Mot. to Decertify at 12.  Some individuals listed as contact persons and sent Class Notice do not fall within the class definition.  *Id*.  But plaintiffs dispose of FAS's concerns by citing to the Certification Order, where I found that the class-definition term "designated by FAS as independent contractors" refers to "vendors that FAS has already identified as having worked for it during the class period."  Certification Order at 9.  Plaintiffs further clarify that this term "is simply intended to *include* Vendor-owners and *exclude* workers of those Vendors."  Opp'n to Mot. to Decertify at 2 (emphasis in original).  Accordingly,

United States District Court
Northern District of California

1    the listed contact person is irrelevant to a determination of class membership and immaterial to the

2    superiority analysis.  Moreover, neither Rule 23 nor the Due Process Clause requires actual notice

3    to each individual class member.  *Briseno v. ConAgra Foods, Inc.*, No. 15-55727, 2017 U.S. App.

4    LEXIS 20, at *13 (9th Cir. Jan. 3, 2017).

5             Next, FAS insists that it has "no way of knowing" which individuals personally performed

6    property preservation services; which vendors work for other entities; and the proportion of time

7    any vendor spent working for another entity.  *Id*. at 13.  It states, "[n]ot a single potential class

8    member has produced any records showing what percentage of time he or she worked for FAS as

9    opposed to other entities."[30]  *Id*.  It cites to deposition testimony to prove that "the evidence

10   needed to determine class membership has a subjective component that precludes certification and

11   makes this case unmanageable."  Reply (Dkt. No. 194 at 12).  It argues that "[d]etermining class

12   membership will require mini-trials that overlap with merits determinations: the percentage of

13   time vendors spent working for FAS and the type of work they performed, is relevant to the

14   control purportedly retained and exerted by FAS."  Reply (Dkt. No. 194 at 13).  It urges that the

15   only way to determine class membership without offending its due process rights is through

16   "individualized analysis [which] defeats the very purpose of class treatment."  *Id*. at 14–15.  And it

17   highlights the 12 percent response rate for the Vendor Questionnaire to conclude there is "no

18   manageable way to collect this 'percentage' information short of mini-trials for each potential

19   class member."[31]  *Id*.

20

21   _____

     [30] FAS identifies potential class members who testified that they have no records of how much
22   time they personally performed property preservation work; do not recall performing property
     preservation work at all; or simply do not know whether they meet the class definition.  Mot. at
23   13–14.  But plaintiffs point out that FAS's evidence pertains to vendors who are not class
     members, and therefore is irrelevant to class certification.  Opp'n at 4.
24
     [31] Plaintiffs take great issue with FAS's characterization; they cite to numerous records and
25   conclusively state that "[n]o one with whom Class Counsel has had contact has been unable to
     determine whether he or she falls within the Class."  Opp'n at 1–2; Olivier Decl. ¶¶ 4–10.  And, in
26   case there was any doubt, "*every* vendor with whom the Parties have had contact has been able to
     determine whether he or she falls within the Class."  Opp'n at 3 (emphasis in original); *see also id*.
27   at 4 ("No individual who has been deposed, submitted a declaration, or with whom Class Counsel
     has spoken, has been unable to determine whether he or she falls within or outside the class
28   definition.").

1    Plaintiffs implore that "FAS's challenge is not to manageability at all – it is simply a

2    regurgitation of its ascertainability argument, which this Court has repeatedly put to rest."  Opp'n

3    at 18.  While I agree that some, if not most, of FAS's arguments are reconstituted ascertainability

4    objections, they are relevant to the manageability inquiry.  *See, e.g.*, *In re Korean Ramen Antitrust*

5    *Litig.*, No. 13-cv-04115-WHO, 2017 U.S. Dist. LEXIS 7756, at *62 (N.D. Cal. Jan. 19,

6    2017)("concerns about illegitimate claims and manageability — such as those expressed by

7    defendants here — are accounted for by other provisions of Rule 23").  FAS doesn't even mention

8    the other factors,[32] but concludes that "when individualized issues will ultimately lead to mini-

9    trials, the burden on the courts will be greater than allowing class members to litigate individual

10   claims."  Reply (Dkt. No. 194 at 14); *see also id.* (Dkt. No. 194 at 15)("It is a stretch to assume

11   that every vendor will pursue litigation if the class is decertified, yet it is a certainty that continued

12   class proceedings will require individual mini-trials that will unnecessarily burden this Court and

13   the parties and render the class action vehicle ineffective.").

14   Plaintiffs are correct that "class litigation is superior than adjudicating the claims of over

15   100 class members."  Opp'n at 18 (capitalization omitted).  While FAS seems preoccupied with a

16   concern about mini-trials, it either cites to non-class member testimony or to its worries about

17   individualized damages.  For purposes of certification, however, the analysis must focus on the

18   requirements of Rule 23.  A determination of class certification often involves an overlap with the

19   merits of a case.  While the court must treat the substantive allegations in the class action

20   pleadings as true, it is also "at liberty to consider evidence which goes to the requirements of Rule

21   23 even though the evidence may also relate to the underlying merits of the case." *Hanon v.*

22   *Dataproducts Corp.,* 976 F.2d 497, 509 (9th Cir. 1992) (internal citations and quotations omitted);

23   *see also* Certification Order at 3 ("The court may consider supplemental evidence that is submitted

24   by the parties.").

25

26   _____

[32] The superiority factors include: "(A) the class members' interests in individually controlling the
27   prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning
the controversy already begun by or against class members; (C) the desirability or undesirability
28   of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties
in managing a class action."  Fed. R. Civ. P. 23(b)(3).

United States District Court
Northern District of California

1    Second, self-identification through declarations is an accepted practice.  *See Briseno*, 2017

2    WL 24618, at *9 ("Given that a consumer's affidavit could force a liability determination at trial

3    without offending the Due Process Clause, we see no reason to refuse class certification simply

4    because that same consumer will present her affidavit in a claims administration process after a

5    liability determination has already been made."); Certification Order at 12:7–10; *Bruton v. Gerber*

6    *Prods. Co.*, No. 12-CV-02412-LHK, 2014 U.S. Dist. LEXIS 86581, at *16-17 (N.D. Cal. June 23,

7    2014)("self-identification may be an acceptable way to ascertain class membership.").  FAS

8    stresses the potential for high-dollar recovery to insist that self-identification raises due process

9    concerns.  In addition to already rejecting this argument,[33] I have been unable to find any cases

10   supporting FAS's position, and FAS provides none.

11   Plaintiffs underscore the lack of any viable alternative for class members to pursue their

12   claims and "the drain on resources that would result from these cases proceeding individually" to

13   conclude that "proceeding as a class in this action is superior to proceeding as numerous

14   individual actions."  Opp'n at 22–23.  While I recognize the legitimacy of FAS's apprehension

15   regarding manageability, it is insufficient to tip the scales away from the superiority of proceeding

16   as a class when its liability to over 100 class members depends on common proof.

17   **B.    Expense Reimbursement Claim**

18   FAS argues that plaintiffs' expense reimbursement claim cannot be adjudicated on a

19   classwide basis due to the need for "individualized evidence," and the fact that "[p]laintiffs seek

20   reimbursement for a wide range of expenses."  Mot. at 22–23.  Plaintiffs counter that

21   individualized evidence is unnecessary to determine liability because "FAS has a policy of

22   refusing to pay for the business expenses[34] for which Class members now seek reimbursement[.]"

23   Opp'n at 23.

24

25   ---

     [33] "The vendor declarations submitted by both plaintiffs and FAS indicate that many if not most
26   vendors will be able to self-identify as being in or out of the class."  Certification Order at 12.

27   [34] Expenses include: "mileage (required to reach FAS's job sites); insurance (required before
     performing any work for FAS); tools and equipment (required to perform work); cell phones
28   (required to use FAStrack Mobile and to upload photos at job sites); and dump fees (required to
     complete work orders)."  Opp'n at 23–24.

1      I agree with plaintiffs: "[t]o the extent that there is any individualized evidence needed, it

2  will pertain to damages."  Opp'n at 24.  FAS's liability is based on a common policy, documented

3  through the vendor qualification agreements, the vendor profiles, the scorecards, and the various

4  training materials.  As previously noted, "[t]he Ninth Circuit has made clear that the presence of

5  individualized damages cannot, by itself, defeat class certification under Rule 23(b)(3)."

6  Certification Order at 22 (internal quotation marks omitted); *see also Briseno v. ConAgra Foods,*

7  *Inc.*, No. 15-55727, 2017 U.S. App. LEXIS 20, at *20 (9th Cir. Jan. 3, 2017)("Rule 23 specifically

8  contemplates the need for such individualized claim determinations after a finding of liability.").

9  FAS's arguments concerning the lack of proof regarding whether a class member's expenses were

10  incurred to provide services for FAS or for personal use and that some class members have already

11  received reimbursement for some expenses all pertain to individualized damages.  Accordingly,

12  they must be addressed during the damages phase.

13      FAS argues in a footnote that "Plaintiffs' expense reimbursement claim also cannot

14  proceed on a class basis because expenses incurred by business entities do not qualify for

15  reimbursement under section 2802."  Mot. at 24 n.41 (citing *Villapando v. Exel Direct Inc.*, 161 F.

16  Supp. 3d 873, 881 (N.D. Cal. 2016)); Opp'n at 25 n.66.  As plaintiffs point out, the cited authority

17  does not support FAS's position.  In *Villapando*, the Hon. Joseph C.  Spero determined that class

18  member drivers could only recover their own expenses, not expenses of others they may have

19  hired.  The issue was one of standing to recover those expenses.  The same issue does not exist

20  here, where vendor-owners may only recover for expenses they have personally incurred.

21  **II.      PLAINTIFFS' PARTIAL MOTION FOR SUMMARY JUDGMENT**

22      "Plaintiffs are entitled to summary judgment on [FAS's] independent contractor defense

23  only if the undisputed facts, viewed in the light most favorable [to FAS], demonstrate that [FAS]

24  will be unable to meet its burden in establishing that Plaintiffs are independent contractors under

25  California law."  *Villapando v. Exel Direct Inc.*, No. 12-cv-04137-JCS, 2015 U.S. Dist. LEXIS

26  118065, at *151-52 (N.D. Cal. Sep. 3, 2015).  Plaintiffs focus their argument on FAS's own

27  documents—the vendor qualification packets, work orders, vendor profiles, scorecards, and

28  training material—to highlight the extensive evidence of FAS's right to control the vendors.  And

United States District Court
Northern District of California

30

they predominantly rely on driver cases to support their argument.  MPSJ at 15–24 (Dkt. No. 155);

*see Ruiz v. Affinity Logistics Corp.*, 754 F.3d 1093 (9th Cir. 2014)(reversing district court and

finding delivery drivers were employees as a matter of law); *Alexander v. FedEx Ground Package*

*Sys., Inc.*, 765 F.3d 981 (9th Cir. 2014)(same); *Narayan v. EGL, Inc.*, 616 F.3d 895 (9th Cir.

2010)(reversing district court's order granting carrier's motion that drivers were independent

contractors and remanding for determination); *N.L.R.B. v. Friendly Cab Co.*, 512 F.3d 1090 (9th

Cir. 2008)(finding taxicab drivers employees protected under the National Labor Relations Act);

*Villalpando*, 2015 U.S. Dist. LEXIS 118065 (finding delivery drivers were employees as a matter

of law); *O'Connor v. Uber Techs., Inc.*, No. 13-cv-3826-EMC, 82 F. Supp. 3d 1133 (N.D. Cal.

2015)(denying developer's motion for summary judgment that drivers were independent

contractors as a matter of law); *Taylor v. Shippers Transp. Express, Inc.*, No. CV 13-02092 BRO

(PLAx), 2014 U.S. Dist. LEXIS 180061 (C.D. Cal. Sep. 30, 2014)( finding delivery drivers were

employees as a matter of law); *Arzate v. Bridge Terminal Transp., Inc.*, 192 Cal. App. 4th 419

(2011)(reversing trial court's order granting defendant's motion that drivers were independent

contractors as a matter of law); *Air Couriers Int'l v. Employment Dev. Dep't*, 150 Cal. App. 4th

923 (2007)(affirming trial court's finding that delivery drivers were employees as a matter of law);

*Estrada v. FedEx Ground Package Sys., Inc.*, 154 Cal. App. 4th 1 (2007)(same); *JKH Enterprises,*

*Inc. v. Dep't of Indus. Relations*, 142 Cal. App. 4th 1046 (2006)(finding substantial evidence

supported conclusion that drivers were employees).

        FAS's cases provide little more guidance on how the law should apply to the facts before

me.  Opp'n at 16–20 (Dkt. No. 189); *see Arnold v. Mut. of Omaha Ins. Co.*, 202 Cal. App. 4th 580

(2011)(affirming trial court's finding that nonexclusive insurance agent was independent

contractor as a matter of law); *Fireman's Fund Ins. Co. v. Davis*, 37 Cal. App. 4th 1432

(1995)(finding sales manager was not employee under corporations' insurance policies);

*McDonald v. Shell Oil Co.*, 44 Cal. 2d 785 (1955)(affirming trial court's judgment of nonsuit

finding oil company could not be held liable for injuries sustained by independent contractor's

employee).  FAS also highlights the decision in *Cotter v. Lyft, Inc.*, in which the court noted that

"[the *Alexander* and *Ruiz*] rulings were based on a conclusion that the arrow pointed so strongly in

United States District Court
Northern District of California

the direction of one status or the other that no reasonable juror could have pointed the arrow in the opposite direction after applying California's multi-factor test." No. 13-cv-4065-VC, 60 F. Supp. 3d 1067, 1078 (N.D. Cal. 2015).

While the driver cases present the most recent authority on the issue of worker classification, the nature of the vendors' work here limits the persuasiveness of those cases. Vendors select and perform a wide variety of tasks. Because the level of skill varies depending on the task, the specifications, training, and level of supervision all vary as well. In some cases, when facts are undisputed, the mixed question of worker status may best be suited for a jury. *Narayan,* 616 F.3d at 901 ("The drawing of inferences from subordinate to 'ultimate' facts is a task for the trier of fact—if, under the governing legal rule, the inferences are subject to legitimate dispute.")(citation omitted); *Cotter,* 60 F. Supp. 3d at 1077 ("[T]he act of weighing and applying numerous intertwined factors, based on particular facts, is itself generally the job of the jury."). In *Cotter,* the Hon. Vince Chhabria concluded that "there must be a trial" because "a reasonable jury could conclude that the plaintiff Lyft drivers were employees[, b]ut … could also conclude that they were independent contractors." 60 F. Supp. 3d at 1078; *see also Harris v. Vector Mktg. Corp.*, 656 F. Supp. 2d 1128, 1138 (N.D. Cal. 2009)("This last point [that some factors weigh in favor of plaintiff and some in favor of defendant] in particular underscores that a summary judgment ruling in favor of [defendant] would not be proper since the existence and degree of each factor is a question of fact for the trier of fact to resolve." But here, I am convinced that the overwhelming evidence on the most important factor of the test tips the scales clearly in favor of finding an employee relationship.

### A.      Vendors are Presumptive Employees Under California Law

As noted during certification, "[o]nce a plaintiff comes forward with evidence that he provided services for an employer, the employee has established a prima facie case that the relationship was one of employer/employee." Certification Order at 5 (quoting *Narayan v. EGL, Inc.*, 616 F.3d 895, 900 (9th Cir. 2010)(quotation marks omitted). Since it is undisputed that the vendors provide services for FAS, the burden shifts to the defendants to prove that the vendors are

32

1    independent contractors, and not employees.[35]

2                    **1.    Right to Control[36]**

3         FAS asserts that it does not dictate who does the work, when it gets done, or how it gets

4    done.  Opp'n at 6–11 (Dkt. No. 189).  And from this conclusion it insists that "vendors – not FAS

5    – retain and exercise the right to control most every aspect of their performance of the contracted

6    services."  *Id.* at 11.  But FAS's statements run counter to all of the evidence giving it the right to

7    control.  As plaintiffs state, "FAS tells Vendors where to go, when to go, what to do, when to get it

8    done, and how much and when they will be paid for their efforts."  Reply ISO MPSJ at 1(Dkt. No.

9    196).  I agree with plaintiffs' assertion that, "No reasonable juror could review the Vendor

10   Packets, the work orders, the trainings, the Vendor Profiles, the discipline, and the Vendor

11   scorecards, and conclude any of the Vendors are independent contractors."  *Id.*; *see also* MPSJ at

12   15–24.

13        Under California's common law test to distinguish between employees and independent

14   contractors, "the defendant's right to control the manner and means by which the plaintiff's work

15   is accomplished, rather than the amount of control actually exercised, is the principal factor in

16   assessing whether a plaintiff is an employee or an independent contractor."  Certification Order at

17   6.  As previously noted, a "defendant's right to control need not extend to every possible aspect of

18   the plaintiff's work[,] rather, "[t]he relevant question is whether the defendant retains 'all

19   necessary control' over the plaintiff's performance of his job duties."  *Id.* (quoting *Borello*, 48 Cal.

20   3d at 357).  Moreover, "the simplicity of the work (take this package from point A to point B)

21   ma[kes] detailed supervision, or control, unnecessary."  *Air Couriers Int'l*, 150 Cal. App. 4th at

22   937.

23

24   _____

     [35] At the onset, it is worth noting FAS concedes that some vendors may be deemed employees
25   under the law: "FAS does not contend that every single potential class member would necessarily
     qualify as an independent contractor under the *Borello* test."  Opp'n to MPSJ at 18; Hr'g Tr. at
26   12:6–7 (Dkt. No. 203[under seal]).

27   [36] Both parties cite to non-class member testimony to support their respective positions.  While
     this may have been the result of uncertainty at the time of briefing, as anticipated, the class
28   member table has clarified the relevant evidence.

United States District Court
Northern District of California

1    I find that FAS's argument that it does not control when vendors perform work

2    disingenuous.  FAS requires work to be performed within three days of receiving a work order.

3    That it does not dictate the precise hours during which the work must be performed is

4    inconsequential.  This element is a small consideration under the right to control factor.  *See, e.g.,*

5    *Air Couriers Int'l,* 150 Cal. App. 4th at 926  (finding drivers were employees even though they

6    "determined their own schedules"); *JKH Enterprises Inc.,* 142 Cal. App. 4th at 1051, (finding

7    drivers were employees even though they were "not required to work either at all or on any

8    particular schedule").

9    FAS claims that "the procedures that Plaintiffs contend qualify as the exertion of

10   'employer control' (e.g., photograph verification, job specifications, inspections, etc.) are all

11   directed towards confirming that the work a vendor accepts has been completed to the client's

12   specifications."  *Id*.  It urges that "Plaintiffs do not submit any evidence demonstrating that FAS

13   has exerted uniform control over areas that are not directly tied to the 'results,' such as (i) the

14   vendors' appearance or apparel; (ii) the brands or appearance of the equipment they use; (iii) their

15   schedules, days of work, and hours; or (iv) their geographic coverage areas."  Opp'n at 20.  It also

16   insists that vendors could negotiate rates, while plaintiffs cite many vendors who testify that they

17   could not negotiate.[37]  Although most of the evidence seems to support plaintiffs' position that

18   negotiations were illusory because FAS had the final say, FAS's evidence demonstrates that these

19   circumstances are not as clear cut as in *Ruiz* in which drivers could not negotiate *at all*.  *See Ruiz*,

20   754 F.3d at 1101.  FAS also cites to "many vendors [that] have confirmed they were never

21   'supervised' or 'monitored' by FAS[.]"  *Id*. at 10 n.20.  While plaintiffs proffer evidence that FAS

22   exercised significant oversight and supervision over vendors' work.  *See, e.g.*, Duckworth Decl.

23   ¶7, Ex. 4 (FAS marketing material entitled "Our National Vendor Network")("This [FAS's

24   technology and expertise] enables us to measure every vendor on every step of every job.").  FAS

25   repeatedly attempts to frame its direction as focused on "the desired end results" Opp'n at 8, with

26

27   _____
     [37] The difference in the evidence may pertain to a vendor's ability to "bid" on additional work not
     itemized in a work order that they discover needs to be performed at the property.  There is some
28   evidence that vendors were able to "negotiate" these rates, but the rates for work identified in the
     work orders are extracted from FAS's standard price lists.

United States District Court
Northern District of California

1    a goal to "confirm that the work is done, and completed according to client specifications.  Opp'n

2    at 10–11.

3          The Ninth Circuit rejected a similar position in *Alexander*.  There, FedEx argued that its

4    control over drivers was similarly limited to the "results it seeks, not the manner and means in

5    which drivers achieve those results."  *Alexander*, 765 F.3d at 990.  The *Alexander* court found that

6    factors such as fashion requirements, grooming, and shelving specifications were unrelated to the

7    results FedEx sought to ensure.  *Id*.  The court also noted that "[o]ther aspects … such as limiting

8    drivers to a specific service area with specific delivery locations[,] also are not merely control of

9    results under California law."  *Id*.  While FAS does not control vendors' appearance, plaintiffs

10   submitted evidence that FAS has dictated the brands and equipment, severely restricted the

11   timeframes for the completion of work orders, and even controlled the service areas by pressuring

12   vendors not to decline work orders within their listed zip codes and encouraging them to expand

13   their capabilities.  Since the relevant inquiry is whether the defendant retains "all necessary

14   control" over the vendors' performance under the work orders, FAS's "lack of control over some

15   parts of its [vendors'] jobs does not counteract the extensive control it does exercise."  *Alexander*,

16   765 F.3d at 990; *see also Cotter*, 60 F. Supp. 3d at 1075–76 (N.D. Cal. 2015) ("a finding of

17   employee status for a particular worker or group of workers does not require that the company

18   retain the right to control every last detail"); *Air Couriers Int'l,* 150 Cal. App. 4th 923 (finding

19   employment status where "[a] certain amount of ... freedom is inherent in the nature of the work").

20         Next, FAS asserts, "Plaintiffs also completely ignore that many job specifications are

21   designed to ensure compliance with applicable law …, thereby precluding Plaintiffs from relying

22   upon them as evidence of control."  *Id*.  But the *Narayan* court explicitly found requirements "to

23   meet 'the industry standard, the DOT regulations, and … customer's requirements" all

24   substantiated evidence of control.  616 F.3d at 902; *see also Hurst v. Buczek Enterprises, LLC*,

25   870 F. Supp. 2d 810, 826 (N.D. Cal. 2012)(" it is not clear why the *reason* for Defendant's control

26   over Plaintiff is relevant … Defendant's attempt to draw a line between some hypothetical form of

27   supervision it would implement absent client demands or legal requirements ... is unpersuasive");

28   *Arnold v. Mutual of Omaha Ins. Co.*, 202 Cal. App.4th 580 (2011).

United States District Court
Northern District of California

1    FAS also points out that vendors signed agreements identifying themselves as independent

2    contractors, and then  emphasizes that "none of the packets includes any limitations with respect to

3    *who* can perform the work."  Opp'n at 18 (emphasis in original).  The former point is "not

4    dispositive," *Borello*, 48 Cal. 3d at 349, and the latter point is only partially relevant.  More

5    importantly, it is not entirely true.  FAS's contention that it does not control who does the work is

6    only one consideration of many relevant to the "means" portion of the inquiry, not the "manner."

7    Moreover, I must consider FAS's right to control the *class members*, not other workers that may

8    have serviced FAS properties.  FAS's liability here will be limited to those vendors designated by

9    FAS, and plaintiffs point to substantial evidence that FAS not only retained a right to control their

10   work, but actually exercised it.  Second, FAS requires vendors to administer "background

11   screening guidelines" for any employee a Vendor utilizes for an FAS job.  *See, e.g.*, 2014 Vendor

12   Qualification Packet (Duckworth Decl. ¶ 9, Ex. 6, Dkt. No. 155-7 at 11).   And it retains the right

13   to request the results of vendors' screenings and conduct background checks of vendors'

14   employees "at its sole discretion."  *Id.* (Dkt. No. 155-7 at 12).  This further supports plaintiffs'

15   position.  *Borello,* 256 Cal.Rptr. 543, 769 P.2d at 408 n. 9 (holding that a contract provision

16   restricting sharefarmers' right to choose employees evidenced defendant's right to control

17   sharefarmers); *Ruiz,* 754 F.3d at 1102–03 ("While the district court found that approval was

18   largely based upon neutral factors, such as background checks required under federal regulations,

19   it is still true that the drivers did not have an unrestricted right to choose these persons, which is an

20   'important right[ ] [that] would normally inure to a self-employed contractor.").  Additionally, the

21   Ninth Circuit has already admonished courts not to overemphasize whether a purported employee

22   was allowed to hire his own workers.  *Ruiz*, at 1103 ("the district court's reliance on this factor [the

23   drivers' freedom to hire helpers] as dispositive in light of the overwhelming evidence of Affinity's

24   control over its drivers was error").

25   I agree with plaintiffs that FAS's  documents clearly establish that it retained the right to

26   control the vendors.  The VQPs contain an at-will termination provisions, which is "strong

27   evidence" of a right to control.  *Borello*, 48 Cal.3d at 350.  They also set out pages of specific

28   requirements, which the work orders elaborate through meticulously detailed task lists.  While

36

1   FAS attempts to frame its position as "results-driven," the straightforward nature of the work

2   severely limits the space between dictating "results" and controlling the manner and means of the

3   work.  *E.g.*, R. Pyzer Decl. ¶ 17 (Duckworth Decl. ¶ 124, Ex. 125, Dkt. No. 157-25); Montes Decl.

4   ¶ 12 (Cubre Decl. Ex. 12, Dkt. No. 198-4 at 190).

5       The vendor profiles demonstrate that FAS not only retained the right to control the vendors

6   but actually exercised that control through extensive supervision and a regimented discipline

7   program.  And if vendors failed to comply with the direction of FAS field team inspectors, they

8   faced penalties.  This is strong evidence of a right to control.  *See Ayala*, 59 Cal.4th at 533

9   ("Whether a right of control exists may be measured by asking whether or not, if instructions were

10  given, they would have to be obeyed on pain of at will discharge for disobedience.").  In

11  *Alexander*, the parties agreed that their working relationship was controlled by FedEx's Operating

12  Agreement, policies and procedures, but they disputed "the extent to which those documents give

13  FedEx the right to control its drivers."  *Alexander*, 765 F.3d at 988.  The *Alexander* court found

14  that "much of the OA is not ambiguous[,]" and "[t]o the extent it is ambiguous, the extrinsic

15  evidence supports a conclusion that FedEx has the right to control its drivers."  *Id.*

16      FAS does not argue that the VQPs are ambiguous, but it focuses on the factual variations

17  in when and how FAS exercised its control.  That is not the touchstone of the analysis.  The five

18  versions of the VQPs are materially the same;[38] they firmly establish FAS's right to control.  The

19  right-to-control test does not require absolute control.  I agree with plaintiffs that all necessary

20  control exists here, where all class members worked the majority of their time for FAS, and were

21

22  [38] FAS urges that "the Packets have varied significantly over time in material ways."  Opp'n at 4
    n.4.  They provide examples,
23

24          such as with respect to contract termination (i.e., some packets did
            not contain a termination provision, others provided that the contract
25          could be terminated at any time, and others contained a notice
            provision), independent contractor acknowledgments (i.e., some
26          packets include an express acknowledgement of independent
            contractor status, while others do not), indemnification provisions,
27          background check provisions, tax information, security provisions,
            non-exclusivity provisions, and the inclusion of job specifications
28          within the packets.

    *Id.*

United States District Court
Northern District of California

1    subject to training requirements, extensive supervision, and ongoing discipline.

2         I find that the evidence, even when viewed in the light most favorable to FAS,

3    demonstrates that it retained "all necessary control" over the vendors.

4                    **2.    Secondary Factors**

5         As noted in the Class Certification Order, "[t]he secondary factors 'cannot be applied

6    mechanically as separate tests; they are intertwined and their weight depends often on particular

7    combinations.'"  Certification Order at 7 (quoting *Germann v. Workers' Comp. Appeals Bd.*, 123

8    Cal. App. 3d 776, 783 (1981)).  "Even if one or two of the individual factors might suggest an

9    independent contractor relationship, summary judgment is nevertheless proper when ... all the

10   factors weighed and considered as a whole establish ... an employment and not an independent

11   contractor relationship."  *Alexander*, 765 F.3d at 988 (quoting *Arnold v. Mut. of Omaha Ins. Co.,*

12   202 Cal. App. 4th 580, 590 (2011)(alterations omitted)).

13        If I ignored the right to control analysis, and focused solely on the secondary factors, I

14   would not grant summary judgment.  As I discuss below, some factors favor viewing the vendors

15   as independent contractors, and some as employees.  But the right to control is pre-eminent, and

16   notwithstanding the conflicting secondary factors, a reasonable jury would have to conclude that

17   the vendor-class members were employees because FAS retained the right to control the manner

18   and means of the vendors' work.  *Borello*, 48 Cal. 3d 341, 350 ("While conceding that the right to

19   control work details is the 'most important' or 'most significant' consideration, the authorities also

20   endorse several 'secondary' indicia of the nature of a service relationship.").  FAS failed to

21   demonstrate that the secondary factors convincingly favor independent contract status.  *See*

22   *Villalpando*, 2015 U.S. Dist. LEXIS 118065, at *168–169 ("In light of the undisputed facts

23   establishing Exel's right to exercise extensive control over how Plaintiffs perform their work, the

24   Court finds that the evidence offered by Exel as to *Borello*'s secondary factors is insufficient to

25   defeat summary judgment that Plaintiffs are employees.").   All the factors weighed and

26   considered as a whole establish an employment relationship as a matter of law.  *Alexander*, 765

27   F.3d at 988; *see also Cotter*, 60 F. Supp. 3d at 1077 ("To be sure, all factors need not point in one

28   direction for a court to rule as a matter of law about a worker's proper classification.").

United States District Court
Northern District of California

### a.     Distinct Occupation or Business

This factor weighs in favor of plaintiffs.  FAS urges me to find a distinction between the vendors and the drivers in *Ruiz*, where the class members' "businesses were in name only[,]" *Ruiz*, 754 F.3d at 1104, because "all vendors here have the right to provide services to others (including FAS competitors)… ." Opp'n at 20.  But plaintiffs argue that "FAS greatly influenced and controlled the Vendors' opportunity to make (or more likely) lose money" because FAS could withhold payment at its discretion and determine a vendors' workload.  Reply at 11.  And they urge that "FAS requires Vendors to have a business license, an EIN, and business insurance." Reply at 10 (citing Hunter Dep.; F. Bowerman Dep. at 13:7–11, 40:24–41:5; Vendor Qualification Packet [requiring company name and company contact information]).

While class members may have had the *right* to work for others, many did not, and none "work[ed] for any other entity more than 30 percent of the time."  Class Certification Order at 2 (reciting class definition).  Plaintiffs contend that the work performed by vendors is "wholly integrated" into FAS's operation, and as such, the vendors are not engaged in a distinct business occupation.  MPSJ at 21 (citing *Alexander*, 765 F.3d at 995); Reply at 9.  They highlight evidence that vendors (1) could not interact directly with FAS clients;[39] (2) were required to do work according to FAS specifications;[40] (3) had to post a sign on properties indicating "Maintained By Field Asset Services, LLC" (or similar notice);[41] (4) had to add FAS as an additional insured on General Liability, Auto Liability, and excess policies for ongoing and completed operations;[42] and (5) were required to waive their right to file a lien on an FAS-serviced property.[43]  MPSJ at 21.  It is undisputed that vendors were prohibited from communicating directly with clients and with each other.  This limits the persuasiveness of the argument that they controlled distinct businesses since each of the class members personally performed property preservation work for FAS at least

---

[39] *E.g.*, Hunter Dep. at 65:23 – 66:5 (Duckworth Decl. Ex. 2, Dkt. No. 155-3).

[40] *E.g.*, Work Order (Duckworth Decl. Ex. 7, Dkt. No. 155-8); Hunter Dep. at 129:1 – 131:8 .

[41] *E.g.*, FAS Sign (Duckworth Decl. Ex. 7, Dkt. No. 155-76).

[42] *E.g.*, Vendor Qualification Packet (Duckworth Decl. Ex. 17, Dkt. No. 155-18 at 16).

[43] *E.g.*, Vendor Qualification Packet (Duckworth Decl. Ex. 37 (Dkt. No. 155-38 at 6).

United States District Court
Northern District of California

1    70 percent of the time.  *See O'Connor v.Uber Techs*., 82 F. Supp.3d 1133, 1142 (2015) (fact that

2    company prohibits its drivers from answering rider queries about booking future rides or otherwise

3    "soliciting" rides was evidence of employee status).

4        Plaintiffs proffer evidence that many vendors were so overwhelmed with FAS work that

5    their businesses were essentially precluded from seeking opportunities with others.   FAS counters

6    that they were not forbidden from doing so.  But the analysis must focus on this factor in light of

7    the class definition.  Given that vendors worked for FAS at least 70 percent of the time, this factor

8    weighs in favor of plaintiffs.

9                **b.**        **Work Done Under Principal's Direction**

10       While "this factor is largely duplicative of the control factor[,]" *Harris*, 656 F. Supp. 2d at

11   1139, which I have discussed at length, I will briefly address FAS's arguments.  It asserts that

12   "[t]he record demonstrates that vendors regularly complete their work without any supervision

13   from FAS, *which is based in Texas*."  Opp'n at 21 (emphasis in original).  FAS, however, ignores

14   the fact that the record *also* demonstrates that vendors sometimes complete their work with

15   substantial supervision from FAS.  And, while defendants mention it numerous times, the

16   relevance of FAS being based in Texas eludes me.  It has quality control inspectors in California

17   whose job is to "verify that work has been completed … to the client's specifications."  Opp'n at

18   21.  And while FAS may take issue with plaintiffs "inaccurately conflat[ing] verification with

19   supervision," *id.*, it fails to explain why before and during photo documentation is necessary if its

20   only concern is with the end results.  As plaintiffs so cogently frame it, "FAS does not 'verify' the

21   results of the work by requiring the work be done in a particular way, or on a particular timeline,

22   or using specific products, or repeatedly disciplining Vendors for not meeting job specifications."

23   Reply at 6.  As in *Borello*, "all meaningful aspects of the business relationship[,]" including the

24   "price," the tasks to be performed, how to perform them, "payment, and right to deal with buyers

25   … are controlled by [FAS]."  *Borello*, 48 Cal. 3d at 356 (alterations and quotation marks omitted).

26   This factor overwhelmingly favors plaintiffs.

27               **c.**        **The Skill Required**

28       This factor tips to plaintiffs because of the lack of skill required to do the vendors' work,

including such tasks as taking out the trash, mowing the lawn, and cleaning a house.  MPSJ at 22.

FAS points to other tasks, such as hazardous materials transportation, home winterization, and

roofing, to argue that "experience and skill in this area is critical."  Opp'n at 21.  Even though the

lack of skill required to complete work orders varies with the tasks, it remains true that "[t]he work

the vendors perform does not require a great deal of experience or skill."  Prior Order at 18.

Although some additional training may be necessary for the particular tasks identified by FAS,

they do not rise to a level requiring "skilled" labor.  That conclusion is bolstered by the fact that

vendors performing the work frequently lacked experience prior to contracting with FAS.

### d. Whether the Principal Supplies the Instrumentalities, Tools, and Place of Work

I am not sure how to evaluate this factor, but it is not important to my analysis.  As

plaintiffs state,"FAS assigns Vendors worksites, thus supplying the place of work[,]"  Reply at 12,

but it is also undisputed that vendors purchase their own tools and equipment.  Plaintiffs assert that

"FAS requires Vendors to purchase and use certain equipment and tools."  Reply at 13.  Both

parties present evidence supporting their positions, and I do not reach a conclusion regarding

them.

### e. The Length of Time for Performance of Services

For the fifth factor, plaintiffs contend that "vendors are hired by FAS for an indefinite

period of time, not linked to any particular job or property, and are paid what FAS decides to pay

them." MPSJ at 22; Reply at 13.  Plaintiffs also point out that "[m]ost vendors work for years on

hundreds of different properties."  Reply at 13.  FAS highlights the most recent template contract,

which "specifies a one-year term, subject to cancellation by either party with 30-days' notice, and

further allows termination for breach by either Party subject to a five-day cure provision."  Opp'n

at 24 (citing Hunter Supp. Decl. ¶ 9; Ex. 7; Hunter Decert. Decl. ¶ 2).  In *Narayan*, the Ninth

Circuit held that a similar agreement was "a substantial indicator of an at-will employment

relationship."  616 F.3d at 902–03; *id*. at 903 ("the length and indefinite nature of the plaintiff

Drivers' tenure …also point toward an employment relationship"); *see also Antelope Valley Press

v. Poizner,* 162 Cal. App. 4th 839, 855 (2008) ("[T]he notion that an independent contractor is

41

1  someone hired to achieve a specific result that is attainable within a finite period of time ... is at

2  odds with carriers who are engaged in prolonged service to [an employer].”); *Air Couriers,* 59 Cal.

3  Rptr. 3d at 47 (finding drivers’ “lengthy tenures … inconsistent with independent contractor

4  status”).  This factor supports plaintiffs’ position.

### f.      The Method of Payment

6  As FAS points out, vendors are paid “by the job, not by the hour[,]” Opp’n at 22, but

7  plaintiffs construe this fact into “another way FAS controls Vendors[.]”  Reply at 14 (citing

8  *Borello*, 48 Cal.3d at 357 (piecework payment formula ensured diligence and

9  quality control); *Yellow Cab Coop. v. Workers' Comp. Appeals Bd*., 226 Cal. App. 3d 1288, 1299

10  (1991)).  In *Alexander*, the Ninth Circuit stated, “where, as here, there is ample independent

11  evidence that the employer has the right to control the actual details of the employee’s work, the

12  fact that the employee is paid by the job rather than by the hour appears to be of minute

13  consequence.”  765 F.3d at 996 (quotations and modifications omitted).  *Alexander’s* analysis

14  applies here.

### g.      Whether the Work is a Regular Part of the Business of FAS

16  FAS urges that it “coordinates the provision of property preservation services,” but “does

17  not itself provide property preservation services.”  Opp’n at 22.  While FAS employs a substantial

18  staff of coordinators and inspectors to oversee its operation, it would not have a business to

19  coordinate without the work of the vendors.  It provides its clients with property preservation

20  services through the use of vendors.  *See* Certification Order at 15 (“FAS’s business model is

21  dependent on vendors performing the services that FAS provides.”).   In its own words, “FAS is

22  the premier Property Preservation, REO Maintenance, and Repair Services company in the United

23  States.”  FAS marketing material (Duckworth Decl. ¶ 4, Ex. 1, Dkt. No. 155-2).  The vendors

24  “perform those very [property preservation] services that are the core of [FAS’s] regular business.

25  Without [vendors], FAS could not be in the [property preservation] business.”  *Ruiz*, 754 F.3d at

26  1105.  This factor also favors plaintiffs.

### h.      Intent of the Parties

28  As already noted, the vendors signed an agreement acknowledging their status as

United States District Court
Northern District of California

1   independent contractors, so this factor weighs in favor of independent contractor status.  The Ninth

2   Circuit, however, found this factor is not dispositive where the initial intent to create an

3   independent contractor agreement is "belied by" FAS's "policies and procedures, which in fact

4   allow [it] to control significant aspects of the [vendor's] day-to-day jobs, and it therefore provides

5   only limited insight into the [vendor's] state of mind. 765 F.3d 996.

6                              **i.        Opportunity for Profit or Loss**

7                FAS highlights this factor as a critical reason why the vendors must be independent

8   contractors because they "have opportunities for profit and loss in the millions of dollars based

9   upon their managerial skill… ."  Opp'n at 23.  This certainly seems to have happened for a few of

10  the vendors, so it is clear that opportunity for profit exists.

11                             **j.        Employment of Others**

12               FAS urges that the vendors' ability and freedom to hire their own workers favors a finding

13  of independent contractor status.  *Id*. at 24.  Plaintiffs underscore the *reasons* vendors may have

14  hired their own workers as a necessary consideration.  And they cite to *Ruiz* to diminish the

15  importance of this factor: "While 'purporting to relinquish' some control to the drivers by making

16  the drivers form their own businesses and hire helpers, Affinity 'retained absolute overall control'

17  over the key parts of the business."  *Ruiz*, 754 F.3d 1103 (*quoting Borello*, 48 Cal. 3d at 355-56);

18  *see also Alexander*, 765 F.3d at 993 ("California cases indicate that entrepreneurial opportunities

19  do not undermine a finding of employee status").  But it is undisputed that the vendors make the

20  ultimate decision to hire workers lied with the vendors, so this factor suggests more of an

21  independent contractor relationship.

22                             **k.        Degree of Permanence**

23               FAS points to the mutual right to terminate the relationship as evidence supporting

24  independent contractor status here.  Opp'n at 24.  *Hennighan*, 38 F. Supp. 3d at 1105 ("A mutual

25  termination clause is evidence of an independent contractor relationship").  This factor was

26  discussed above.

27                             **l.        Whether the Relationship Was Exclusive**

28               While the class is limited to those vendors that "did not work for any other entity more

43

United States District Court
Northern District of California

1    than 30 percent of the time," FAS attempts to point to their *ability* to provide services for others.

2    Opp'n at 24.  It does not matter what the vendors were free to do; rather the scope of the analysis

3    is governed by the class definition.  The class members here had a nearly exclusive relationship

4    with FAS.

5         As noted at the outset of this section, some of the secondary factors support FAS's

6    argument that the vendors are independent contractors.  But its right to control swamps those

7    factors in importance, and other secondary factors favor plaintiffs' argument that the vendors are

8    employees.  A reasonable jury could not conclude otherwise.

9         **B.    Overtime Violations and Failure to Reimburse Certain Expenses**

10        California law requires payment of overtime compensation to all non-exempt employees,

11   Cal. Lab.Code § 510, as well as the reimbursement of necessary and reasonable business expenses.

12   Cal. Lab. Code § 2802.  Summary judgment on these claims necessarily depends on a finding that

13   the vendors are employees as a matter of law.  Once that is established, plaintiffs contend that they

14   are entitled to summary judgment on the issue of FAS's liability for failing to pay overtime and to

15   reimburse expenses because it is undisputed that FAS did not pay vendors' overtime nor did it

16   reimburse them for business expenses.  MPSJ at 25.  They assert that "[a]ny issue as to how much

17   Plaintiffs should be [sic] received, i.e., whether a particular Vendor worked overtime on a specific

18   day, or whether a specific expense was reasonable and necessary, are all issues for the damages

19   phase of these claims."  *Id.*

20        FAS disagrees, citing cases suggesting summary judgment on claims for expenses and

21   overtime is inappropriate when issues of fact are left unresolved.  Opp'n at 25 (citing *Morgan v.*

22   *Wet Seal Inc.*, 210 Cal. App. 4th 1341, 1358 (2012) (proving liability for failure to reimburse

23   expenses would involve answering: (1) what, if anything, the employee was told regarding

24   reimbursement of expenses; (2) whether each expense was necessary and a direct consequence of

25   the discharge of the employees' job duties; (3) whether the employee sought reimbursement of

26   that expense; and (4) whether the employee was in fact reimbursed); *Sotelo v. MediaNews Group*,

27   207 Cal. App. 4th 639, 654 (2012) (recognizing that "simply having the status of an employee

28   does not make the employer liable to a claim for overtime compensation.").  Defendants' cases are

44

1    inapposite.  In *Morgan*, the court noted that the written policies at issue did not resolve the liability

2    question, therefore individualized inquiry was necessary.  *Morgan*, 210 Cal. App. 4th at 1356–58.

3    The same is not true here, and FAS admits as much.  Opp'n at 25 ("FAS does not reimburse

4    vendors for their business expenses as a matter of policy… .").  FAS

5        FAS concedes that it does not pay overtime.  It contends  that "vendors can and do

6    negotiate over payment for some of the very same costs Plaintiffs seek to recover by way of their

7    expense reimbursement claim… ."  *Id*.  But because employees are entitled to overtime and

8    payment of expenses as a matter of law, summary judgment with respect to liability to the class is

9    appropriate.  Whether and to what amount an individual class member should be compensated for

10   working overtime or being reimbursed for expenses will be determined in the damages or claims

11   phase of the case.

12   **III.    FAS'S MOTION FOR SUMMARY JUDGMENT[44]**

13       FAS argues that "there are many individuals in the group of 48 whose claims fail as a

14   matter of law[,]" but it pinpoints the claims of purported class members Julia Magdaleno (f.k.a.

15   Bowerman); Matthew Cohick, owner of vendor Monster Mowers; and Eric Ackel, owner of Kurb

16   Appeal, Inc. to attack on summary judgment.  MSJ at 1 (Dkt. No. 152).  It argues Magdaleno is

17   not a class member and Cohick and Ackel are not employees.  *Id*.  And it insists that "these three

18   individuals illustrate the variety of factual obstacles that Plaintiffs face in their misguided effort to

19   prove misclassification."  *Id*.

20       **A.    Julia Magdaleno**

21               **1.    Class Status**

22       FAS argues for summary judgment of Magdeleno's claims because she "never executed a

23   contract with FAS," FAS never designated her as an independent contractor, and she therefore

24   does not meet the class definition.[45]  MSJ at 1.  Plaintiffs counter that Magdaleno is a class

25   _____

26   [44] Plaintiffs argue that FAS's motion is procedurally improper because it is not "directed at claims
     or defenses."  Opp'n at 6.  I disagree.  FAS's argument that Magdaleno is not a class member and
27   Cohick and Ackel are independent contractors as a matter of law is equivalent to a defense to the
     claims against it, as to those purported class members.

28   [45] The class is defined as,

United States District Court
Northern District of California

member because "BBHS was designated as a vendor for FAS[,]" and Magdaleno "was a joint owner of BBHS." Opp'n at 7.   To support her ownership status, plaintiffs cite to Magdaleno's self-identification and subjective understanding; status as co-signor of the BBHS bank account; authority to enter contracts on behalf of BBHS; designation on BBHS work orders; and signature on BBHS documents. *Id*.

The issue of Magdaleno's purported ownership interest in BBHS derived from her marriage to Fred Bowerman is distinct from the issue of whether she was ever "designated by FAS as an independent contractor."[46]  This remains true even given plaintiffs' representation that class members are vendor-owners.  Simply because all class members are vendor-owners does not mean that all vendor-owners are class members.  Each vendor-owner must have been designated by FAS as an independent contractor to meet the class definition.[47]  FAS argues that she was never designated as such, irrespective of her marriage or her ability to act as an agent, on FAS's behalf. I agree.  Because Magdaleno does not fall within the class definition, her class claims must fail.[48]

---

> All persons who at any time from January 7, 2009 up to and through the time of judgment (the "Class Period") (1) were designated by FAS as independent contractors; (2) personally performed property preservation work in California pursuant to FAS work orders; and (3) while working for FAS during the Class Period, did not work for any other entity more than 30 percent of the time.  The class excludes persons who primarily performed rehabilitation or remodel work for FAS.

FAS does not dispute that Magdaleno personally performed property preservation work, or worked for FAS at least 70 percent of the time.

[46] Accordingly, plaintiffs' argument based on California community property law is irrelevant to the issue of class membership.

[47] Plaintiffs separately argue that Magdaleno was designated as a vendor through work orders, and FAS admitted Magdaleno's status in its answer.  But Magdaleno did not sign the VQP documents and is not in the same position as the other vendor class members.  She is not a member of the class.

[48] In the section of plaintiffs' opposition dedicated to the breach of contract claim, plaintiffs argue that Magdaleno, as an employee, "was entitled to overtime pay and reimbursement of business expenses from FAS[,]" independent of any written agreement.  Opp'n at 8.  I do not consider this argument here, as plaintiffs have elected to pursue their misclassification claims on a classwide basis.  Since Magdaleno does not meet the class definition, those claims are not properly considered part of this action.

### 2. Claims for Breach of Contract and Breach of the Covenant of Good Faith and Fair Dealing

As an initial matter, Magdaleno's claims for breach of contract and breach of the covenant of good faith and fair dealing are not dependent on her membership in the class because "plaintiffs did not seek certification of the claims for breach of contract, breach of the implied covenant of good faith and fair dealing, or violations of the UCL not predicated on Labor Code violations." Certification Order at 3:10–12. Because plaintiffs did not seek to pursue those claims on a classwide basis, they are not contingent on Magdaleno's class status. Nevertheless, FAS insists, "even assuming Ms. Magdaleno is a proper class member, her contract claims still fail." MSJ at 5 (capitalization omitted). It states that her claims for breach of contract and breach of the covenant of good faith and fair dealing must be dismissed because she never signed an agreement with FAS. MSJ at 5. Its arguments are unpersuasive.

While FAS focuses on the "documents that memorialized the contractual relationship between BB Homes Services and FAS," Opp'n at 5, a contract may be implied by conduct. *See* Cal. Civ. Code § 1621 ("An implied contract is one, the existence and terms of which are manifested by conduct."). Magdaleno's claim for breach of contract need not depend on the existence of any written agreement.[49]

As for her claim for breach of the implied covenant of good faith and fair dealing, it too survives. FAS misrepresents *Guz*'s holding when it states, "there is no independent claim for breach of the implied covenant of good faith and fair dealing in the employment context… ." MSJ at 6 (citing *Guz v. Bechtel*, 24 Cal. 4th 317, 377[50] (2000)). While a claim for breach of the implied covenant of good faith and fair dealing "that merely realleges th[e] beach [of contract claim] as a violation of the covenant is superfluous[,]" that is not what is happening here. Plaintiffs' breach of contract claim is based on the actual terms of their agreement, as expressed in the Vendor

---

[49] I also agree with plaintiffs that FAS would be liable to Magdaleno "to the extent it failed to pay on a specific work order" that Magdaleno signed. Opp'n at 8.

[50] I do not see how FAS's pincite supports its position at all, although other sections of the decision at least relate to the topic at issue here. *See Guz v. Bechtel*, 24 Cal. 4th 317, 348–352 (2000).

47

1    Qualification Packet.  *See* FAC ¶ 38 ("FAS materially breached Plaintiffs' and other class

2    members' Agreements when they failed to compensate them as provided for in the Agreements.").

3    Their claim for breach of the implied covenant of good faith and fair dealing, on the other hand, is

4    based on FAS's "[f]ail[ure] and refus[al] to pay Plaintiffs and class members in accordance with

5    California law[.]"  FAC ¶ 43(A).  Accordingly, that claim is not superfluous.

### B.    Absent Class Members Matthew Cohick and Eric Ackel

6

7        While FAS separates its attack on Cohick and Ackel, its argument is the same: the level of

8    success or independence of each individual's business precludes a finding that they are FAS's

9    employees.  MSJ at 15 ("On its own initiative, Monster Mowers grew to be a multi-million dollar

10   business with dozens of employees and subcontractors, extensive equipment, and a fleet of

11   vehicles, that it used to provide property preservation services to a number of clients – before,

12   during, and after the time period it provided services to FAS."); Reply at 9 ("Mr. Ackel did not

13   create Kurb Appeal to contract with FAS, but rather, to enter the industry, and when Mr. Ackel

14   when 'looking for clients,' he found FAS.").

### 1.    Right to Control

15

16       FAS argues, due to the size of the businesses of Cohick and Ackel, that it could not have

17   exercised control over their work.  MSJ at 17 ("Compared to the expansive nature of Cohick's

18   operations, FAS exerted minimal, if any, control.")(capitalizations omitted).  Without a doubt, the

19   size of their businesses differentiates them to some degree from the other vendors.  But once

20   again, FAS focuses on the wrong question, the actual exercise of control rather than the right to

21   control.  "Under this [common law] test, the defendant's right to control the manner and means by

22   which the plaintiff's work is accomplished, rather than the amount of control actually exercised, is

23   the principal factor in assessing whether a plaintiff is an employee or an independent contractor."

24   Certification Order at 6 (citing *Ayala v. Antelope Valley Newspapers, Inc.*, 59 Cal. 4th 522, 533-34

25   (2014) ("What matters under the common law is not how much control a hirer *exercises,* but how

26   much control the hirer retains the *right* to exercise.") (emphasis in original)).

27       As plaintiffs point out, FAS terminated its relationships with both Cohick and Ackel,

28   which is "'strong evidence' of a right to control and an employment relationship."  Certification

United States District Court
Northern District of California

1    Order at 7 (quoting *Borello*, 48 Cal.3d at 350).  But that is not all.  As Ackel testified, "they [FAS]

2    controlled all the work we did.  They decided when we worked, when we didn't work, how much

3    we worked, how much we got paid, when we didn't get paid, how we were going to get paid."

4    Ackel Dep. at 47:8–11 (Duckworth Decl. ¶ 7, Ex. D).  Moreover, "[t]here was no negotiation." *Id*.

5    at 55:25–56:2; *see also* Cohick Dep. 96:2-97:16 ("[FAS] always decided what I was going to get

6    paid").  The size of their businesses is largely irrelevant to the question of FAS's right to exercise

7    control over each, as vendor-owners.  *See O'Connor v. Uber Techs., Inc.*, 82 F. Supp. 3d 1133,

8    1152 (N.D. Cal. 2015)("The more relevant inquiry is how much control Uber has over its drivers

9    *while they are on duty* for Uber.")

10                    **2.    Secondary Factors**

11          All but one of the secondary factors— including the level of supervision, the skill

12   required,[51] whether the principal supplies the tools and place of work, the length of time for which

13   the services are to be performed, the method of payment, whether the work is part of the

14   principal's regular business, and the intent of the parties—come out the same for Cohick and

15   Ackel as for the rest of the class.  *See* supra section II.A.2 (analyzing secondary factors in regards

16   to plaintiffs' motion for partial summary judgment).  FAS's strongest argument lies within the

17   distinct business factor, and related considerations of "opportunity for profit or loss depending on

18   his managerial skill," and "investment in equipment or materials required for his task, or his

19   employment of helpers."  *Borello*, 48 Cal.3d at 355.

20          In regards to Cohick's Monster Mowers, FAS points to Monster Mower's financial

21   success, as well as its investment in vehicle and equipment inventory, clothing bearing the

22   Monster Mowers logo, and dozens of workers and subcontractors.  MSJ at 20–22.  It also

23   highlights Monster Mower's work for FAS competitor AMS, and its freedom to "*follow*[] *the*

24   *client while still contracting with FAS*."  *Id*. at 22 (emphasis in original).  But, according to

---

[51] However, FAS argues that "the skill that Monster Mowers brought was not its ability to mow a lawn but rather the company's professed ability to handle lawn care services for '1000+' properties – including all the equipment needs and logistics arising from this workload."  MSJ at 18.  While this implies Cohick may have possessed some additional management skills, this is not synonymous with the "skill required" to do the work assigned.

United States District Court
Northern District of California

1  plaintiffs, FAS told Cohick to hire helpers, provided its own training, supervised him (and other

2  workers) through calls and emails, inspected the work, disciplined him by paying him less, and

3  left him under constant fear that he would lose work if he did not do exactly as FAS demanded.

4  Opp'n at 3–4. Additionally, "FAS sent inspectors to show Cohick and his helpers how to do the

5  work and to review the work, in addition to training the laborers, inspecting the manner and

6  quality of the work and whether FAS directions were followed." *Id*. (citing Cohick Dep. at

7  110:24–111:18).

8          For Ackel, FAS highlights Kurb Appeal's 1500-square foot office space and the several

9  other businesses owned by Ackel, both before and after contracting with FAS.  MSJ at 29–31.  It

10 also focuses on his discretion to refuse work, his liberty to hire workers without FAS approval,

11 and the small percentage of on-site inspections to argue that FAS did not exercise a right of

12 control over Kurb Appeal.  *Id*.  While FAS never "trained" Ackel, "they [FAS] controlled

13 everything you did[,]" and "there was no negotiation."  Ackel Dep. at 55:12–13.  Further, when

14 they showed up unannounced for site inspections, they would "just give [him] direction."  *Id*. at

15 67:23.  The differences FAS identifies regarding Cohick and Ackel from the other vendors are not

16 sufficient to exclude them as class members.  FAS's motion for summary judgment concerning

17 them is DENIED.

18                              **CONCLUSION**

19         Plaintiffs' motion for partial summary judgment is GRANTED.  FAS's motion to decertify

20 the class is DENIED.  Its motion for summary judgment is GRANTED with respect to Julia

21 Magdaleno and denied as to Matthew Cohick and Eric Ackel.

22         The damages phase of the case remains set for trial on May 22, 2017 at 8:30 a.m.  The pre-

23 trial conference is set for April 24, 2017 at 2:00 p.m.

24         **IT IS SO ORDERED.**

25 Dated: March 17, 2017

26

27                                                    _____

28                                                    William H. Orrick
                                                      United States District Judge

United States District Court
Northern District of California