UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

FRED BOWERMAN, et al.,

       Plaintiffs,

  v.

FIELD ASSET SERVICES, INC., et al.,

       Defendants.

Case No. 3:13-cv-00057-WHO

**FINDINGS OF FACT AND CONCLUSIONS OF LAW ON UCL CLAIMS**

## INTRODUCTION

This is a classwide misclassification case involving workers who perform property preservation services in California for Field Asset Services, Inc. and Field Asset Services, LLC ("FAS"). In July 2017, the claims of Plaintiff Fred Bowerman and ten class members were tried to a jury. The ten class members were Jake Bess, Janeen Cloud, Matthew Cohick, Linda Dunham, Kenneth Freeborn, Amy Gowan, John Gowan, Matt Jaques, Kim Miller, and Anthony Yager. Plaintiff and these class members are collectively referred to as the "Claimants."

Because the Claimants' certified claims for violations of the Unfair Competition Law, Business and Professions Code §§ 17200 *et seq*. ("UCL") are equitable claims, they were presented to the bench without a jury. Following the jury trial and the bench proceedings (which were concluded in a one-day proceeding on January 5, 2018), I set forth the findings of fact and conclusions of law below. *See* Fed. R. Civ. P. 52(a)(1).

## BACKGROUND

### I.    PROCEDURAL HISTORY

1.    This case was filed on January 7, 2013 by Plaintiffs Fred Bowerman and Julia

Magdaleno (f/k/a Bowerman) on behalf of themselves and similarly situated individuals against

FAS.  Plaintiffs were "vendors" who performed maintenance and repair work on foreclosed and

other homes.

   2. On January 26, 2015, I granted Plaintiffs' Renewed Motion for Class Certification.

Dkt. 78.  On March 24, 2015, I issued a decision "explain[ing] that the modifications plaintiffs

made to the proposed class definition allow for common questions of law and fact to predominate

over questions affecting only individual class members[.]" Order Granting Renewed Mot. for

Class Certification at 1 ("Certification Order")(Dkt. No. 85).  The certified class is defined as:

> All persons who at any time from January 7, 2009 up to and through the time of judgment
> (the "Class Period") (1) were designated by FAS as independent contractors; (2) personally
> performed property preservation work in California pursuant to FAS work orders; and (3)
> while working for FAS during the Class Period, did not work for any other entity more
> than 30 percent of the time. The class excludes persons who primarily performed
> rehabilitation or remodel work for FAS.

*Id*.  Pursuant to the agreement of the parties, the Class Period was subsequently fixed as beginning

on January 7, 2009 and ending on December 20, 2016.

   3. On January 4, 2017, FAS moved for decertification and summary judgment as to

potential class members Julia Magdaleno (f/k/a Bowerman), Matthew Cohick, and Eric Ackel.

Dkt. 152. The same day, Plaintiffs moved for summary judgment on (1) "FAS's affirmative

defense that Plaintiffs and Class Members are independent contractors"; (2) "FAS's liability under

California law for failing to pay the Class overtime"; and (3) "FAS's liability under California law

for failing to reimburse the Class for reasonable and necessary business expenses."  Dkt. 155.

   4. On March 17, 2017, I denied FAS's motion for decertification, concluding that the

class "meets the requirements of Rule 23 and discovery has not revealed otherwise."  Order

Denying Defs.' Mot. to Decertify; Granting Pls.' Mot. for Partial Summ. J.; Granting Defs.' Mot.

for Summ. J. as to Magdaleno and Denying as to Cohick and Ackel at 1 ("Prior Order")(Dkt. 205).

I also granted Plaintiffs' motion for partial summary judgment concluding as a matter of law that

Class members were employees of FAS, and that FAS was liable to the Class for unpaid overtime

and unreimbursed business expenses because:

> The overwhelming weight of the evidence supports a finding that FAS retained and, more often than not, *actually exercised* a right to control the manner and means of the vendors' work. While some of the secondary factors for evaluating proper classification fall in FAS's favor, they cannot overcome the powerful evidence of control that establishes that the vendors are employees as a matter of law. A reasonable jury could not return a verdict for FAS on that issue.

Prior Order at 1-2, emphasis in original.

5. I also granted FAS's motion for summary judgment as to Julia (Bowerman) Magdaleno because she was not designated by FAS as a vendor and therefore did not meet the class definition. But I concluded that Ms. Magdaleno could continue to pursue her individual claims alleged in the First Amended Complaint. Prior Order at 46. I denied FAS's motion for summary judgment as to Class members Matthew Cohick and Eric Ackel. *Id*. at 50.

6. On July 5, 2017, a jury trial proceeded on behalf of Plaintiff Fred Bowerman and ten class members (the 11 "Claimants") for (1) damages for unpaid overtime; (2) damages for unreimbursed business expenses; and (3) liability and damages for waiting time penalties pursuant to Labor Code § 203. On July 17, 2017, the jury returned its verdict, awarding specific damages, penalties and prejudgment interest per class member, the total of which is $2,060,237. Dkt. 358.

7. In moving for class certification, Plaintiffs did not seek certification of UCL claims that were not predicated on their Labor Code claims. Dkt. 85 at 3. Thus, with the exception of the time period at issue, Plaintiffs' UCL claims are coextensive with Plaintiffs' Labor Code claims; that is, Plaintiffs allege that FAS violated UCL's unlawful prong by violating the same Labor Code claims that were certified and upon which liability was established at summary judgment, i.e., FAS's failure to pay overtime, and FAS's failure to reimburse for reasonable and necessary business expenses. *Id.*; Dkt. 205. Based on the applicable statutes of limitations, plaintiffs' certified UCL claims have a recovery period of January 7, 2009 through December 20, 2016, while Plaintiffs' certified Labor Code claims have a recovery period of January 7, 2010 through December 20, 2016. The separate one-year period covered only by the UCL—from January 7, 2009 to January 7, 2010—is referred to as the "Exclusive UCL Period."

8. On January 5, 2018, the Court held a bench trial on the Claimants' certified UCL claims.

## II.    FINDINGS OF FACT

9.    I previously determined as a matter of law that Class members are employees. Dkt. 205.

10.    I previously determined as a matter of law that FAS did not pay overtime wages to Class members. Dkt. 205 at 44-45. That fact was repeatedly confirmed by the Claimants throughout the jury trial without contradiction.

11.    I previously determined as a matter of law that FAS did not reimburse Class members for the following categories of business expenses, which were necessary to perform work for FAS: (1) mileage/fuel; (2) insurance; (3) tools and equipment; (4) cell phones; and (5) dump fees. Prior Order at 29, n.34, 30, 44-45. These facts were repeatedly confirmed by the Claimants throughout the jury trial without contradiction.

12.    Class members performed property preservation services for FAS. This work included a variety of tasks that comprise the maintenance and servicing of foreclosed homes. TT, V6, 1170:24-1174:15. The Claimants testified that it also included reviewing and downloading work orders, taking directions from and reporting to FAS (by telephone and otherwise), driving to the various job locations assigned by FAS, performing the various tasks at the work sites, taking before, during and after photos as required by FAS, uploading those photos to FAS's system, invoicing FAS for the work, and addressing any quality control ("QC") issues which sometimes entailed additional work on-site. FAS admitted that the majority of property preservation work is unskilled work. TT 1/5/18 117:17-24. FAS also acknowledged that the vast majority of vendors perform work for FAS for a period of years. TT 1/5/18 118:24-119:4.

13.    The work of FAS's vendors is, by FAS's admission, "integral to FAS's operations." FAS cannot fulfill its business mission but for the vendors' performance of their work. TT 1/5/18, 119:21-120:3.

14.    FAS paid Class members largely on a per task or piece rate basis, but also paid for certain work on an hourly basis, while not paying for certain work activities at all. TT, V6, 1201:23-24. FAS did not produce pay records for the Class. FAS had no formula by which it

determined how much of the piece rate was attributable to compensation for labor and how much, if any, was attributable to reimbursement of business expenses. TT 1/5/18 119:11-20.

15. FAS did not provide Class members with accurate, periodic wage statements indicating the hours worked or the amounts paid. Instead, FAS required Class members to submit "invoices" for work completed pursuant to FAS work orders. The invoices do not contain the schedule of hours worked, the total hours worked, or all rates of pay for hours worked. TT, V7, 1235:17-21.

16. FAS has a computer system for hourly employees to clock in and clock out. TT, V6, 1216:18-22. FAS does not, however, record the hours that Class members work. FAS also does not track or record any meal periods for Class members. TT, V7, 1235:17-21. FAS also has procedures and processes in place to reimburse individuals it designates as employees for business expenses, but does not reimburse Class members for any of their expenses. TT, V6, 1217:11-13.

17. FAS offered the testimony of two of its employees: Sarah Hunter, who was FAS's corporate designee; and Robert George, a vice president of sales and business development for FAS's field services division and vendor Operations Manager from 2008 - 2010. TT, V6, 1218:7–1345:16; TT 1/5/18, 76:21-24. Ms. Hunter testified during the jury trial; Mr. George testified during the bench trial on the UCL claims.

18. Both Mr. George and Ms. Hunter confirmed that FAS does not do any investigation to determine whether a vendor is actually an independent contractor or an employee because it is FAS's position that it only hires vendors who are "independent businesses." TT, V6, 1199:9-15, 1200:21-1201:24, 1210:4-1211:3, 1212:2-13; TT 1/5/18 101:2-14, 110:8-14. Mr. George admitted that FAS did not do any pre-employment review of the vendors, nor did it audit vendor operations to determine whether they were employees. TT 1/5/18 101:2-14. Similarly, when a vendor is terminated, Ms. Hunter confirmed that FAS does not perform any evaluation to determine whether the vendor is an employee, or whether that vendor is owed any wages. TT, V6, 1212:2-13.

19. Mr. George testified that FAS only hired "viable businesses," but admitted that FAS did not give any consideration to the form of business a vendor had, did not assess whether a vendor had been in existence as a business for any period of time before beginning work for FAS

5

and did not engage in any examination of the assets or financial status of any vendor to determine if, in fact, any vendor was a "viable business" based upon any objective or material factors. TT 1/5/18 90:16-21, 91:3-6, 97:22-98:4, 107:17-108:13. The only concrete step Mr. George could identify that FAS took to determine whether a vendor was a "viable business" was that FAS would ask for a W-9 form at the beginning of employment. TT 1/5/18 107:17-108:13, 136:7-137:11. I take judicial notice of the fact that individuals regularly are required to provide W-9 forms when getting paid pursuant to a service agreement or contract; there is no requirement that a W-9 form only be completed by businesses. *See* https://www.irs.gov/pub/irs-pdf/iw9.pdf (explaining that a W-9 is to be used to request the taxpayer identification "of a U.S. person" which includes an "individual who is a U.S. citizen or U.S. resident alien").

20. Ms. Hunter claimed that FAS's actions in treating Class members as independent contractors and not employees were in "good faith." TT, V6, 1214:2-15. The jury disagreed and found that FAS willfully failed or refused to pay wages to each Claimant. Dkt. 358.

21. Mr. George testified that Claimants did not notify FAS of their claims for unreimbursed business expenses, or ask to become employees of FAS and, thus, recover overtime wages from FAS while they performed services for FAS. 1/5/18 TT at 107:08-19.

22. Both Ms. Hunter and Mr. George gave testimony that was often inconsistent with the documentary evidence and vendor testimony presented in this case. For example, Ms. Hunter repeatedly asserted that vendors, including the Claimants, were not required to attend trainings or do tasks for FAS in specific ways, despite significant documentary evidence from FAS and testimony to the contrary. *See, e.g.,* TT, V6, 1181:2-10, 1188:1-25, 1202:23-1204:5; TT, V7, 1286:10-1288:10. She also testified that a word like "must" in direction to a vendor does not signal a requirement or a mandatory task; rather, she insisted that FAS used "must" as an "informative" or "instructional" direction. TT, V6, 1188:16–1189:7; TT, V7, 1289:1-23. Mr. George similarly testified that, if FAS documents referred to training as mandatory, that would be "mistaken." TT 1/5/18 107:10-16.

23. Ms. Hunter insisted that FAS had no control over the Claimants' work but, when faced with FAS documents, Ms. Hunter admitted that FAS had a progressive discipline policy for

vendors.  Ex. 298; TT, V6, 1205:4-23.  Similarly, Mr. George repeatedly asserted that vendors, including Claimants, could perform their work in any manner that they chose, but he admitted that FAS reduces work it gives to vendors when it finds the work unsatisfactory (meaning they are not able to earn more income), that FAS scores vendors on their performance, including how often they turn down work assignments, and that FAS puts vendors on probation or deactivates them when they are not performing to FAS's standards.  TT 1/5/18, 104:1-8, 110:15-111:3, 113:17-20, 122:5-123:23.

24.     FAS's own documents showed that Mr. George disciplined vendors.  Ex. 573.  Mr. George placed Mr. Bowerman on probation and reduced the amount of work he would receive from FAS (and therefore the amount he could earn) due to perceived failures in work performance, including the manner in which he spoke to FAS staff.  Ex. 573; TT 1/5/18, 104:1-8, 124:10-19, 125:17-127:17, 128:3-24, 129:14-131:9.

25.     A fundamental concern in this case was the lack of documentary evidence of the hours worked and expenses incurred by the vendors.  FAS did not require the vendors to provide the specific categories of time/expenses for which the vendors now seek compensation, and the vendors did not maintain time records and (in some cases) other expense information.  Prior to the jury trial, I determined that the presumption in *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687–88 (1946) applied and instructed the jury that "if Field Asset Services did not keep accurate records of the expenses incurred by Claimants, then Claimants may prove the expenses incurred by making a reasonable estimate of those expenses."  Final Jury Instructions, Jury Instruction No. 7 (Dkt. No. 356); *see also* Jury Instruction No. 16 ("If Field Asset Services did not keep accurate records of the hours worked by Claimants, then Claimants may prove the number of overtime hours worked by making a reasonable estimate of those hours.").  FAS received detailed job reports from the vendors after the completion of each job, which could have either corroborated the testimony of the vendors or undercut it.  FAS did not produce those job reports in discovery, despite plaintiffs' requests.

26.     On July 17, 2017, the jury entered special verdicts for each of the Claimants.  Dkt. 358.  Those verdicts award damages for overtime and unreimbursed expenses, waiting time

7

penalties under Labor Code § 203, and prejudgment interest for the period each Claimant worked between January 7, 2010 and December 20, 2016. *Id.*

27.     In awarding the special verdicts, the jury made the following findings of fact, either implicitly or explicitly, for each Claimant, during the time period between January 7, 2010 and the present:

> a.     That each Claimant worked unpaid overtime for FAS;
>
> b.     That each Claimant incurred the following expenses while working for FAS: insurance, tools & equipment, cell phone charges, dump fees, and mileage/fuel;[1]
>
> c.     That FAS willfully failed or refused to pay wages due to each Claimant at the time they were due. Dkt. 358.

28.     I adopt the findings of fact above. The jury's verdict makes clear that it credited the vendors' testimony and did not significantly reduce the estimates to which the vendors testified. For purposes of this Order, I will adopt the jury's damages analysis as a base number for my consideration of restitution for the Exclusive UCL Period. I further find that, for the Exclusive UCL Period, each Claimant (with the exception of Matt Jaques, who is not eligible to claim damages during that time period) worked unpaid overtime for FAS and incurred the following expenses while working for FAS: insurance, tools & equipment, cell phone charges, dump fees, and mileage/fuel. However, damages are different than restitution. As discussed in the Conclusions of Law, I will make the following adjustments to determine the restitution amount necessary to return money obtained through FAS's unfair business practices. I will start with the Claimants' damages awards at trial; reduce them if they exceed the amount suggested by plaintiffs' counsel in their closing statement at trial; calculate any overtime for the Exclusive UCL Period based on the Claimants' working no more than 50 weeks during that period; and decline to award pre-judgment interest on the result.

29.     Claimants each testified about their working relationship with FAS. Each

_____

[1] For Claimant Amy Gowan, who worked with her husband John Gowan, the jury awarded their joint expenses to John Gowan. *See* Dkt. 358 at pp. 19, 21.

described their daily schedules, which were largely the same, and consisted of rising early to review FAS work orders, gather tools and equipment, and plan out routes for the day. After they returned home at the end of the day, the Claimants had to upload the great number of photos that had been taken to document their work throughout the day in order to get paid. The jury accepted the Claimants testimony that they typically worked at least ten hours per day and at least six days per week.

30.     Because the restitutionary award is based on the evidence presented to the jury, I will restate the evidence with respect to each Claimant:

31.     **Plaintiff Fred Bowerman.**

a.     Mr. Bowerman testified that he worked for FAS from 2008 through 2012. On average, Mr. Bowerman worked 12 to 14 hours per day, six to seven days per week. TT, V2, 329:20-23; TT, V1, 213:5-19. During the entire time he worked for FAS, he stated that he took off a total of two weeks for vacation. TT, V2, 319:11-15.

b.     Of his working time during the time he worked for FAS, Mr. Bowerman said that he worked over 95% to 98% of his time for FAS. TT, V2, 316:7-11.

c.     For the Exclusive UCL Period, I accept Mr. Bowerman's testimony that he worked 13 hours per day, 7 days per week, 25 weeks per year, and 13 hours per day, 6 days per week, 25 weeks per year), and at least 95% of his time for FAS. This amounts to 1,740.4 hours [(25 x 40 = 1,000) + (25 x 32 = 800) = 1,800 x .95 = 1,710] of overtime for FAS in excess of 8 hours per day and up to twelve hours per day, in excess of 40 hours per week, and up to 8 hours on the seventh day of work in one workweek.

d.     For the Exclusive UCL Period, based upon calculations using the evidence presented, Mr. Bowerman worked 13 hours per day, 7 days per week, at least 25 weeks per year, and 13 hours per day, 6 days per week, at least 25 weeks per year) and at least 95% of his time for FAS. This amounts to

409.45 hours [(25 x 11 = 275) + (25 x 6 = 150) = 425 x .95 = 403.75] of overtime for FAS in excess of 12 hours per day and in excess of 8 hours on the seventh day of work in a workweek.

e.  For the Exclusive UCL Period, this amounts to 1,710 hours of overtime to be calculated at $12/hour (1.5x minimum wage), and 403.75 hours of overtime to be calculated at $16/hour (2x minimum wage), for a total of $26,980 in unpaid overtime wages.

f.  For the time period from January 7, 2010 to December 20, 2016, the jury found that Mr. Bowerman worked 4,336 hours of overtime for FAS to be calculated at $12/hour (1.5x minimum wage), and 509 hours of overtime to be calculated at $16/hour (2x minimum wage).  The jury awarded Mr. Bowerman unpaid overtime wages plus pre-judgment interest of $98,615 as of July 17, 2017.  Dkt. 358, p.2.

g.  For the Exclusive UCL Period, Mr. Bowerman testified that he incurred the following expenses were unreimbursed by FAS:

i.  *Mileage*.  Mr. Bowerman testified that he drove approximately 200 miles a day while working for FAS.  TT, V2, 338:11-20. The jury accepted this as a reasonable estimate.  A reasonable estimate of the number of days that Mr. Bowerman worked for FAS during the relevant time period is 318.  TT, V2, 294:15-295:12.  The 2009 IRS mileage reimbursement rate is $.55 per mile. *See* https://www.irs.gov/tax-professionals/standard-mileage-rates.

ii.  *Insurance.*  Mr. Bowerman paid $375 for errors & omissions insurance.  TT, V2, 266:20-267:2.  Mr. Bowerman paid $3,667 for general liability insurance. TT, V2 269:22-270:16 ; Ex. 135, pp. 215, 224.

iii.   *Dump Fees.*  Mr. Bowerman paid $14,930.82 in dump fees for FAS in 2009.  Ex. 135; TT, V2, 264:2-265:13, TT, V2, 336:10-23, 337:6-8.

iv.   *Phone.*  Mr. Bowerman paid $861.40 for one cell phone in 2009 that he used to work for FAS.  Ex. 2; TT, V2, 334:12-19.

v.   *Tools & Equipment*.  Mr. Bowerman testified that he paid $31,010.22 in tools and equipment for FAS in 2009.  Ex. 135; TT, V2, 261:15-17, 334:20-336:9.

h.   For the Exclusive UCL Period, this amounts to a total of $85,824.44 in unreimbursed expenses, broken out as follows**:**

i.   *Mileage*.  $34,980

ii.   *Insurance.*  $4,042

iii.   *Dump Fees.*  $14,930.82

iv.   *Phone.*  $861.40

v.   *Tools & Equipment*.  $31,010.22

i.   For the time period from January 7, 2010 to December 20, 2016, the jury found that Mr. Bowerman was entitled to an award of $168,746 for unreimbursed business expenses plus pre-judgment interest as of July 17, 2017, broken out as follows:

i.   *Insurance.* $4,609

ii.   *Tools and Equipment.* $36,055

iii.   *Phone.* $4,302

iv.   *Dump Fees.* $28,533

v.   *Mileage.* $95,247.  Dkt. 358, p.3.

32.   **Jake Bess**.

a.   Jake Bess worked for FAS from 2007 through the spring of 2012.  TT, V3, 450:17-21, 459:22-460:13.

11

b. On average in 2009, Mr. Bess testified that he worked 8 to 12 hours per day, six days per week. TT, V3, 453:18 -454:11, 471:7-13. He did not typically take a lunch break. TT, V3, 455:9-12. During the entire time he worked for FAS, he took time off from work for a total of three or four weekend trips, and Thanksgiving and Christmas each year. TT, V3, 463:21-464:2, 470:13-22.

c. Of his working time during the time he worked for FAS, Mr. Bess worked 100% of his time for FAS. TT, V3, 462:6-9.

d. For the Exclusive UCL Period, based upon calculations using the evidence presented, this amounts to 1,000 hours [20 hours (5 x 2 + 1 x 10) x 50 weeks (365-10/7)] of overtime for FAS in excess of 8 hours per day and up to twelve hours per day, in excess of 40 hours per week, and up to 8 hours on the seventh day of work in one workweek (1.5x minimum wage) for a total of $12,000 in unpaid overtime wages.

e. For the time period from January 7, 2010 to December 20, 2016, the jury found that Mr. Bess worked 1,380 hours of overtime for FAS to be calculated at $12/hour (1.5x minimum wage). Dkt. 358, p.6. The jury awarded Mr. Bess unpaid overtime wages plus pre-judgment interest of $27,797 as of July 17, 2017. Dkt. 358, p.6.

f. For the Exclusive UCL Period, Mr. Bess testified that the following expenses were unreimbursed by FAS:

   i. *Mileage*. Mr. Bess drove approximately 249 miles a week while working for FAS, based upon the average miles for which Mr. Bess retained records. Ex. 156. A reasonable estimate of the number of weeks that Mr. Bess worked for FAS during the relevant time period is at least 50 weeks.

12

ii.    *Insurance.* Mr. Bess paid $1,624 for errors & omissions insurance and general liability insurance in 2009. Exs. 153, 154; TT, V3, 480:3-6.

iii.    *Dump Fees.* Mr. Bess paid $5,081 in dump fees he personally incurred while working for FAS in 2009. Exs. 153, 157; TT, V3, 481:19-482:1.

iv.    *Phone.* Mr. Bess paid $2,389 for his cell phone expenses in 2009 while working for FAS. Ex. 153; TT, V3, 481:5-17.

v.    *Tools & Equipment.* Mr. Bess paid $11,198 in tools and equipment for FAS in 2009. Exs. 153, 155; TT, V3, 482:2-15.

g.    For the Exclusive UCL Period, this amounts to a total of to $27,139.50 in unreimbursed expenses, broken out as follows:

i.    *Mileage.* $6,847.50

ii.    *Insurance.* $1,624

iii.    *Dump Fees.* $5,081

iv.    *Phone.* $2,389

v.    *Tools & Equipment.* $11,198

h.    For the time period from January 7, 2010 to December 20, 2016, the jury found that Mr. Bess was entitled to an award of $50,947 for unreimbursed business expenses plus pre-judgment interest as of July 17, 2017, broken out as follows:

i.    *Insurance.* $2,508

ii.    *Tools and Equipment.* $24,960

iii.    *Phone.* $5,459

iv.    *Dump Fees.* $4,747

v.    *Mileage.* $13,273. Dkt. 358, p.7.

33.    **Janeen Cloud.**

a.     Janeen Cloud worked for FAS from 2008 through April 2012.  TT, V4, 730:15-19.

b.     On average, in 2009, Ms. Cloud testified that she worked 13 hours per day Monday through Friday, 8 to 9 hours on Saturdays (3 to 4 Saturdays per month), and 2 to 4 hours on Sundays (3 Sundays per month).  TT, V4, 737:25-738:5, 738:11-22.  She says that she ate on the job, and during the entire time she worked for FAS did not take any sick days, took a total of four days of vacation and generally did not work on Christmas.  TT, V4 736:11-16, 739:5-9, 739:12-19.

c.     Of her working time during the time she worked for FAS, Ms. Cloud worked 100% of her time for FAS.  TT, V4, 733:19-734:4.

d.     For the Exclusive UCL Period, this amounts to 1,444.5 hours [1165.5 hours (20 hours (5 days x 4 hours) + 8.5 hours on 6th day + 3 hours on the 7th day = 31.5 hours x 37 weeks) + 260 hours (20 hours (5 days x 4 hours) x 13 weeks) = 1,424.5] of overtime for FAS in excess of 8 hours per day and up to twelve hours per day, in excess of 40 hours per week, and up to 8 hours on the seventh day of work in one workweek.

e.     For the Exclusive UCL Period, this amounts to 250 hours [5 hours per week (1 hour on day one through day five) x 50 weeks] of overtime for FAS in excess of 12 hours per day and in excess of 8 hours on the seventh day of work in a workweek.

f.     For the Exclusive UCL Period, this amounts to 1,424.5 hours of overtime for FAS to be calculated at $12/hour (1.5x minimum wage), and 250 hours of overtime to be calculated at $16/hour (2x minimum wage), for a total of $21,094.

g.     For the time period from January 7, 2010 to December 20, 2016, the jury found that Ms. Cloud worked 3,748.5 hours of overtime for FAS to be calculated at $12/hour (1.5x minimum wage), and 595 hours of overtime to

14

1    be calculated at $16/hour (2x minimum wage).  Dkt. 358, p.14.  The jury

2    awarded Ms. Cloud unpaid overtime wages plus pre-judgment interest of

3    $89,210 as of July 17, 2017.  Dkt. 358, p.14.

h.    For the Exclusive UCL Period, Ms. Cloud testified that she incurred the

      following expenses that were unreimbursed by FAS:

      i.    *Mileage.*  Ms. Cloud drove 43,232 miles in 2009 for FAS.  Ex. 282;
            TT, V4, 751:11-752:2, 771:14-15.

      ii.   *Insurance.*  Ms. Cloud paid approximately $800 for errors &
            omissions insurance, and $1,563 for general liability insurance.  TT,
            V4, 744:5-10, 749:17-23.

      iii.  *Dump Fees.*  Ms. Cloud paid $1,981 in dump fees she personally
            incurred while working for FAS in 2009.  Ex. 282; TT, V4, 750:18-
            22.

      iv.   *Phone.*  Ms. Cloud paid $70 per month for her cell phone expenses
            in 2009 while working for FAS for total expenses of $840.00.  TT,
            V4, 752:12-17.

      v.    *Tools & Equipment*.  Ms. Cloud paid $348 in tools and equipment in
            2009.  Ex. 282.

i.    For the Exclusive UCL Period, this amounts to a total of $29,309.60 in
      unreimbursed expenses, broken out as follows:

      i.    *Mileage.*  $23,777.60

      ii.   *Insurance.*  $2,363

      iii.  *Dump Fees.*  $1,981

      iv.   *Phone.*  $840

      v.    *Tools & Equipment*.  $348

j.    For the time period from January 7, 2010 to December 20, 2016, the jury
      found that Ms. Cloud was an entitled to an award of $162,932 in

15

unreimbursed business expenses plus pre-judgment interest as of July 17, 2017, broken out as follows:

  i.    *Insurance.* $10,579

  ii.   *Tools and Equipment.* $26,196

  iii.  *Phone.* $4,125

  iv.   *Dump Fees.* $21,853

  v.    *Mileage.* $100,179.  Dkt. 358, p.15.

  vi.

34. **Matthew Cohick**.

  a.  Matthew Cohick worked for FAS from late 2006 or early 2007 to May 2013.  TT, V5, 1002:14-21.

  b.  On average, Mr. Cohick testified that he generally worked 12 to 18 hours per day, seven days per week.  TT, V5, 1007:19-24.  He took about six days of vacation a year, and worked some holidays.  TT, V5, 1007:19-1008:11.

  c.  Of his working time during the time he worked for FAS, Mr. Cohick stated that he worked approximately 95-98% of his time for FAS.  TT, V5, 1005:18-21.

  d.  For the Exclusive UCL Period, this amounts to 1,880 hours [50 weeks x .95 = 47 weeks x 40 hours (20 (4 hours x 5 days) + 12 (1 day) + 8 (1 day)) = 1,880 hours]of overtime for FAS in excess of 8 hours per day and up to twelve hours per day, in excess of 40 hours per week, and up to 8 hours on the seventh day of work in one workweek.

  e.  For the Exclusive UCL Period, based upon calculations using the evidence presented, this amounts to 1,175 hours [50 weeks x .95 = 47 weeks x 25 hours (18 (3 hours x 6 days) + 7 (1day)) = 1,175 hours] of overtime for FAS in excess of 12 hours per day and in excess of 8 hours on the seventh day of work in a workweek.

f.     For the Exclusive UCL Period, this amounts to 1,880 hours of overtime for FAS to be calculated at $12/hour (1.5x minimum wage), and 1,175 hours of overtime to be calculated at $16/hour (2x minimum wage), for a total of $41,360 in unpaid overtime.

g.     For the time period from January 7, 2010 to December 20, 2016, the jury found that Mr. Cohick worked 5,280 hours of overtime for FAS to be calculated at $12/hour (1.5x minimum wage), and 528 hours of overtime to be calculated at $16/hour (2x minimum wage). Dkt. 358, p.22. The jury awarded Mr. Cohick unpaid overtime wages plus pre-judgment interest of $116,328 as of July 17, 2017. Dkt. 358, p.22.

h.     For the Exclusive UCL Period, Mr. Cohick testified that he incurred the following expenses that were unreimbursed by FAS:

    i.     *Mileage*. Mr. Cohick testified that he exclusively drove three vehicles for work in 2009. The mileage was 35,266 on one vehicle, 49,260 on the second vehicle, and 6,020 on the third vehicle. Ex. 365; TT, V5, 1039:8-1040:3. That totals 90,546 miles driven for 2009.

    ii.     *Insurance.* Mr. Cohick paid between $1,200-$1,400 for general liability insurance, and between $200-$400 for errors & omissions insurance. TT, V5, 1038:4-16.

    iii.     *Dump Fees.* Mr. Cohick's dump fees for 2009 totaled $53,282. Ex. 365; TT, V5, 1038:17-1039:2. He personally performed about one-third of the dump runs and incurred the fees for those runs. TT, V5, 1031:15-1032:16. That totals $17,760.67.

    iv.     *Phone.* Mr. Cohick paid for ten cell phones, one of which he personally used to perform work for FAS. TT, V5, 1026:25-1028:6. The cost of the ten phones was $4,765. Ex. 365. One-tenth of that amount is $476.50.

v.      *Tools & Equipment.* For expenses he incurred while personally performing work, Mr. Cohick testified that he paid a total of $55,894.67 in tools and equipment for FAS in 2009, which represents his machine fuel, materials and supplies, software and postage. Ex. 365.

i.      For the Exclusive UCL Period, this amounts to a total of $125,532.14 in unreimbursed expenses, broken out as follows:

         i.      *Mileage.* $49,800.30

         ii.      *Insurance.* $1,600

         iii.      *Dump Fees.* $17,760.67

         iv.      *Phone.* $476.50

         v.      *Tools & Equipment.* $55,894.67

j.      For the time period from January 7, 2010 to December 20, 2016, the jury found that Mr. Cohick was an entitled to an award of $255,652.00 in unreimbursed business expenses plus pre-judgment interest as of July 17, 2017, broken out as follows:

         i.      *Insurance.* $7,614

         ii.      *Tools and Equipment.* $21,013

         iii.      *Phone.* $3,350

         iv.      *Dump Fees.* $106,919

         v.      *Mileage.* $116,756. Dkt. 358, p.23.

35.      **Linda Dunham**.

a.      Linda Dunham worked for FAS from May 2008 through March 2012. TT, V3, 541:4-14.

b.      On average in 2009, Ms. Dunham testified that she worked 11 hours per day, seven days per week. TT, V3, 546:13-21, 550:2-551:17. She ate on the job, took 2 or 3 sick days during the time she worked for FAS, and took no vacations. TT, V3 551:18-552:5, 552:24-553:3.

1  c.  Of her working time during the time she worked for FAS, Ms. Dunham

2       worked 100% of her time for FAS.  TT, V3, 555:21-23.

3  d.  For the Exclusive UCL Period, this amounts to 1,700 hours [34 hours (3

4       hours x 5 days + 11 hours x 1 day + 8 hours x 1 day) x 50 weeks] of

5       overtime for FAS in excess of 8 hours per day and up to twelve hours per

6       day, in excess of 40 hours per week, and up to 8 hours on the seventh day of

7       work in one workweek.

8  e.  For the Exclusive UCL Period, this amounts to 150 hours [3 hours (3 hours

9       x 1 day) x 50 weeks] of overtime for FAS in excess of 12 hours per day and

10      in excess of 8 hours on the seventh day of work in a workweek.

11 f.  For the Exclusive UCL Period, therefore, this amounts to 1,700 hours of

12      overtime for FAS to be calculated at $12/hour (1.5x minimum wage), and

13      150 hours of overtime to be calculated at $16/hour (2x minimum wage), for

14      a total of $22,800.

15 g.  For the time period from January 7, 2010 to December 20, 2016, the jury

16      found that Ms. Dunham worked 3,434 hours of overtime for FAS to be

17      calculated at $12/hour (1.5x minimum wage), and 303 hours of overtime to

18      be calculated at $16/hour (2x minimum wage). Dkt. 358, p.8.  The jury

19      awarded Ms. Dunham unpaid overtime wages plus pre-judgment interest of

20      $76,148 as of July 17, 2017.  Dkt. 358, p.8.

21 h.  For the Exclusive UCL Period, Ms. Dunham testified that she incurred the

22      following expenses that were unreimbursed by FAS:

23      a.  *Mileage*.  Ms. Dunham testified that she drove approximately 175

24          miles per day while working for FAS.  TT, V3, 566:9-13.  A

25          reasonable estimate of the number of days she worked for FAS

26          during the relevant time period is 350 (7 days x 50 weeks).

27

28

b. *Insurance.* Ms. Dunham paid approximately $250 for errors & omissions insurance. TT, V3, 566:21-567:1. She purchased general liability insurance but could not recall the cost. *Id.*

c. *Dump Fees.* Ms. Dunham paid $520 in dump fees she personally incurred while working for FAS in 2009. TT, V3, 567:23-568:9.

d. *Phone.* Ms. Dunham paid $225 for her cell phone expenses in 2009 while working for FAS. TT, V3, 567:13-20.

e. *Tools & Equipment.* Ms. Dunham personally incurred $9,428.00 in tools and equipment expenses in 2009. Ex. 196; TT, V3, 588:19-22.

i. For the Exclusive UCL Period, this amounts to a total of $44,110.50 in unreimbursed expenses, broken out as follows:

    i. *Mileage.* $33,687.50

    ii. *Insurance.* $250

    iii. *Dump Fees.* $520

    iv. *Phone.* $225

    v. *Tools & Equipment.* $9,428

j. For the time period from January 7, 2010 to December 20, 2016, the jury found that Ms. Dunham was an entitled to an award of $149,731.00 in unreimbursed business expenses plus pre-judgment interest as of July 17, 2017, broken out as follows:

    i. *Insurance.* $3,459

    ii. *Tools and Equipment.* $36,375

    iii. *Phone.* $2,133

    iv. *Dump Fees.* $11,608

    v. *Mileage.* $96,156. Dkt. 358, p.9.

United States District Court
Northern District of California

36. **Kenneth Freeborn**.

    a.    Kenneth Freeborn worked for FAS as Freeborn & Sons from February 18, 2009 through the middle of August 2010. TT, V2, 373:6-11, 397:19-22.

    b.    On average, Mr. Freeborn testified that he worked 14 to 16 hours per day, seven days per week. TT, V2 396:19-20; TT, V3, 430:12-431:2. During the entire time he worked for FAS, he did not take vacations and would work even if he was sick. TT, V3, 397:23-398:12.

    c.    Of his working time during the time he worked for FAS, Mr. Freeborn worked approximately 90% of his time for FAS. TT, V3, 434:12-434:15.

    d.    For the Exclusive UCL Period, this amounts to 1,692 hours [40 hours (20 (4 x 5 days ) + 12 (1 day) + 8 (1 day) x 47 weeks x .90) of overtime for FAS in excess of 8 hours per day and up to twelve hours per day, in excess of 40 hours per week, and up to 8 hours on the seventh day of work in one workweek.

    e.    For the Exclusive UCL Period, this amounts to 1,057.50 hours [25 hours (18 hours (3 hours x 6 days) + 7 hours (1 day)) x 47 x .90) of overtime for FAS in excess of 12 hours per day and in excess of 8 hours on the seventh day of work in a workweek.

    f.    For the Exclusive UCL Period, this amounts to 1,692 hours of overtime for FAS to be calculated at $12/hour (1.5x minimum wage), and 1,057 hours of overtime to be calculated at $16/hour (2x minimum wage), for a total of $37,216 in unpaid overtime wages.

    g.    For the time period from January 7, 2010 to December 20, 2016, the jury found that Mr. Freeborn worked 1,320 hours of overtime for FAS to be calculated at $12/hour (1.5x minimum wage), and 495 hours of overtime to be calculated at $16/hour (2x minimum wage). Dkt. 358, p.4. The jury awarded Mr. Freeborn unpaid overtime wages plus pre-judgment interest of $40,869 as of July 17, 2017. Dkt. 358, p.4.

h.    For the Exclusive UCL Period, Mr. Freeborn testified that he incurred the following expenses that were unreimbursed by FAS:

    i.    *Mileage*. Mr. Freeborn's reported mileage on his 2009 tax return for his Ford F-350 truck was 71,248. Ex. 151. He testified that only he drove the Ford F-350. TT, V2, 412:4-9, 401:21-24.

    ii.    *Insurance.* Mr. Freeborn paid between $300-400 for errors & omissions insurance. Ex. 151; TT, V2, 411:14-17. He paid between $600-$1000 for general liability insurance. Ex. 151; TT, V2, 410:11-22.

    iii.    *Dump Fees.* Mr. Freeborn's dump fees for 2009 totaled $8,196. Ex. 151; TT, V3, 423:20-424:9.

    iv.    *Phone.* Mr. Freeborn paid $4,030 for two cell phones he used to work for FAS. Ex. 151; TT, V3, 422:23-423:19.

    v.    *Tools & Equipment*. Mr. Freeborn paid $6,170 in tools and equipment for FAS in 2009. Ex. 151.

i.    For the Exclusive UCL Period, this amounts to a total of $58,732.40 in unreimbursed expenses, broken out as follows:

    i.    *Mileage.* $39,186.40

    ii.    *Insurance.* $1,150

    iii.    *Dump Fees.* $8,196

    iv.    *Phone.* $4,030

    v.    *Tools & Equipment*. $6,170

j.    For the time period from January 7, 2010 to December 20, 2016, the jury found that Mr. Freeborn was an entitled to an award of $38,613 in unreimbursed business expenses plus pre-judgment interest as of July 17, 2017, broken out as follows:

    i.    *Insurance.* $3,444.

    ii.    *Tools and Equipment.* $3,820.

1    iii.    *Phone.* $3,444.

2    iv.    *Dump Fees.* $3,444.

3    v.    *Mileage.* $24,461. Dkt. 358, p.5.

4    37.    **John Gowan**.

5    a.    John Gowan worked for FAS from 2007 through mid-2012.  TT, V4, 856:9-

6        10, 859:6-7.

7    b.    On average, Mr. Gowan testified that he worked 12 to 14 hours per day

8        Monday through Friday, and five to six hours per day on Saturdays, which

9        he worked two to three per month.  TT, V4, 866:18-867:1, 867:18-20.  Due

10        to the volume of work during the time he worked for FAS, he said that he

11        did not take vacations or sick days.  TT, V4, 868:3-869:1.

12    c.    While working for FAS, Mr. Gowan stated that he did small jobs for the

13        City of San Jacinto but at most that comprised 5% of his work.  TT, V4,

14        862:2-15.

15    d.    For the Exclusive UCL Period, this amounts to 1,080.63 hours [22.75 (20

16        hours (4 hours x 5 days) + 2.75 (average hours worked on 6th day)) x 50 x

17        .95] of overtime for FAS in excess of 8 hours per day and up to twelve

18        hours per day, in excess of 40 hours per week, and up to 8 hours on the

19        seventh day of work in one workweek.

20    e.    For the Exclusive UCL Period, this amounts to 237.5 hours [5 hours (5 days

21        x 1 hour) x 50 weeks x .95] of overtime for FAS in excess of 12 hours per

22        day and in excess of 8 hours on the seventh day of work in a workweek.

23    f.    For the Exclusive UCL Period, this amounts to 1,080.63 hours of overtime

24        for FAS to be calculated at $12/hour (1.5x minimum wage), and 237.5

25        hours of overtime to be calculated at $16/hour (2x minimum wage), for a

26        total of $15,367.56 in unpaid overtime wages.

27    g.    For the time period from January 7, 2010 to December 20, 2016, the jury

28        found that Mr. Gowan worked 1,655 hours of overtime for FAS to be

calculated at $12/hour (1.5x minimum wage). Dkt. 358, p.18. The jury

awarded Mr. Gowan unpaid overtime wages plus pre-judgment interest of

$32,842 as of July 17, 2017. Dkt. 358, p.18.

h. For the Exclusive UCL Period, Mr. Gowan testified that he incurred the

following expenses that were unreimbursed by FAS:

    i. *Mileage.* Mr. Gowan testified that he drove approximately 200

miles per day working for FAS. TT, V5, 907:23-908:8. A

reasonable estimate of the number of days Mr. Gowan worked

during the relevant time period is 260.

    ii. *Insurance.* Mr. Gowan paid $1,075 for errors & omissions

insurance. TT, V5, 949:19-950:7. He paid $2,464 for general

liability insurance. *Id.*, Ex. 299, pp. 103-112.

    iii. *Dump Fees.* Mr. and Mrs. Gowan testified that they had to perform

dump runs and pay dump fees on a regular basis. TT, V5, 988:5-16.

Mr. Gowan's records for 2009 show $369.75 in dump fees. Ex. 299,

p.41. Mrs. Gowan testified that the fees would have been more than

that, but that they were likely included under the general job

expenditure categories in their accounting documents. TT, V5,

988:5-16.

    iv. *Phone.* Mr. Gowan paid $3,260.62 for three cell phones in 2009,

two of which he used to work for FAS. TT, V5, 916:25-917:9; Ex.

299, pp.124-126. Two-thirds of that total is $2,173.75.

    v. *Tools & Equipment.* Mr. Gowan paid $4,407.11 in tools and

equipment for FAS in 2009. Ex. 299, pp. 41-56; TT, V4, 876:23-

877:19.

i. For the Exclusive UCL Period, this amounts to a total of $39,089.61 in

unreimbursed expenses, broken out as follows:

    i. *Mileage.* $28,600

24

  ii.  *Insurance.* $3,539

  iii.  *Dump Fees.* $369.75

  iv.  *Phone.* $2,173.75

  v.  *Tools & Equipment.* $4,407.11

j. For the time period from January 7, 2010 to December 20, 2016, the jury found that Mr. Gowan was an entitled to an award of $63,351.00 in unreimbursed business expenses plus pre-judgment interest as of July 17, 2017, broken out as follows:

  i.  *Insurance.* $11,309

  ii.  *Tools and Equipment.* $11,574

  iii.  *Phone.* $3,833

  iv.  *Dump Fees.* $658

  v.  *Mileage.* $35,977. Dkt. 358, p.19.

38. **Amy Gowan**.

a. Amy Gowan worked for FAS doing property preservation work in California, with her husband John Gowan, from September 2007 through April 2012.  TT, V5, 928:14-19, 929:3-7.

b. Mrs. Gowan worked for FAS mostly from her home office but spent approximately a day per week out in the field in 2009.  TT, V5, 929:8-930:4.  Mrs. Gowan testified that she worked 12 to 13 hours per day Monday through Friday, and seven to eight hours per day on Saturdays.  TT, V5 930:17-21, 935:1-936:14, 938:2-8.  She kept her phones with her whenever she was working as calls from FAS would come throughout the day, and she was always on call.  TT, V5, 936:8-14, 937:17-20.  She stated that she tried to take holidays off, but did not take any vacations in 2009.  TT, V5, 938:16-939:9.

c.     While working for FAS, Mrs. Gowan did some work for the City of San Jacinto but testified that at most such work comprised 5% of her work. TT, V5, 932:17-21.

d.     For the Exclusive UCL Period, this amounts to 1,306.25 hours [27.5 (20 hours (4 hours x 5 days) + 7.5 hours (on sixth day)) x 50 x .95] of overtime for FAS in excess of 8 hours per day and up to twelve hours per day, in excess of 40 hours per week, and up to 8 hours on the seventh day of work in one workweek.

e.     For the Exclusive UCL Period, this amounts to 118.75 hours [2.5 hours (5 days x .5 hour) x 50 weeks x .95] of overtime for FAS in excess of 12 hours per day and in excess of 8 hours on the seventh day of work in a workweek.

f.     For the Exclusive UCL Period, this amounts to 1,306.25 hours of overtime for FAS to be calculated at $12/hour (1.5x minimum wage), and 118.75 hours of overtime to be calculated at $16/hour (2x minimum wage), for a total of $17,575 in unpaid overtime wages.

g.     For the time period from January 7, 2010 to December 20, 2016, the jury found that Mrs. Gowan worked 451 hours of overtime for FAS to be calculated at $12/hour (1.5x minimum wage). Dkt. 358, p.20. The jury awarded Mrs. Gowan unpaid overtime wages plus pre-judgment interest of $8,957 as of July 17, 2017. Dkt. 358, p.20.

h.     For the Exclusive UCL Period, Mrs. Gowan testified that she incurred the following expenses that were unreimbursed by FAS (costs shared with Mr. Gowan are attributable to Mr. Gowan as found above):

    i.     *Phone.* Mrs. Gowan paid $1,076 in 2009 for the phone she used to work for FAS. TT, V5, 936:8-14; Ex. 299, pp.124-126.

i.     For the Exclusive UCL Period, this amounts to $1,076 in unreimbursed expenses:

    i.     *Phone.* $1,076

26

j.    For the time period from January 7, 2010 to December 20, 2016, the jury found that Mrs. Gowan was entitled to an award of $3,833 in unreimbursed business expenses plus pre-judgment interest as of July 17, 2017.

39.    **Matt Jaques**.

a.    Matt Jaques worked for FAS from February 2010 through April 2012.  TT, V4, 683:19-21.

b.    Mr. Jaques did not work for FAS prior to January 7, 2010, so I do not make findings about his overtime or expenses independent of the jury's findings.

c.    For the time period from January 7, 2010 to December 20, 2016, the jury found that Mr. Jaques worked 3,105 hours of overtime for FAS to be calculated at $12/hour (1.5x minimum wage), and 287.5 hours of overtime to be calculated at $16/hour (2x minimum wage).  Dkt. 358, p.12.  The jury awarded Mr. Jaques unpaid overtime wages plus pre-judgment interest of $68,374 as of July 17, 2017.  Dkt. 358, p.12.

d.    For the time period from January 7, 2010 to December 20, 2016, the jury found that Mr. Jaques was an entitled to an award of $102,287 in unreimbursed business expenses plus pre-judgment interest as of July 17, 2017, broken out as follows:

i.    *Insurance.* $4,696

ii.    *Tools and Equipment.* $11,434

iii.    *Phone.* $3,381

iv.    *Dump Fees.* $11,434

v.    *Mileage.* $71,342. Dkt. 358, p.13.

40.    **Kim Miller**.

a.    Kim Miller worked for FAS from 2008 to 2015.  TT, V3, 600:14-20.

b.    Mr. Miller testified that he had three distinct work periods in terms of his hours in 2009.  Until mid-August, he worked 10 to 12 hours in the field, then an additional two hours at home, for an average of 12 to 14 hours per

27

1   day, six days per week.  TT, V3, 578:8-12, 617:20-618:3, 625:5-11.  Then

2   from mid-August until October 2009, he worked four days per week,

3   approximately 12 hours per day.  TT, V3, 619:18-25.  Then in the last part

4   of 2009 into the beginning of 2010, he worked six days per week,

5   approximately 12 hours per day. TT, V3, 622:13-623:23, 625:5-21, 626:8-

6   16.  During that time he said that he did not take any additional vacation or

7   sick days, except most of Thanksgiving and Christmas day.  TT, V3,

8   633:20-24, 637:21-638:1.

9   c.   During the time he worked for FAS, Mr. Miller worked 100% of his time

10      for FAS.  TT, V3, 613:8-12.

11  d.   For the Exclusive UCL Period, this amounts to 1,128 hours [until Mid-

12      August 2009: 24 hours (4 hours per day x 6 days per week) x 30 weeks =

13      720 hours; Mid-August 2009 – October, 2009: 16 hours (4 hours per day x

14      4 days per week) x 9 weeks = 144 hours; 24 hours (4 hours per day x 6 days

15      per week) x 11 weeks = 264 hours)] of overtime for FAS in excess of 8

16      hours per day and up to twelve hours per day, in excess of 40 hours per

17      week, and up to 8 hours on the seventh day of work in one workweek.

18  e.   For the Exclusive UCL Period, this amounts to 180 hours [until Mid-August

19      2009: 6 hours (1 hour per day x 6 days per week) x 30 weeks = 180 hours]

20      of overtime for FAS in excess of 12 hours per day and in excess of 8 hours

21      on the seventh day of work in a workweek.

22  f.   For the Exclusive UCL Period, this amounts to 1,128 hours of overtime for

23      FAS to be calculated at $12/hour (1.5x minimum wage), and 180 hours of

24      overtime to be calculated at $16/hour (2x minimum wage), for a total of

25      $16,416 in unpaid overtime wages.

26  g.   For the time period from January 7, 2010 to December 20, 2016, the jury

27      found that Mr. Miller worked 6,032 hours of overtime for FAS to be

28      calculated at $12/hour (1.5x minimum wage), and 624 hours of overtime to

be calculated at $16/hour (2x minimum wage). Dkt. 358, p.10. The jury awarded Mr. Miller unpaid overtime wages plus pre-judgment interest of $126,861 as of July 17, 2017. Dkt. 358, p.10.

h. For the Exclusive UCL Period, Mr. Miller testified that he incurred the following expenses that were unreimbursed by FAS:

    i. *Mileage*. Mr. Miller testified that over the course of the year, he would drive in the range of 80 to 160 miles a day depending on what properties FAS assigned to him. TT, V3, 636:18-637:9. I will use the low end of his estimate, 80 miles a day to calculate the mileage owed. A reasonable estimate of the number of days Mr. Miller worked during the relevant time period is 294.

    ii. *Insurance.* Mr. Miller paid $375 for errors & omissions insurance, and approximately $2,500 for general liability insurance in 2009. TT, V3, 612:4-9, 635:23-636:6

    iii. *Dump Fees.* Mr. Miller testified that he paid $8.00 per cubic yard in dump fees and had about 200 cubic yards of debris per month. Having worked a total of 12.0 months in the period between January 7, 2009 and January 6, 2010, the total estimated amount of Mr. Miller's dump fees is $19,200. TT, V3, 642:20-643:8.

    iv. *Phone.* Mr. Miller paid between $80 and $90 per month for his cell phone. I will use $80 to calculate his phone fees. Having worked 12.0 months in the period between January 7, 2009 and January 6, 2010, the total estimated amount of Mr. Miller's telephone is $960.00. TT, V3, 641:21-642:2

    v. *Tools & Equipment*. Mr. Miller testified that he paid between $1,500 and $2,000 for tools and equipment for FAS in 2009. TT, V3, 639:1-641:12. I will use $1,500 as the amount paid.

1          i.      For the Exclusive UCL Period, this amounts to a total of $44,249 in

2                 unreimbursed expenses, broken out as follows:

3             i.      *Mileage.* $12,936

4             ii.     *Insurance.* $2,875

5             iii.    *Dump Fees.* $19,200

6             iv.    *Phone.* $960

7             v.     *Tools & Equipment.* $1,500

8        j.    For the time period from January 7, 2010 to December 20, 2016, the jury

9                 found that Mr. Miller was entitled to an award of $199,780 in unreimbursed

10              business expenses plus pre-judgment interest as of July 17, 2017, broken

11              out as follows:

12             i.      *Insurance.* $13,756

13             ii.     *Tools and Equipment.* $23,088

14             iii.    *Phone.* $5,013

15             iv.    *Dump Fees.* $16,327

16             v.     *Mileage.* $141,596. Dkt. 358, p.11.

17    41.    **Anthony Yager**.

18        a.    Anthony Yager worked for FAS from April 2008 through to March 2012.

19               TT, V3, 780:18-19, 781:7-8.

20        b.    On average, Mr. Yager testified that he worked 12 hours per day Monday

21               through Friday, and then four hours on Sunday. TT, V4, 789:8-790:18. He

22               took Christmas and Thanksgiving off, and did not take any sick days in

23               2009. TT, V4, 791:19-20.

24        c.    Of his working time during the time he worked for FAS, Mr. Yager worked

25               75-80% of his time for FAS. TT, V4, 843:21-24.

26        d.    For the Exclusive UCL Period, this amounts to 900 hours [24 hours (4

27               hours x 6 days) x 50 x .75] of overtime for FAS in excess of 8 hours per day

28

1    and up to twelve hours per day, in excess of 40 hours per week, and up to 8

2    hours on the seventh day of work in one workweek.

3    e.    For the Exclusive UCL Period, this amounts to 900 hours of overtime for

4    FAS to be calculated at $12/hour (1.5x minimum wage), for a total of

5    $10,800 in unpaid overtime wages.

6    f.    For the time period from January 7, 2010 to December 20, 2016, the jury

7    found that Mr. Yager worked 1,818 hours of overtime for FAS to be

8    calculated at $12/hour (1.5x minimum wage). Dkt. 358, p.16. The jury

9    awarded Mr. Yager unpaid overtime wages plus pre-judgment interest of

10    $36,070 as of July 17, 2017. Dkt. 358, p.16.

11    g.    For the Exclusive UCL Period, Mr. Yager testified that he incurred the

12    following expenses that were unreimbursed by FAS:

13    i.    *Mileage.* Mr. Yager testified that he drove approximately 100 miles

14    per day working for FAS. TT, V4, 800:5 - 800:22. During the

15    relevant time period, the reasonable estimate that Mr. Yager worked

16    for FAS is 234 days. TT, V4, 789:8-790:18, 791:19-20.

17    ii.    *Insurance.* Mr. Yager paid $582.70 for errors & omissions

18    insurance, and $2,889.01 for general liability insurance in 2009. Ex.

19    340, TT, V4, 801:21-802:3, 807:2-13.

20    iii.    *Dump Fees.* Mr. Yager's records indicate that he spent $4,055.59 in

21    dump fees in 2009, all of which was related to his work for FAS.

22    Exs. 339, 340; TT, V4, 798:6-19, 804:3-16.

23    iv.    *Phone.* Mr. Yager's records indicate that he spent $288.58 for a cell

24    phone in 2009. Ex. 340. He testified that figure was inaccurate and

25    that he spent approximately $100 per month on a cell phone, for a

26    total of $1,200 for 2009. I will use his record amount, $288.58. TT,

27    V4, 803:17-23.

28

v.  *Tools & Equipment.*  Mr. Yager's records indicate that he paid a total of $88,519.25 for supplies (75% of which would be for FAS work), $2,456.29 for tools and another $436.50 in office supplies in 2009. Ex. 340; TT, V4, 801:3-20, 803:8-14.

h.  For the Exclusive UCL Period, this amounts to a total of $90,879.53 in unreimbursed expenses, broken out as follows:

i.  *Mileage.*  $12,870

ii.  *Insurance.*  $3,471.71

iii.  *Dump Fees.*  $4,055.59

iv.  *Phone.*  $1,200

v.  *Tools & Equipment.*  $69,282.23

i.  For the time period from January 7, 2010 to December 20, 2016, the jury found that Mr. Yager was entitled to an award of $120,934 in unreimbursed business expenses plus pre-judgment interest as of July 17, 2017, broken out as follows:

i.  *Insurance.* $11,489

ii.  *Tools and Equipment.* $36,375

iii.  *Phone.* $3,348

iv.  *Dump Fees.* $25,793

v.  *Mileage.* $43,929. Dkt. 358, p.17.

42.  During the bench trial on Claimants' UCL claims, FAS called two vendors, Jack Young and Bill Kleiser, to testify. Mr. Young and Mr. Kleiser both testified that they started their own businesses without input or direction from FAS. 1/5/18 TT at 8:12–9:4. They also confirmed that they intended to perform services for FAS as independent contractors, and not as employees of FAS, and that they do not seek recovery in this lawsuit. 1/8/18 TT at 12: 22-13:6, 49:13-18.

43.  Mr. Young testified that he signed a vendor packet with FAS that was similar in all material terms to those signed by Claimants. Ex. 6827; TT 1/5/18, 27:7-14. He also stated that FAS maintained the client relationship with the owners of the properties FAS vendors were

servicing, that he had no contact with the homeowners, and that the owners paid FAS (who would in turn pay the vendors). TT 1/5/18 26:24-27:6.

44.     Mr. Young said that FAS had to approve all prices he was paid for piece work, required him to take before, during and after photos of all work done, required him to upload photos of all work on jobs, and retained the right to refuse payment if it did not receive what it considered to be adequate photos of work done or if photos were not uploaded within FAS's strict deadlines. TT 1/5/18, 30:9-31:18, 32:3-33:1.  He also stated that FAS retained the right to reassign work, to refuse payment if work was not completed on time, and to charge a penalty whenever it declined payment for quality control reasons and later reversed that decision. *Id.*, 33:2-9, 36:1-18.

45.     Mr. Young testified that he often did not follow FAS's direction and requirements. He also stated that FAS refused to pay him for work that he had done and that he told FAS that he did not want to do more work for them because its refusals to pay him was "QC harassment." TT 1/5/18 37:21-25, 39:2-7.  He said that FAS put him on probation because it determined that he was continually late on recurring services. *Id.* 40:24-41:6.

46.     Mr. Kleiser testified that he signed a vendor packet with FAS that was similar in all material terms to those signed by Claimants. Ex. 6823; TT 1/5/18, 64:7-22.  He confirmed that FAS requires him to respond to a work order within 24 hours and will reassign work if he does not respond. TT 1/5/18, 65:17-25.  He also stated that FAS forbids him from talking with other vendors about how much he was being paid, requires him to upload action photos of all work completed within 24 hours, and retains the right to refuse payment if work is not done or if photos are not received by deadlines unilaterally set by FAS.  TT 1/5/18, 66:10-67:22, 70:13-20, 71:2-23. He said that FAS requires him to fix any deficiencies found at properties at no cost to FAS, to waive his right to put liens on properties on which he worked (in order to secure payment), and to list FAS as an additional insured on his insurance policies, which FAS requires him to carry. *Id.*, 68:6-69:11.  Mr. Kleiser also confirmed that when FAS assesses a penalty after a vendor complains about non-payment and gets the payment reinstated, that penalty is automatically deducted from the vendor's pay. *Id.*, 72:13–25.

**CONCLUSIONS OF LAW**

## I.      UNFAIR COMPETITION LAW[2]

The UCL prohibits "any unlawful, unfair or fraudulent business act or practice."  Cal. Bus. & Prof.  §§  17200 *et seq.*  Plaintiffs' certified UCL claim asserts that FAS violated the UCL's unlawful prong by violating the same Labor Code claims that were certified—FAS's failure to pay overtime, and FAS's failure to reimburse for reasonable and necessary business expenses.  Order Granting Renewed Mot. for Class Certification at 3 (Dkt. 85).[3]  Section 17203 provides, "[t]he court may make such orders or judgments … as may be necessary to prevent the use or employment by any person of any practice which constitutes unfair competition, as defined in this chapter, or as may be necessary to restore to any person in interest any money or property, real or personal, which may have been acquired by means of such unfair competition."  Cal. Bus. & Prof. Code § 17203.

"Under the UCL, an individual may recover profits unfairly obtained to the extent that these profits represent monies given to the defendant or benefits in which the plaintiff has an ownership interest."  *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1148 (2003).  Overtime wages and unreimbursed expenses may be recovered as restitution under the UCL.  *See*

---

[2] The UCL claim has a four-year statute of limitations, Cal. Bus. & Prof. Code § 17208, whereas the Labor Code claims for overtime and unreimbursed business expenses have a three-year statute of limitations.  The UCL claim, therefore, covers the period of January 7, 2009 to December 20, 2016, while the non-UCL Labor Code claims cover the period of January 7, 2010 to December 20, 2016.  Throughout this Order, the separate one-year period covered only by the UCL—from January 7, 2009 to January 7, 2010—is referred to as the "Exclusive UCL Period."

[3] The Labor Code sections at issue are:

Labor Code § 510, which provides that "any work in excess of eight hours in one workday and any work in excess of 40 hours in any one workweek and the first eight hours worked on the seventh day of work in any one workweek shall be compensated at the rate of no less than one and one-half times the regular rate of pay for an employee. Any work in excess of 12 hours in one day shall be compensated at the rate of no less than twice the regular rate of pay for an employee. In addition, any work in excess of eight hours on any seventh day of a workweek shall be compensated at the rate of no less than twice the regular rate of pay of an employee."

And Labor Code § 2802, which provides that "an employer shall indemnify his or her employee for all necessary expenditures or losses incurred by the employee in direct consequence of the discharge of his or her duties."

*Cortez v. Purolator Air Filtration Products Co.*, 23 Cal. 4th 163, 177 (2000)("[O]rders for payment of wages unlawfully withheld from an employee are also a restitutionary remedy authorized by section 17203"); *Espejo v. The Copley Press, Inc.*, 13 Cal. App. 5th 329, 367-68 (2017) ("[A]n employee's recovery of unlawfully withheld expenses under section 2802 is a proper restitutionary remedy under the UCL."); *Harris v. Best Buy Stores, L.P.*, No. 15-CV-00657-HSG, 2016 WL 4073327, at *10 (N.D. Cal. Aug. 1, 2016)("[T]he UCL claim may be maintained to the extent it is predicated on Plaintiff's § 2802 claim."). This restitutionary relief is not equivalent to compensatory damages, which "are not available under section 17203." *Cortez*, 23 Cal. 4th at 173 (quoting another source); *see also id.* at 177–78 (explaining that an order that "earned wage be paid" is a restitutionary remedy and "not one for payment of damages.").

The Labor Code requires that plaintiffs be awarded all damages, but "[s]ection 17203 does not mandate restitutionary or injunctive relief when an unfair business practice has been shown." *Cortez*, 23 Cal. 4th at 180. Rather, "[t]he court's discretion is very broad." *Id*. The *Cortez* court went on to note that "[t]he UCL imposes strict liability when property or monetary losses are occasioned by conduct that constitutes an unfair business practice." *Id.* at 181. It concluded: "[t]herefore, while we cannot foresee how any equitable consideration could defeat a claim for unpaid wages, we cannot foreclose the possibility that defendant has evidence that the trial court might consider relevant when, on remand, it fashions a remedy for plaintiff's unfair business practice." *Id*.

FAS has not presented evidence to "wholly defeat" plaintiffs' claims under the UCL. *See Cortez*, 23 Cal. 4th at 179 ("We agree that equitable defenses may not be asserted to wholly defeat a UCL claim since such claims arise out of unlawful conduct."). A surprising gap in the evidence was the lack of testimony from the FAS executives who developed its business model to demonstrate their good faith belief that it comported with California law. FAS did offer the testimony of Mr. George, who testified that FAS utilized the independent contractor model so that it could flexibly respond to fluctuations in the property preservation business caused by the volatile housing market. 1/5/18 TT at 99:14–100:15. That explained the self-evident result of the policy—it is less expensive for a company if it does not pay overtime to the people who work for

35

it, requires them to pay expenses that in the ordinary course would be paid by the employer, and can fire them immediately without notice, let alone cause. There was no testimony that FAS considered the state of the relevant law in California when it decided to classify vendors as independent contractors or that it periodically re-evaluated its business model based on its knowledge of its treatment of the vendors. *See* Findings of Fact, ¶¶ 18–19; 1/5/18 TT at 109:16–110:14.

To the contrary, the evidence confirmed that FAS had a uniform policy of classifying all of its vendors as independent contractors without regard for whether the nature of the employment relationship and the degree of control asserted by FAS rendered the vendors employees. Mr. George and Ms. Hunter admitted that FAS did not investigate employment status, before, during or after vendors performed work for FAS. 1/5/18 TT at 100:23–101:14. Mr. George testified that FAS did not think it needed to do any pre-contract review of vendor's business operations because the vendor presented itself as an independent contractor and FAS had no reason to doubt that representation. He also testified that FAS found vendors because they came to FAS, or by searching for businesses in the Yellow Pages, or through NAMFS. TT 101. The testimony of the vendors belies Mr. George's explanation. FAS would have to have been recklessly ignorant of the status of the vendors given its regular, often daily contact with the vendors by phone, the job reports, the knowledge of its inspectors in the field, and its training programs, not to mention the inquiries it received from applicants at the initiation of their relationship.

In contrast to Mr. George's testimony, the Claimants explained how FAS hired individual workers to perform demanding and unskilled manual labor pursuant to specific requirements by FAS. Should vendors not perform in the manner FAS demanded, FAS's documents and Claimants' testimony proved that FAS retained the right to discipline vendors, refuse to pay them, and cut off their supply of work altogether by unilaterally terminating them without notice. In short, FAS failed to substantiate its purported good faith belief that the vendors operated as independent contractors.

Neither did it introduce documentary evidence of payments made to the Claimants to offset any restitutionary remedy. It insists that it reasonably believed that the job bids adequately

36

compensated Claimants for all hours worked and business expenses incurred, but it offered scant evidence in support of this belief. Mr. George testified that vendors were able to and often did negotiate prices, and that the negotiated price included the cost of labor and expenses. 1/5/18 TT at 79–86. But when pressed, he was unable to identify any kind of accounting formula to determine how much of the fee schedule was attributable to compensation for labor as opposed to reimbursement for expenses. 1/5/18 TT at 119:5–20. FAS had no basis to determine whether the negotiated prices actually included costs of labor and expenses. *See Gattuso v. Harte-Hanks Shoppers, Inc.*, 42 Cal. 4th 554, 573 (2007)("[T]he employer must provide some method or formula to identify the amount of the combined employee compensation payment that is intended to provide expense reimbursement. Using that method or formula, the employee (and also officials charged with enforcement of state and federal wage laws) then can readily determine whether the employer has discharged all of its legal obligations as to both wages and business expense reimbursement."); *Cf. Espejo*, 13 Cal. App. 5th at 368 ("[T]he court erred in failing to take into account clearly specified credits, reversals, and payments to carriers in the business expense categories at issue in determining the amount of restitution to award plaintiffs."). And although FAS received all of the invoices with the comprehensive documentation required from Claimants in order to determine their payment and the quality of their performance, none was produced as evidence at trial.

FAS argues that a restitutionary award under the UCL must be limited to wages "earned but not paid[.]" *Cortez*, 23 Cal. 4th at 178. It asserts that "none of the Claimants testified regarding the amount of hours worked that remained uncompensated based on the prices paid by FAS for their work, even though the evidence submitted demonstrates that these Claimants renegotiated prices with FAS to ensure that they were compensated for their time." Defs.' MPA re Remedies at 7 (Dkt. No. 396). As previously mentioned, FAS failed to offer sufficient evidence of payments to defeat plaintiffs' claims. But it counters that the Claimants have failed to offer sufficient evidence of "quantifiable sums" to justify a restitutionary award at all. *See Cortez*, 23 Cal. 4th at 178 ("Our conclusion that these wages may be the subject of a restitutionary order under section 17203 is consistent with our recognition in *Walnut Creek Manor v. Fair*

37

*Employment & Housing Com.* (1991) 54 Cal.3d 245, 263 [284 Cal.Rptr. 718, 814 P.2d 704], that restitutionary awards encompass quantifiable sums one person owes to another… .").

I disagree.  Plaintiffs' claims under the UCL are quantifiable because it is possible to estimate the amounts necessary to make the Claimants whole based on evidence presented at trial. *See Ridgeway v. Wal-Mart Stores Inc.*, No. 08-cv-05221-SI, 2017 U.S. Dist. LEXIS 10510, at *9 (N.D. Cal. Jan. 25, 2017)(noting that the jury accepted plaintiffs' expert's calculations based on representative sampling and averages and extending those calculations to fashioning plaintiffs' restitutionary award under the UCL).  *Compare Walnut Creek Manor v. Fair Employment & Hous. Com.*, 54 Cal. 3d 245, 263 (1991)("Restitutive damages, in short, are akin to special damages, i.e., they are quantifiable amounts of money due an injured private party from another party to compensate for the pecuniary loss directly resulting from the second party's violation of law."), *with id.* ("General compensatory damages for emotional distress, by contrast, are not pecuniarily measurable, defy a fixed rule of quantification, and are awarded without proof of pecuniary loss.").

FAS contends that 6 of the 10 claimants failed to offer specific testimony of their hours worked during the Exclusive UCL Period, so any "estimate" is not really based on the evidence, and (2) FAS argues that any "rough calculation" will result in an impermissible award of damages. *See* Defs.' MPA at 7.

> [R]estitution under the [UCL] must be of a measurable amount to restore to the plaintiff what has been acquired by violations of the statutes, and that measurable amount must be supported by evidence." (*Id.* at p. 698, 38 Cal.Rptr.3d 36.) "That the trial court may have discretion as to whether to order restitution as a remedy [citation] does not mean that when it does, it may select an amount unsupported by evidence.

*Espejo v. Copley Press, Inc.*, 13 Cal. App. 5th 329, 368 (Ct. App. 2017).

The vendors here were not required to keep the critical documentation.  And FAS, which had possession at one time of the invoices that it used to compensate the vendors, did not produce them.  In light of the circumstances of this case, I am satisfied that Claimants provided the requisite amount of certainty for me to consider their claim for restitution.  But I am also mindful that the damages awarded by the jury were generous and at times exceeded the amounts sought by

plaintiffs' counsel in closing arguments. *See* Osborn Decl. ¶ 1, Ex. A (Dkt. No. 396-2). The damages awarded by the jury must factor into any relief designed to "restore" the status quo. Cal. Bus. & Prof. Code § 17203; *see, e.g.*, *Korea Supply Co.*, 29 Cal. 4th at 1149 ("The object of restitution is to restore the status quo by returning to the plaintiff funds in which he or she has an ownership interest."); *Day v. AT & T Corp.*, 63 Cal. App. 4th 325, 339 (1998)("The intent of the section is to make whole, equitably, the victim of an unfair practice."). I will account for these overages in fashioning equitable relief on the UCL claims.

In light of all the evidence at trial, I will adjust the amounts sought by plaintiffs as a restitutionary award for the Exclusive UCL Period. First, I will deduct any overages granted by the jury in its damages award.[4] Second, I will calculate the base award on overtime using a 50 week calendar, eliminating any estimates exceeding this amount. Finally, I will decline to award prejudgment interest for the Exclusive UCL Period because I am not convinced that it is necessary to make the Claimants whole. *See Espejo*, 13 Cal. App. 5th at 375–76 ("Although a court may not award prejudgment interest under Civil Code section 3287, subdivision (a), to a restitutionary award under the UCL, the court nevertheless has discretion in equity to award prejudgment interest on a UCL award as a component of restitution."). These "compromise[s]" are "reasonable" in light of the broad discretion to award restitution under the UCL. *Id.* at 377.

I will, however, grant an award of prejudgment interest on the jury verdict from the date of the verdict through June 4, 2018. Plaintiffs should file a notice indicating the amounts applicable for each Claimant by May 25, 2018. If FAS disagrees with the calculations, it should meet and confer with Plaintiffs and, if disagreement remains, file a competing calculation by June 1, 2018. I will resolve any disagreement and enter judgment on June 4, 2018.

---

[4] This calculation will not account for any instances where the jury awarded less than that amount requested in plaintiffs' closing.

| **Fred Bowerman** | | | | |
|---|---|---|---|---|
| | Jury Verdict | Amount Over Closing | UCL Period Request | **UCL Award** |
| Overtime | $98,615.00 | $1,513.98 | $26,980.00 | **$25,466.02** |
| Expenses | $168,746.00 | $2,692.50 | $85,824.44 | **$83,131.94** |
| **Jake Bess** | | | | |
| | Jury Verdict | Amount Over Closing | UCL Period Request | **UCL Award** |
| Overtime | $27,797.00 | $2,543.00 | $12,000.00 | **$9,457.00** |
| Expenses | $50,947.00 | $4,431.80 | $27,139.50 | **$22,707.70** |
| **Janine Cloud** | | | | |
| | Jury Verdict | Amount Over Closing | UCL Period Request | **UCL Award** |
| Overtime | $89,210.00 | $17,827.00 | $21,094.00 | **$3,267.00** |
| Expenses | $162,932.00 | $3,215.00 | $29,309.60 | **$26,094.60** |
| **Matthew Cohick** | | | | |
| | Jury Verdict | Amount Over Closing | UCL Period Request | **UCL Award** |
| Overtime | $116,328.00 | $0.00 | $41,360.00 | **$41,360.00** |
| Expenses | $255,652.00 | $8,798.00 | $125,532.14 | **$116,734.14** |
| **Linda Dunham** | | | | |
| | Jury Verdict | Amount Over Closing | UCL Period Request | **UCL Award** |
| Overtime | $76,148.00 | $3,915.00 | $22,800.00 | **$18,885.00** |
| Expenses | $149,731.00 | $1,044.13 | $44,110.50 | **$43,066.37** |
| **Kenneth Freeborn** | | | | |
| | Jury Verdict | Amount Over Closing | UCL Period Request | **UCL Award** |
| Overtime | $40,869.00 | $0.00 | $37,216.00 | **$37,216.00** |
| Expenses | $38,613.00 | $927.23 | $58,732.40 | **$57,805.17** |
| **Amy Gowan** | | | | |
| | Jury Verdict | Amount Over Closing | UCL Period Request | **UCL Award** |
| Overtime | $8,957.00 | $0.00 | $17,575.00 | **$17,575.00** |
| Expenses | $3,833.00 | $291.00 | $1,076.00 | **$785.00** |
| **John Gowan** | | | | |
| | Jury Verdict | Amount Over Closing | UCL Period Request | **UCL Award** |
| Overtime | $32,842.00 | $0.00 | $15,367.56 | **$15,367.56** |
| Expenses | $63,351.00 | $21,344.00 | $39,089.61 | **$17,745.61** |
| **Kim Miller** | | | | |
| | Jury Verdict | Amount Over Closing | UCL Period Request | **UCL Award** |
| Overtime | $126,861.00 | $32,586.00 | $16,992.00 | **$0.00** |
| Expenses | $199,780.00 | $60,899.00 | $44,249.00 | **$0.00** |
| **Anthony Yager** | | | | |
| | Jury Verdict | Amount Over Closing | UCL Request Request | **UCL Award** |
| Overtime | $36,070.00 | $0.00 | $11,700.00 | **$11,700.00** |
| Expenses | $120,934.00 | $29,527.00 | $90,879.53 | **$61,352.53** |

## II.     DECLARATORY RELIEF

Consistent with the jury's verdicts and my own findings, I grant Plaintiffs' request for declaratory relief and declare that FAS has violated California Labor Code § 510, § 2802, and the

California Unfair Competition Law, Business and Professions Code § 17200 *et seq.* by

misclassifying Claimants as independent contractors rather than employees, and by failing to pay

them overtime and unreimbursed expenses. *See People ex rel. Harris v. Aguayo,* 11 Cal. App. 5th

1150, 1177-78 (2017) (citations omitted) ("the broad nature of the trial court's discretion in

making any orders 'necessary to prevent the use … of any practice which constitutes unfair

competition.' …gives the trial court 'great latitude in protecting the public.'").

## III.    ATTORNEYS' FEES

Plaintiffs seek attorneys' fees and costs pursuant to California Code of Civil Procedure §

1021.5.  That statutory section provides that:

> Upon motion, a court may award attorneys' fees to a successful party against one or more opposing parties in any action which has resulted in the enforcement of an important right affecting the public interest if: (a) a significant benefit, whether pecuniary or nonpecuniary, has been conferred on the general public or a large class of persons, (b) the necessity and financial burden of private enforcement, or of enforcement by one public entity against another public entity, are such as to make the award appropriate, and (c) such fees should not in the interest of justice be paid out of the recovery, if any.

Code Civ. P. § 1021.5.

Given the significant benefit conferred upon the Class in this case, the public benefit in

prosecuting employee misclassification, the necessity of private enforcement to redress Class

members' rights, and the fact that it would not be in the interest of justice to require the fees to be

paid from Claimants' recovery, I find that Plaintiffs are entitled to recover reasonable attorney's

fees, costs, and expenses incurred in bringing this action. *See Graham v. DaimlerChrysler Corp.*,

34 Cal. 4th 553, 578 (2004); *Monterey/Santa Cruz etc. Trades Council v. Cypress Marina Heights

LP,* 191 Cal. App. 4th 1500, 1501 (2011) (holding that attorney fees were appropriate in wage

case because enforcement of prevailing wage requirement served the public interest and benefited

many workers and the local economy).

Plaintiffs shall file a motion for fees and costs for a determination as to the amount of such

award.

## CONCLUSION

Accordingly, I find that Claimants have prevailed on their UCL claim and shall be awarded

the amounts indicated above.  A separate judgment under Federal Rule of Civil Procedure 54(b)

shall be entered that fully resolves the issues of the Claimants whose cases have been tried once the calculation of pre-judgment interest on the jury's verdict, as described above on page 39, is completed.

**IT IS SO ORDERED.**

Dated: May 18, 2018

William H. Orrick
United States District Judge