Robert G. Hulteng, Bar No. 071293
rhulteng@littler.com
Damon M. Ott, Bar No. 215392
dott@littler.com
Courtney Chambers, Bar No. 312011
cchambers@littler.com
Shane Young, Bar No. 313853
shyoung@littler.com
Alvin Arceo, Bar No. 342387
aarceo@littler.com
LITTLER MENDELSON, P.C.
101 Second Street
San Francisco, California  94105
Telephone:    415.433.1940
Fax No.:       415.399.8490

Attorneys for Defendants
CYPREXX SERVICES, LLC, FIELD ASSET
SERVICES, INC. AND FIELD ASSET SERVICES,
LLC N/K/A XOME FIELD SERVICES, LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re Field Asset Services, Inc., et al. | Case No. 3:13-cv-00057-WHO |
| _____ This Document Relates To: Ron Terry, Case No. 4:23-cv-01905; Gregory Armstrong, Case No. 3:23-cv-01837; Tim Miller, Case No. 3:23-cv-01342; Darin Bush, Case No. 3:23-cv-01321; Matthew Cohick, Case No. 3:23-cv-01154; Rebecca Mladinich and Rick Mladinich, Case No. 4:23-cv-02728; Sam Cherrin, Case No. 3:23-cv-01525 | **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, SUMMARY ADJUDICATION**<br><br>Date:      January 10, 2024<br>Time:     2:00 p.m.<br>Dept.:     2 |

LITTLER
MENDELSON, P.C.
101 Second Street
Suite 1000
San Francisco, CA
94104
415.433.1940

MPA ISO DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT OR, SUMMARY
ADJUDICATION

CASE NO. 3:13-CV-00057-WHO

# TABLE OF CONTENTS

**PAGE**

I.     INTRODUCTION ................................................................................................. 1

II.    STATEMENT OF FACTS ................................................................................... 3

    A.     Bowerman Facts Pertaining to All Plaintiffs. ......................................... 3

    B.     Undisputed Facts Pertaining To Bankruptcy Plaintiffs .......................... 3

        1.     Plaintiff Ron Terry ..................................................................... 3

        2.     Plaintiff Gregory Armstrong ...................................................... 4

        3.     Plaintiff Tim Miller .................................................................... 5

        4.     Plaintiff Darin Bush .................................................................... 5

        5.     The Allegations, Claims, And Legal Theories of the Corporate Vendor Plaintiffs ................................................................................. 6

        6.     The Undisputed Evidence On The Corporate Vendor Plaintiffs ..................... 8

            a.     Plaintiffs Rebecca And Rick Mladinich ............................ 8

            b.     Plaintiff Sam Cherrin ..................................................... 11

            c.     Plaintiff Darin Bush ....................................................... 12

            d.     Plaintiff Matthew Cohick ............................................... 13

III.   LEGAL ARGUMENT ....................................................................................... 15

    A.     Legal Standard for Summary Judgment ................................................ 15

    B.     The Claims of Plaintiffs Bush, Armstrong, Terry, and Miller Must Be Judicially Estopped Because Plaintiffs Failed to Disclose Their Claims In Their Respective Bankruptcy Petitions ...................................................... 16

        1.     The Judicial Estoppel Factors Are Satisfied For Each Plaintiff ................... 17

            a.     Plaintiff Terry's facts satisfy the judicial estoppel factors and his claims against Defendants must be barred. ................................ 17

            b.     Plaintiff Armstrong's facts satisfy the judicial estoppel factors and his claims against Defendants must be barred. ......................... 19

            c.     Plaintiff Miller's facts satisfy the judicial estoppel factors and his claims against Defendants should be barred. ............................. 20

            d.     Plaintiff Bush's facts satisfy the judicial estoppel factors and his claims against Defendants should be barred. ............................. 21

LITTLER
MENDELSON, P.C.
101 Second Street
Suite 1000
San Francisco, CA
94105
415.433.1940

MPA ISO DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT OR, SUMMARY
ADJUDICATION

i

CASE NO. 3:13-CV-00057-WHO

**TABLE OF CONTENTS**
(CONTINUED)

PAGE

2.      This Case Is Distinguishable From Aguilar ........................................ 22

C.      Summary Judgment Should Be Granted For The Corporate Vendor Plaintiffs' Claims Because They Are Legally And Factually Invalid. ...................................... 23

1.      The Undisputed Evidence Demonstrates That Plaintiffs' Claims Are Based On An Erroneous Legal Theory And, Therefore, Invalid As A Matter Of Law ........................................................................................ 25

2.      Plaintiffs' Claims Fail Because They Cannot Change Their Legal Theory .............................................................................................. 27

IV.   CONCLUSION ................................................................................................ 28

LITTLER MENDELSON, P.C.
101 Second Street
Suite 1000

MPA ISO DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT OR, SUMMARY
ADJUDICATION

ii

CASE NO. 3:13-CV-00057-WHO

1

# <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**Cases**

4

*Addisu v. Fred Meyer, Inc.*,
  198 F.3d 1130 (9th Cir. 2000) ........................................................15

5

6

*Adickes v. S.H. Kress & Co.*,
  398 U.S. 144 (1970) (overruled on other grounds).................................16

7

*Aguilar v. Zep Inc.*,
  2014 WL 4245988 (N.D. Cal. Aug. 27, 2014) ...........................17, 22, 23

8

9

*Ah Quin v. Cnty. of Kauai Dep't of Transp.*,
  733 F.3d 267 (9th Cir. 2013) ................................................... *passim*

10

11

*Bowerman v. Field Asset Servs., Inc.*,
  60 F.4th 459 (9th Cir. 2023) .................................................... *passim*

12

13

*Cagle v. C&S Wholesale Grocers, Inc.*,
  505 B.R. 534 (E.D. Cal. 2014)...............................................17, 22, 23

14

*Carr v. Beverly Health Care and Rehabilitation Services, Inc.*,
  2013 WL 5946364 (N.D. Cal. Nov. 5, 2013) .............................17, 18, 23

15

16

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986).................................................................16, 23

17

*Church v. Jamison*,
  143 Cal.App.4th 1568 (Cal. Ct. App. 2006) ......................................19

18

19

*Coleman v. Quaker Oats Co.*,
  232 F.3d 1271 (9th Cir. 2000) .....................................................27

20

21

*Curry v. Equilon Enters., LLC*,
  23 Cal.App. 5th 289 (2018) .........................................................24

22

*Cusano v. Klein*,
  264 F.3d 936 (9th Cir. 2001) ......................................................19

23

24

*Hamilton v. State Farm Fire Cas. Co*,
  270 F.3d 778 (9th Cir. 2001) ...............................................16, 18, 19

25

26

*Hay v. First Interstate Bank of Kalispell*,
  978 F.2d 555 (9th Cir. 1992) ...............................................17, 18, 23

27

28

LITTLER
MENDELSON, P.C.
101 Second Street
Suite 1000
San Francisco, CA
94104
415.433.1940

*Henderson v. Equilon Enters., LLC*,
    40 Cal. App.5th 1111 (2019) ........................................................................24

*Martinez v. Combs*,
    49 Cal.4th 35 (2010) ...............................................................................3, 26

*Navajo Nation v. United States Forest Serv.*,
    535 F.3d 1058 (9th Cir. 2008) .....................................................................27

*Patel v. City of Long Beach*,
    564 F. App'x 881 (9th Cir. 2014) ...................................................................3

*Pickern v. Pier 1 Imps. (U.S.), Inc.*,
    457 F.3d 963 (9th Cir. 2006) ......................................................................27

*Thornhill Publ'g Co. v. GTE Corp.*,
    594 F.2d 730 (9th Cir. 1979) .......................................................................16

*Vertkin v. Wells Fargo Home Mortgage*,
    2010 WL 3619798 (N.D. Cal. 2010) .......................................................16, 17

*Wasco Prod., Inc. v. Southwall Tech., Inc.*,
    435 F.3d 989 (9th Cir. 2006) .......................................................................28

*Zyla v. Am. Red Cross Blood Servs.*,
    2014 WL 1266852 (N.D. Cal. Mar. 27, 2014), *motion for relief from judgment
    granted*, 2014 WL 3868235 (N.D. Cal. Aug. 6, 2014) ....................................21, 22

**Other Authorities**

Fed. Rules of Civ. Proc., Rule 56 ..............................................................15, 23

Fed. Rules of Civ. Proc., Rule 56(e)(2) .............................................................16

Rule 26 .........................................................................................................27

LITTLER MENDELSON,
P.C.
101 Second Street
Suite 1000
San Francisco, CA
94104

MPA ISO DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT OR, SUMMARY          iv          CASE NO. 3:13-CV-00057-WHO
ADJUDICATION

## I.     INTRODUCTION

Defendants move for summary judgment against plaintiffs Ron Terry, Gregory Armstrong, Tim Miller, Darin Bush, Matthew Cohick, Sam Cherrin, and Rebecca and Rick Mladinich (collectively, "Plaintiffs").

Plaintiffs Terry, Armstrong, Bush, and Miller (collectively, "Bankruptcy Plaintiffs") all filed bankruptcies after their contractual relationship with Defendants began, and in some cases long after their contractual relationship with Defendants ended.  All Bankruptcy Plaintiffs were fully aware of the underlying facts on which they now rely to support their complaints. And yet it is undisputed that each of the Bankruptcy Plaintiffs failed to disclose their claims on their respective bankruptcy petitions. After obtaining a benefit from their non-disclosure of high-value claims, the Bankruptcy Plaintiffs now assert the same claims against Defendants.  Bankruptcy Plaintiffs cannot plausibly argue mistake or inadvertent omission because none of the four have taken *any* steps to reopen their bankruptcy proceedings over the many years that they have been pursuing claims against FAS---years in which those claims were litigated with the full knowledge and participation of the Bankruptcy Plaintiffs. The Bankruptcy Plaintiffs' claims must be judicially estopped in order to protect the integrity of the judicial process.

In their Complaints, plaintiffs Darin Bush, Matthew Cohick, Sam Cherrin, and Rebecca and Rick Mladinich (collectively, "Corporate Vendor Plaintiffs") all assert the same three causes of action[1] based on nearly-identical allegations and the same legal theory.  To wit, they allege they worked for and were paid by FAS to perform property preservation services, and FAS willfully misclassified them as independent contractors to "evade" the requirements – and related costs – of complying with

---

[1] In their Complaints, the Corporate Vendor Plaintiffs originally asserted the same four causes of action brought in the original Bowerman action: (1) Failure to Pay Overtime; (2) Failure to Reimburse Business Expenses; (3) Waiting Time Penalties; and (4) Violation of the UCL.  However, after filing their Complaints, the Corporate Vendor Plaintiffs voluntarily agreed to dismiss their fourth cause of action for Violation of the UCL. (See ECF 533-535, Plaintiffs' Oppositions to Defendants' Motions to Dismiss) In their Complaints, the Corporate Vendor Plaintiffs contend the limitation periods applicable to their claims were tolled by the original Bowerman action and, on that basis, argue that the period covered by their cases begins on January 7, 2009 and continues through December 20, 2016. (See, e.g., Mladinich Comp. ¶ 80, fn. 1 and ¶ 87.)  Defendants dispute Plaintiffs' tolling argument, but note that, even if credited, Plaintiffs' subsequent dismissal of their claims for Violation of the UCL (the only claim subject to a four-year statute of limitations) means the period covered by Plaintiffs' cases begins – at the very earliest – on January 7, 2010 (and continues to December 20, 2016).

LITTLER MENDELSON, P.C.
101 Second Street
Suite 1000
San Francisco, CA
94104
415.433.1940

MPA ISO DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT OR, SUMMARY
ADJUDICATION                    1                    CASE NO. 3:13-CV-00057-WHO

California employment law, namely the payment of employee wages and benefits. The insurmountable problem for the Corporate Vendor Plaintiffs is that their allegations and legal theory are directly disproven by the undisputed evidence. The Corporate Vendor Plaintiffs have all conceded that they were in fact treated and paid as employees by corporations for which they directly worked. Each Corporate Vendor Plaintiff admitted as much in their recent depositions, where they testified that: (1) they worked for corporations ("Vendor Corporations") that entered into contracts with FAS to perform property preservation services and (2) the Vendor Corporations treated and paid the Corporate Vendor Plaintiffs as employees *of their Corporations*, including for all work that the Vendor Corporations did with FAS. The undisputed evidence also proves that FAS paid the Vendor Corporations – not the Plaintiffs – for the services the Vendor Corporations provided for FAS, and it was the Vendor Corporations – not FAS – that determined the amounts (and all other details) of the payments made to the Corporate Vendor Plaintiffs. In sum, the Corporate Vendor Plaintiffs were employees of their corporations, and treated themselves as such.

It is settled law that, with respect to the same work, an individual may not be both an independent contractor and an employee, as the two legal classifications are mutually exclusive. Thus, as the Corporate Vendor Plaintiffs concede that they were treated and paid as employees of the Vendor Corporations, the undisputed evidence proves that these Plaintiffs were not "misclassified" as independent contractors with respect to the work done by the Vendor Corporations. Instead, at all times they were employees of the Vendor Corporations. Therefore, as a matter of law, Defendants are entitled to summary judgment on the Corporate Vendor Plaintiffs' claims that FAS misclassified them as independent contractors.

This outcome will not come as a surprise to these Plaintiffs, as its inevitability was made clear by the Ninth Circuit's opinion reversing class certification. In its opinion, the appellate court correctly noted that the ABC standard used to determine independent contractor or employee status does not extend to the "joint employment" context, *i.e.*, where the plaintiff works as an admitted employee of a primary employer (here, a Vendor Corporation). In such cases, the Ninth Circuit explained, the nature of the plaintiff's relationship with a secondary employer (here, FAS) must be determined using

LITTLER MENDELSON, P.C.
101 Second Street
Suite 1000
San Francisco, CA
94104

MPA ISO DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT OR, SUMMARY
ADJUDICATION

2

CASE NO. 3:13-CV-00057-WHO

1   the joint employer standards the California Supreme Court established in *Martinez v. Combs*, 49

2   Cal.4th 35, 64 (2010). Yet, knowing this, the Corporate Vendor Plaintiffs brought their claims solely

3   under a theory of independent contractor misclassification, even going so far as to omit altogether the

4   existence of their corporate employers from their allegations.  And it is now too late for the Corporate

5   Vendor Plaintiffs to assert a joint employer theory---or any theory other than independent contractor

6   misclassification---as  the Ninth Circuit has long held that theories raised for the first time at summary

7   judgment cannot survive. *Patel v. City of Long Beach*, 564 F. App'x 881, 4 (9th Cir. 2014) ("a plaintiff

8   cannot raise a new theory for the first time in opposition to summary judgment") *citing Coleman v.*

9   *Quaker Oats Co.*, 232 F.3d 1271, 1292-93 (9th Cir. 2000) (plaintiff could not proceed with new theory

10  not pled in complaint).

11  **II.     STATEMENT OF FACTS**

12      **A.   *Bowerman* Facts Pertaining to All Plaintiffs.**

13          The Plaintiffs who are the subjects of this motion were all members of the *Bowerman* class

14  action lawsuit ("original Bowerman action") filed against Field Asset Services on January 7, 2013.

15  (*Bowerman Dkt.* 1.)  On May 7, 2015, this court issued an order adopting the class notice. (*Bowerman*

16  *Dkt.* 93.) Class notices were distributed to the Plaintiffs via First Class Mail on June 5, 2015.

17  (Declaration of Alvin A. Arceo ("Areco Decl."), ¶ 2, Exh. A, ("Project Update").

18      **B.   Undisputed Facts Pertaining To Bankruptcy Plaintiffs**

19          **1.   Plaintiff Ron Terry**

20          Plaintiff Terry completed his first work order for Defendants on November 5, 2010

21  (Declaration of Kyle Higgins ("Higgins Decl."), ¶ 3.) Plaintiff Terry testified that FAS told him he

22  was an employee during the period of time he contracted with FAS. (Areco Decl., Exh. B ("Terry

23  Depo."), 42:17-23.) During the time he contracted with FAS, Plaintiff Terry did not think he was

24  working as an independent contractor. (*Id.* at 43:14-16.) The last work order Plaintiff Terry completed

25  for Defendants was on October 12, 2011.  (Higgins Decl., ¶ 3.)

26          On October 19, 2011, Terry filed a voluntary Chapter 7 Bankruptcy Petition in the United

27  States Bankruptcy Court, Eastern District of California, case number 11:44905. (Arceo Decl., Terry

28

LITTLER MENDELSON,
P.C.
101 Second Street
Suite 1000
San Francisco, CA
94104

MPA ISO DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT OR, SUMMARY
ADJUDICATION                                3                    CASE NO. 3:13-CV-00057-WHO

Depo., 107:16-108:12, Exh. 12.)  Terry filed a Schedule B, with the assistance of counsel, in the Eastern District Bankruptcy Court. (*Id.*) Terry's Schedule B, in which he was required to list all assets of the estate, did not list his "contingent and unliquidated claims" against Defendants. (*Id.*) Specifically, Question 21 of the Schedule B requests that the petitioner list "[o]ther contingent and unliquidated claims of every nature, including tax refunds, counterclaims of the debtor, and rights to setoff claims. Give estimated value of each." (*Id.*)  Plaintiff Terry checked the box that stated "none." (*Id.*) Question 35 of the Schedule B required Plaintiff Terry to itemize "[o]ther personal property of any kind not already listed." Terry again failed to disclose his legal claims against Defendants. (*Id.*) On February 6, 2012, the Eastern District Bankruptcy Court discharged Terry from Bankruptcy. (Arceo Decl., Terry Depo., 114:22-115:2, Exh. 14.)   At his deposition, Plaintiff Terry did not claim that, during the eleven years that have passed since then, he has at any time sought to reopen his bankruptcy case to include his claims against Defendants.

## 2.    Plaintiff Gregory Armstrong

Plaintiff Armstrong completed his first work order with FAS on January 18, 2010. (Higgins Decl., ¶ 4.) He completed his last work order on November 28, 2011. (*Id.*)  Between March 31, 2011 and November 28, 2011, Plaintiff Armstrong completed only eight work orders for FAS. (*Id.*) During his deposition, Plaintiff Armstrong testified that he always thought he was underpaid. (Arceo Decl., Exh. C ("Armstrong Depo."), 105:5-6.) He also testified that he thought he was underpaid at the time he filed for bankruptcy. (*Id.* at 105:8-18.)

Plaintiff Armstrong filed for bankruptcy on March 31, 2011 in the United States Bankruptcy Court for the Central District of California. (Arceo Decl., Armstrong Depo., 101:9-102:1, Exh. 6.) Plaintiff Armstrong did not list any of his claims against Defendants in his Schedule B. Item 21 of the Schedule B required Plaintiff Armstrong to list "[o]ther contingent and unliquidated claims of every nature, including tax refunds, counterclaims of the debtor, and rights to set off claims." (*Id.*) Plaintiff marked "none" for item 21. (*Id.*)  He also marked "none" for item 35, which required Plaintiff Armstrong to itemize "[o]ther personal property of any kind not already listed." (*Id.*).  Plaintiff Armstrong did not list anywhere in his Schedule B his claims against Defendants.  His bankruptcy

LITTLER MENDELSON, P.C.
101 Second Street
Suite 1000
San Francisco, CA
94104

MPA ISO DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT OR, SUMMARY
ADJUDICATION

4

CASE NO. 3:13-CV-00057-WHO

1   was discharged on July 19, 2011. (Arceo Decl., Armstrong Depo., 118:12-23, Exh. 9.) At his

2   deposition, Plaintiff Armstrong did not claim that, over the twelve years since then, he ever sought to

3   reopen his bankruptcy case to include his claims against Defendants.

4               **3.      Plaintiff Tim Miller**

5           Plaintiff Miller completed his first work order with Defendants on May 27, 2008.  (Higgins

6   Decl., ¶ 5.)  He completed his last work order on November 8, 2013.  (*Id.*)  During his deposition,

7   Plaintiff Miller testified that he would work 10 to 14 hours a day on a regular basis for FAS. (Arceo

8   Decl., Exh. D ("Miller Depo.") 89:5-7.)

9           Plaintiff Miller filed his voluntary petition for bankruptcy in the United States Bankruptcy

10  Court, Eastern District of California on January 16, 2015. (Arceo Decl., Miller Depo., 110:17-111:22,

11  113:2-114:12, Exh 8.) In his Schedule B filing, which required Plaintiff Miller to list all assets of his

12  estate, he did not disclose his claims against Defendants.  Question 21 in Schedule B required Plaintiff

13  to list "[o]ther contingent and unliquidated claims of every nature, including tax refunds, counter

14  claims of the debtor, and right to setoff claims."  (*Id.*) Plaintiff marked "none."  (*Id.*) Question 35 on

15  Schedule B required Plaintiff to itemize all "[o]ther personal property of any kind not already listed."

16  (*Id.*) Plaintiff Miller checked "none" in response to Question 35.

17          Plaintiff Miller's bankruptcy petition was discharged on December 27, 2016. (Request for

18  Judicial Notice, ("RJN"), Exh. A) At his deposition, Plaintiff Miller did not claim that, over the eight

19  years since then, he ever sought to reopen his bankruptcy case to include his claims against Defendants.

20              **4.      Plaintiff Darin Bush**

21          Plaintiff Bush completed his first work order for FAS on May 13, 2008 (Higgins Decl., ¶ 6.)

22  His last work order date was July 26, 2012. (*Id.*)

23          Plaintiff Bush filed for bankruptcy on November 22, 2019 in the United States Bankruptcy

24  Court for the District of Oregon. (Arceo Decl., Exh. E ("Bush Depo.") 170:13-171:15, Exh. 13.)  On

25  his Schedule A/B form in the bankruptcy filing, Plaintiff Bush did not list anything under Item 30,

26  which required him to disclose "[o]ther amounts someone owes you. Examples: unpaid wages . . ."

27  (*Id.*)  Plaintiff Bush did not list any property under Item 33, which required him to disclose "[c]laims

28

LITTLER MENDELSON, P.C.
101 Second Street
Suite 1000
San Francisco, CA
94104

MPA ISO DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT OR, SUMMARY
ADJUDICATION

5

CASE NO. 3:13-CV-00057-WHO

1   against third parties, whether or not you have filed a lawsuit or made a demand for payment," and

2   which listed "employment disputes" as an example of such a claim.   (*Id.*)   Finally, Plaintiff Bush

3   checked "no" in item 35, which asked if he had "any financial assets" that he did not already list.

4        Plaintiff Bush's bankruptcy was discharged on February 19, 2020. (Arceo Decl., Bush Depo.

5   175:20-176:24, Exh. 14.)   At his deposition, Plaintiff Bush testified that he informed his bankruptcy

6   attorney about his claims against Defendants (Arceo Decl., Bush Depo., 174:25-175:4).   There is no

7   evidence that Plaintiff Bush ever disclosed the claims against FAS during the course of his bankruptcy

8   case, and there is no evidence that he has ever sought to reopen the bankruptcy proceeding to disclose

9   the claims.

10        **5.**    **The Allegations, Claims, And Legal Theories of the Corporate Vendor Plaintiffs**

11

12        The cookie cutter Complaints of the Corporate Vendor Plaintiffs assert the same three causes

13   of action based on the same legal theory, supported by virtually identical allegations.   Specifically, the

14   Corporate Vendor Plaintiffs contend that FAS violated California employment law requiring the

15   payment of overtime, reimbursement of business expenses, and timely payment of final wages by

16   willfully misclassifying the Corporate Vendor Plaintiffs as independent contractors.   (See, e.g.,

17   Mladinich Comp. ¶ 2 ("FAS evaded responsibility for paying Plaintiffs' wages and employment

18   benefits by … misclassifying them as 'independent contractors'…"); Cohick Comp. ¶ 2 (same); Bush

19   Comp. ¶ 2 (same); Cherrin Comp. ¶ 2 (same).)   The Corporate Vendor Plaintiffs' Complaints make

20   clear in multiple allegations and contentions that all of their causes of action are based on this sole

21   theory of independent contractor misclassification.   For example, in each of their Complaints, the

22   Corporate Vendor Plaintiffs make the following identical assertions:

23        a.  "Defendants willfully misclassified Plaintiffs as an independent contractor

24        when they were employees under California law." (Mladinich Comp. ¶ 89; see

25        also Cherrin Comp. ¶ 84 (same); Bush Comp. ¶ 84 (same); Cohick Comp. ¶ 86

26        (same)).

27        b.  "Defendants had a policy and practice of classifying Plaintiffs … as 'vendor'

28        independent contractors rather than W-2 employees." (Mladinich Comp. ¶ 91;

LITTLER MENDELSON, P.C.
101 Second Street
Suite 1000
San Francisco, CA
94104

MPA ISO DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT OR, SUMMARY
ADJUDICATION
6
CASE NO. 3:13-CV-00057-WHO

1  see also Cherrin Comp. ¶ 104 (same); Bush Comp. ¶ 104 (same); Cohick

2  Comp. ¶ 88 (same)).

3  c.  "Defendants' misclassification of Plaintiffs as independent contractors … is

4  unlawful and unfair." (Mladinich Comp. ¶ 109; see also Cherrin Comp. ¶ 84

5  (same); Bush Comp. ¶ 84 (same); Cohick Comp. ¶ 106 (same)). "Defendants'

6  willful misclassification scheme, through which Plaintiffs were denied

7  overtime pay, reimbursement of work-related expenses, and prompt payment

8  of all wages owed at the conclusion of the employment, has been, and

9  continues to be, unfair, unlawful, and harmful to Plaintiffs, the general public,

10  and Defendants' law-abiding competitors." (Mladinich Comp. ¶ 109; see also

11  Cherrin Comp. ¶104 (same); Bush Comp. ¶ 104 (same); Cohick Comp. ¶ 106

12  (same)).

13  d.  Defendants' misclassification scheme allowed Defendants to strip Plaintiffs of

14  their fundamental employment rights as discussed above.  (Mladinich Comp.

15  ¶ 110; see also Cherrin Comp. ¶105 (same); Bush Comp. ¶ 105 (same); Cohick

16  Comp. ¶ 107 (same)).

17  e.  "Under their unlawful scheme, Defendants are further able to evade their other

18  legal responsibilities as employers, and instead shift the burden of paying the

19  costs of self-employment and unemployment taxes onto Plaintiffs, as well as

20  the costs of running Defendants' business." (Mladinich Comp. ¶ 110; see also

21  Cherrin Comp. ¶ 105 (same); Bush Comp. ¶ 105 (same);  Cohick Comp. ¶ 107

22  (same)).

23  Notably, none of the complaints contains any assertion of joint employment, nor do any of the

24  complaints set forth a legal theory of joint employment.

25

26

27

28

LITTLER MENDELSON, P.C.
101 Second Street
Suite 1000
San Francisco, CA
94104

MPA ISO DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT OR, SUMMARY
ADJUDICATION

7

CASE NO. 3:13-CV-00057-WHO

**6.** **The Undisputed Evidence On The Corporate Vendor Plaintiffs**

**a.** **Plaintiffs Rebecca And Rick Mladinich**

Plaintiffs Rebecca and Rick Mladinich were corporate officers and employees of Rock Bottom Solutions, Inc. ("RBS, Inc.") a company that entered into a contract (signed by Rebecca Mladinich) with FAS on May 26, 2009 (prior to the period covered by Plaintiffs' Complaint), making Rock Bottom Solutions, Inc. a "vendor" qualified to perform property preservation projects for FAS. (Maldinich Compl. ¶ 54 (alleging Plaintiffs signed a vendor contract on May 26, 2009); see also Arceo Decl., Exh. G, Deposition of Rebecca Mladinich, ("Reb. Mladinich Depo."), 37:3-18, 91:14-19, Exh. 3 (2009 VQP).) In addition to signing the contract for RBS, Inc., Rebecca Mladinich signed and submitted a W-9 to FAS identifying the company as an S-Corporation and listing the company's Employer Identification Number ("FEIN"). (Arceo Decl., ¶ 25, Exh. S.) RBS, Inc. completed its first work order for FAS on June 25, 2009 (approximately one month after contracting with FAS). (Higgins Decl. ¶ 9.) RBS, Inc. was originally founded on January 2, 2009, when Rebecca Mladinich filed Articles of Incorporation with California's Secretary of State forming the company. (Arceo Decl., Exh. L (Articles of Incorporation).)

Prior to establishing RBS, Inc., Rebecca and Rick Mladinich owned and operated Rock Bottom Pools Designer Consultants, LLC ("Rock Bottom Pools"), a California Limited Liability Company that built swimming pools. (Reb. Mladinich Depo. 16:1-20; 17:1-3; 17:7-9.) Rock Bottom Pools was established on February 16, 2005 by Rebecca Mladinich (the company's "organizer" and agent for service of process), who testified that she performed the accounting and scheduling functions of the business, while Rick Mladinich – an ironworker by trade and licensed contractor – handled the construction side. (Id. at 16:1-20; 17:1-3; 17:24-18:11; Arceo Decl., Exh. J (Articles of Organization).) Rock Bottom Pools left the pool building business in 2008 because "the economy crashed." (Id. at 17:1-3.) While Rock Bottom Pools was winding down, Rebecca and Rick Mladanich's business entered into a contract with FAS (signed by Rebecca on behalf of "Rock Bottom, LLC") on January 2, 2008. (Acreo Decl., Exh. F, Deposition of Rick Mladinich ("Rick Mladinich Depo."), 60:18-62:13, Exh. A (2008 VQP).) However, FAS's records indicate that the LLC never

LITTLER MENDELSON, P.C.
101 Second Street
Suite 1000
San Francisco, CA
94104

MPA ISO DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT OR, SUMMARY
ADJUDICATION

8

CASE NO. 3:13-CV-00057-WHO

1   performed any services for FAS, and it was eventually closed (on December 23, 2008) when RBS,

2   Inc. was formally established (on January 2, 2009). (Higgins Decl. ¶ 9; Reb. Mladinich Depo. at 17:1-

3   3; Arceo Decl., Exh. K (Certificate of Cancellation).)

4        Plaintiff Rebecca Mladinich testified that, during the period RBS, Inc. contracted with FAS (a)

5   the company hired and paid workers as acknowledged employees of the company (Reb. Mladinich

6   Depo at 31:4-11); (b) the company was responsible for finding and hiring its employees, which it did

7   by running ads for open positions and interviewing candidates (*id.* at 34:2-8); (c) the number of

8   company employees fluctuated, but she recalled there were approximately 16 employees at a particular

9   time (*id*. at 30:19-22); (d) in addition to employees who performed property preservation work in the

10  field, the company eventually employed two employees who worked full-time (8 hours per day plus a

11  lunch) in the company's office doing business administration work (*id*. at 53:4-54:4); (e) the company

12  employed her brother to work in the company's office doing administrative work, and she supervised

13  his work (*id*. 61:5-19); (f) the company used timecards to record the employees' worktime and

14  calculate their wages owed (*id*. at 33:4-18); (g) the company was responsible for paying its employees

15  (*id*. at 33:20-21); (h) the company paid its employees at least minimum wage (*id*. at 85:24-86:22); (i)

16  she was responsible for overseeing the company's payroll function, but she used an outside payroll

17  company, Paychex, to perform the function (*id*. at 31:4-8; 33:22-25; 56:4-8); (j) the company had an

18  employee handbook that it obtained from Paychex (*id*. at 34:20-25); (k) Rebecca, with help from Rick

19  Mladinich, was responsible for deciding work schedules, work assignments, and staffing for the

20  company's employees (*id*. at 43:7-44:8); (l) she was responsible for creating the routing used to

21  establish the order in which the company's employees were to perform the jobs for the day, including

22  the route used to travel to and between jobs (*id.* At 51:24-52:18); (m) creating this routing could take

23  her as long as one to two hours to create due to the complexity of the schedule (*id*.); and (n) the

24  company's employees were directed to meet with Rick Mladinich in-person at the outset of the

25  workday to obtain the company's routing instructions (*Id*.).  When asked whether FAS was ever

26  involved in RBS, Inc.'s employee hiring decisions, Plaintiff Rebecca Mladinich testified, "I don't

27  believe so, no."  (*Id*. at 104:5-7.)  When asked the same question, but about firing decisions, she

28

LITTLER MENDELSON, P.C.
101 Second Street
Suite 1000
San Francisco, CA
94104

MPA ISO DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT OR, SUMMARY
ADJUDICATION

9

CASE NO. 3:13-CV-00057-WHO

1    replied: "Not that I recall." (*Id*. at 104:8-9.)

2          RBS, Inc. had a single business bank account. (*Id*. at 94:6-19.) Checks issued by FAS for

3    completed work orders were paid to RBS, Inc. – not Rebecca or Rick Mladinich – and deposited in

4    the company's account (*id*. at 82:11-17; 89:18-25) and the money remained in the company's bank

5    account until used to pay the company's operating expenses such as "payroll, daily expenses, [and]

6    gas." (*Id*.)

7          Plaintiffs Rebecca and Rick Mladinich were the sole officers of RBS, Inc. and were paid

8    salaries for their work for RBS, Inc.  (Reb. Mladinich Depo. at 86:23:-87:20; 91:14-19; 90:12-91:4

9    Exh. 4, pg. 1.) Plaintiff Rebecca testified that RBS, Inc. paid her a salary of roughly $11,000 per month

10   during 2010 (*Id*. at 84:17-22; 87:11-20). RBS, Inc. began paying her something less than $11,000 per

11   month in 2011 or later when the company hired a new bookkeeper and the company determined that

12   $11,000/month "was too much money to be paid … because we needed the money in the business, to

13   keep it running." (*Id*. at 87:13-20.)  In addition to her salary, Plaintiff Rebecca Mladinich testified that

14   RBS, Inc. provided her a company car (a BMW), which the company paid in full. (*Id*. at 66:4-24;

15   99:20-100:18; 90:12-91:4, Exh. 4, pgs. 6, 8.)

16         Rick Mladinich testified at deposition that Rebecca handled all the administrative details for

17   the company, and that he was not familiar with its pay practices.  (Rick Mladinich Depo., 24:10-22;

18   28:12-22.) However, in the absence of evidence to the contrary, it can be presumed that he drew a

19   salary from the company, just as Rebecca did.  Rick did recall that the company provided him a car

20   fully paid for by the company (for which the company also took a tax deduction, along with deductions

21   for multiple work trucks the company owned and used to perform company business).  (Reb.

22   Mladinich Depo. 66:4-19; 100:23-101:11; 90:12-91:4 Exh. 4, pgs. 6, 8.)

23         RBS, Inc. ceased operations in or around 2014 when Plaintiff Rick Mladinich was injured in a

24   motorcycle accident, however, the company continued to exist until it was formally suspended by the

25   California FTB in 2019 (all of which time Rick and Rebecca Mladinich remained its sole officers).

26   (Reb. Mladinich Depo., 21:1-6.; see also Arceo Decl.  ¶ 14.)

27

28

LITTLER MENDELSON,
P.C.
101 Second Street
Suite 1000
San Francisco, CA
94104

MPA ISO DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT OR, SUMMARY
ADJUDICATION                                        10                    CASE NO. 3:13-CV-00057-WHO

### b. Plaintiff Sam Cherrin

Sam Cherrin is the founder and shareholder of two corporations that contracted with and performed services for FAS as corporate vendors. (Arceo Decl., Exh. H, Sam Cherrin Deposition, ("Cherrin Depo."), 20:10-25, 21:1-6; see also Arceo Decl. ¶ 22-23, Exh. P-Q) The two corporations, both of which contracted with FAS in California, were: New Age Services, Inc. (fka New Age Real-Estate) ("NAS, Inc."), a Michigan corporation incorporated in 2002; and Field Service Professionals, Inc. ("FSP, Inc."), another Michigan corporation incorporated on July 23, 2010 (approximately the same time that New Age Services, Inc. was formally dissolved on July 15, 2010).  (Cherrin Depo., 20:10-25, 21:1-6, 57:15-24; see also Arceo Decl.  ¶¶ 21-24, Exhs. P-R, ¶¶ 26-28, Exhs. T-V .)[2]

At his deposition, Plaintiff Cherrin testified that the operation and services of FSP, Inc. were the "same or similar" to that of NAS, Inc.  (Cherrin Depo. 49:25-50:1-4.)  NAS, Inc. first entered into a vendor contract with FAS on September 25, 2009 (Arceo Decl., ¶ 26, Exh. T; see also Comp. ¶ 54 (alleging Plaintiff signed a vendor contract with FAS in September 25, 2009).) NAS, Inc. subsequently signed another contract with FAS on May 18, 2010 (*Id.* at ¶ 27, Exh. U). FSP, Inc. subsequently contracted with FAS on September 4, 2010 (*Id.* at ¶ 28, Exh. V). Each time, Plaintiff Cherrin executed the contracts as a representative of the corporations.  (Cherrin Depo. 57:15-24; see also Arceo Decl., Exhs. T-V).

During his deposition, Plaintiff Cherrin testified that: (a) he operated his corporations from a primary office located in Warren, Michigan, where he also personally resided (and continues to reside) (Cherrin Depo. at 41:4-6); (b) his corporations performed services (including projects for FAS) in multiple states, including California and Michigan (*id.* at 59:3-14); (c) he did not personally operate

---

[2]  In his Complaint, Plaintiff Cherrin alleges that he created the entity "NAS Preservation" to contract with and perform services for FAS.  However, the evidence makes clear, including Plaintiff's own testimony, that the allegation in the Complaint is inaccurate. (Cherrin Compl. ¶55; see also Cherrin Depo., 20:10-25, 21:1-6, 151:22-152:8, 152:12-24) During his deposition, Plaintiff testified that his company, NAS, Inc. was his first company to contract with FAS, and that his business, FSP, Inc., was the second of his companies to contract with FAS. (Cherrin Depo., 20:10-25, 21:1-6, 151:22-152:8, 152:12-24.) Further, the Articles of Incorporation for NAS Preservation, Inc., indicate that Plaintiff Cherrin first incorporated that entity on January 22, 2015, meaning the corporation was not established until at least two years after Plaintiff alleges he ceased performing services for FAS. (Cherrin Compl. ¶ 54 (alleging Plaintiff's services end in 2012); see also Arceo Decl., Exh. R (Articles of Incorporation).)

LITTLER MENDELSON, P.C.
101 Second Street
Suite 1000
San Francisco, CA
94104

MPA ISO DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT OR, SUMMARY
ADJUDICATION

11

CASE NO. 3:13-CV-00057-WHO

1  his business in California, but instead, his corporation hired roughly five to six employees to handle

2  work in California (*id.* at 65:20-25, 66:1-2); (d) he did "commute to California" approximately "two

3  or three times a month" to directly interface with the employees of his company who worked on the

4  projects his company performed for FAS in California (*id.* at 66:12-25); (e) his corporations last

5  performed services on a project for FAS in California in September 2010 (*id.* at 87:7-25;88:1-2; see

6  also Higgins Decl., ¶ 8.); (f) his corporations employed approximately 16 workers at any one given

7  time, but "[o]ver the course of its lifetime, [had] probably hundreds" of employees (*id.* 50:8-15); (g)

8  he was always paid by his company (first NAS, Inc. and then FSP, Inc.), and not paid by FAS (*id.* at

9  30:15-25; 32:21-25, 33:1-2; 57:4-14); (h) he always served as a corporate officer of his corporations

10  (*Id.* at 26:16-18); and (i) and he was paid a salary by his corporations and was issued annual Form W-

11  2s from his corporations for all work the corporations performed for FAS; on top of that, Plaintiff

12  Cherrin testified that he took annual distributions of profit from his corporations. (*Id.* at 57:1-14)

13  **c.   Plaintiff Darin Bush**

14         Plaintiff Darin Bush was the founder and owner of Integrity Contracting, which was first

15  organized as a Limited Liability Company under Oregon law on October 26, 2000 but was later

16  incorporated as a C Corporation under Oregon law on January 9, 2009 (collectively "Integrity

17  Contracting").   (Bush Depo. 18:17-20:13; 19:2-23; 35:21-36:6; see also, Arceo Decl., Exh. N

18  (Business Information Page), and Exh. O (Articles of Incorporation).)   When first incorporated,

19  Plaintiff Bush was the sole corporate officer, but a second corporate officer joined the company in or

20  around 2010.[3]

21         On May 19, 2008, Plaintiff Bush signed a contract with FAS on behalf of Integrity Contracting

22  for it to provide services as a vendor for FAS.  (Bush Compl. ¶ 54 (alleging Plaintiff signed a vendor

23  contract with FAS on May 19, 2008); see also Bush Depo., 75:1-4.))   Plaintiff Bush testified he did

24  not ever personally enter into a contract with FAS, but rather, "it was under Integrity Contracting."

25  (*Id.* at 121:1-14). Plaintiff Bush's corporation, Integrity Contracting, Inc. subsequently performed

26  services as a vendor for FAS under that same contract. (*Id.*). During his deposition, Plaintiff Bush

27

---

[3] In or around 2010 Jay Halverson joined Integrity Contracting, Inc as a consultant and was later
added as a corporate officer. (Bush Depo. 18:17-20:13; 35:21-36:6).

28

LITTLER MENDELSON, P.C.
101 Second Street
Suite 1000
San Francisco, CA
94104

MPA ISO DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT OR, SUMMARY                    12                    CASE NO. 3:13-CV-00057-WHO
ADJUDICATION

testified that: (a) Integrity Contracting, Inc. employed workers that it paid as acknowledged employees of the company, including for work the employees performed on projects the company handled for FAS (Bush Depo.at 65:24-25, 66:1-11); (b) Integrity Contracting, Inc. used ADP to handle the company's payroll (*id*. at 66:1-11); (c) at its peak, around 2011 or 2012, the company had approximately 100 employees (*id*. at 38:8-16); (d) the company hired approximately two to three employees who were dedicated to administrative work as well as a controller, an administrator, and a CEO (*id.* at 62:7-63:1); (e) although Plaintiff Bush was not certain, he recalled that Integrity Contracting likely had its own employee policies because the company "had a lot of employees" and "had to follow [the] laws" (*id.* at 66:12-15); (f) the company hired both "hourly" and "salary people as supervisors" (*id.* at 67:2-13); and (g) Plaintiff Bush himself was also classified as "an employee of Integrity" and received wages on an IRS Form W-2 issued by Integrity Contracting for a least a portion of his time employed by Integrity Contracting. (*Id*. at 43:20-25,44:1; 44:10-17).

Plaintiff additionally testified that his business was active in numerous states, including California, Oregon, Washington, Indiana, and Illinois. (*Id*. at 47:17-22). Plaintiff himself did not operate his business in California, but instead, he maintained a "remote office in Placerville, CA" where he occasionally visited his company's teams of employees performing the services on behalf of FAS. (*Id.* at 48:16-24.) Plaintiff maintained his own office in Oregon, where he has personally resided and worked since the early 2000s. (*Id*. at 48:25; 49:1-20.)

### d.   Plaintiff Matthew Cohick

Plaintiff Cohick began his lawncare and landscaping business "Monster Mowers" in 2001 as a sole proprietorship, and obtained a business license from the City of Lancaster, California on July 31, 2006.  (Arceo Decl., Exh. I, Deposition of Matthew Cohick ("Cohick Depo."), 46:1-14.) Cohick and Monster Mowers first entered into an arrangement with FAS by signing a vendor contract on May 2, 2007, wherein Cohick identified his business as "Monster Mowers" as the vendor and submitted a W-9 indicating his business was a sole proprietorship.   (Cohick Depo., 119:21-120:19; Exh. 5; see also Cohick Comp. ¶ 54 (alleging Plaintiff signed a vendor contract with FAS in April 2007).)

On April 14, 2009, Plaintiff Cohick executed a new agreement with FAS as part of a new

LITTLER MENDELSON,
P.C.
101 Second Street
Suite 1000
San Francisco, CA
94104

MPA ISO DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT OR, SUMMARY
ADJUDICATION

13

CASE NO. 3:13-CV-00057-WHO

vendor contract in which he again identified Monster Mowers as the vendor. (Cohick Depo., 121:1-14; Exh. 6.)  With the new contract, Plaintiff submitted a new W-9 identifying a Federal Employer Identification Number ("FEIN") for his business (which the W-9 identified as a sole proprietorship). (Arceo Decl., ¶ 29, Exh. W).

On August 10, 2010, Plaintiff Cohick filed Articles of Incorporation with the California Secretary of State forming the C-Corporation, Monster Mowers, Inc.  (Arceo Decl., Exh. M (Articles of Incorporation)). Subsequently, in 2012, the name of the corporation appeared on the next contract that Monster Mowers entered into with FAS.   (Arceo Decl., ¶ 30 Exh. X).

During the period Monster Mowers, Inc. contracted with FAS, Plaintiff Matthew Cohick testified that: (a) the company hired and paid employees, including his father and brother, as acknowledged employees of the corporation (reported using IRS Form W-2) (Cohick Depo. 56:4-57:7); (b) the company was responsible for finding and hiring its employees, which it did by running Craigslist ads for open positions (*id.* at 71:4-9); (c) although Plaintiff Cohick could not remember the exact amount, he recalled that the number of employees employed by the company fluctuated, stating Monster Mowers, Inc. employed "more than 50" employees throughout the company's existence (*id.* at 69:1-12); (d) in addition, the company eventually employed employees who were exclusively assigned to handle administrative tasks, such as, closing out work orders for FAS and replying to e-mails (*id.* at 62:17-21; 63:1-6); (e) Plaintiff Cohick was responsible for overseeing the company's payroll function and used an outside payroll company, ADP, to perform the function (*id.* at 67:1-17) (f) Plaintiff Cohick was responsible for scheduling and staffing for the company's employees (*id.* at 63:22-25); (g) the company's employees were required to track and submit their time in order to calculate the wages owed (*id.* at 64:11-23) (h) Plaintiff Cohick himself decided how much to pay his employees – he admitted "[t]he hourly [rate] was based on minimum wage, plus if they were good employees or hardworking employees, then [he] could pay them more, per hour" (*id.* at 79:24-80:3); and (i) towards the end of the company's time contracting with FAS, the company did perform drug screening tests on its employees to ensure "[m]ore reliable employees." (*id.* at 77:16-23).

Plaintiff Matthew Cohick maintained separate bank accounts for his personal accounts and his

LITTLER MENDELSON, P.C.
101 Second Street
Suite 1000
San Francisco, CA
94104

MPA ISO DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT OR, SUMMARY
ADJUDICATION

14

CASE NO. 3:13-CV-00057-WHO

business accounts. (*Id.* at 88:11-23.) Monster Mower, Inc.'s business bank accounts included "one for payroll and one for everything else . . .that consist of banking" such as "paying supplies, [and] bills." (*Id*. at 88:19-89:2).

Plaintiff Cohick admitted during his deposition that he held the position of the sole officer of Monster Mowers, Inc., and that the corporation paid him a salary for the work he performed for the company. (Cohick Depo. 184:13-22.) Although he could not recall the exact amount of the salary the corporation paid him for other years, Plaintiff Cohick testified that, in 2011, Monster Mowers, Inc. paid him a salary of approximately ███████. (*Id.* at 184:8-22, 182:10-20, Exh. 10.) Plaintiff Cohick testified that by reviewing "[a]ll the work that [he] put in that year, is how [he] decided how much [he] received" as his salary. (*Id.* at 184:14-15.)

In or around 2010, two separate lawsuits were filed against Monster Mowers, Inc. by former employees of the company for alleged violations of employment law. (RJN, Exh. B-C.) Although the violations alleged in the lawsuits took place during the time period that FAS contracted with Monster Mowers, DBA and Monster Mowers, Inc., FAS was not named as a defendant in either action. (Cohick Depo. 85:2-25.) In defending those lawsuits, Monster Mowers, Inc. never asserted that FAS was a joint employer of its employees. (RJN, Exh. B-C.)

Plaintiff and his company ceased doing business with FAS in May 2013, but Monster Mowers, Inc. continued to operate until 2015. (Arceo Decl., ¶ 16. (FTB Suspension); see also Higgins Decl. ¶7.) Subsequent to Monster Mowers, Inc. going out of business in 2015, Plaintiff Cohick testified that he opened a new landscaping business, KMC Landscaping, which he and his wife continue to operate in California. (Cohick Depo. 21:14-25, 22:1-21.)

## III.   LEGAL ARGUMENT

### A.   Legal Standard for Summary Judgment

Summary judgment must be granted where "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. A claimant must affirmatively present specific admissible evidence sufficient to enable a reasonable trier of fact to find in his or her favor. *See Addisu v. Fred Meyer, Inc*., 198 F.3d 1130, 1134 (9th Cir. 2000) ("A scintilla

LITTLER MENDELSON, P.C.
101 Second Street
Suite 1000
San Francisco, CA
94104

MPA ISO DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT OR, SUMMARY
ADJUDICATION

15

CASE NO. 3:13-CV-00057-WHO

1    of evidence that is merely colorable or not significantly probative does not present a genuine issue of

2    material fact."). A defendant may support its summary judgment motion either by submitting

3    affirmative evidence disproving an essential element of a plaintiff's claim, or by showing that the

4    plaintiff lacks sufficient evidence to support an essential element of his claim. *See Adickes v. S.H.*

5    *Kress & Co.*, 398 U.S. 144, 158-160 (1970) (overruled on other grounds); *see also Celotex Corp. v.*

6    *Catrett*, 477 U.S. 317, 325 (1986). A plaintiff opposing a summary judgment motion may not rely

7    merely on allegations or denials but must provide specific factual evidence showing a genuine issue

8    for trial. Fed. Rules of Civ. Proc., Rule 56(e)(2). Conclusory or speculative testimony in affidavits is

9    insufficient to raise genuine issues of fact and defeat summary judgment. *See Thornhill Publ'g Co. v.*

10    *GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).

11
12       **B.**      **The Claims of Plaintiffs Bush, Armstrong, Terry, and Miller Must Be Judicially Estopped Because Plaintiffs Failed to Disclose Their Claims In Their Respective Bankruptcy Petitions.**

13       Judicial estoppel precludes a party from gaining an advantage "by asserting one

14    position, and then later seeking an advantage by taking clearly inconsistent positions." *Hamilton v.*

15    *State Farm Fire Cas. Co*, 270 F.3d 778, 782 (9th Cir. 2001). Courts may consider the following three

16    factors when determining whether to apply the judicial estoppel doctrine: (1) whether a party's later

17    position is "clearly inconsistent" with its earlier position; (2) whether that party has "succeeded in

18    persuading a court to accept the party's earlier position"; and (3) whether the party seeking to assert

19    an inconsistent position would obtain an unfair advantage over the opposing party if not estopped. *Id.*

20    (*quoting New Hampshire v. Maine,* 532 U.S. 742, 750-751 (2001)).

21       In the bankruptcy context, the "basic default rule" is that "[i]f a plaintiff-debtor omits

22    a pending (or soon-to-be-filed) lawsuit from the bankruptcy schedules and obtains a discharge (or plan

23    confirmation), judicial estoppel bars the action." *Ah Quin v. Cnty. of Kauai Dep't of Transp.*, 733 F.3d

24    267, 271 (9th Cir. 2013). In a Northern District case, the court held that a plaintiff "is estopped from

25    making claims which [they] omitted from [their] bankruptcy schedule." *Vertkin v. Wells Fargo Home*

26    *Mortgage*, 2010 WL 3619798, at *3 (N.D. Cal. 2010). "Judicial estoppel is imposed when the debtor

27    'has knowledge of enough facts to know that a potential cause of action exists during the pendency of

28

LITTLER MENDELSON, P.C.
101 Second Street
Suite 1000
San Francisco, CA
94104

MPA ISO DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT OR, SUMMARY
ADJUDICATION

16

CASE NO. 3:13-CV-00057-WHO

1   the bankruptcy, but fails to amend his schedules or disclosure statements to identify the cause of action

2   as a contingent asset.'" *Id.* (quoting *Hamilton*, 270 F.3d at 784).  It is not even necessary that a plaintiff

3   know "all" facts giving rise to a particular claim.  *See Hay v. First Interstate Bank of Kalispell*, 978

4   F.2d 555, 557 (9th Cir. 1992) ("We recognize that all facts were not known to [plaintiff] at that time,

5   but enough was known to require notification of the existence of the asset to the bankruptcy court.").

6   It is also not necessary that the plaintiff understand that the facts give rise to a cause of action.  *Carr*

7   *v. Beverly Health Care and Rehabilitation Services, Inc.*, 2013 WL 5946364, at *5 (N.D. Cal. Nov. 5,

8   2013) (collecting cases); *see also Ah Quin*, 733 F.3d at 271 (the default rule is that judicial estoppel

9   applies).

10          Judicial estoppel will not apply where there was a mistake or inadvertent omission from the

11   bankruptcy filing. *Id.* The courts ask whether the debtor knew about the claim when the debtor filed

12   the bankruptcy schedules, and whether the debtor had motive to conceal the claim. *Id.* A "key factor"

13   is whether the debtor has reopened their bankruptcy proceeding and filed an amended schedule that

14   lists the claim as an asset. *Aguilar v. Zep Inc.,* 2014 WL 4245988, at *7 (N.D. Cal. Aug. 27, 2014). In

15   *Aguilar,* this court focused on how the plaintiffs in the case had timely reprocessed their bankruptcies

16   to disclose their legal claims against defendant, and therefore found two of the three *New Hampshire*

17   factors were no longer met. *Id.* at *8. However, even if a party has amended their bankruptcy petition

18   to later disclose a claim, a court may still find the non-disclosure was not an inadvertent or mistaken

19   omission. *Cagle v. C&S Wholesale Grocers, Inc.,* 505 B.R. 534, 539-541 (E.D. Cal. 2014). In *Cagle*,

20   the plaintiff amended her schedule to include her omitted claims a month after defendants moved for

21   summary judgment based on her omission. *Id.* Under this circumstance, the court held that judicial

22   estoppel still applied. *Id.*

23              1.      **The Judicial Estoppel Factors Are Satisfied For Each Plaintiff**

24                  a.      **Plaintiff Terry's facts satisfy the judicial estoppel factors and his
                            claims against Defendants must be barred.**

25          Plaintiff Terry failed to disclose his wage and expense reimbursement claims against

26   Defendants as an asset in his bankruptcy petition, yet he now asserts those same legal claims against

27   Defendants. His positions are clearly inconsistent and thus the first factor is met.  Next, the Eastern

28

LITTLER MENDELSON, P.C.
101 Second Street
Suite 1000
San Francisco, CA
94104

MPA ISO DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT OR, SUMMARY
ADJUDICATION

17

CASE NO. 3:13-CV-00057-WHO

1  District Bankruptcy Court relied on Plaintiff Terry's earlier position that he was not potentially owed

2  any money as a result of unresolved claims. *Carr v. Beverly Health Care & Rehab. Servs., Inc.,* 2013

3  WL 5946364, at *3 (holding the second *New Hampshire* factor was met since "the bankruptcy court

4  clearly accepted that earlier position in ultimately discharging" a plaintiff from bankruptcy). Finally,

5  Plaintiff Terry enjoyed the immediate benefit of an automatic stay that prevented creditors from

6  pursuing his assets and he received a discharge of debt in his Chapter 7 bankruptcy proceeding.

7  *Hamilton,* 270 F.3d at 784 ("The debtor, once he institutes the bankruptcy process, disrupts the flow

8  of commerce and obtains a stay and the benefits derived from listing all his assets.").

9       Plaintiff Terry was admittedly aware of all the underlying facts that gave rise to his claims

10 against Defendant, yet did not disclose them on his petition. Notably, it is not even necessary that a

11 plaintiff know "all" facts giving rise to a particular claim.  See *Hay v. First Interstate Bank of Kalispell*,

12 978 F.2d 555, 557 (9th Cir. 1992) ("We recognize that all facts were not known to [Plaintiff] at that

13 time, but enough was known to require notification of the existence of the asset to the bankruptcy

14 court."). Plaintiff Terry filed for bankruptcy six days after his business stopped contracting with

15 Defendant. During his deposition, Plaintiff Terry testified that he believed at the time that he was an

16 employee of FAS, and that he did not feel like he was an independent contractor. This testimony

17 demonstrates undisputedly that Plaintiff Terry was sufficiently aware of the facts giving rise to his

18 current claims against Defendant. Thus, judicial estoppel must bar his claims. Plaintiff Terry cannot

19 argue that his omission of claims against FAS was a mistake or was inadvertent, particularly because

20 he filed bankruptcy immediately after he stopped doing business with FAS, when the relationship with

21 FAS was fresh in mind.

22       Even more significantly, Plaintiff Terry cannot claim mistake or inadvertence because he has

23 made no efforts to reopen or amend his bankruptcy schedules in the eleven years since his bankruptcy

24 petition was discharged.   For ten of those years, the *Bowerman* litigation has been underway.   As a

25 class member in that case, Plaintiff Terry had ample notice of the wage and expense reimbursement

26 claims he now attempts to make. And yet, even after becoming a member of the class action litigation

27 against FAS, he still made no efforts to reopen his bankruptcy proceedings. *Ah Quin v. County of*

28

LITTLER MENDELSON, P.C.
101 Second Street
Suite 1000
San Francisco, CA
94104

MPA ISO DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT OR, SUMMARY
ADJUDICATION

18

CASE NO. 3:13-CV-00057-WHO

*Kauai Dep't of Transp.,* 733 F.3d 267, 275 (9ᵗʰ Cir. 2013) (explaining a bankruptcy case "may be reopened even if it has long been closed").  Such inaction demonstrates the type of deceit or willful disregard that judicial estoppel is meant to prevent.  Accordingly, judicial estoppel must be applied to bar Plaintiff Terry's claims against Defendants.

### b. Plaintiff Armstrong's facts satisfy the judicial estoppel factors and his claims against Defendants must be barred.

 "[G]enerally, a debtor has no duty to schedule a cause of action that did not accrue prior to bankruptcy." *Cusano v. Klein*, 264 F.3d 936, 947 (9th Cir. 2001) (holding plaintiff would be barred from seeking recovery for claims that accrued before the date plaintiff filed their petition). "A cause of action for unpaid wages *accrues* when the wages first become legally due." *Church v. Jamison*, 143 Cal.App.4th 1568, 1575 (Cal. Ct. App. 2006).

Plaintiff Armstrong filed bankruptcy on March 31, 2011, which was over a year after he first contracted with FAS, and nine months before he stopped contracting as a vendor. He testified that he was aware in 2011 of the salient facts that gave rise to his current claim, particularly the fact that FAS was not (in his opinion) paying him properly. (Armstrong Depo. 105:2-18).  Yet, he did not include any of his legal claims against FAS in his bankruptcy petition. To the contrary, he represented in his Schedule B that he was not owed any money from any claims. (Arceo Decl., Armstrong Dep., Exh. 6.)

Now, long after his debts were discharged, Plaintiff Armstrong is asserting legal claims against Defendants based on events that took place prior to the discharge of his bankruptcy petition. His current position is clearly inconsistent with the position taken in this bankruptcy petition. Based on the misrepresentation in Plaintiff Armstrong's petition that he had no pending or potential legal claims, the Bankruptcy Court discharged his petition and debts.  Plaintiff Armstrong obtained an unfair advantage in bankruptcy by failing to list his claims against Defendants and subsequently obtaining a discharge. *Hamilton*, 270 F.3d at 784.  Judicial estoppel is clearly warranted for all claims that accrued before Plaintiff Armstrong filed his bankruptcy petition.

Moreover, even if Plaintiff Armstrong argues he was unaware of his actual legal claims, he could have reopened his bankruptcy case when he learned of them through the *Bowerman* class action,

LITTLER MENDELSON,
P.C.
101 Second Street
Suite 1000
San Francisco, CA
94104

MPA ISO DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT OR, SUMMARY
ADJUDICATION

19

CASE NO. 3:13-CV-00057-WHO

which he failed to do. *Ah Quin v. County of Kauai Dep't of Transp.,* 733 F.3d 267, 275 (9th Cir. 2013) (explaining a bankruptcy case "may be reopened even if it has long been closed"). The *Bowerman* case has been underway for over ten years, which gave Plaintiff Armstrong ample time to return to the bankruptcy court and disclose the claims he omitted.

As a final note, FAS records show that Plaintiff Armstrong performed the bulk of his work for FAS prior to filing for bankruptcy. The only claims Plaintiff Armstrong may arguably pursue are the claims that accrued after his petition was filed. According to FAS records, there were only eight work orders completed by Armstrong after the bankruptcy filing. And all of those eight work orders had been completed by the time that Armstrong's bankruptcy petition was discharged.

### c. Plaintiff Miller's facts satisfy the judicial estoppel factors and his claims against Defendants should be barred.

Plaintiff Miller actively litigated wage and hour claims against Defendants as one of the trial vendors in the *Bowerman* case. Now he seeks to pursue similar wage and hour claims in his individual case, despite the fact that he did not disclose in his bankruptcy petition any legal claims against Defendants. These positions are clearly inconsistent, thus satisfying the first *New Hampshire* prong. The Bankruptcy Court relied on Miller's representation that he did not have any pending wage and hour claims when the court entered an order discharging the petition and Plaintiff Miller's debts, thus satisfying the second *New Hampshire* prong. Finally, Plaintiff Miller benefited economically when the Bankruptcy Court discharged his debts without ever knowing of additional assets he claimed. As such, Plaintiff Miller will obtain an unfair advantage if he is not estopped from now prosecuting the claims he failed to disclose.

Plaintiff Miller filed his bankruptcy petition on January 16, 2015, two years after his business stopped contracting with Defendants. Accordingly, Plaintiff Miller was well aware of all the underlying facts that give rise to his claims against Defendants. Furthermore, the original *Bowerman* class action was well under way at the time Plaintiff Miller filed his petition. Even assuming, *arguendo*, that Plaintiff Miller was unaware of his claims against FAS when he filed his petition, which is not plausible, he would have learned of the claims before his debts were discharged. Class notices were mailed out on June 5, 2015 and the final discharge occurred on December 27, 2016,

LITTLER MENDELSON, P.C.
101 Second Street
Suite 1000
San Francisco, CA
94104

MPA ISO DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT OR, SUMMARY
ADJUDICATION

20

CASE NO. 3:13-CV-00057-WHO

1  which means Plaintiff Miller had a year and a half to amend his Schedule B to include his claims

2  against FAS, yet he did not.

3          Given these facts, there is no doubt that Plaintiff Miller was aware of his claims against

4  Defendants, and the omission of the claims was either intentional deceit or willful disregard for the

5  integrity of the bankruptcy process.   His failure to disclose claims in bankruptcy—right up until the

6  present--has allowed him to enjoy the benefits of filing for bankruptcy. *Ah Quin v. County of Kauai*

7  *Dep't of Transp.,* 733 F.3d 267, 275 (9th Cir. 2013) (explaining a bankruptcy case "may be reopened

8  even if it has long been closed").   Accordingly, Plaintiff Miller's claims should be judicially estopped.

9              **d.    Plaintiff Bush's facts satisfy the judicial estoppel factors and his**
               **claims against Defendants should be barred.**

10          As with Terry, Armstrong, and Miller, judicial estoppel is clearly warranted in the case of

11  Plaintiff Bush.  Plaintiff Bush did not disclose on his Schedule B his legal claims against Defendants,

12  yet he has filed individual wage and hour claims against Defendants for conduct occurring prior to his

13  bankruptcy petition.  These are directly inconsistent positions. Plaintiff Bush succeeded in persuading

14  the Bankruptcy Court to accept his earlier position, as he received a discharge of his debts.  Now,

15  Plaintiff Bush seeks an advantage by asserting his legal claims against Defendants.   Under these

16  circumstances, judicial estoppel must be applied.

17          Plaintiff Bush filed for bankruptcy on November 22, 2019 in the United States Bankruptcy

18  Court for the District of Oregon.   This was nearly seven and a half years after he stopped providing

19  services to FAS and four and a half years after the class notices were mailed out in the original

20  *Bowerman* class action.  Plaintiff Bush's bankruptcy case was discharged on February 19, 2020.  Given

21  these facts, it would be unreasonable to conclude that Plaintiff Bush did not have sufficient knowledge

22  that he had wage and hour claims against Defendants at the time his bankruptcy was discharged.

23          At deposition, Plaintiff Bush asserted that he told his bankruptcy attorney about the wage and

24  hour claims he is now seeking to pursue.   It appears that he may wish to argue that his omission was

25  based either on ignorance or bad advice from his bankruptcy attorney. However, if made, such an

26  argument should be given no weight. *Zyla v. Am. Red Cross Blood Servs.,* 2014 WL 1266852 (N.D.

27  Cal. Mar. 27, 2014), *motion for relief from judgment granted,* 2014 WL 3868235 (N.D. Cal. Aug. 6,

28

LITTLER MENDELSON,
P.C.
101 Second Street
Suite 1000
San Francisco, CA
94104

MPA ISO DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT OR, SUMMARY          21          CASE NO. 3:13-CV-00057-WHO
ADJUDICATION

2014). In *Zyla,* the plaintiff submitted a declaration explaining he informed his bankruptcy counsel of the lawsuit and the bankruptcy counsel conceded that he may have failed to acknowledge the lawsuit. *Id.* at *2.  The court still dismissed the claim without prejudice because plaintiff failed to have his bankruptcy reprocessed with the new information. *Id.* at *7 ("Here, Mr. Zyla has taken a step to correcting his omission by filing amended disclosures but there is nothing to suggest the Bankruptcy court has in fact reprocessed the bankruptcy with this new information.")

It is undisputed that Plaintiff Bush has made no efforts to reopen his bankruptcy proceedings, nor has the bankruptcy been reprocessed with the new information.  Moreover, Plaintiff Bush has had legal resources beyond his bankruptcy counsel.   He was represented by class counsel in the *Bowerman* action, and by individual counsel for the past six months.   He has not lacked for legal advice. Permitting Plaintiff Bush to argue inadvertence or mistaken omission at this late hour would undermine the integrity of the bankruptcy courts.

### 2.      This Case Is Distinguishable From *Aguilar*

In *Aguilar v. Zep Inc.,* 2014 WL 4245988, this Court held that material issues of fact were in dispute as to whether plaintiffs' claims of mistake or inadvertence should prevent the application of the judicial estoppel doctrine.  However, a "key factor" in this Court's analysis in the *Aguilar* decision was the fact that the plaintiffs had reopened their bankruptcy proceeding and filed amended schedules that listed their claims as an asset. *Aguilar*, 2014 WL 4245988, at *7.  As such, this Court found that two of the three *New Hampshire* factors were no longer met. *Id.* at *8.

Here, none of the Plaintiffs who have filed for bankruptcy have reopened their cases to amend their initial disclosures.  The Court must attribute Plaintiffs' failure to their motive to conceal their claims from the bankruptcy court, which the Ninth Circuit has determined is "nearly always present" in bankruptcy cases. *Ah Quin*, 733 F.3d at 271.  At a minimum, these Plaintiffs acted with willful disregard for judicial processes. Even more unforgivable is the undisputed fact that Plaintiffs knew of the existence of their legal claims for years, particularly once they received judicially-approved notice of the class action litigation in July 2015.

In *Cagle v. C&S Wholesale Grocers, Inc.,* 505 B.R. 534, 539-541 (E.D. Cal. 2014), the court

LITTLER MENDELSON, P.C.
101 Second Street
Suite 1000
San Francisco, CA
94104

MPA ISO DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT OR, SUMMARY
ADJUDICATION

22

CASE NO. 3:13-CV-00057-WHO

applied the judicial estoppel doctrine in a case where the plaintiff amended her schedule to include her omitted claims a month after defendants moved for summary judgment based on her omission. *Id.* In rejecting the plaintiff's claims or mistake or inadvertence, the *Cagle* court gave no weight to the plaintiff's affidavit statement that they were unaware of their ongoing obligation to disclose any litigation claims as an asset in their bankruptcy proceeding. *Id.* at 539.  The court found plaintiff's affidavit to be conclusory, self-serving, and insufficient to create a genuine dispute of material fact. *Id*.  Moreover, the court held there was "no question that Plaintiff had knowledge of the facts giving rise to [his] lawsuit," particularly after plaintiff filed his lawsuit, and yet plaintiff still waited four months to amend his schedules and disclosure statements. *Id.* at 540.

Here, Plaintiffs Terry, Armstrong, Miller, and Bush have similarly failed to reopen their bankruptcy cases to amend their initial disclosures to include their claims against Defendants.  And the amount of time that has passed is far more than the four months that passed in *Cagle.*  Thus, these cases are far different than *Aguilar,* and judicial estoppel must be applied.  As the court in *Carr* noted, the "crucial" inquiry under Ninth Circuit case law "is whether the debtor-plaintiff has knowledge of the underlying facts constituting the wrongdoing, not whether the wrongdoing necessarily gives rise to a legal cause of action."  2013 WL 5946364, at *5; *see also Hay v. First Interstate Bank, N.A.*, 978 F.2d 555, 557 (9th Cir.1992) ("recogniz[ing] that *all* facts were not known to [plaintiff] at that time, but enough was known to require notification of the existence of the asset to the bankruptcy court"). It is undisputed that these four plaintiffs had knowledge of the underlying facts constituting the alleged wrongdoing in their cases, and yet they still failed to include or ever amend their schedule of assets in their bankruptcy cases.  Thus, judicial estoppel must be applied.

### C.     Summary Judgment Should Be Granted For The Corporate Vendor Plaintiffs' Claims Because They Are Legally And Factually Invalid.[4]

Federal Rule of Civil Procedure 56 empowers the Court to enter summary judgment on factually unsupported claims. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 327 (1986).  Under California law, wage and hour claims based on alleged independent contractor misclassification are

---

[4] As this section relates only to the cases and claims asserted by the Corporate Vendor Plaintiffs, for brevity, in this section alone (Section C) we sometimes refer to them only as the "Plaintiffs" (and expressly clarify when the term "Plaintiffs" is intended to have a more expansive meaning.

LITTLER MENDELSON, P.C.
101 Second Street
Suite 1000
San Francisco, CA
94104

MPA ISO DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT OR, SUMMARY
ADJUDICATION                                        23                    CASE NO. 3:13-CV-00057-WHO

separate and distinct from claims based on a joint employment theory, as they involve fundamentally different arrangements that are subject to different public policy concerns and considerations, leading the California Supreme Court to establish different legal standards governing the two types of claims. *Curry v. Equilon Enters., LLC,* 23 Cal.App. 5th 289, 233 (2018) (explaining that the "reasons for selecting the 'ABC' test are uniquely relevant to the issue of allegedly misclassified independent contractors," and holding that the ABC test does not extend to the joint employment context, where those concerns are not present); *see also Henderson v. Equilon Enters., LLC,* 40 Cal. App.5th 1111, 1125 (2019) (holding that the ABC test also does not apply to joint employment claims because "parts B and C of the ABC test do not fit analytically with such claims…").

The Ninth Circuit acknowledged this distinction in its July 5, 2022 opinion in the original Bowerman action on July 5, 2022, where it recognized that "FAS is correct that *Dynamex* does not apply to joint employment claims." *Bowerman v. Field Asset Servs., Inc.,* 60 F.4th 459, 472 (9th Cir. 2023). Applying the principle to the Bowerman class members, including the very same Corporate Vendor Plaintiffs at issue here, the Ninth Circuit further opined that "FAS's joint employment argument would likely succeed were an actual *employee* of a vendor suing FAS, claiming that FAS was an employer." *Id.* at 473. Going even further, the Ninth Circuit found it "notabl[e]" that Plaintiffs-Appellees' counsel "conceded at oral argument that at least some of the class members are employed by entities other than FAS." *Id.* And based on this, the Ninth Circuit expressly opined that "some the class members' theories of liability could depend on their ability to establish that FAS was a joint employer." *Id.* It then went on to direct this Court to "consider the joint employment issue in the first instance for class members who own or operate LLCs or corporations, which are distinct legal entities." *Id.* at 474.

The undisputed evidence makes clear that the Corporate Vendor Plaintiffs were owners and principals of corporations that contracted with FAS (the Vendor Corporations), that the Plaintiffs were treated by the Vendor Corporations as employees of those Corporations, and that the Vendor Corporations paid the Plaintiffs as employees for the work they allege they performed for FAS during the periods covered by their claims. Despite this evidence, and in defiance of the Ninth Circuit's clear

LITTLER MENDELSON, P.C.
101 Second Street
Suite 1000
San Francisco, CA
94104

MPA ISO DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT OR, SUMMARY
ADJUDICATION

24

CASE NO. 3:13-CV-00057-WHO

guidance, the Corporate Vendor Plaintiffs nonetheless seek to pursue an independent contractor misclassification theory. In doing so, the Plaintiffs have filled their Complaints with false and misleading allegations that are directly disproved by the undisputed evidence, including the Plaintiffs' own deposition testimony. The Ninth Circuit was clear. Where a plaintiff was employed by their own corporation, any claim against FAS for alleged violations of the Labor Code or wage orders must be brought as a joint employment claim. The Vendor Corporation Plaintiffs failed to do so, choosing instead to assert their claims on an erroneous independent contractor misclassification theory. They made this choice with full knowledge of the risk laid out in the Ninth Circuit's decision. Given that the Complaints rely exclusively on independent contractor misclassification, they must be dismissed in their entirety.

1.   **The Undisputed Evidence Demonstrates That Plaintiffs' Claims Are Based On An Erroneous Legal Theory And, Therefore, Invalid As A Matter Of Law.**

As employees of their own Vendor Corporations, the Plaintiffs may only bring their claims against FAS under a joint employment theory. Their assertion of their claims under an independent contractor misclassification theory, therefore, fails as a matter of law. *Bowerman v. Field Asset Servs., Inc.,* 60 F.4th at 473 ("FAS's joint employment argument would likely succeed were an actual *employee* of a vendor suing FAS, claim that FAS was employer.")

With respect to Plaintiffs Rebecca and Rick Mladinich, the undisputed evidence demonstrates that they owned and operated RBS, Inc. RBS, Inc. paid its workers as employees, including paying salaries to Rebecca and Rick Mladinich as the sole directors of the corporation. Indeed, they were paid handsomely. During her deposition, Rebecca Mladinich admitted that RBS, Inc. paid her a monthly salary of $11,000 in 2011 (and possibly beyond), in addition to providing her a BMW paid for by the company (which she used for both business and personal purposes). She also testified that RBS, Inc. had as many as approximately 16 employees at a time, she was responsible for overseeing the company's payroll function, and she used an outside payroll company (Paychex) to pay the company's employees.

Plaintiff Cherrin testified during his deposition that he owned and operated two different

LITTLER MENDELSON, P.C.
101 Second Street
Suite 1000
San Francisco, CA
94104

MPA ISO DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT OR, SUMMARY
ADJUDICATION

25

CASE NO. 3:13-CV-00057-WHO

1   corporations ("NAS, Inc." and "FSP, Inc.") that contracted as vendors with FAS.  Cherrin admitted
2   that he was employed by his corporations and paid a salary for all the work he performed for his
3   corporations, including work relating to FAS.  In addition to himself, Cherrin testified that his
4   corporations probably employed hundreds of different workers over the years, and that he primarily
5   managed his corporations from an office located in Michigan, where he also lived.

6          With respect to Plaintiff Darin Bush, the undisputed evidence demonstrates that he owned and
7   operated a corporation – Integrity Contracting, Inc. ("IC, Inc.") – that performed services as a vendor
8   for FAS, and he was employed by and paid a salary for IC, Inc., including for work IC, Inc. performed
9   for FAS.  Plaintiff Bush further testified that IC, Inc. used ADP to handle the company's payroll, had
10  approximately 100 employees at its peak (around 2011 or 2012), and he primarily managed the
11  company from an office in Oregon, where he lived.

12         Plaintiff Cohick testified that he owned and operated Monster Mowers, Inc. ("MM, Inc."),
13  which performed services as a vendor for FAS.  MM, Inc. always paid its workers as employees,
14  including paying Plaintiff Cohick a salary (indeed, a salary of $347,000 for 2011). MM, Inc. used
15  ADP to prepare the company's payroll; the number of workers MM, Inc. employed increased over
16  time, and continued to increase after the company stopped performing services for FAS; and at its
17  peak, the company employed more than 50 – and possibly more than 75 – employees.

18         An individual cannot be both an independent contractor and an employee with respect to the
19  same work under the same statutory scheme.  Thus, as the Ninth Circuit acknowledged, if a plaintiff
20  is treated as an employee of one company, a claim brought against a second putative employer must
21  be brought as a joint employment claim and adjudicated under the standard established in *Martinez*,
22  not as an independent contractor misclassification claim subject to the ABC test.  The Corporate
23  Vendor Plaintiffs failed to heed this guidance.  Instead, they assert claims exclusively based on a
24  theory of independent contractor misclassification that is directly contravened, and made invalid by,
25  the undisputed facts, including Plaintiffs' own admissions.  Accordingly, summary judgment of the
26  Corporate Vendor Plaintiffs' claims should be granted.

27

28

LITTLER MENDELSON,
P.C.
101 Second Street
Suite 1000
San Francisco, CA
94104

MPA ISO DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT OR, SUMMARY
ADJUDICATION                26        CASE NO. 3:13-CV-00057-WHO

2. **Plaintiffs' Claims Fail Because They Cannot Change Their Legal Theory**

Defendants anticipate the Corporate Vendor Plaintiffs may argue their claims should nonetheless proceed under a joint employer theory. However, the Ninth Circuit has long held that theories raised for the first time at summary judgment cannot survive. *See Navajo Nation v. United States Forest Serv.*, 535 F.3d 1058, 1080 (9th Cir. 2008) ("Nevertheless, our precedents make clear that where, as here, the complaint does not include the necessary factual allegations to state a claim, raising such claim in a summary judgment motion is insufficient to present the claim to the district court"); *see also Coleman v. Quaker Oats Co*., 232 F.3d 1271, 1292 (9th Cir. 2000) ("A complaint guides the parties' discovery, putting the defendant on notice of the evidence it needs to adduce in order to defend against the plaintiff's allegations."); *Pickern v. Pier 1 Imps. (U.S.), Inc*., 457 F.3d 963, 968 (9th Cir. 2006) (holding that a plaintiff could not raise new factual allegations at summary judgment because defendants were not given "fair notice of what the plaintiff's claim [were] and the grounds upon which [they] rest[ed]," as required by Fed. R. Civ. Pro Rule 8(a)(2)). Any attempt by Plaintiffs to revise their claims, at this very late hour, to allege joint employment between FAS and the vendor corporations would contravene these established legal principles.

In addition, it would be prejudicial to Defendants for the Corporate Vendor Plaintiffs to change the theory of their cases. *See Coleman*, 232 F.3d at 1292 (changing theory of liability would be prejudicial as it "requires that the defendant develop entirely different defenses."). Over the 10 years of the Bowerman class action litigation, joint employment was never alleged. The individual complaints of these Plaintiffs were filed after the Ninth Circuit decision, and those complaints knowingly omitted any joint employer theory. Defendants have relied on Plaintiffs' complaints to guide their discovery and litigation. Even following their admission at deposition, these Plaintiffs did not plead joint employment in their Complaints, nor have they ever raised this argument in their Rule 26 disclosures or at any time during discovery. Now that Defendants have established that Plaintiffs' claims for independent contractor misclassification fail as a matter of law, it is far too late for Plaintiffs to raise a new theory of liability for the first time in their Opposition to Defendants' Motion. "Simply

LITTLER MENDELSON,
P.C.
101 Second Street
Suite 1000
San Francisco, CA
94104

MPA ISO DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT OR, SUMMARY
ADJUDICATION

27

CASE NO. 3:13-CV-00057-WHO

1    put, summary judgment is not a procedural second chance to flesh out inadequate pleadings." *Wasco*

2    *Prod., Inc. v. Southwall Tech., Inc*., 435 F.3d 989, 991 (9th Cir. 2006).

3            Accordingly, the Court should grant Defendants' motion for summary judgment as to the

4    Corporate Vendor Plaintiffs. The independent contractor misclassification theory is resoundingly

5    disproved by the undisputed evidence, including the admissions of the Plaintiffs themselves.  Given

6    that this is the sole legal theory on which the Complaints are based, the Corporate Vendors simply

7    have no case to pursue.

8    **IV.    CONCLUSION**

9            In sum, the judicial estoppel doctrine must be applied against the Bankruptcy Plaintiffs. Those

10   Plaintiffs are responsible for willful omissions on their respective bankruptcy petitions. The

11   bankruptcy courts relied on those petitions to relieve the Bankruptcy Plaintiffs of their debts.  As a

12   result, the Bankruptcy Plaintiffs obtained a benefit from representations that are directly inconsistent

13   with what the Plaintiffs now allege. If judicial estoppel is applied, as it must be, then there will not be

14   any genuine issue as to any material facts and summary judgment should be granted in favor of

15   Defendants.

16           Similarly, summary judgment must be granted on the claims of the Corporate Vendor

17   Plaintiffs. There is no dispute that these Plaintiffs were employed by their own corporations and paid

18   by those corporations.   The only legal theory under which these Plaintiffs could sue FAS for wages

19   and expense reimbursement would be a joint employer theory.   Plaintiffs have elected not to allege

20   joint employment.   As a result, there is no viable legal theory on which they can proceed.

21   ///

22   ///

23   ///

24   ///

25   ///

26   ///

27   ///

28

LITTLER MENDELSON,
P.C.
101 Second Street
Suite 1000
San Francisco, CA
94104

1   Dated:  November 27, 2023

2                                            LITTLER MENDELSON, P.C.

3

4                                            /s/ Robert G. Hulteng
                                             Robert G. Hulteng
5                                            Damon M. Ott
                                             Courtney Chambers
6                                            Shane Young
                                             Alvin Arceo

7                                            Attorneys for Defendants
8                                            Cyprexx Services, LLC, Field Asset Services,
                                             Inc. and Field Asset Services, LLC n/k/a Xome
9                                            Field Services, LLC

10   4884-1343-5533.15 / 066383-1256

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LITTLER MENDELSON, P.C.
101 Second Street
Suite 1000
San Francisco, CA
94104

MPA ISO DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT OR, SUMMARY
ADJUDICATION                              29                CASE NO. 3:13-CV-00057-WHO