1

2

3

4                          UNITED STATES DISTRICT COURT

5                        NORTHERN DISTRICT OF CALIFORNIA

6

7    FRED BOWERMAN, et al.,                    Case No.  3:13-cv-00057-WHO

8                  Plaintiffs,

9         v.                                   ORDER ON CROSS MOTIONS FOR
                                               SUMMARY JUDGMENT AND
10   FIELD ASSET SERVICES, INC., et al.,       SUMMARY ADJUDICATION

11                 Defendants.                 Re: Dkt. Nos. 650, 651, 652, 664, 667, 672

12

13         In anticipation of the first group of plaintiffs going to trial in this case, the parties filed

14   cross motions for summary judgment with respect to those plaintiffs.  The plaintiffs seek a ruling

15   that the ABC test, rather than *Borello*, applies to their claims at trial.  This motion is granted in

16   part and denied in part.  The defendants point to disputed facts that the business-to-business

17   exception to the ABC test may apply to plaintiffs Cohick, Dolack, Murray, and Terry, so the jury

18   will decide whether the exception is met and which employment test applies to their claims.  But

19   there is no evidence in the record that the exception applies to plaintiffs Bush, Cherrin, Miller,

20   Rodriguez, or Purkett.  The ABC test therefore applies to their claims—at least for the sole

21   proprietors, Miller, Purkett, and Rodriguez—and summary judgment is appropriate as to their

22   status as employees of FAS.  Summary judgment is also appropriate for liability for their overtime

23   and tools and expense reimbursement claims, though the jury will calculate damages.  I will

24   address the plaintiffs' waiting time penalty claims in a subsequent order.

25         The defendants' motion seeks to dismiss the claims of the "corporate vendor plaintiffs"

26   and the "bankruptcy plaintiffs" from this case.  I will address the arguments about the corporate

27   vendor plaintiffs and the joint employment test in a subsequent order.  As for the bankruptcy

28   plaintiffs, the defendants' motion is denied—I decline to exercise my discretion to judicially estop

the plaintiffs from bringing these claims, so long as all three bankruptcy plaintiffs file declarations confirming they reopened their bankruptcy petitions before the pretrial conference in this case.

For those and the following reasons, the parties' cross motions are granted in part and denied in part.

## BACKGROUND

In 2013, Fred Bowerman filed a putative class action alleging that defendant Field Asset Services ("FAS") misclassified him and the other putative class members as independent contractors.  [Dkt. No. 1].  He sought damages and other relief for violations of California wage orders and the Labor Code, including for failure to pay overtime and failure to reimburse business expenses.  *Id.*  The class was eventually certified, partial summary judgment was granted in favor of the class, and there was a trial with ten bellwether plaintiffs in which the jury awarded the plaintiffs significant damages.  FAS subsequently moved to decertify the class, which I denied.  [Dkt. No. 452].

FAS then appealed most of my decisions.  On appeal, the Ninth Circuit decertified the class due to issues that arose during trial related to individual damages calculations, and it reversed summary judgment with respect to the employment classification test for the plaintiffs and for other reasons.  *See Bowerman v. Field Asset Servs., Inc.*, 60 F.4th 459 (9th Cir. 2023), *as amended*.  It remanded the case.  *See id.*

The plaintiffs did not move to certify another class on a different basis and instead filed dozens of individual cases.  I directed the parties to divide the cases into five groups for the purposes of managing the dispositive motions and trials.  [Dkt. No. 550].  The parties selected 16 cases for Group 1.  [Dkt. No. 642].  Eric Ackel, Gregory Armstrong, William Canepa, Michael Fowler, Richard Hopper, Rebecca and Rick Mladinich, and Rick Pyzer settled before the dispositive motions were heard.  [Dkt. No. 680].  The remaining nine plaintiffs in Group 1 are Darin Bush, Sam Cherrin, Matthew Cohick, Stephen Dolack, Tim Miller, Ancil Murray, Tim Purkett, Gilberto Rodriguez, and Ron Terry ("the plaintiffs").

The undisputed background facts of these cases are well known to both me and the parties.  As relevant to these motions, it is undisputed that FAS was in the business of property

preservation for clients in the residential mortgage industry.  The plaintiffs, some as sole proprietors and some as separate business entities, contracted with FAS to carry out the property preservation work.  The dates of contracting were somewhat different for each plaintiff and generally ranged from about 2007 until about 2012.  The activities performed by the plaintiffs also varied and included maintenance and repairs, removing trash, yard work, and more.  The defendants imposed specific requirements about how the plaintiffs could and should accept jobs, how quickly they needed to be completed, how to do the work itself, and how to inform the defendants that the work was done, though the parties dispute the level of control exerted.  The other relevant, disputed facts are discussed throughout this Order.

Now the plaintiffs filed a motion for partial summary judgment.  ("P. Mot.") [Dkt. Nos. 652, 672].  The defendants opposed.  ("D. Oppo.") [Dkt. No. 668].  The plaintiffs replied.  ("P. Repl.") [Dkt. No. 673].

The defendants filed a cross motion for summary judgment or in the alternative summary adjudication against Bush, Miller, and Terry (the "Bankruptcy Plaintiffs"), and against Bush, Cherrin, and Cohick (the "Corporate Vendor Plaintiffs").  ("D. Mot.") [Dkt. Nos. 651, 655].  The plaintiffs opposed.  ("P. Oppo.") [Dkt. No. 669].  The defendants replied.  ("D. Repl.") [Dkt. No. 674].

The defendants also filed a request for judicial notice [Dkt. No. 654] and motions to seal, [Dkt. Nos. 650, 667].  The plaintiffs also filed a motion to seal.  [Dkt. No. 664].

I issued a tentative order on these motions and provided specific questions for the parties to address at the hearing.  [Dkt. No. 683].  I held a hearing on these motions, at which counsel for both parties appeared.  [Dkt. No. 687].  I then issued an order for supplemental briefing concerning the joint employment issues and the waiting time penalties, [Dkt. No. 686], and I will address those issues in a subsequent order.

## LEGAL STANDARD

Summary judgment on a claim or defense is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. Proc. 56(a).  In order to prevail, a party moving for summary judgment must

United States District Court
Northern District of California

1   show the absence of a genuine issue of material fact with respect to an essential element of the

2   non-moving party's claim, or to a defense on which the non-moving party will bear the burden of

3   persuasion at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant has

4   made this showing, the burden then shifts to the party opposing summary judgment to identify

5   "specific facts showing there is a genuine issue for trial." *Id.* The party opposing summary

6   judgment must then present affirmative evidence from which a jury could return a verdict in that

7   party's favor. *Anderson v. Liberty Lobby,* 477 U.S. 242, 257 (1986).

8         On summary judgment, the court draws all reasonable factual inferences in favor of the

9   non-movant. *Id.* at 255. In deciding a motion for summary judgment, "[c]redibility

10   determinations, the weighing of the evidence, and the drawing of legitimate inferences from the

11   facts are jury functions, not those of a judge." *Id.* However, conclusory and speculative testimony

12   does not raise genuine issues of fact and is insufficient to defeat summary judgment. *See*

13   *Thornhill Publ'g Co., Inc. v. GTE Corp.,* 594 F.2d 730, 738 (9th Cir. 1979).

14         "If the nonmovant bears the burden of persuasion on the ultimate issue, the movant may

15   make its required initial showing that there is no genuine dispute of material fact by demonstrating

16   that 'there is an absence of evidence to support the non-moving party's case.'" *Pac. Gulf Shipping*

17   *Co. v. Vigorous Shipping & Trading S.A.*, 992 F.3d 893, 897-98 (9th Cir. 2021) (first citing Fed.

18   R. Civ. Proc. 56(c)(1)(A); and then quoting *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th

19   Cir. 2010)). "The burden of production then shifts to the nonmovant, who must go beyond the

20   pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and

21   admissions on file, designate specific facts showing that there is a genuine issue for trial." *Id.*

22   (internal quotation marks omitted) (quoting *Celotex Corp.*, 477 U.S. at 324). "The nonmovant's

23   burden of production at this point 'is not a light one'—it 'must show more than the mere existence

24   of a scintilla of evidence' or 'some "metaphysical doubt" as to the material facts at issue.'" *Id.*

25   (quoting *Oracle Sec. Litig.*, 627 F.3d at 387). The nonmoving party "must come forth with

26   evidence from which a jury could reasonably render a verdict in the non-moving party's favor,"

27   assuming that "all justifiable inferences are . . . drawn in its favor." *Id.* (quoting *Oracle Sec.*

28   *Litig.*, 627 F.3d at 387).

**DISCUSSION**

**I.      PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

At issue in the plaintiffs' motion for partial summary judgment is whether California's ABC test from *Dynamex*[1] or its multi-factor test from *Borello*[2] applies to govern the plaintiffs' misclassification claims for unpaid overtime, waiting time penalties, and reimbursement for tools and equipment. *See* P. Mot.  The plaintiffs argue that on appeal, the Ninth Circuit held that the ABC test applied to these claims and that because FAS cannot satisfy part B of the ABC test, they are employees as a matter of law and entitled to liability findings. *See id.*

On appeal, however, the Ninth Circuit said that the ABC test *would* apply to these claims save for a recent development in California law: Labor Code section 2776, the business-to-business ("B2B") exception to *Dynamex.  See Bowerman*, 60 F.4th at 478.  Under section 2776, "[i]f an individual acting as a sole proprietor, or a business entity formed as a partnership, limited liability company, limited liability partnership, or corporation ('business service provider') contracts to provide services to another such business or to a public agency or quasi-public corporation ('contracting business')," and all twelve listed criteria are met, the *Borello* test applies

---

[1] The ABC test provides:

> A worker is properly considered an independent contractor to whom a wage order does not apply only if the hiring entity establishes: (A) that the worker is free from the control and direction of the hirer in connection with the performance of the work, both under the contract for the performance of such work and in fact; (B) that the worker performs work that is outside the usual course of the hiring entity's business; and (C) that the worker is customarily engaged in an independently established trade, occupation, or business of the same nature as the work performed for the hiring entity.

*Dynamex Operations W. v. Superior Ct.*, 4 Cal. 5th 903, 916-17, 416 P.3d 1, 7 (2018).

[2] The multi-factor *Borello* test for employment considers:

> (a) whether the one performing services is engaged in a distinct occupation or business; (b) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the principal or by a specialist without supervision; (c) the skill required in the particular occupation; (d) whether the principal or the worker supplies the instrumentalities, tools, and the place of work for the person doing the work; (e) the length of time for which the services are to be performed; (f) the method of payment, whether by the time or by the job; (g) whether or not the work is a part of the regular business of the principal; and (h) whether or not the parties believe they are creating the relationship of employer-employee.

*S. G. Borello & Sons, Inc. v. Dep't of Indus. Rels.*, 48 Cal. 3d 341, 351, 769 P.2d 399, 404 (1989).

5

United States District Court
Northern District of California

to determine the employment relationship, not the ABC test from *Dynamex*. Cal. Lab. Code § 2776. Except for its arguments about joint employment, which will be addressed in a subsequent order, FAS does not seriously contest that if the B2B exception does not apply, then the ABC test applies to the plaintiffs' claims for overtime, waiting time penalties, and tools and equipment reimbursement. FAS does contest that plaintiffs can establish liability for these claims as a matter of law at summary judgment.

Accordingly, first I address whether the B2B exception applies. If it does not, I will turn to whether the ABC test is satisfied. If it is, I will then address the merits of the liability arguments for each claim.

But as a preliminary matter, I note that the defendants contest whether the plaintiffs can rely on their declarations to create disputes of fact because, in the defendants' view, the declarations are conclusory and self-serving, lack details and support, and are contradicted by their deposition testimony. *See* D. Oppo. 18 n.45, 19:1-4 & n.46, 20:8-13; *see also F.T.C. v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1171 (9th Cir. 1997), *as amended* (Apr. 11, 1997) ("A conclusory, self-serving affidavit, lacking detailed facts and any supporting evidence, is insufficient to create a genuine issue of material fact." (citations omitted)). Though the plaintiffs' declarations are somewhat sparse, they are sufficiently detailed to create a reliable factual basis, particularly where they are *supported* by the deposition testimony, as addressed below. *Cf. Kennedy v. Allied Mut. Ins. Co.*, 952 F.2d 262, 266 (9th Cir. 1991) ("[A] party cannot create an issue of fact by an affidavit contradicting his prior deposition testimony." (citations omitted)). And especially in this case, where much of the evidence is grounded in the memories of the plaintiffs and FAS's representatives, the declarations are permissible at this stage to the extent discussed below.

### A.    Business-to-Business Exception, Cal. Lab. Code § 2776

With respect to the B2B exception, the plaintiffs choose four of the criteria and say that there is no genuine dispute of material fact that the defendants cannot meet those four criteria. Because all twelve criteria must be met to apply the exception, the plaintiffs say it does not apply, and the ABC test prevails. The four criteria addressed are:

- (2) The business service provider is providing services directly to the contracting business rather than to customers of the contracting business.  This subparagraph does not apply if the business service provider's employees are solely performing the services under the contract under the name of the business service provider and the business service provider regularly contracts with other businesses.
- (6) The business service provider is customarily engaged in an independently established business of the same nature as that involved in the work performed.
- (8) The business service provider advertises and holds itself out to the public as available to provide the same or similar services.
- (10) The business service provider can negotiate its own rates.

Cal. Lab. Code § 2776(a).

FAS has the burden to establish that this exception applies.  *Lawson v. Grubhub, Inc.*, No. 15-CV-05128-JSC, 2023 WL 2746290, at *2 (N.D. Cal. Mar. 30, 2023) (first citing Cal. Lab. Code § 2776(a); and then citing *Lawson v. Grubhub, Inc.*, 13 F.4th 908, 917 (9th Cir. 2021)).  Because FAS has the burden of persuasion on this issue, at summary judgment the plaintiffs may show that there is "an absence of evidence" to support FAS's argument and the burden of production then shifts to FAS to "designate 'specific facts showing that there is a genuine issue for trial.'"  *Pac. Gulf Shipping Co.*, 992 F.3d at 897 (citation omitted).

FAS argues that there is evidence to create a genuine dispute of fact that at least one plaintiff meets each criterion.  For example, as discussed below, there is evidence that at least some plaintiffs advertised under subsection (8).  Because of that, FAS contends that any plaintiff *could* have advertised ,and the choice to not do so was a "business decision" to "escape liability," which should not be a reason for the plaintiffs to prevail.  *See* D. Oppo. 15:21-17:11.  In FAS's view, that outcome would be contrary to California law: contractual parties cannot prevent fulfillment of a condition precedent and then rely on such condition to defeat liability, *see Omni Inv. Corp. v. Cordon Int'l Corp.*, 603 F.2d 81, 84 (9th Cir. 1979); *Pac. Venture Corp. v. Huey*, 15 Cal. 2d 711, 717, 104 P.2d 641, 644-45 (1940), and an individual cannot take advantage of her own wrongful act or omission to escape liability, *see* Cal. Civ. Code § 3517; *Rains v. Arnett*, 189 Cal. App. 2d 337, 347 (1961).

I am unpersuaded by this argument in part because the plaintiffs are not arguing to "escape liability" but rather to apply the ABC test instead of *Borello* to their claims.  More importantly,

United States District Court
Northern District of California

1    FAS's interpretation of section 2776 is contrary to the plain language of the statute for two

2    interrelated reasons.  *See Herrera v. Zumiez, Inc.*, 953 F.3d 1063, 1071 (9th Cir. 2020) (explaining

3    that California statutory interpretation considers first the "plain and commonsense meaning" of a

4    statute and the inquiry ends if the language is "clear and unambiguous" (citations omitted)).

5         First, the unambiguous, plain language of the statute asks what the *plaintiff* did or is doing,

6    not what other individuals or entities did.  Though FAS says that any plaintiff could advertise

7    because there is evidence that some plaintiffs advertised, the plain language of section 2776

8    accounts for what the "business service provider"—meaning the plaintiff herself, not other

9    similarly situated individuals or entities—is doing:  "*The business service provider* is providing

10   services directly to the contracting business . . ."; "*The business service provider* is customarily

11   engaged . . ."; "*The business service provider* advertises or holds itself out . . ."; and "*The business*

12   *service provider* can negotiate its own rates . . ."  Cal. Lab. Code § 2776(a)(2),(6),(8),(10)

13   (emphases added).  FAS cites no case where section 2776 was applied by looking at what other

14   individuals or entities did or could do, rather than what the plaintiff herself did.[3]  And in the

15   closest case on point, the Honorable Jacqueline Scott Corley rejected a nearly identical argument.

16   *See Lawson*, 2023 WL 2746290, at *2.  There, the employer argued that, in deciding whether the

17   B2B exception from section 2776 applies, courts should "consider [the defendant's] business (the

18   contracting business) as a whole rather than in relation to [the specific plaintiff]."  *Id.*  Judge

19   Corley rejected this as "incorrect as a matter of law" because section 2776 "requires the

20   contracting business to show '[*t*]*he* business service provider' meets each criterion."  *Id.* (quoting

21   Cal. Lab. Code § 2776(a)).  "Thus, the exemption focuses on [the plaintiff's] *particular*

22   *relationship* with [the defendant]."  *Id.* (emphasis added).  That is the correct application given the

23   plain language of section 2776—the law looks at whether each plaintiff satisfied each criterion,

24   not whether any individual working for FAS could have satisfied the criteria.[4]

25

26   [3] Interestingly, this argument seems to cut against FAS's assertion that the B2B exception "should
     not be applied mechanically" and that "the dispositive circumstances may vary from case to case."
27   D. Oppo. 14:18-15:3 (citing *Borello*, 769 P.3d at 404).  In making that argument, FAS seems to
     recognize that there must be evidence concerning each individual plaintiff.

28   [4] No other case law addresses this exact question, but neither does it support FAS's interpretation

United States District Court
Northern District of California

1    This is closely related to the second issue with FAS's argument, which asserts that I should

2    look at evidence of other plaintiffs' actions to determine whether the criterion *could* be satisfied

3    for any other plaintiff.  In FAS's view, section 2776 should be interpreted such that if there is

4    evidence that someone else satisfied a criterion, that evidence would be enough to create a dispute

5    of fact that another plaintiff *could* satisfy that criterion, and so summary judgment should be

6    precluded.  According to FAS, a plaintiff *choosing* to not satisfy the criterion is equivalent to a

7    party to a contract preventing a condition precedent from happening.  Because the plaintiff could

8    do something but did not, the plaintiff should be prevented from taking advantage of her choice—

9    should be prevented from avoiding her liability under that contract, or from satisfying the

10   exemption criteria under section 2776.

11   The problem with this argument, again, starts with the text of the statute.  For three of the

12   four contested criteria, the statute focuses on what the plaintiff *is* doing, not what she can or could

13   do:  "The business service provider *is providing* services directly to the contracting business . . .";

14   "The business service provider *is customarily engaged* . . ."; "The business service provider

---

of section 2776.  In *Ortolivo v. Precision Dynamics Int'l, LLC*, No. 22-CV-01812-JSW, 2023 WL
7440249, at *5-8 (N.D. Cal. Nov. 9, 2023), the Honorable Jeffrey S. White considered the
evidence concerning the *plaintiff* to determine whether there were disputes of material fact
concerning the B2B criteria.  Judge White did not discuss evidence about what other individuals in
similar positions could or did do.  In *Roman v. Jan-Pro Franchising Int'l, Inc.*, 342 F.R.D. 274,
308-09 (N.D. Cal. 2022), the Honorable William H. Alsup found—in a certified class action—that
there was common evidence concerning all class members that they could not negotiate their own
rates, based on the defendants' testimony that rates were set by the contracting business.  Judge
Alsup's reliance on "common evidence" was not the same as what FAS seeks here, which is a
ruling that, for example, the evidence that some plaintiffs advertised mean that all plaintiffs met
the advertising criterion.  *Cf. id.*  The defendants in *Canava v. Rail Delivery Serv. Inc.*, No. 5:19-
CV-00401-SB-KK, 2021 WL 4907227, at *8 (C.D. Cal. Aug. 8, 2021), did try to argue that
assessment of each criteria requires asking each individual plaintiff about the criteria—though the
argument was rejected by the court for failure to point to any genuine disputes of material fact that
would preclude summary judgment.  Finally, *People v. Superior Court of Los Angeles County*, 57
Cal. App. 5th 619, 634 (2020) addressed preemption issues related to the B2B exception and did
not directly address its applicability as to any one plaintiff.
Finally, in a footnote in the *Bowerman* appeal, the Ninth Circuit rejected the plaintiffs' then-
argument (which they do not raise again) that the court hold as a matter of law that FAS could not
invoke the B2B exception concerning any class member.  *Bowerman*, 60 F.4th at 679 n.17.  The
court instructed that I may decide whether FAS can rely on the B2B exception "as to a particular
class member, should the undisputed evidence *as to that class member* so warrant."  *Id.*  Thus by
rejecting the plaintiffs' request that one argument and set of evidence could apply to all plaintiffs
with respect to the B2B exception, the court implied—though did not hold, as the question was not
squarely presented—that courts should look at evidence *as to each plaintiff* to determine if the
exception is met.  *See id.*

*advertises or holds itself out . . .*" Cal. Lab. Code § 2776(a)(2),(6),(8) (emphases added).  These subsections do not speak to what the business service provider *could* or *can* do.  Though I take the defendant's point regarding intentionally avoiding liability, their contract and tort cases are not applicable: they concern different law.  Section 2776 is a statute, not a contract or common law tort.  If the criteria are not satisfied, the statute does not apply because of the way it was written.  There is no subsection that says the law applies even if the criteria are not satisfied where an entity took action to avoid the criteria applying[5]—which is essentially what FAS asks for.  I will not rewrite California law to create such a carveout.

FAS's argument does hold water with respect to the negotiation exception in subsection (10), which reads, "The business service provider *can negotiate* its own rates."  Cal. Lab. Code § 2776(a)(10) (emphasis added).  The other three criteria discussed by the parties do not have the same "can" language.  This supports FAS's interpretation that the criterion is satisfied where it is possible for the plaintiff to negotiate her rates.  A superior court in California recently reached a similar conclusion with respect to another subsection of the statute, which provides, "The business service provider *can contract* with other businesses . . ."  *Id.* § 2776(a)(7) (emphasis added).  In a minute order, the court found triable issues of material fact regarding this criterion because the defendants presented evidence that the plaintiff *could* contract with other businesses under certain circumstances, and that another individual did so.  *Zacharda v. Orange Cnty. Youth Sports Ass'n*, 2023 Cal. Super. Lexis 7236, at *7 (Feb. 16, 2023).

That some subsections of section 2776 are written in such a way to account for what an individual can or could do further supports the interpretation that the subsections without that language—such as subsections (2), (6), and (8)—are not meant to be interpreted that way.  *See also Gonzales v. CarMax Auto Superstores, LLC*, 840 F.3d 644, 650 (9th Cir. 2016) (noting that in interpreting California statutes, courts must "ascertain the intent of the Legislature so as to effectuate the purpose of the law" (quoting *People v. Coronado*, 12 Cal.4th 145, 906 P.2d 1232, 1234 (1995))).  If the legislature wanted to include the "can" language for the other subsections, it

---

[5] To be clear, I do not find that any plaintiff took intentional action to avoid the criteria applying.

1    knew how to do so, but it did not.

2           This means that the plaintiffs can show an absence of evidence that subsections (2), (6),

3    and (8) apply to each plaintiff, and FAS—whose burden it is to show that section 2776 applies, *see*

4    *Lawson*, 2023 WL 2746290, at *2—must point to the record evidence *for each plaintiff* to

5    demonstrate a material dispute of fact that these subsections apply.  In other words, FAS must be

6    able to show that there is evidence that each plaintiff "is providing services"; "is customarily

7    engaged"; and "advertises or holds itself out" per the language of the statute.  Cal. Lab. Code

8    § 2776(2), (6), (8).  FAS may be able to show a genuine dispute of fact regarding subsection (10)

9    if it points to evidence showing that a plaintiff "*can* negotiate its own rates," *id.* § 2776(10)

10   (emphasis added), and for support it may look to evidence that the plaintiff was not precluded

11   from negotiating her own rates, or that other similarly situated plaintiffs were able to do so, *see*

12   *Zacharada*, 2023 Cal. Super. Lexis 7236, at *7.

13          Turning to the factors, as explained below, there is no genuine dispute of fact that at least

14   one criterion is not met for Bush, Cherrin, Miller, Rodriguez, and Purkett.  For those plaintiffs,

15   section 2776 does not apply and so the ABC test governs their claims, except for the joint

16   employment arguments addressed in a subsequent order.  For the other plaintiffs—Cohick,

17   Dolack, Murray, and Terry—the question will go to the jury whether any of the exceptions are met

18   and whether the ABC test or *Borello* govern.

19                          **1.      Subsection 2: Providing Services Directly**

20          The parties debate whether the plaintiffs provided services to FAS or to FAS's clients.

21   The plaintiffs contend that they provided services to FAS's customers because FAS's business

22   was to provide maintenance and repair of properties that were owned by their customers, and the

23   work the plaintiffs did directly benefitted the customers.  *See* P. Mot. 20:24-22:1.  In turn, FAS

24   asserts that its corporate representative as well as several plaintiffs testified that the plaintiffs

25   provided services to FAS, not its customers.  *See* D. Oppo. 17:12-19:4.

26          Both parties rely on and somewhat misread *People v. Superior Court of Los Angeles*

27   *County*, 57 Cal. App. 5th 619 (2020) ("*Cal Cartage*").  There, the California Court of Appeal

28   analyzed whether federal law preempted the ABC test for truck drivers, and cited the B2B

United States District Court
Northern District of California

exception in section 2776 in support of its findings that the ABC test was not preempted.  *See id.* at 633-34.  The defendants-putative employers were motor carriers that contracted with owner-operators of trucks to move goods.  *Id.* at 624-25.  The defendants argued that the criterion in section 2776 about "providing services directly to the" putative employer rather than the would-be employer's customers would be "impossible" for an owner-operator to ever meet—meaning the ABC test would always apply—because the owner-operator "necessarily is providing services to the motor carrier's customers by moving the customer's goods at the customer's direction."  *Id.* at 634.  But the court rejected that argument, reasoning that this was a "strained reading" of section 2776 and that the defendants, not their customers, "could contract with owner-operators . . . , direct their actions, and pay them.  Services would be provided by the owner-operators directly to the motor carriers, notwithstanding that those services would include moving freight belonging to the motor carrier's customers."  *Id.*  The court emphasized looking to who contracted with, directed, and paid the workers for determining to whom the services were provided.  (Then, almost contradictorily, the court pointed to evidence showing that at least one defendant contracted with independent owner-operators as well as trucking companies, the latter of which were "legally organized business entities and appear to be *among the kinds of businesses contemplated* by the business-to-business exemption."  *Id.* (emphasis added).  In other words, it seems that the court read the B2B exception as intending to apply to specific kinds of businesses, notwithstanding its analysis of contract, direction, and pay.).

Despite this potential incongruity, the court's reasoning makes sense: where a middleman or broker hires and contracts with a worker to provide certain services, but the employer ultimately directs the performance of services and pays the worker, it makes sense that the services are provided to the employer, not the middleman, whose business it is to make the contractual connections.  For example, where a party planner finds and hires a florist to do flower arrangements for a party, but the party host tells the florist what the flowers should look like and where they should be placed, and the host ultimately pays the florist, the florist would have provided services to the host, not the party planner.

In *Ortolivo*, 2023 WL 7440249, at *6, Judge White applied the reasoning from *Cal*

United States District Court
Northern District of California

*Cartage* to analyze the "providing services" criterion.  The plaintiff was the sole owner and employee of a consultancy company that trained automotive manufacturers and dealerships, third-party Nissan was the company where the plaintiff conducted the trainings, and the defendant was the entity that contracted with the plaintiff to provide the trainings at Nissan.  *Id.* at *1-2.  Judge White, relying in part on *Cal Cartage*, found that there were genuine disputes of fact whether the plaintiff provided services to the defendant or to the defendant's customer, Nissan, because the record showed that the defendant contracted with and paid the plaintiff.  *Id.* at *6.  Judge White also discussed numerous ways that the defendant directed the plaintiff, the third *Cal Cartage* consideration, *see id.* at *5-6, though the order did not rely on that analysis in assessing the "providing services" criterion.

Here, in the absence of any binding authority from the California Supreme Court analyzing section 2776(a)(2), and without any reason to believe (nor argument from either party) that the state's highest court would interpret the statute differently from the appellate court in *Cal Cartage*, I will follow that case's reasoning.  *See Edgerly v. City & Cnty. of San Francisco*, 713 F.3d 976, 982 (9th Cir. 2013) (holding that where a federal court is required to apply California law, "[i]n the absence of a controlling California Supreme Court decision," the federal court should "follow decisions of the California Court of Appeal unless there is convincing evidence that the California Supreme Court would hold otherwise" (citations omitted)); *see also Bowerman*, 60 F.4th at 472 n.10 (same).  Consistent with *Cal Cartage* and *Ortolivo*, I consider whether there is record evidence that FAS contracted with, directed, and paid the plaintiffs.  Indisputably there is, for each plaintiff—indeed the entire basis for this case is whether those actions and others were sufficient to constitute employment.  *See, e.g.*, Declaration of Darin Bush ("Bush Decl.") [Dkt. No. 652-5 Ex. 47] ¶¶ 3-4 (contract), ¶¶ 11-12 (pay), 16, 18-19, 22-24 (direction).[6]  Under California law, then, there is a genuine dispute of fact whether the plaintiffs provided service for FAS or for its customers.  This will go to the jury.[7]

---

[6] Each plaintiff's declaration contains similar assertions.  Evidence of contract, direction, and payment are also found throughout the plaintiffs' depositions.

[7] Because there is a genuine dispute whether the exception applies, I need not address the

### 2.    Subsection 6: Customarily Engaged

The defendants argue that the plaintiffs were customarily engaged in property preservation because each had an independent property preservation business and many had clients other than FAS before, during, and after their engagements with FAS.  *See* D. Oppo. 22:4-23:12.  They also assert that this factor is the same as prong C under the ABC test, and the Ninth Circuit precluded summary judgment on that prong on appeal.  *See id.*  The plaintiffs contend that having an independent business is insufficient to show any plaintiff was "customarily" engaged in the business, particularly if they did not have any other clients.  *See* P. Mot. 23:1-15.  They also argue that each plaintiff testified she did not have enough time to do much if any work for non-FAS clients.  *See id.*; P. Repl. 7:12-8:5.

When the *Bowerman* case was on appeal, the Ninth Circuit held that "summary judgment would not be proper" under Part C of the ABC test, which considers whether "the worker is customarily engaged in an independently established trade, occupation, or business of the same nature as that involved in the work performed."  *Bowerman*, 60 F.4th at 477 (quoting *Dynamex*, 416 P.3d at 34).  It relied on its "discussion of *Borello*" which it said "explained that genuine disputes of material fact underlie[d]" this question.  *Id.*  In turn, its discussion of *Borello* included only one paragraph discussing factors other than control, including the "customarily engaged" factor.  *See id.* at 471-76.  The court approved my prior finding that "[s]everal" factors under *Borello*, aside from control, were "subject to genuine dispute, including the exclusivity of the class members' relationship with FAS, whether their businesses are distinct from FAS's business, and whether FAS supplied their tools, instrumentalities, and place of work."  *Id.* at 476.  Accordingly, the Ninth Circuit's reasoning that there were genuine disputes of fact precluding summary judgment on the "customarily engaged" factor was apparently based on my findings on the first round of summary judgment motions that there were disputed facts concerning whether the plaintiffs' businesses were distinct from FAS's business.  *See id.* at 476-77.

Those issues of fact are different now because there is a different record with different

---

defendants' argument about the "exception to the exception."  *See* D. Oppo. 19:5-21.

plaintiffs, and I no longer consider common issues as opposed to those related to a particular plaintiff. *See also id.* at 476 n.15 ("We do not foreclose summary judgment in favor of an individual class member (or FAS as to an individual class member), as the facts as to every class member are not before us."). As noted above, the parties must show evidence that *each* plaintiff was or was not "customarily engaged in an independently established business of the same nature as that involved in the work performed" for the exception to apply. Cal. Lab. Code § 2776(a)(6). Accordingly, I address the evidence for each plaintiff, analyzing whether a reasonable factfinder could find that that any of them were "customarily engaged in an independently established" property preservation business at the time they contracted with FAS. To guide my inquiry, I note that the California Supreme Court in *Dynamex* emphasized that this factor is meant to apply to a worker "who *independently* has made the decision to go into business for himself or herself." *Dynamex*, 416 P.3d at 39 (citing *Borello*, 769 P.2d at 406). Additionally, I emphasize that the statute uses the word "customarily," not "occasionally" or any other word that would connote something happened infrequently.

**Bush**: Bush testified at his deposition that in 2023, he "just got back into" the property preservation business. Deposition of Darrin Bush ("Bush Depo.") [Dkt. No. 668-1 Ex. 2] 23:13-24:12. He also filed a declaration stating that he stopped working for FAS around March 2012. Declaration of Darin Bush ("Bush. Decl.") [Dkt. No. 652-5 Ex. 47] ¶ 28. The defendants do not explain or cite cases explaining why actions taken nine years after leaving FAS can be used to show that Bush was customarily engaged in property preservation when he worked for FAS, nor can the statute clearly or reasonably be interpreted to provide for this reading when its language provides that the business service provider "*is*" customarily engaged in the business. Cal. Lab. Code § 2776(a)(6) (emphasis added). They point to no other evidence that Bush was customarily engaged in property preservation work.

**Cherrin**: The defendants' evidence that they point to in opposition is on the line. They note that Cherrin stated in his deposition that he provided property preservation services for FAS and "believe[d]" he provided them for "various banks [and] asset management companies," as well. Deposition of Sam Cherrin ("Cherrin Depo.") [Dkt. No. 668-1 Ex. 4] 34:1-4, 37:17-24.

United States District Court
Northern District of California

This might be enough for a factfinder to infer that Cherrin was customarily engaged in property preservation. The defendants also point out that Cherrin had other businesses before he worked for FAS, *see* D. Oppo. 12:19-13:2, and in their cross motion, the defendants attach a different excerpt of Cherrin's deposition that clearly states that one of his corporations engaged in property preservation, [Dkt. No. 656 Ex. H] 49:25-50:4. Together, that is enough to create a dispute of fact as to this element.

**Cohick**: FAS argues that Cohick started a lawncare and landscaping business called Monster Mowers in 2001, before he contracted with FAS. D. Oppo. 23:1-4. The evidence that FAS cites shows only that he started a sole proprietorship called Monster Mowers sometime between 2000 and 2001, and that he started working for FAS in 2006 or 2007, but it does not say what kind of business Monster Mowers was. D. Oppo. 23 n.59 (citing Deposition of Matthew Cohick ("Cohick Depo.") [Dkt. No. 668-1 Ex. 5; Dkt. No. 656 Ex. I] 32:8-20, 41:3-6[8]). However, some of the uncited deposition testimony implies that Cohick did property preservation work for Monster Mowers. *See id.* 32:1-7 (Cohick stating that he did "less property preservation work" with a later company than he did with Monster Mowers). This is enough to create a dispute of fact as to this element.

**Dolack**: At Dolack's deposition, he testified that to him, "property preservation" meant "cleaning foreclosed homes," though he does not specify if he did more than that for FAS. Deposition of Stephen Dolack ("Dolack Depo.") [Dkt. No. 668-1 Ex. 6] 43:6-7. He then explained that he "clean[ed] offices" for several other clients during the time he worked for FAS,

---

[8] The section of Cohick's deposition cited by FAS provides only:

> Q: Okay. So going back—so, now, going back in time to when you operated—or, apologies, when you operated Monster Mowers. You said it was a sole proprietor at first. Can you tell me the years in which it was a sole proprietor?
> A: A good—I think I started the business around 2001 or 2002 as a sole proprietorship.
> Q: And then when did you incorporate it?
> A: That, I don't remember—remember. I think it was 2000. I'd have to look it up. But it was year—years later. I'd have to look it up. I don't recall.
> . . .
> Q: Do you recall what years you contracted with FAS with Monster Mowers as a sole proprietor?
> A: So I started with them in 2006—2006/2007—or 2006, I started with FAS.

and also before and after working for FAS.  *Id.* 49:15-25, 100:2-101:25, 108:23-109:5.  A trier of fact could interpret this evidence to mean that janitorial cleaning constituted property preservation work, at least for Dolack, and that Dolack provided essentially identical services to FAS and other clients.  Together this could support finding that he was "customarily engaged" in property preservation work.

**Miller**:  There is evidence that Miller provided property preservation services before he worked for FAS.  *See* Deposition of Tim Miller ("Miller Depo.") [Dkt. No. 668-1 Ex. 9] 19:8-15 (describing doing "trash-outs" for Coldwell Banker before working for FAS); 36:13-20 (describing property preservation activities for another entity before working for FAS).  Given the plaintiffs' limited rebuttal of this evidence, a reasonable factfinder could find that he was customarily engaged in property preservation.

**Murray**: There is evidence from which a factfinder could infer that Murray was customarily engaged in property preservation.  *See* Deposition of Ancil Murray ("Murray Depo.") [Dkt. No. 668-1 Ex. 12] 13:20-14:14 (stating he has operated an independent property preservation business since 2001 through the present).

**Purkett**: FAS cites Purkett's deposition testimony, which provides that he worked in lawn maintenance before and after working for FAS.  *See* Deposition of Tim Purkett ("Purkett Depo.") [Dkt. No. 668-1 Ex. 13] 36:6-25.  Though FAS's property preservation business included lawn maintenance, it was much broader.  As the Ninth Circuit explained on appeal, FAS offered "a full range of professional services for [its] clients" including "[p]roperty re-key, secure openings, debris removal, repairs, eviction lockouts, personal property removal, smoke detector installs, retrofit services, lawn maintenance, janitorial service, winterization, pool maintenance, rehabilitation/construction & repairs, [and] emergency maintenance."  *Bowerman*, 60 F.4th at 477.  Based on FAS's own definition, then, a reasonable jury could not find that lawn maintenance alone was "the same nature as . . . the work performed" by FAS, given that property preservation is clearly much broader.  Cal. Lab. Code § 2776(a)(6).  Showing that Purkett did one activity is not enough to show customary engagement in the business as a whole—and unlike for Dolack, the defendants do not point to evidence that Purkett considered lawn maintenance to be property

preservation work.  Finally, though Purkett testified that he "did a small stint" of property preservation work for three months after being terminated from FAS, Purkett Depo. 83:16-19, a factfinder could not infer "customary" engagement from this, given the lack of any evidence that he did any property preservation work in the decade following that three-month stint, or any before working for FAS.

**Rodriguez**:  The defendants point to no evidence that Rodriguez was customarily engaged in the property preservation business.  *See generally* D. Oppo.; Deposition of Gilberto Rodriguez ("Rodriguez Depo.") [Dkt. No. 668-1 Ex. 15].

**Terry**:  There is (limited) evidence that Terry provided services before he worked for FAS, and a reasonable jury could find that these services were property preservation services and that he was customarily engaged in property preservation.  *See* Deposition of Ron Terry ("Terry Depo.") [Dkt. No. 668-1 Ex. 16] 20:1-21:17 (stating he did lawn maintenance, cleaning, and trash hauling at properties before working for FAS).

Finally, I note that FAS's citation to *Ortolivo*, 2023 WL 7440249, at *7, is not persuasive. Judge White found there were genuine disputes whether the plaintiff and defendant "were engaged in the same business" in part because of evidence that the plaintiff incorporated his business before working with the defendant and contracted with someone else after stopping work with the defendant.  *Id.*  But Judge White did not discuss—as the plaintiffs do here—the kinds of work that the plaintiff's corporation carried out before working with the defendant, nor did he discuss how much time passed after terminating the relationship with the defendants until the plaintiffs again engaged in that same type of work.  Those considerations are important in this case on this record, as addressed above.

Accordingly, the plaintiffs have shown an absence of genuine dispute of material fact for this criterion as to Bush, Purkett, and Rodriguez.  It does not apply for these plaintiffs.  There is a genuine dispute whether it applies for the other plaintiffs.

### 3.   Subsection 8: Advertising

Next, the parties contest whether the plaintiffs could or did advertise their services.  *See* D. Oppo. 25:6-26:4; P. Mot. 23:16-24:9; P. Repl. 5:23-6:11; Cal. Lab. Code § 2776(a)(8).  The

18

defendants take issue with the plaintiffs' apparent definition of "advertise," which seems to encompass only activities directed at "potential hiring entities." *See* P. Mot. 24:1-2. The plaintiffs cite no case law for support of this definition, and the defendants say this is a narrower definition than provided by California law, which includes activities that involve displaying messages to the public. *See* D. Oppo. 24:7-15. For support though, the defendants cite a Ninth Circuit case, which cited several California cases, which defined "advertise" "[i]n the context of mobile billboard regulations" and analyzed whether those regulations were content-based restrictions on speech— none of which is at issue here. *Lone Star Sec. & Video, Inc. v. City of Los Angeles*, 827 F.3d 1192, 1198-1200 (9th Cir. 2016) (collecting cases).

I need not decide whether "advertise" encompasses activities directed at the public or only at potential hiring entities because the statutory section at issue clearly refers to activities directed at the public: "The business service provider advertises *and holds itself out to the public* as available to provide the same or similar services." Cal. Lab. Code § 2776(a)(8) (emphasis added). Accordingly, to the extent that there is evidence showing any plaintiff held herself out to the public—or advertised—as providing property preservation services, there is a genuine dispute of material fact precluding summary judgment as to that plaintiff.[9]

**Bush**: Bush testified at his deposition that he did not do any "marketing," and while he made business cards "once," the cards were never "handed out." Bush Depo. 59:14-22. But he had a third party create a logo which he put on t-shirts—"so that my guys look professional . . . FAS requested that"—though he did not consider t-shirts "promotional material." *Id.* 59:23-54:17. He also could not recall if he used the logo elsewhere and said he "might have" put it on vehicles but was not sure. *Id.* 60:22-61:4. A reasonable factfinder could find that creating a logo, putting a logo on a vehicle driven in public, and creating business cards constitute advertising or holding oneself out to the public as available to provide services—though the evidence is not strong, there is enough to create a genuine dispute of fact. *Cf.* Bush Decl. ¶ 10 ("I did not advertise any

---

[9] Because this aligns with the defendants' definition and argument, I need not address their alternative argument that this statutory subsection is unconstitutionally vague. *See* D. Oppo. 24:16-25:5.

property preservation services to the public during the time I worked for FAS.").

**Cherrin**:  Cherrin's deposition shows that his corporation purchased t-shirts for its workers, though the shirts "did not" identify any particular company on them.  Cherrin Depo. 142:1-14.  Defense counsel asked if the shirts "may have said something to the effect of 'property preservation' on [them]" and Cherrin agreed but could not recall for certain.  *Id.*  Without any other evidence or context, wearing a shirt that says "property preservation" does not show that Cherrin was advertising and holding himself out to the public *as available to provide* property preservation services.  The defendants point to no cases that reached a contrary conclusion.  There is no genuine dispute of fact.  *See* Declaration of Sam Cherrin ("Cherrin Decl.") [Dkt. No. 652-5 Ex. 49] ¶ 10 ("I did not advertise any property preservation services to the public during the time I worked for FAS.").

**Cohick**:  Cohick's deposition testimony shows that he advertised before working for FAS and then it is unclear whether he continued advertising when he worked for FAS.  *See* Cohick Depo. 50:9-51:12.  Because it could reasonably be interpreted either way by a factfinder, there is a genuine dispute of fact as to his advertising activities.  *Cf.* Declaration of Matthew Cohick ("Cohick Decl.") [Dkt. No. 652-5 Ex. 50] ¶ 10 ("I rarely advertised but I did buy holiday gifts for FAS personnel, and only FAS personnel.  I bought shirts, sweatshirts and other swag with Monster Mowers emblazoned on them to ensure I continued to get work from FAS.").

**Dolack**:  When defense counsel asked Dolack if he advertised his janitorial business, he responded, "Whatever is on LinkedIn.  That's all."  Dolack Depo. 30:22-25.  Combined with the evidence that Dolack used the name of his janitorial business for his work for FAS, *supra* Part I.A.2, there is (just) enough evidence for a trier of fact to find that Dolack held himself out to the public as available to provide property preservation services.  *Cf.* Declaration of Stephen Dolack ("Dolack Decl.") [Dkt. No. 652-5 Ex. 51] ¶ 10 ("I did not advertise any property preservation services to the public during the time I worked for FAS.").

**Miller**:  The defendants point to no evidence that Miller advertised or held himself out to the public as available to provide similar services.  *See generally* D. Oppo; Miller Depo.; *see also* Declaration of Tim Miller ("Miller Decl.") [Dkt. No. 652-5 Ex. 54] ¶ 10 ("I did not advertise any

property preservation services to the public during the time I worked for FAS.").

**Murray**:  Murray testified that in the early 2000s, he advertised his business in "Sofi . . . where other national preservation companies would advertise."  Murray Depo. 19:1-17.  In that November 2023 deposition, he also testified that he has had business cards for his services for about 12 years which listed his name and address, the name of his company, and the fact that they "do[] property preservation."  *Id.* 19:18-20:3.  Murray also declared that he began working for FAS around March 2009 and "was deactivated from FAS on or around July 2011."  Declaration of Ancil Murray ("Murray Decl.") [Dkt. No. 652-5 Ex. 57] ¶¶ 3, 28.  Accordingly, the evidence shows that he stopped advertising in Sofi before he started working for FAS.  However, given Murray's lack of direct testimony as to when he started using the business cards—which could be interpreted as advertising to the public as available to provide similar services—a reasonable factfinder could interpret the testimony to show that his use began before he stopped working with FAS.  *Cf. id.* (no discussion of advertising).

**Purkett**:  Purkett declared that he started working with FAS around December 2007. Declaration of Tim Purkett ("Purkett Decl.") [Dkt. No. 652-5 Ex. 58] ¶ 2.  The defendants point to Purkett's tax returns for 2010 and 2011, during the time he worked with FAS, which provide that he spent over $3,000 on "advertising."  *See* Purkett Depo. Exs. 11, 12.  The plaintiffs say this is "not definitive proof of advertising of the type covered by section 2776(a)(8)," P. Repl. 6:10-11, but that is not the standard to survive summary judgment.  This evidence is sufficient to create a dispute of fact for the jury.  *Cf.* Purkett Decl. (not discussing advertising).

**Rodriguez**:  FAS points to Rodriguez's deposition testimony, where he stated that FAS required him to wear a uniform, "so the city, and the people, the neighbors don't get afraid when we [were] working in the houses late, and they know that we work for Field Assets."  Deposition of Gilberto Rodriguez ("Rodriguez Depo.") [Dkt. No. 668-1 Ex. 15] 93:8-21.  Rodriguez testified that FAS required the uniforms to read "Rodriguez General Services" and that they did not say FAS on them.  *Id.* 93:22-94:5.  But the defendants do not explain—or cite case law explaining— why wearing a uniform at a private property constitutes advertising and holding oneself to the public *as available* to provide property preservation services.  *See* Cal. Lab. Code § 2667(a)(8).

United States District Court
Northern District of California

United States District Court
Northern District of California

To the extent that the record at all supports that the public may have seen Rodriguez's uniform, it was in the context of assuaging potential concerns late at night that he was allowed to be at the property—there is no evidence from which a factfinder could infer that the uniform indicated he was holding himself out to the public as "available" to provide services.  For example, the defendants do not show that Rodriguez went into public with the uniform, or that the name on the uniform could be searched online or in the phone book to get in contact with him to provide services.  Indeed, the defendants fail to point to evidence that Rodriguez *did* provide property preservation services for anyone else.  *Supra* Part I.A.2.  Though not necessary to show that he advertised his services, that kind of evidence would at least provide a basis for the inference that the uniform advertised his availability to provide services.  Without any such evidence, there is no genuine dispute of fact that Rodriguez advertised.  *Cf.* Declaration of Gilberto Rodriguez ("Rodriguez Decl.") [Dkt. No. 652-5 Ex. 60] ¶ 10 ("I did not advertise any property preservation services to the public during the time I worked for FAS.").

**Terry**:  There is evidence from which a reasonable factfinder could infer that Terry advertised and held himself out to the public as providing similar services.  *See* Terry Depo. 24:24-25:25 (noting he made business cards for his services and passed them out on the street and at houses).

Based on the above evidence, the plaintiffs have shown an absence of genuine dispute of material fact for this criterion as to Cherrin, Miller, and Rodriguez.  It does not apply for these plaintiffs.  There is a genuine dispute as to the other plaintiffs and the jury will decide for them.

### 4.    Subsection 10: Negotiation

As addressed above, evidence that another plaintiff in a similar position negotiated her rates can be sufficient to show a genuine dispute of fact that a particular plaintiff "can negotiate" her own rates under subsection (10)—though a factfinder is not required to find that a particular plaintiff could negotiate just because another similarly situated individual was able to do so.

The parties point to conflicting evidence concerning negotiation, including some evidence that Bush, Cohick, Miller, Murray, Purkett, and Rodriguez negotiated and bid on prices, which

United States District Court
Northern District of California

1   could be sufficient for a factfinder to determine that they could negotiate.[10]  Bush Depo. 86:12-25

2   (confirming he negotiated rates, if "[v]ery rarely"]; Cohick Depo. 150:9-25 (confirming he

3   negotiated sometimes); Miller Depo. 67:4-68:20 (stating he negotiated prices when he bid on

4   "something at the job that was outside the normal scope"); Murray Depo. 51:6-24 (negotiating

5   extra payments for extra debris); Purkett Depo. 134:21-135:5 (same); Rodriguez Depo. 61:3-25

6   (confirming he sometimes negotiated).  FAS points to testimony from its corporate representative

7   that the prices provided by FAS were merely starting points and that workers could and did

8   negotiate.  Deposition of Sarah Hunter ("Hunter Depo.") [Dkt. No. 668-1 Ex. 17] 53:16-24, 78:2-

9   4, 157:6-21, 187:6-188:20.  Finally, the plaintiffs point to some evidence that the plaintiffs were

10  technically allowed to bid and negotiate but in reality FAS set the prices.  *See, e.g.*, Murray Depo.

11  46:10-47:6; Terry Depo. 54:1-24.  That might support the plaintiffs' theory that they had a

12  "hypothetical" right to negotiate but not a real one—but these depositions alone are not

13  dispositive, given the conflicting evidence.  *Cf. Lawson*, 2023 WL 2746290, at *4-5 (finding the

14  plaintiff's right to negotiate prices was hypothetical, without discussing any conflicting evidence).

15         Together, this is sufficient to create a dispute of fact whether any particular plaintiff could

16  negotiate her own rates, including whether it was literally possible for each plaintiff to negotiate

17  and whether FAS ever accepted any of each plaintiff's offered bids.  *See also Ortlivo*, 2023 WL

18  7440249, at *6-7 (finding a dispute of fact sufficient to preclude summary judgment on the

19  negotiation criterion where the plaintiff testified that he once asked for and was granted a rate

20  increase).  This question is for the jury.

21                                    *     *     *

22         Accordingly, for plaintiffs Cohick, Dolack, Murray, and Terry, the defendants point to

23  genuine disputes of material fact regarding the applicability of the four B2B exception criteria that

24  were discussed in the papers.  The jury will decide whether the evidence shows that all twelve

---

[10] FAS also points to Cherrin's deposition to assert that he testified that he negotiated prices, but the citation shows the kind of work he did, not anything about negotiation.  *See* D. Oppo. 9 n.9 (citing Cherrin Depo. 101:2-10).  It also cites Dolack's deposition, but that shows only that Dolack "submit[ted] bids for particular jobs during the time that [he] contracted with FAS," Dolack Depo 63:22-25, and without any other context or explanation, submitting bids does not show negotiation.

United States District Court
Northern District of California

criteria apply to these plaintiffs, except for the arguments about joint employment law that I address in a subsequent order. But for Bush, Cherrin, Miller, Purkett, and Rodriguez, there is no record evidence that they at least one B2B exception criterion. As a matter of law, then, the B2B exception does not apply to these plaintiffs. I turn next to the ABC test.

### B.      Substantive Claims and the ABC Test

The defendants do not challenge that the ABC test applies if the B2B exception does not, but they do assert that the joint employment test rather than the ABC test applies to the claims of "corporate vendor plaintiffs" who were not sole proprietors—as relevant for this section, Bush and Cherrin. *See* D. Mot. 23:22-28:7; *see also Bowerman*, 60 F.4th at 473-74. I will address these arguments in a subsequent order.

As for Miller, Purkett, and Rodriguez, the defendants only contest whether summary judgment is warranted for their claims for overtime, waiting time penalties, and tools and equipment reimbursement. I address the waiting time arguments in a subsequent order and the other arguments in turn below.

#### 1.      Overtime Claims

On appeal in *Bowerman*, the Ninth Circuit held that the ABC test applies to the overtime claims of the sole proprietor plaintiffs because they are rooted in California's wage orders. 60 F.4th at 472-73. For that reason, here the ABC test applies to the overtime claims for Miller, Purkett, and Rodriguez, who were sole proprietors. The Ninth Circuit also held that summary judgment would be appropriate for the sole proprietor plaintiffs under prong B of the ABC test if the B2B exception does not apply. *See id.* For that reason, summary judgment is appropriate for their claims—Miller, Purkett, and Rodriguez were employed by FAS. FAS does not seriously contest this. *See* D. Oppo. 26:25-27:5.

FAS also does not point to any evidence that genuinely or materially disputes the plaintiffs' evidence that they worked more than eight hours per day and/or forty hours per week in the time they worked for FAS and that FAS never paid overtime premiums. *See* Miller Decl. ¶ 18 (worked 10 to 14 hours per day, 7 days per week), ¶¶ 11-14, 16, 19, 23 (describing how he was paid per work order, with no mention of overtime pay, and stating he sometimes did not get paid

at all); Rodriguez Decl. ¶ 19 (worked 15 to 17 hours per day, 5 days per week), ¶¶ 11-14, 17, 20, 22 (describing how he was paid per work order, with no mention of overtime pay, and stating he sometimes did not get paid at all); Purkett Decl. ¶ 18 (worked 10 to 15 hours per day, 7 days per week), ¶¶ 14-16, 19 (describing how he was paid per work order, with no mention of overtime pay, and stating he sometimes did not get paid at all); *see also* Deposition of Sarah Hunter [652-2 Ex. 23] 118:21-119:16 (corporate representative testifying that all FAS's vendors were considered independent contractors, implying no overtime was ever paid or calculated).  Accordingly, summary judgment is GRANTED as to FAS's liability for these plaintiffs' overtime claims. Damages shall be calculated by the jury.

### 2.    Wage Order Reimbursements for Tools and Equipment

On appeal, the Ninth Circuit held that the *Borello* multi-factor test, not the ABC test, applies to the plaintiffs' expense reimbursement claims because those are based on California Labor Code section 2802, not any wage order.  *See Bowerman*, 60 F.4th at 471-72.  Though the plaintiffs had argued on appeal that their expense reimbursement claims were rooted in the wage order so that the ABC test would apply, the Ninth Circuit reasoned that "Wage Order 16-2001 does not 'cover[ ] most of the [section 2802] violations alleged,' and its provisions are not 'equivalent or overlapping' with section 2802."  *Bowerman*, 60 F.4th at 472 (quoting *Gonzales v. San Gabriel Transit, Inc.*, 40 Cal. App. 5th 1131, 1157, 1160 (2019)).  Rather, "many expenses for which class members sought and recovered reimbursement at trial, including insurance, cellphone charges, dump fees, and mileage/fuel, are covered *only* by [Labor Code] section 2802—*not* by Wage Order 16-2001's 'tools and equipment' provision."  *Id.*

Now the plaintiffs assert that they are not seeking summary judgment for the expense reimbursement claims rooted in the Labor Code, like cellphone charges and dump fees, but rather only for the specific tools and equipment costs that they argue are rooted in Wage Order 5 § 9(B) and Wage Order 16 § 8(B).[11]  P. Mot. 15 n.63, 25:1-26:20; P. Repl. 14:12-21.  FAS does not

---

[11] Wage Order 5 § 9(B) provides in relevant part:
When tools or equipment are required by the employer or are necessary to the performance of a job, such tools and equipment shall be provided and maintained

25

contest that the tools and equipment claims are rooted in Wage Orders 5 and 16 but at the hearing

asserted that the ABC test still should not apply.  Citing *Gonzales*, 40 Cal. App. 5th at 1159-60 &

n.15, FAS argued that under California law, where reimbursement claims rooted in a wage order

and reimbursement claims rooted in the Labor Code sufficiently overlap, they are all governed by

the Labor Code.  That is not quite was *Gonzales* held—there, and in *Lawson*, 13 F.4th at 917, the

appellate court remanded to the lower court the question of whether the ABC test or *Borello*

applied to the expense reimbursement claims.  And importantly, on appeal in *Bowerman*, the

Ninth Circuit specifically cited *Gonzales* to hold that the requested expenses here under the wage

order do *not* overlap with those rooted in the Labor Code, *see Bowerman*, 60 F.4th at 472, so this

argument fails.

FAS also argues that summary judgment is improper because employers are not required to

reimburse employees for "hand tools and equipment customarily required by the trade or craft" if

the worker is paid at least twice the minimum wage.  Wage Order 5 § 9(B); *see also* Wage Order

16 § 8(B).  Neither party cites evidence about the plaintiffs' rates of pay: the plaintiffs argue that

the defendants "fail to conclusively prove that Plaintiffs clear the twice-minimum wage hurdle," P.

Repl. 15:6-10, and FAS argues that the plaintiffs "presumably clear such a hurdle," D. Oppo.

26:19-23.  This does not clearly show a genuine dispute of material fact or its absence, and the

question will go to the jury.

With respect to whether any of the requested reimbursements are for "hand tools," the

parties agreed at the hearing that the definition from the California Division of Labor Standards

Enforcement ("DLSE") applies.  DLSE defines "hand tools and equipment" as "limited to hand

---

by the employer, except that an employee whose wages are at least two (2) times
the minimum wage provided herein may be required to provide and maintain hand
tools and equipment customarily required by the trade or craft.

Wage Order 16 § 8(B) similarly provides:

When the employer requires the use of tools or equipment or they are necessary for
the performance of a job, such tools and equipment shall be provided and
maintained by the employer, except that an employee whose wages are at least two
(2) times the minimum wage may provide and maintain hand tools and equipment
customarily required by the particular trade or craft in conformity with Labor Code
Section 2802.

(as opposed to power) tools and personal equipment, such as tool belts or tool boxes, that are needed by the employee to secure those hand tools."  DLSE Policies & Interpretation Manual 45.5.8.1 (ed. Aug. 2019).  As described below, some of the plaintiffs' requests clearly fall in this category and some clearly do not.

Turning now to the reimbursements themselves: the plaintiffs fail to identify in their motion the tools and equipment for which they seek reimbursement.  *See* D. Oppo. 26:11-23.  Instead, the motion lists the "expenses necessary for them to perform the work for FAS's clients," including generally "tools and equipment because they were required to do the work in the work order."  P. Mot. 11:11-12:1; *see also id.* 17:2-20 (arguing that the tools and equipment claims are covered by the wage orders without identifying the specific tools or equipment).  But the motion also cites certain paragraphs in each plaintiff's declaration that identified reimbursable tools and equipment.  P. Mot. 12 n.62; *see also* P. Repl. 14:22-15:5.  Each plaintiff declared that he made expenditures and incurred losses in direct consequent of his employment duties and to follow FAS's directions, and that the expenditures and losses were necessary for the following tools and equipment.  The defendants do not dispute or point to conflicting evidence disputing that these tools and equipment were "necessary for the performance of the job" of property preservation and so are rooted in the wage orders.

**Miller**:  "[A]ll cleaning supplies, basic construction tools, and even things as expensive as chainsaws, lawnmowers, and a utility trailer."  Miller Decl. ¶ 26.

**Purkett**:  "[A]ll cleaning supplies, basic construction tools, and even things as expensive as generators and other gas-powered equipment."  Purkett Decl. ¶ 27.

**Rodriguez**:  "[A]ll cleaning supplies, basic construction tools, and even things as expensive as generators and other gas-powered equipment."  Rodriguez Decl. ¶ 28.

The plaintiffs' reply also names items such as "specific types of air fresheners, bolts, plywood, padlocks, vacuums, . . . zip ties[,] smoke detectors[,] gas caps[,] electrical cover plates[,] nail guns[,] paint sprayers," and more, P. Repl. 14:23-28, though none of these are referenced directly in their motion or even in the declaration citations in the motion, which cite to only the above equipment.

United States District Court
Northern District of California

Some of these items are clearly hand tools.  "[B]asic construction tools" fall squarely within the DLSE's definition to the extent that they encompass things like hammers and screwdrivers, as do certain cleaning supplies.  *See* DLSE Policies & Interpretation Manual 45.5.8.1.  However, it is not clear from the record what kinds of "basic construction tools" or cleaning equipment the plaintiffs used and purchased, so this question will go to the jury—if any plaintiff was paid at least twice the minimum wage.  It is also clear that generators, gas-powered equipment, nail guns, chainsaws, lawnmowers, pumps, compressors, and other gas-powered equipment are not hand tools as a matter of law under the California definition, which excludes power tools.  *See id.*  The plaintiffs are entitled to reimbursements for these expenses.

Accordingly, the reimbursement claims for non-hand tools are governed by the ABC test, so summary judgment is appropriate under prong B.  *See Bowerman*, 60 F.4th at 472-73 (holding that the overtime claims were governed by the ABC test because they were rooted in the wage orders).  The jury will assess damages.

To the extent that any of the reimbursement requests are for hand tools, or to the extent that there is a dispute of fact whether they are for hand tools, the jury will first decide whether a particular plaintiff was compensated more than twice the minimum wage.  If so, the jury will then decide if any of the requested reimbursements were for hand tools.

\*     \*     \*

For those reasons, the plaintiffs' motion is GRANTED in part and DENIED in part.  I will address the arguments about waiting time penalties in a subsequent order.

## II.     DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OR SUMMARY ADJUDICATION

The defendants seek summary judgment for the claims of three plaintiffs—Bush, Miller, and Terry (the "bankruptcy plaintiffs")—who filed for bankruptcy both before and after the original *Bowerman* litigation was filed, arguing that their claims against FAS are barred by judicial estoppel because the claims were not disclosed in the bankruptcy proceedings.  The defendants also seek summary judgment for the claims of three plaintiffs—Bush, Cherrin, and Cohick (the "corporate vendor plaintiffs")—for failure to bring their claims under theories of joint

employment rather than independent contractor misclassification.  I address the arguments about the bankruptcy plaintiffs below.  I will address the joint employment arguments in a subsequent order.

### A.    Bankruptcy Plaintiffs

The defendants argue that the bankruptcy plaintiffs should be judicially estopped from bringing their claims against FAS because the claims were not disclosed in the bankruptcy petitions, the courts relied on their lack of disclosure in discharging the bankruptcies, and the plaintiffs did not reopen their petitions to disclose the claims.  D. Mot. 16:11-23:21.  In response, the plaintiffs argue that FAS should be barred from asserting the affirmative defense of judicial estoppel where it failed to plead it; that courts do not judicially estop absent class members from bringing wage and hour claims despite failure to include the litigation in bankruptcy petitions; that FAS does not show that the bankruptcy courts relied on any positions from the plaintiffs; that courts do not apply judicial estoppel where the prior position was based on inadvertence or mistake; and that FAS does not point to evidence that any plaintiff intended to conceal his claim as opposed to inadvertently or mistakenly failed to disclose it.  P. Oppo. 3:16-12:15.  At the hearing, the plaintiffs added that Miller and Terry have now filed amended petitions and that Bush is awaiting his attorney's admission to the court to file his.

Bush filed for bankruptcy on November 22, 2019, and it was discharged by February 19, 2020.  [Dkt. No. 656 Ex. E] 170:23-171:25; 176:3-24.  He did not include the claims against FAS.  *Id.* 172:3-24.  Miller filed for bankruptcy on January 16, 2015, [Dkt. No. 656 Ex. D] Ex. 8, and the petition was discharged on December 27, 2016, [Dkt. No. 654[12] Ex. A].  He did not include the claims against FAS.  [Dkt. No. 656 Ex. D] Ex. 8.  And Terry filed for bankruptcy on October 19, 2011, which was discharged on February 6, 2012.  [Dkt. No. 656 Ex. B] 107:16-24; 114:24-115:7.  He did not include the claims against FAS.  *See id.* Ex. 12.  The plaintiffs say they failed to include the action in their bankruptcy schedules in part because Terry's bankruptcy petition was filed before the litigation began, and in part because all three were unnamed and nonparticipating

---

[12] The defendants' request for judicial notice of Miller's bankruptcy case is GRANTED for the fact that he filed it and that it was discharged on the given date.  [Dkt. No. 654].

plaintiffs in the *Bowerman* litigation and were unaware that they had claims.  P. Oppo. 5:9-8:8, 9:5-11:15; *see also Dzakula v. McHugh*, 746 F.3d 399, 401 (9th Cir. 2014) (distinguishing between plaintiffs that amended their petitions to include the pending litigation, where one plaintiff offered an explanation for the initial failure and the other did not).  It is undisputed that the bankruptcy plaintiffs did not reopen their bankruptcy petitions to amend them and include the claims from this litigation until days before the hearing on this motion.

"Judicial estoppel is a discretionary doctrine, applied on a case-by-case basis."  *Ah Quin v. Cnty. of Kaua'i Dep't of Transp.*, 733 F.3d 267, 272 (9th Cir. 2013) (citing *New Hampshire v. Maine*, 532 U.S. 742, 751 (2001)).  This "equitable doctrine . . . precludes a party from gaining an advantage by asserting one position, and then later seeking an advantage by taking a clearly inconsistent position."  *Arconic, Inc. v. APC Inv. Co.*, 969 F.3d 945, 956 (9th Cir. 2020) (quoting *Hamilton v. State Farm Fire & Cas. Co.*, 270 F.3d 778, 782 (9th Cir. 2001)).  The purpose of the doctrine "is to protect the integrity of the judicial process, by prohibiting parties from deliberately changing positions according to the exigencies of the moment . . . [and] to prevent improper use of judicial machinery."  *New Hampshire*, 532 U.S. at 749-50 (internal quotation marks and citations omitted).

Courts consider at least three "non-exclusive factors" when deciding to invoke judicial estoppel: whether "a party's later position" is "'clearly inconsistent' with its earlier position"; whether "'the party has succeeded in persuading a court to accept that party's earlier position,' such that judicial acceptance of an inconsistent position in a later proceeding would create the perception that on court was misled'"; and whether "the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped."  *Bock v. Washington*, 33 F.4th 1139, 1145 (9th Cir. 2022) (quoting *New Hampshire*, 532 U.S. at 750-51).  But these factors are not "inflexible prerequisites or an exhaustive formula for determining the applicability of judicial estoppel.  Additional considerations may inform the doctrine's application in specific factual contexts."  *Ah Quin*, 733 F.3d at 270-71 (quoting *New Hampshire*, 532 U.S. at 751).

"In the bankruptcy context, the federal courts have developed a basic default rule:  If a

plaintiff-debtor omits a pending (or soon-to-be-filed) lawsuit from the bankruptcy schedules and obtains a discharge . . . , judicial estoppel bars the action." *Id.* at 271 (collecting cases); *see also Aguilar v. Zep Inc.*, No. 13-CV-00563-WHO, 2014 WL 4245988, at *7 (N.D. Cal. Aug. 27, 2014) ("The debtor has an ongoing affirmative obligation to disclose all its assets and liabilities to the bankruptcy court in its petition and before discharge, including pending and contingent claims." (citations omitted)). This rule "comports" with the policy rationale from *New Hampshire*: "to prevent litigants from playing 'fast and loose' with the courts and to protect the integrity of the judicial system." *Ah Quin*, 733 F.3d at 271 (citing *New Hampshire*, 532 U.S. at 749-50). But "[a] court is not 'bound' to apply judicial estoppel, particularly when 'a party's prior position was based on inadvertence or mistake.'" *Id.* at 272 (quoting *New Hampshire*, 532 U.S. at 753).

The Ninth Circuit applies a "narrow interpretation" of "inadvertence or mistake" where "a plaintiff-debtor has *not* reopened bankruptcy proceedings" to amend her petition. *Id.* at 272. In that context, to establish that there was no inadvertence or mistake, a defendant need only show that the plaintiff "knew of her claim" and "had a motive to conceal the claim from the bankruptcy court." *Id.* at 271. The motive to conceal is "nearly always present" in the bankruptcy context. *Id.* (citations omitted).

But where a plaintiff-debtor has reopened the bankruptcy proceedings to correct the initial filing error, "[t]he relevant inquiry is, more broadly, the plaintiff's subjective intent when filling out and signing the bankruptcy schedules." *Id.* at 276-77. That is because, if amended, the bankruptcy petition shows that "the bankruptcy court ultimately did not accept the initial position" and the plaintiff-debtor "did not obtain an unfair advantage," meaning that two of the three *New Hampshire* factors are no longer met. *Id.* at 274 (emphasis omitted). This narrower interpretation applies in part because of the "equitable considerations underlying the doctrine." *Id.* at 277.

In *Ah Quin*, 733 F.3d at 269-70, the plaintiff filed her bankruptcy petition five months after filing a civil lawsuit for employment discrimination yet did not amend the petition to assert the claim until ten months later—and five months after the bankruptcy petition was discharged. Despite this delayed timing and apparent clear evidence of knowledge, the Ninth Circuit held that material disputes of fact as to the plaintiff's subjective intent precluded application of judicial

estoppel.  *Id.* at 277-78.

Similarly, in *Aguilar*, 2014 WL 4245988, at *9-10, I found material issues of fact precluded application of judicial estoppel where the plaintiff filed for bankruptcy two months after joining the litigation yet did not seek to reopen the bankruptcy case until after the defendant raised the issue of judicial estoppel.  Again, despite this delayed timing and apparent straightforward evidence of knowledge, I found that the jury should decide the trustworthiness of the plaintiff's contradictory testimony regarding his knowledge.  *Id.* at *10.

In contrast, in *Cagle v. C & S Wholesale Grocers Inc.*, 505 B.R. 534, 536-37 (E.D. Cal. 2014), the plaintiff commenced bankruptcy proceedings in October 2010; as of May 2012 he had hired an attorney to pursue wage and hour claims arising from conduct between September 2010 and May 2011; he filed those claims in July 2013, failing to include the claims in his bankruptcy amendments in April or September 2011 or additional declaration in January 2012; and subsequently he amended his bankruptcy petition to include the claims in November 2013.  In 2011 the plaintiff also made a declaration under penalty of perjury about participating in a lawsuit against his then-current employer, which the district court later found "plainly contradicted" a later declaration that the plaintiff did not know of claims against the employer until late 2013.  *Id.* at 539-40.  Holding that his argument of inadvertence or mistake was "simply not plausible," the court applied judicial estoppel to bar the plaintiff's claims.  *Id.* at 540.  The court did not directly cite the "broad[er]" definition of inadvertence or mistake that applies when a plaintiff amends his position, but even under that broader definition, the order showed subjective malintent given the plaintiff's clear evidence of knowledge in 2011 and repeated knowing failures to amend his petition.

Here, as provided above, the narrow interpretation of "inadvertence or mistake" would ordinarily apply because the bankruptcy plaintiffs did not amend their petitions until days before the hearing.  *See Ah Quin*, 733 F.3d at 272.  And there is evidence that the plaintiffs knew of their claims in this litigation once they filed the individual lawsuits in 2023, though the plaintiffs dispute these facts.  *But see id.* at 277-78 (finding disputes of fact precluded judicial estoppel despite apparently clear knowledge of the claim at the time of filing); *Aguilar*, 2014 WL 4245988,

at *9-10 (same).

But there are equitable reasons to apply the broad interpretation that is usually applied where the plaintiff has already amended her petition.  First, the plaintiffs say they will amend their petitions, to the extent possible.  *See* P. Oppo. 10 n.21.  Indeed, a bankruptcy case "may be reopened even if it has long been closed."  *Ah Quin*, 733 F.3d at 275 (first citing 11 U.S.C. § 350(b); and then citing Fed. R. Bankr. Proc. 5010).  At the hearing, plaintiffs' counsel indicated that two of the three bankruptcy plaintiffs have reopened their petitions and that the third will do so shortly.

Second, courts in this circuit generally do not apply judicial estoppel to wholesale preclude individuals from bringing litigation when they did not include the litigation in their bankruptcy petitions, if the individual was an unnamed and nonparticipating class member to the litigation. *See, e.g.*, *Ribota v. Cnty. of San Bernardino*, No. ED-CV-20505-JGB-KKX, 2023 WL 2558561, at *13-14 (C.D. Cal. Jan. 31, 2023) (declining to apply judicial estoppel where plaintiffs opted in to class action between one and two years after their bankruptcy petitions were discharged, and noting that "[s]ince *Ah Quin*, the Ninth Circuit has evinced considerable skepticism about applying the doctrine in the instant context" (citation omitted)); *Bolding v. Banner Bank*, No. C17-0601RSL, 2018 WL 4908260, at *1 n.1 (W.D. Wash. Oct. 10, 2018) (declining to take judicial notice of absent putative class members' bankruptcy court filings and rejecting the argument that putative class members waived their wage claims by failing to include them in their asset lists in part because there was no "indication that [absent members] were aware of the wage claim the named plaintiffs have asserted during their bankruptcy proceedings"); *Cruz v. Dollar Tree Stores, Inc.*, No. CV 07-2050 SC, 2010 WL 4807072, at *1 (N.D. Cal. Nov. 19, 2010) (declining to apply judicial estoppel where absent class members filed for bankruptcy and did not opt out because "[t]heir participation in this class action is too passive").  Though this reasoning no longer directly applies to the bankruptcy plaintiffs here, who have since filed individual lawsuits and are no longer absent class members, the equitable considerations and policy reasons for this decision are still important: their bankruptcy claims were filed before or during their class action involvement, and so that affects how I view their knowledge and apply this equitable doctrine.

United States District Court
Northern District of California

Third, as the *Ah Quin* court explained, once the bankruptcy petitions are amended, at least two of the *New Hampshire* factors are no longer met.  733 F.3d at 274-75.  The integrity of the courts is protected.  But preventing the plaintiffs from going forward with their claims may harm the creditors—so "the only 'winner' in this scenario is the alleged bad actor in the estopped lawsuit." *Id.* (citation omitted); *see also Aguilar*, 2014 WL 4245988, at *10 (same).

And here, by applying the broad definition of inadvertence or mistake, I find that the defendants have not pointed to evidence showing the plaintiffs' subjective malintent when they filled out and signed the bankruptcy schedules.  *See Ah Quin*, 733 F.3d at 276-77.  Certainly they cannot show this for Terry, whose bankruptcy was discharged before the *Bowerman* litigation was even filed.  But they also do not show any evidence of Bush's or Miller's malintent at the time of filling out and signing the schedules, in part because, as unnamed and nonparticipating class members in *Bowerman*, it is not clear they had the requisite knowledge of any facts underlying their claims.  Given the lack of record support, I cannot hold as a matter of law that the plaintiffs' failure to include their claims at the time they signed the schedules constituted the requisite subjective intent.

There is one final, important equitable consideration with respect to applying judicial estoppel on these facts.  As an affirmative defense, judicial estoppel had to be raised in the defendants' answer.  *See* Fed. R. Civ. Proc. 8(c)(1).  The defendants correctly point out that the Federal Rules do not specifically distinguish between raising *judicial* estoppel and "estoppel" more generally, the latter of which undisputedly was raised in their answers for each bankruptcy plaintiff.[13]  And I could not find, nor did the parties point to, case law specifically distinguishing

---

[13] That answer read:

> As a separate and distinct affirmative defense, Defendants allege that all or portions of Plaintiff's claim(s) are barred, in whole or in part, by the doctrine of estoppel and/or laches.  Plaintiff entered knowingly and voluntarily into at least one written agreement, wherein Plaintiff acknowledged Plaintiff's independent contractor status, and agreed to perform services as an independent contractor.  Defendants relied in good faith on the existence of that agreement and Plaintiff's representations that Plaintiff sought and accepted an independent contractor relationship, as well as Plaintiff's conduct consistent with independent contractor status.  Without limiting Defendants' reliance on this affirmative defense, to the

between raising judicial estoppel versus "estoppel" in an answer, though the relevant standards differ for each defense.[14]  But the defendants' invocation of "estoppel" in the answers had nothing to do with bankruptcy: they asserted that the plaintiffs should be estopped from suing for misclassification because they agreed in writing to perform services as independent contractors, which the defendants relied on, and the plaintiffs never complained during the period of those written contracts.  *Supra* n.13.  That seems insufficient to put the plaintiffs even on vague notice of the defense.  *See Kohler v. Flava Enters., Inc.*, 779 F.3d 1016, 1019 (9th Cir. 2015) (noting that an affirmative defense must be described at least in "general terms" to give parties fair notice (citation omitted)).[15]  On the other hand, the defendants assert and the plaintiffs do not contest that it was not possible for the defendants to know about the bankruptcies until they deposed these plaintiffs in late 2023.  *See* D. Repl. 2:23-3:2.  The defendants then told the plaintiffs of their intended arguments before filing this motion, yet the plaintiffs took no steps to amend their bankruptcy petitions until I issued my tentative order before the hearing on this motion.  *See id.* 3 n.1.  So, while the affirmative defense was not necessarily properly asserted in the answer, it is not clear that it could have been, and the defendants seem to have taken reasonable steps to apprise the plaintiffs of their intentions since learning this new information.

---

extent that Plaintiff failed to complain during the period of the parties' contractual arrangement about supposed violations of the law (as alleged in the Complaint) and/or any inconsistency with the independent contractor nature of the relationship memorialized in the parties' agreement, Plaintiff is now barred from seeking relief by the doctrine of estoppel and/or laches.

[Dkt. No. 565 at 21 (Bush); Dkt. No. 592 at 20 (Miller); Dkt. No. 596 at 20-21 (Terry)].

[14] *Compare Bock*, 33 F.4th at 1145, *with In re Guevarra*, 638 B.R. 120, 129 (B.A.P. 9th Cir. 2022) (holding that invocation of equitable estoppel under California law requires the objecting party to establish "(a) a representation or concealment of material facts; (b) made with knowledge, actual or virtual, of the facts; (c) to a party ignorant, actually and permissibly, of the truth; (d) with the intention, actual or virtual, that the ignorant party act on it; and (e) that party was induced to act on it" (citation omitted)).

[15] There is some debate in this circuit whether "fair notice" of an affirmative defense is still all that is required after *Twombly* and *Iqbal* or if an affirmative defense must be described with the same particularity required by those cases for complaints.  *See, e.g.*, *Audionics Sys., Inc. v. AAMP of Fla., Inc.*, No. CV-12-10763-MMM-JEMX, 2013 WL 1120652, at *3-6 (C.D. Cal. Nov. 19, 2013) (collecting cases and engaging in the debate).  Regardless of the appropriate standard, the affirmative defense asserted in the answers here is entirely different from the arguments asserted in this motion.

United States District Court
Northern District of California

1    Taken together, there are good reasons that the defendants should be or should not be

2  permitted to assert judicial estoppel.  There are also good reasons that the plaintiffs should or

3  should not be judicially estopped from bringing their claims, with the understanding that they will

4  amend their respective bankruptcy petitions.  Ultimately, the equitable doctrine of judicial estoppel

5  is discretionary and relies on the facts of the case.  *See Ah Quin*, 733 F.3d at 270-71; *New*

6  *Hampshire*, 532 U.S. at 751).  Its purposes are to protect the integrity of the courts and prevent

7  parties from deliberately and unfairly changing positions.  Neither of these purposes is served by

8  precluding these plaintiffs from bringing these claims, given the lack of evidence about subjective

9  intent, the facts of this case, the other equitable considerations, and the above rationale.

10  Accordingly, I hold that judicial estoppel does not apply, so long as the plaintiffs file to reopen

11  their bankruptcy cases and amend them to include their claims from this litigation.  They must do

12  so and file declarations to this effect before the pretrial conference in this case.  For those reasons,

13  the defendants' motion on this basis is DENIED.

### CONCLUSION[16]

15    For those reasons, the plaintiffs' motion is GRANTED in part and DENIED in part.  The

16  defendants' motion is DENIED in part.

17    **IT IS SO ORDERED.**

18    Dated: January 19, 2024



William H. Orrick
United States District Judge

---

[16] The motions to seal the plaintiffs' tax returns and other personal confidential information, [Dkt. Nos. 650, 664, 667], are GRANTED for good cause.