UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re: FIELD ASSET SERVICES, INC., et al.,<br><br>*and related cases* | Case No. 3:13-cv-00057-WHO<br><br>**ORDER ON REMAINING ISSUE FROM DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (TRIAL GROUP ONE)**<br><br>Re: Dkt. No. 651 |

The parties filed cross motions for summary judgment that I addressed in my prior orders, except for the defendants' argument about the "corporate vendor plaintiffs" and joint employment theories.[1] This Order addresses those arguments and denies the defendants' motion for summary judgment because the claims are not, and do not need to be, joint employment claims.

## BACKGROUND

This order incorporates by reference and assumes familiarity with the facts and background laid out in the Prior Orders. In brief, the plaintiffs contracted with the defendants (Field Asset Services, "FAS") to provide property preservation services at the beginning of the Great Recession and lasting almost until this case was filed in 2013. They performed different tasks at the properties, including construction, yard work, cleaning, and trash hauling. The parties dispute

---

[1] The defendants filed a cross motion for summary judgment or in the alternative, summary adjudication. ("D. Mot.") [Dkt. No. 651]. The plaintiffs opposed. ("P. Oppo.") [Dkt. No. 669]. The defendants replied. ("D. Repl.") [Dkt. No. 674]. I issued a tentative order, [Dkt. No. 683], and held a hearing at which counsel for both parties appeared, [Dkt. No. 687]. Subsequently, I issued an order for supplemental briefing on two issues, including the defendants' arguments about the corporate vendor plaintiffs. [Dkt. No. 686]. The defendants filed their supplemental brief. ("D. Supp. Br.") [Dkt. No. 688]. The plaintiffs filed a response. ("P. Supp. Br.") [Dkt. No. 693]. I have issued two prior orders addressing everything raised in the cross motions except for the issue concerning the corporate vendor plaintiffs. ("Prior Orders") [Dkt. Nos. 691, 694].

1    how the tasks and projects were assigned, how much choice the plaintiffs had in accepting or

2    declining projects, how much FAS controlled the execution of the assignments, and how payments

3    worked.  Some plaintiffs, including the three at issue in this motion, owned and operated corporate

4    entities that brought on additional people to do the work for FAS.  Matthew Cohick's corporation,

5    Monster Mowers, started as a sole proprietorship but after incorporation it employed dozens of W-

6    2 employees.

7         The plaintiffs were initially members of a certified class action that sued the defendants for

8    overtime pay, waiting time penalties, and expense reimbursements related to their property

9    preservation work.  Members of the class were awarded significant damages at trial but on appeal,

10   the Ninth Circuit decertified the class, reversed summary judgment, and remanded for

11   consideration of additional issues.  *Bowerman v. Field Asset Servs.*, 60 F.4th 459 (9th Cir. 2023),

12   *as amended*.  Former members of the class subsequently filed individual actions, three of which

13   are at issue in this Order.

14   **LEGAL STANDARD**

15        Summary judgment on a claim or defense is appropriate "if the movant shows that there is

16   no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

17   law." Fed. R. Civ. Proc. 56(a).  In order to prevail, a party moving for summary judgment must

18   show the absence of a genuine issue of material fact with respect to an essential element of the

19   non-moving party's claim, or to a defense on which the non-moving party will bear the burden of

20   persuasion at trial.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the movant has

21   made this showing, the burden then shifts to the party opposing summary judgment to identify

22   "specific facts showing there is a genuine issue for trial." *Id.*  The party opposing summary

23   judgment must then present affirmative evidence from which a jury could return a verdict in that

24   party's favor.  *Anderson v. Liberty Lobby*, 477 U.S. 242, 257 (1986).

25        On summary judgment, the court draws all reasonable factual inferences in favor of the

26   non-movant.  *Id.* at 255.  In deciding a motion for summary judgment, "[c]redibility

27   determinations, the weighing of the evidence, and the drawing of legitimate inferences from the

28   facts are jury functions, not those of a judge." *Id.*  However, conclusory and speculative testimony

does not raise genuine issues of fact and is insufficient to defeat summary judgment. *See Thornhill Publ'g Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).

"If the nonmovant bears the burden of persuasion on the ultimate issue, the movant may make its required initial showing that there is no genuine dispute of material fact by demonstrating that 'there is an absence of evidence to support the non-moving party's case.'" *Pac. Gulf Shipping Co. v. Vigorous Shipping & Trading S.A.*, 992 F.3d 893, 897-98 (9th Cir. 2021) (first citing Fed. R. Civ. Proc. 56(c)(1)(A); and then quoting *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010)). "The burden of production then shifts to the nonmovant, who must go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Id.* (internal quotation marks omitted) (quoting *Celotex Corp.*, 477 U.S. at 324). "The nonmovant's burden of production at this point 'is not a light one'—it 'must show more than the mere existence of a scintilla of evidence' or 'some "metaphysical doubt" as to the material facts at issue.'"" *Id.* (quoting *Oracle Sec. Litig.*, 627 F.3d at 387). The nonmoving party "must come forth with evidence from which a jury could reasonably render a verdict in the non-moving party's favor," assuming that "all justifiable inferences are . . . drawn in its favor." *Id.* (quoting *Oracle Sec. Litig.*, 627 F.3d at 387).

**DISCUSSION**

Three plaintiffs in Group 1— Darin Bush, Sam Cherrin, and Matthew Cohick (the "corporate vendor plaintiffs")—owned and operated corporate entities that contracted with FAS.[2] The defendants seek summary judgment on their claims for overtime, waiting time penalties, and expense reimbursements because, in the defendants' view, these claims had to be brought as joint employment claims rather than independent contractor misclassification claims if the plaintiffs want to hold the defendants liable as employers. Because the plaintiffs did not bring claims under a joint employer theory, defendants argue, they cannot bring the claims at all. All claims must be dismissed. *See* D. Mot. 23:22-28:7.

---

[2] Bush and Cherrin have recently agreed to settle their claims against FAS. The issues addressed in this Order remain relevant to Cohick and to some of the other plaintiffs in the related actions.

1  The parties' papers were not a vision of clarity. This analysis will explain their arguments,
2 the case law, and the reasons why these claims were properly brought as misclassification claims,
3 along with how the defendants can still assert similar arguments to the jury to defend against
4 liability. First, I will provide a brief overview of how I reached this conclusion. Then, I will lay
5 out the relevant law in the area, including the cases relied upon by the parties. Finally, I will apply
6 the law to this case.

**I.    OVERVIEW**

The defendants largely rely on the Ninth Circuit's decision in *Bowerman*, arguing that the Ninth Circuit held that the corporate vendor plaintiffs' claims had to be brought as joint employment claims and had to be dismissed if not brought as such. As explained below, that is not what the appellate court held. In instructing me to consider the "joint employment" issues on remand, the Ninth Circuit was responding to the defendants' arguments that the *Borello* employment test[3] should apply to these claims, not that these claims were joint employment claims in disguise. And while the defendants have a point that these corporate vendor plaintiffs differ from the sole proprietors in that they operated larger corporate entities that employed other workers—ranging from a dozen to 75 or more—these arguments and defenses fit neatly into the application of the business-to-business ("B2B") exception.[4] Indeed, as the plaintiffs pointed out at the hearing, the very existence of the B2B exception shows that the California legislature did not

---

[3] The multi-factor *Borello* test for employment considers:
> (a) whether the one performing services is engaged in a distinct occupation or business; (b) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the principal or by a specialist without supervision; (c) the skill required in the particular occupation; (d) whether the principal or the worker supplies the instrumentalities, tools, and the place of work for the person doing the work; (e) the length of time for which the services are to be performed; (f) the method of payment, whether by the time or by the job; (g) whether or not the work is a part of the regular business of the principal; and (h) whether or not the parties believe they are creating the relationship of employer-employee.

*S. G. Borello & Sons, Inc. v. Dep't of Indus. Rels.*, 48 Cal. 3d 341, 351, 769 P.2d 399, 404 (1989).

[4] The business-to-business exception is found in California Labor Code section 2776. It provides that *Borello*, rather than the ABC test, applies to classification claims where all twelve statutory criteria are met.

intend to preclude workers from bringing misclassification claims in such situations. Rather, in cases where a plaintiff asserts misclassification but contracted with the putative employer as a corporate entity, the B2B exception addresses whether there was a legitimate business-to-business relationship, such that *Borello* applies to determine employment liability, or instead whether the incorporation was aimed at preventing the classification of workers as employees, such that the ABC test[5] applies. If the exception applies—which is plausible, given the current record—then the *Borello* test applies to determine the defendants' liability. That is exactly what the defendants sought on appeal and so this analysis is what the Ninth Circuit instructed me to address.

To the extent that the defendants argue that the ABC test does not apply to joint employment claims, the cases that reached this conclusion cited the policy reasons for applying the ABC test and reasoned that they do not apply in the joint employment context. But one of those policy reasons is to ensure that an entity does not structure its business solely to misclassify workers and avoid liability under the employment laws, which *does* apply in this case given the plaintiffs' allegations. And to determine whether the defendants' business structure and classification decisions were designed to avoid such liability, or whether they represented legitimate business-to-business relationships, California law applies the B2B exception.

Accordingly, there is no law that precludes the plaintiffs from bringing these claims as ones for misclassification, or that requires them to bring them as joint employment claims. And all of the defendants' arguments are encompassed by the B2B exception. They may present their arguments about the exception to the jury; their motion for summary judgment is denied.

## II.  RELEVANT LAW

In *Martinez v. Combs*, 49 Cal. 4th 35, 42-43, 231 P.3d 259, 262-63 (2010), *as modified*

---

[5] The ABC test provides:
> A worker is properly considered an independent contractor to whom a wage order does not apply only if the hiring entity establishes: (A) that the worker is free from the control and direction of the hirer in connection with the performance of the work, both under the contract for the performance of such work and in fact; (B) that the worker performs work that is outside the usual course of the hiring entity's business; and (C) that the worker is customarily engaged in an independently established trade, occupation, or business of the same nature as the work performed for the hiring entity.

*Dynamex Operations W. v. Superior Ct.*, 4 Cal. 5th 903, 916-17, 416 P.3d 1, 7 (2018).

5

(June 9, 2010), the plaintiffs were agricultural workers directly employed by a strawberry grower, and they alleged that they were not paid minimum wage or overtime as required by state law. For recovery, they sued both the strawberry grower and several produce merchants that regularly purchased the grower's goods, arguing that they were jointly employed by the merchants who were therefore liable for their unpaid wages and damages. *See id.* at 263-67. To determine whether the merchants employed the plaintiffs, the California Supreme Court analyzed the definition of "employ." *See id.* at 273-78. It held that "employ" had "three alternative definitions: It means: (a) to exercise control over the wages, hours or working conditions, *or* (b) to suffer or permit to work, *or* (c) to engage, thereby creating a common law employment relationship." *Id.* at 278. The court reasoned that because the grower rather than the merchants exclusively controlled firing, setting wages and hours, and directing where and when to report, the merchants did not have the power to prevent the plaintiffs from working and so did not suffer or permit them to work or employ them jointly. *Id.* at 282.

Then in *Dynamex Operations West, Inc. v. Superior Court*, 4 Cal. 5th 903, 416 P.3d 1, 7-8, 25-26 (2018), the California Supreme Court addressed whether "the wage order definitions of 'employ' and 'employer' discussed in *Martinez* are applicable to the question of whether a worker is properly considered an employee or an independent contractor for purposes of the obligations imposed by an applicable wage order." The court rejected the defendants' argument that only the third *Martinez* definition governed misclassification claims, holding instead that the "suffer or permit" definition applied. *See id.* at 7. But it addressed the defendants' concern that, when read literally and without historical context, "suffer or permit" could "encompass within the employee category the type of individual workers, like independent plumbers or electricians, who have traditionally been viewed as *genuine* independent contractors who are working only in their own independent business." *Id.* at 8, 30, 32-33. To avoid that outcome, the *Dynamex* court looked to how other entities such as courts, states, and agencies defined "suffer or permit." *See id.* at 32-34. The court noted that multi-factor tests like *Borello* had benefits but also "significant disadvantages" for classifying workers as employees or independent contractors, including (1) complicating and therefore delaying determination of how a worker is classified, leaving both

6

businesses and workers "in the dark with respect to basic questions relating to wages and working conditions"; and (2) creating "greater opportunity" for businesses to structure their entities in such a way as to intentionally evade their "fundamental responsibilities" under wage and hour law. *Id.* at 33-34. Given those drawbacks, the court determined that the ABC test would be more appropriate and consistent with the history and purpose of the "suffer or permit" definition of "employ." *Id.* at 35.

Subsequently, two California appellate courts determined that the disadvantages outlined in *Dynamex* were not present in "wage and hour claims arising under a joint employer theory of liability." *Henderson v. Equilon Enters., LLC*, 40 Cal. App. 5th 1111, 1128 (2019); *see also Curry v. Equilon Enters., LLC*, 23 Cal. App. 5th 289, 314-15 (2018), *as modified on denial of reh'g* (May 18, 2018). They reasoned that *Dynamex* and the ABC test were "concerned with the problem of businesses misclassifying workers . . . [in order to] obtain economic advantages that result from the avoidance of legal and economic obligations" imposed by state and federal employment law. *Henderson*, 40 Cal. App. 5th at 1127-28. But in the joint employment context, "the policy purpose [from the ABC test] for presuming the worker to be an employee and requiring the secondary employer to disprove the worker's status as an employee is unnecessary" because the primary employer pays employment taxes and provides the worker employment protections. *Curry*, 23 Cal. App. 5th at 313-14. Therefore, those cases reasoned, the ABC test does not apply to joint employment claims. *Id.* at 314-15; *Henderson*, 40 Cal. App. 5th at 1127-28.

Subsequently, in *Vazquez v. Jan-Pro Franchising Int'l, Inc.*, 986 F.3d 1106 (9th Cir. 2021), and the remanded case, *Roman v. Jan-Pro Franchising Int'l, Inc.*, 342 F.R.D. 274, 309 (N.D. Cal. 2022), the courts addressed workers' employment claims against the defendant cleaning company, Jan-Pro Franchising. Jan-Pro had a three-tier business model, where it filled the "top-level" or top tier as the overarching company; it contracted directly with the middle tier, which were regional franchisors with the exclusive right to use the Jan-Pro name in a certain geographical area and had their own employees and workers; and the middle tier contracted with the bottom tier "unit franchisees" who were either single workers or larger entities with their own employees, who conducted the actual cleaning work. *Vazquez*, 986 F.3d at 1111-12 (citations omitted). The

7

1    plaintiffs were owners of the unit franchisees, which were purchased from the middle tier regional
2    master franchisors. *Id.* at 1118. The plaintiffs' agreements with the middle tier franchisors stated
3    that the unit franchisees were independent contractors. *Id.* at 1119-20. The unit franchisees sued
4    the top tier company, Jan-Pro, directly for claims arising under the wage orders. *See id.* at 1111-
5    12.

6    To determine whether the top tier defendants could be held liable as employers despite the
7    lack of direct contract between the parties, the district court had rejected the suffer or permit
8    definition and instead applied a combination of the *Martinez* standard and a separate test for
9    franchisor liability. *Id.* at 1121. On appeal, the Ninth Circuit noted that the district court's order
10   was published before *Dynamex* altered the definition of suffer or permit, and so the district court
11   had not been able to consider that change in the law. *See id.* at 1121-22. The Ninth Circuit
12   remanded the case, instructing the district court to apply "all three prongs of the ABC test" to the
13   misclassification claims in the first instance. *Id.* at 1122. It also offered guidance for applying the
14   test, noting that "[o]ther courts have specifically examined three-tier franchise structures" like
15   those at issue in the case, and at least one concluded the top tier franchisor was an employer. *Id.* at
16   1122-25. The court cited a Massachusetts decision that found the "agent of misclassification"
17   could be directly liable under the ABC test, "even where it utilizes a proxy to make arrangements
18   with its employees." *Id.* at 1124 (quoting *Depianti v. Jan-Pro Franchising Int'l, Inc.*, 465 Mass.
19   607, 990 N.E.2d 1054, 1068 n.17 (2013)). The *Vazquez* opinion did not discuss joint employment.

20   On remand, the defendants asked the district court to apply the *Martinez* test for joint
21   employment rather than the ABC test, arguing that there was no evidence that the defendants were
22   the "agent[s] of misclassification." *Roman*, 342 F.R.D. at 309. The district court rejected the
23   argument. *Id.* It stated that (1) the Ninth Circuit instructed it to apply the ABC test; (2) the "agent
24   of misclassification" test was not the law in California; and (3) even if that were the law, there was
25   evidence that the defendants *were* the agents of misclassification. *Id.* Accordingly, the district
26   court held that the ABC test, not the joint employment test, applied. *Id.*

27   In the Massachusetts case cited by *Vazquez*, the plaintiffs sued the same defendant (Jan-
28   Pro) for misclassification under the same three-tier structure. *Depianti*, 990 N.E.2d 1054. The

8

1  Massachusetts high court addressed whether a defendant could be liable for misclassification
2  under the state wage laws "where there was no contract for service between the plaintiff and
3  defendant." *Id.* at 1064.  The court held that the lack of contract by itself did not preclude liability
4  under the law. *Id.* at 1064-65.  It reasoned that holding otherwise would mean that a putative
5  employer could impose a contractual structure intentionally to avoid liability under the wage
6  statute, contravening the purpose of and obligations imposed by the statute and allowing an "end
7  run" about it. *Id.* at 1068-69.

Indeed, courts in California regularly look to Massachusetts cases that apply the ABC test and similar employment law protections.  *See Dynamex*, 416 P.3d at 34 n.23 (modeling California's ABC test on Massachusetts' ABC test); *Vazquez*, 986 F.3d at 1122-23 ("California incorporated Massachusetts's employment classification statute into its labor laws" and "*Dynamex* favorably cited two Massachusetts decisions . . ."); *Ortolivo v. Precision Dynamics Int'l, LLC*, No. 22-CV-01812-JSW, 2023 WL 7440249, at *7 (N.D. Cal. Nov. 9, 2023) ("Because the California Supreme Court adopted a version of the ABC test that tracks Massachusetts' version of the test, case law interpreting Massachusetts law is persuasive." (citation omitted)).[6]  As relevant here, the Massachusetts district court in *Cook v. Estes Express Lines, Corp.*, noted that under Massachusetts law, the ABC test applied only to "*individuals* who have been misclassified as independent contractors—not companies."  No. 1:16-CV-11538-RGS, 2018 WL 1773742, at *1 (D. Mass. Apr. 12, 2018) (citation omitted).  The plaintiff was an individual with an LLC that "provided last-mile delivery services" for the defendant-putative employer.  *Id.*  He "entered into an Independent Contractor Operating Agreement" with the defendant using the name of the LLC and he incorporated about two and a half years later.  *Id.*  Within about six months of the initial contract, the plaintiff added two more trucks and drivers, and about a year later he expanded operations to eight trucks, reaching a peak of thirteen trucks in four states and employing over 20 drivers.  *Id.* at *1-2.  Though he personally performed the driving services at first, within a year he stopped

---

[6] *See also Vazquez*, 986 F.3d at 1122 (permitting the district court "to consider authorities from other jurisdictions" on remand (citation omitted)); *Cal. Trucking Ass'n v. Bonta*, 996 F.3d 644, 663 (9th Cir. 2021) (looking to Massachusetts law on the ABC test to address preemption questions).

9

1    regularly driving so that he could "run" the LLC "and oversee and ensure daily delivery services."
2    *Id.* He also engaged a payroll service, hired a bookkeeper, and paid himself the company's profits,
3    which amount to about double what the "average" driver was paid. *Id.* at *2. From those facts,
4    the court determined that the plaintiff operated his own business such that he was an independent
5    contractor in a legitimate business-to-business relationship with the defendant. *Id.*

6    Similarly, in *Debnam v. FedEx Home Delivery*, the plaintiff was a delivery driver who
7    contracted with the defendant, FedEx Ground, and operated up to nine delivery routes by
8    employing at least nine drivers at any given time, totaling 60 drivers in five years. No. 10-11025-
9    GAO, 2013 WL 5434142, at *1 (D. Mass. Sept. 27, 2013). The plaintiff also filed business tax
10   returns that "disclose[d] substantial business income." *Id.* The district court concluded that, under
11   Massachusetts law, the plaintiff was not an "individual" within the meaning of the Wage Act
12   because his relationship with the defendants was that of "a 'legitimate independent contractor' in a
13   'business-to-business relationship.'" *Id.*

14   And in *DaSilva v. Border Transfer of MA, Inc.*, 377 F. Supp. 3d 74, 81 (D. Mass. 2019),
15   the defendant was "a property broker" that contracted with federally-authorized "motor
16   carriers"—truck drivers—to perform home deliveries for large retail stores. *Id.* at 81. The
17   plaintiff-motor carriers signed agreements with the defendant that stated they were independent
18   contractors and that any personnel they might use were not the defendant's employees. *Id.* The
19   defendant only contracted with corporate entities, and while some drivers had previously formed
20   corporations, others formed corporate entities solely to contract with the defendant. *Id.* at 81-82.
21   The plaintiffs included "single driver[s]" as well as drivers that employed multiple other drivers,
22   and the class definition was limited to those who "drove personally full-time." *Id.* at 82, 86. The
23   plaintiffs sued the defendants for misclassification and for violation of various employment laws,
24   and the defendants asserted that the state's Wage Act protections did not apply because the
25   plaintiffs were corporate entities, not "individuals" covered by the statute. *Id.* at 86. The district
26   court found that Massachusetts law "ignore[s] a worker's corporate form for purposes of the
27   [Massachusetts] Wage Act when incorporation aims 'to prevent the classification of workers as
28   employees' instead of representing 'a legitimate business-to-business relationship' initiated 'at the

worker's behest.'" *Id.* (citation omitted). Given the facts of that case, the court reasoned that the plaintiffs were "not in legitimate business-to-business relationships" with the defendant, distinguishing *Cook* and *Debnam* because in those cases the plaintiffs did "much more than" personally driving the vehicles for the defendants. *Id.* at 87.

The final critical case to address here is, of course, the appeal in *Bowerman*. There, the defendants argued that *Borello* applied to what they viewed as "joint employment" claims asserted by the plaintiffs. *Bowerman*, 60 F.4th at 468, 472. The Ninth Circuit agreed that "*Dynamex* does not apply to joint employment claims" because the ABC test was created to address concerns about delaying determination of a worker's classification and to avoid encouraging hiring entities to evade legal obligations. *Id.* at 472-73 (citing *Dynamex*, 416 P.3d at 33-35). But those concerns are not present in the joint employment context because "the alleged employee is already considered an employee of the primary employer," and so "is afforded legal protections due to being an employee of the primary employer." *Id.* (quoting *Curry*, 23 Cal. App. 5th at 314). The court held that the claims of the sole proprietors in that case "are not joint employment claims— they are employee misclassification claims, like those in *Dynamex* . . . [s]o *Dynamex* applies to [their] overtime claims." *Id.* at 473. "But FAS's joint employment argument"—that "*Borello* governs"—"would likely succeed were an actual *employee* of a vendor suing FAS, claiming that FAS was an employer," specifically pointing to class members that "own[ed] or operate[d] LLCs or corporations, which are distinct legal entities." *Id.* at 473-74 (citations omitted). The court also noted that plaintiffs' counsel "conceded at oral argument that at least some of the class members are employed by entities other than FAS" and so "some of the class members' theories of liability could depend on their ability to establish that FAS was a joint employer." *Id.* at 473. Finally, the appellate court directed me to consider "in the first instance" the joint employment issue on remand. *Id.* at 473-74.

### III. THE LAW AS APPLIED TO THIS CASE

The cases above and the caselaw in general do not wholesale preclude the plaintiffs from bringing misclassification claims on these facts, and while they support the plaintiffs' ability to bring such claims, they do not directly provide this, either. Indeed, the parties overgeneralize the

11

holdings of many of these cases, arguing that they stand for propositions that they do not reach. For example, the defendants say that the *Bowerman* opinion found these kinds of plaintiffs could only bring claims under joint employment theories of liability—but that is not what the case held, in part because no party made that argument. Rather, the Ninth Circuit addressed the defendants' argument that *Borello* governs all claims, noting that some of the plaintiffs appeared to be employed by another entity so joint employment should be considered. *Bowerman*, 60 F.4th at 472-74. The Ninth Circuit did not hold that misclassification claims and joint employment claims are mutually exclusive, nor did it hold that corporate vendor plaintiffs or former class members could only hold FAS liable for wage and hour violations under joint employment theories.

The defendants also assert that individuals "cannot be both an independent contractor and an employee with respect to the same work under the same statutory scheme," and that a claim brought against a second putative employer must be brought as a joint employment claim and adjudicated under the *Martinez* standard. D. Mot. 26:18-22. But again, no cases say this directly; the closest support in the law is the recognition that the employment tests differ for misclassification and joint employment claims.[7] *See, e.g.*, *Henderson*, 40 Cal. App. 5th at 1125, 1128; *Curry*, 23 Cal. App. 5th at 314-15. Applying different tests to different claims is not a novel concept. This does not mean the plaintiffs cannot bring misclassification claims.

And while *Martinez* defines "employ" for joint employment claims, *see Medina v. Equilon Enters., LLC*, 68 Cal. App. 5th 868, 874 (2021) ("The controlling case on joint employment in California is *Martinez*[]."), it does not stand for the proposition that plaintiffs must bring joint employment claims when they believe a top tier or secondary employer misclassified them. (Indeed, misclassification was not an issue and was not addressed in that case.). The case also came before *Dynamex* and its progeny, as well as California's statutory B2B exception, and so did not have the opportunity to address those developments or the nuanced issues that are posed here. *Dynamex*, too, did not hold that plaintiffs can or cannot bring claims for misclassification where

---

[7] There are also close similarities between the tests: for example, the *Martinez* joint employment standard incorporates a version of the control test as well as the common law definition of employment, which "may often overlap" with the *Borello* standard. *Dynamex*, 416 P.3d at 17 (citing *Borello*, 769 P.2d at 407).

1    there is a middle tier entity that may employ the plaintiffs.  *Cf.* D. Repl. 6:21-24 (asserting that

2    *Martinez* and *Dynamex* create "binary . . . legal standards"); *id.* 7:18-22 ("The settled case law . . .

3    necessarily establishes a binary analysis.").  *Dynamex* did emphasize—as was repeated by *Curry*

4    and *Henderson* and is echoed by the Massachusetts line of cases—that one of the guiding

5    principles in applying employment laws is ensuring that putative employers do not escape liability

6    simply by structuring their business solely to avoid liability under employment laws.

7           The plaintiffs, for their part, say that *Vazquez*, *Roman*, and the Massachusetts cases show

8    that these kinds of claims can and should be brought under misclassification theories, but those

9    holdings are somewhat more nuanced given their underlying facts.  For example, *Vazquez* and

10   *Roman* involved similar factual patterns as this case but differed in that the plaintiffs were

11   classified as independent contractors by the middle tier entity.  Here, at least according to the

12   defendants, the plaintiffs were classified by the middle tier corporate entities as employees, which

13   makes these plaintiffs' argument that they were "misclassified" somewhat distinct.  And though

14   these plaintiffs say that the *Roman* court found that misclassification claims can be brought against

15   a secondary employer who is "the agent of misclassification," P. Oppo. 15:10-14, that case

16   specifically held that was *not* the law, *Roman*, 342 F.R.D. at 309 ("[N]either our court of appeals

17   nor *Dynamex* required that the hirer be the 'agent of misclassification' before the ABC test can

18   apply.").

19          What the plaintiffs' cases do stand for is the concept that putative employers cannot avoid

20   liability by intentionally structuring their business or relationships with other entities to avoid

21   providing the legal protections afforded to workers.  *See Dynamex*, 416 P.3d at 34 (reasoning that

22   multifactor employment tests give employers "greater opportunity" to intentionally structure their

23   business to evade wage and hour liabilities); *Bowerman*, 60 F.4th at 473 (echoing that a concern of

24   multifactor tests is "afford[ing] a hiring business greater opportunity to evade its fundamental

25   responsibilities under a wage and hour law" (quoting *Dynamex*, 416 P.3d at 33-35)); *Roman*, 342

26   F.R.D. at 309 (citing Massachusetts law and stating that implementing a contractual framework to

27   evade wage and hour obligations "would amount to an 'end run' around the top tier's wage law

28   obligations" (citations omitted)); *see also Depianti*, 990 N.E.2d at 1068-69 (emphasizing that

13

employers should not be able to intentionally structure their business to create an "end run" around the Massachusetts Wage Act protections); *DaSilva*, 377 F. Supp. 3d at 86-87 (same); *see also Jinks v. Credico (USA) LLC*, 488 Mass. 691, 697-98, 177 N.E.3d 509, 516-17 (2021) (collecting cases describing the same). In emphasizing this principle, these cases affirm that the policy reasons for the added protections of the ABC test are not present when there is a "legitimate" "business-to-business relationship" between the plaintiff and defendant. *See Dynamex*, 416 P.3d at 33-34; *Henderson*, 40 Cal. App. 5th at 1127-28; *Curry*, 23 Cal. App. 5th at 313-15; *Cook*, 2018 WL 1773742, at *2; *Debnam*, 2013 WL 5434142, at *1.

Here, the plaintiffs say that the defendants forced them to incorporate to intentionally avoid wage and hour liability. P. Oppo. 17:4-19:27. The defendants dispute that incorporation was required,[8] but the plaintiffs point to enough evidence to create a material dispute of fact, *see, e.g.*, [Dkt No. 652-5] Ex. 50 (Cohick declaring that FAS "required" him to have a business to contract, yet issued him 1099s "in my name and with my personal tax identification number rather than issue the form 1099s to Monster Mower's corporate tax identification number"); [Dkt No. 652-4] Ex. 33 at -366, -375 (requiring a "company name" to sign various parts of Vendor Qualification Packet). And, if the plaintiffs' version of the events is correct, the policy reasons for applying the ABC test to misclassification claims—preventing employers from structuring businesses to avoid wage and hour liability—would be directly applicable. That means the plaintiffs can bring these claims as misclassification claims.

But as these cases also emphasize, the protections of the ABC test do not apply where the plaintiffs have "legitimate" business-to-business relationships with the putative employers. *See Dynamex*, 416 P.3d at 33-34; *Henderson*, 40 Cal. App. 5th at 1127-28; *Curry*, 23 Cal. App. 5th at 313-15; *Cook*, 2018 WL 1773742, at *2; *Debnam*, 2013 WL 5434142, at *1. That means that while the plaintiffs can bring these claims, their success will depend on whether their corporate entities were in legitimate business-to-business relationships with the defendants. And in

---

[8] Pointing out the plaintiffs were allowed to "leave Business Name . . . blank" is not the same as pointing to evidence that they did not have to incorporate. *See* D. Repl. 8:16-9:2. It is also disputed.

1    California, to determine whether those relationships existed, courts look to the statutory B2B

2    exception.  *See* Cal. Lab. Code § 2776.  Indeed, this reasoning echoes the plaintiffs' argument at

3    the hearing: the very existence of the B2B exception shows that state law has contemplated

4    bringing misclassification claims on these kinds of facts.  Whether they succeed depends on

5    whether the twelve B2B criteria are met.

6          The B2B exception is therefore the proper vehicle for the defendants' arguments about

7    these claims.  This is reinforced in part by the exception itself:  if all twelve criteria are met, the

8    *Borello* test applies, *see id.*, which is what the defendants argued for at the Ninth Circuit, and so is

9    within the scope of what the Ninth Circuit contemplated when remanding for me to consider the

10   "joint employment" issue.  This outcome is also reinforced by the substance of the defendants'

11   arguments, many of which align with the twelve B2B criteria.  For example, the defendants point

12   to evidence that the plaintiffs employed other workers and were paid high salaries, which affect

13   whether they were in legitimate B2B relationships and may go to the "providing services directly"

14   and "customarily engaged" factors discussed at length in the Prior Order, among others.  Cal. Lab.

15   Code § 2776(a)(2),(6); *see also Cook*, 2018 WL 1773742, at *2 (holding the plaintiff was in a

16   legitimate business-to-business relationship with the putative employer where he employed over

17   20 workers, paid himself twice the salary of his workers, and carried out administrative business

18   tasks rather than "personal[ly]" doing the work for the defendant); *Debman*, 2013 WL 5434142, at

19   *1 (similar).[9]  Many of their other arguments, including that the plaintiffs were paid overtime or

20   were reimbursed by their corporate entities, go to credibility and damages.  *See also* D. Supp. Br.

21   2:10-20.

22         Accordingly, the defendants' argument that these claims must be brought as joint

23   employment claims is not grounded in the law and is DENIED as a basis for summary judgment.

---

[9] Compare Cohick's deposition testimony: for example, he said his corporation, Monster Mowers, started as a sole proprietorship. [Dkt. No. 656 Ex. I] 21:22-22:3, 46:6-47:3, 57:2-19.  After incorporation, he "had W-2 employees," including at least one solely for administrative tasks, and over the course of the corporation's existence there were at least 50 employees total.  *Id.* 52:17-25, 57:2-19, 60:10-12, 69:1-12.  He hired them and decided what to pay them, which was usually hourly based on minimum wage.  *See id.* 79:24-80:3.  Cohick received a significant salary.  [Dkt. No. 650 Ex. I] 184:8-16.

15

Their related argument that these claims must be dismissed because they were not pleaded as joint employment claims is also DENIED. The defendants may present to the jury their arguments that the plaintiffs' corporate entities were in legitimate business-to-business relationships with FAS so that *Borello* applies, and they may argue to the jury that they did not employ the plaintiffs under the *Borello* standard. To the extent that my Prior Order provided otherwise, it is hereby AMENDED. These questions will go to the jury.

## CONCLUSION[10]

For those reasons, the remainder of the defendants' motion is DENIED.

**IT IS SO ORDERED.**

Dated: January 29, 2024



William H. Orrick
United States District Judge

---

[10] The requests for judicial notice of two lawsuits filed against Cohick's corporation, [Dkt. No. 654] are DENIED as irrelevant. A third party's choice to include or not include parties in a lawsuit is not relevant to *Cohick's* business relationship with the *defendants*.